1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   SUZANNE IVIE,                    )
                                     )
4           Plaintiff,               )      3:19-cv-01657-JR
                                     )
5   vs.                              )      June 18, 2021
                                     )
6   ASTRAZENECA PHARMACEUTICALS, LP, )      Portland, Oregon
                                     )
7           Defendant.               )

8

9

10              (Jury Trial - Volume 5)

11         BEFORE THE HONORABLE JOLIE A. RUSSO

12        UNITED STATES DISTRICT COURT MAGISTRATE

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES

 2

    FOR THE PLAINTIFF:      Anita Mazumdar Chambers
 3                          Robert Scott Oswald
                            The Employment Law Group
 4                          1717 K Street, NW, Suite 1110
                            Washington, DC  20006
 5

 6  FOR THE DEFENDANT:      Melinda S. Riechert
                            Morgan, Lewis & Bockius, LLP
 7                          1400 Page Mill Road
                            Palo Alto, CA  94304
 8

 9                          Ryan P. McCarthy
                            Morgan, Lewis & Bockius, LLP
10                          1701 Market Street
                            Philadelphia, PA  19103
11
                            Anne M. Talcott
12                          Schwabe, Williamson & Wyatt
                            1211 SW Fifth Avenue, Suite 1900
13                          Portland, OR  97204

14

15

16

17

18

19

20

21  COURT REPORTER:         Dennis W. Apodaca, RDR, FCRR, CRR
                            United States District Courthouse
22                          1000 SW Third Avenue, Room 301
                            Portland, OR  97204
23                          (503) 326-8182

24

25
```

1                              INDEX

2

3    Witnesses:  (For the plaintiff)    Direct   Cross   ReD   ReX

4    Richard Edelman                      761     784    796

5    Larry Hinson                         797     810    846   847

6    Plaintiff rests                                          848

7    Witnesses:   (For the defendant)

8    Genie Hamilton                       849     858    860   862

9    Craig Barnes                         865     876    881

10   Amy Welch                            882     901

11   Edward Bierhanzl                     904     926    930

12   Robert Stickle                       932     941    942

13   Christopher Thomsen                  943     964

14   Defendant rests                                          966

15   Motions                                                  968

16

17

18

19

20

21

22

23

24

25

R. Edelman - D

1       (June 18, 2021)

2              P R O C E E D I N G S

3          (Open court; jury present:)

4          THE COURT:  Good morning.  Please be seated.

5          Good morning, Ms. Chambers.

6          Is this your witness?

7          MS. CHAMBERS:  Yes.

8          THE COURT:  We will start by swearing him.

9          MS. CHAMBERS:  I call Dr. Richard Edelman.

10         (The witness was duly sworn and testified via video

11 conference.)

12         MR. OSWALD:  Can we put him on the screens for all of

13 us and the jurors.

14              DIRECT EXAMINATION

15 BY MS. CHAMBERS:

16 Q    Good morning, Dr. Edelman.  Can you introduce yourself to

17 the jury.

18 A    My name is Professor Richard Edelman.

19 Q    Dr. Edelman, what is your profession?

20 A    I am a professor emeritus of financial economics at the

21 American University in Washington, D.C.  I have held that

22 status for almost 20 years.  I also operate a forensic

23 economics practice.  I have operated that as a sole

24 practitioner for 43 years.

25 Q    What is a professor emeritus?

R. Edelman - D

1   A    A professor emeritus means that I am retired from active

2   teaching, but I hold senior academic rank for life; that is, if

3   I wanted to teach, I could.  I am a member of the faculty.  I

4   can attend college meetings, department meetings, faculty

5   senate meetings.  I can vote and all of that.  So I am an

6   active faculty member maintaining senior academic status for

7   life, but I don't have a regular teaching schedule.

8   Q    Do you teach any courses?

9   A    No, I do not teach any courses.  In the past, given my

10  around 35 years of active teaching at the university level, I

11  have taught courses both at the master's level, the MBA level,

12  and at the undergraduate level.

13  Q    Can you describe your duties as an economic analysis

14  expert?

15  A    As an economic analysis expert, I basically calculate the

16  value of damages that are incurred.  My practice mostly

17  encompasses employment cases, personal injury cases, and death

18  cases; that is, I calculate how much money would have to be

19  available today lump sum in order to replace any past or future

20  loss.  That loss could be wages.  It could be household

21  services.  It could be medical expenses, depending upon the

22  type of case that we are dealing with.

23  Q    So I want to talk a little bit about your education.  Can

24  you describe for the jury your educational history.

25  A    Yes.  I hold a bachelor of science degree awarded with

R. Edelman - D

1   high honors from the University of Maryland in 1968 in the area

2   of finance, an MBA also from the University of Maryland awarded

3   in 1970, and a Ph.D., a doctorate of business administration,

4   which was awarded in 1975 in the area of financial economics.

5   Q    What professional memberships do you have that are

6   relevant to your field?

7   A    Well, I hold a number of memberships; for example, the

8   American Economics Association, the American Finance

9   Association, various regional professional associations, and

10  also I belong to the National Association for Forensic

11  Economics, which publishes an academically reviewed journal and

12  holds conferences and meetings in the area of economic analysis

13  for litigation.

14  Q    Have you authored any relevant publications in your field?

15  A    Well, over my three-and-a-half decades as a professional,

16  I have published around 65 articles in the area of financial

17  economics, everything from public utility regulatory economics

18  out through market microstructure.  I've also given about 125

19  presentations over those decades to professional organizations

20  primarily dealing with ongoing research that I had been doing.

21  Q    Have you received any awards relevant to your field?

22  A    Oh, yes.  Probably the one I'm most proud of, I received

23  the University Award for Outstanding Teaching while I was at

24  the University of Hawaii.  That was in 1978.  At the American

25  University, I received the Outstanding Award for Scholarship

R. Edelman - D

1    and Research for publications and research and so forth, and

2    that award was given in 1992.

3    Q    Have you been consulted by the media concerning economic

4    issues?

5    A    Oh, yes.  I'm frequently asked by TV, the newspapers,

6    sometimes financial publications, like Business Week and so

7    forth, about what is the stock market doing, what's going to

8    happen next year, what's going on with wages, housing prices,

9    employment, and all of that, yes.

10   Q    Were you paid for your time working on Ms. Ivie's matter?

11   A    Yes, I have been paid for my time.  All of my work is done

12   on retainer so that my payment is no way contingent on the

13   outcome of the case.

14   Q    And you were also paid for time in preparing your report

15   in this matter?

16   A    Yes, ma'am, I was.

17   Q    And for your time today?

18   A    Yes, I was.

19   Q    Does the fact that you were paid for your time alter your

20   testimony in any way?

21   A    Absolutely not.  I do my testimony in accordance with good

22   economic practice and economic literature.

23   Q    And I think you already touched on this, but just to

24   clarify:  Is your fee or payment contingent on the outcome of

25   this case at all?

R. Edelman - D

1   A    Absolutely not.  I've already been paid for my time in

2   full prior to being here today.

3   Q    And what's your professional hourly rate?

4   A    My professional hourly rate for both analysis and

5   testimony is $400 per hour.

6   Q    And how many hours did you spend on this matter?

7   A    Overall, is it was about -- probably about 24, 25 hours

8   altogether.

9   Q    Have you testified on behalf of other individuals in an

10  expert witness capacity?

11  A    Yes, ma'am, I have.  Over the last 50 years I have

12  testified 239 times, of which 83 of those 239 testimonies were

13  trials or hearings.  Of that 83, 21 were in various federal

14  jurisdictions.  Overall, 31 were employment cases, of which 12

15  were in federal jurisdictions.  The balance were in mostly

16  state courts and places such as OSHA, JAMS, AAA, and so

17  forth.

18  Q    Have you ever testified in the District of Oregon?

19  A    No, ma'am, I have not.

20  Q    Were you qualified as an expert in your previous cases?

21  A    Yes, I was.

22  Q    Have you ever been denied or not qualified as an expert?

23  A    No.

24  Q    Okay.  Are you a plaintiffs' economist or a defense

25  economist?

R. Edelman - D

1    A     Really neither one.  As I mentioned a little earlier, it

2    doesn't matter whether I'm working for a plaintiff's case or a

3    defense case, I do my work consistent with conservative and

4    scientific principles, good economic practice, and so basically

5    they take what they get.

6    Q     Have you previously testified for clients of the

7    Employment Law Group?

8    A     Yes, ma'am, I have.

9    Q     Does that fact alter your opinions in this case in any

10   way?

11   A     No, it does not.

12   Q     Do you perform any other consulting services?

13   A     Well, occasionally I'll be asked by textbook publishers to

14   review textbooks that they are considering for publication.

15   Once in a while I'll have a small businessperson talk about how

16   to prepare financial statements in preparation for consultation

17   with banks, dealing with loans, and I'll do that work mostly

18   pro bono.

19          MS. CHAMBERS:  At this time I would like to offer

20   Dr. Edelman in the area of finance and economics.

21          THE COURT:  Thank you.

22          MS. TALCOTT:  No objection.

23          MS. CHAMBERS:  Thank you.

24   BY MS. CHAMBERS:

25   Q     Dr. Edelman, we talked about your background.  Now I want

R. Edelman - D

1   to move into your opinion and your analysis in Ms. Ivie's

2   matter.  What were you asked to do in this case regarding the

3   evaluation of Ms. Ivie's economic damages?

4   A    Well, basically what I was asked to do was calculate what

5   we call the present value of the benefits.  "Present value"

6   essentially means how many dollars would we have to have

7   available lump sum today for any past loss is immediately

8   replaced and the remainder of the lump sum value is invested at

9   current interest rates and year-by-year in the future, over

10  Ms. Ivie's work-life expectancy, we can withdraw an amount that

11  will replace her diminished wages; wages that she argues she

12  should have earned had she stayed at AZ and the wages that she

13  argues that she will make at BYU.  So financially either having

14  that lump sum amount available today or her having remained

15  employed at AZ is exactly the same thing.

16  Q    By "AZ," you mean AstraZeneca?

17  A    Yes, I do.

18  Q    Did you review any documents in this matter in preparing

19  your report and analysis?

20  A    Yes, I did.  I was provided basically two types, I guess,

21  elements of information.  The first element of information

22  deals with information that is particular to this case.  When I

23  was first contacted, I was provided Mr. Sevart's February 13th,

24  2020, vocational report, the 2014 through 2018 AstraZeneca W-2

25  forms, various 2019 AstraZeneca paystubs, the AstraZeneca

R. Edelman - D

1   global restricted stock plan summary, the AstraZeneca Savings

2   and Security Plan summary.

3         I was provided a copy of Ms. Ivie's resume, a copy of

4   the complaint, and answers to questions that I asked in order

5   to be sure that I captured all of the relevant information that

6   I need to be comfortable that I can produce both a conservative

7   and scientifically accurate report.

8         Subsequent to that information about a year later in

9   February of this year, I was also provided an updated copy of

10  Mr. Sevart's vocational report.  That updated copy was dated

11  February 16th, 2021, the 2019 AstraZeneca W-2, the 2020

12  Brigham Young University W-2, the January 15 and January 29th,

13  2021, BYU paystubs, a summary of the 401(k) plan contributions,

14  and again, answers to some additional questions that I posed to

15  determine what kind of changes there were over the prior years.

16  That's the first element of information that I request.

17        The second element of information that I was provided

18  is primarily government information, and that information deals

19  with things like life expectancy, work-life expectancy, fringe

20  benefit rates, tax rates, federal predictions of wage growth,

21  inflation growth, and the like.

22  Q    Okay.  So I want to talk a little bit about -- we talked

23  about all the documents you reviewed and the sources you relied

24  on, and so I want to talk a little bit about the process that

25  you undergo to make your assessment.  Can you walk us through

R. Edelman - D

1  that process and also explain what you mean by things like life

2  expectancy, work-life expectancy, fringe benefits, and things

3  like living adjustments?

4  A     Sure.  Basically the process to calculate the loss is a

5  three-step methodology, a three-step process.  First, as

6  counsel just mentioned, I look at life expectancy and work-life

7  expectancy.  Life expectancy is derived from federal life

8  tables, and I want to be sure that the life expectancy, which

9  usually beyond a person's typical retirement age, and the life

10  expectancy figure given in those tables is an average date of a

11  person of a given gender and at a given age will survive to.

12  The life expectancy for Ms. Ivie, given by the tables, is 33

13  years, to age 84 in 2052.  That was the life expectancy at the

14  time that she was terminated.

15         Now, sometimes people live just to their life

16  expectancy.  Sometimes they live beyond their life expectancy.

17  And sometimes they don't make it to their life expectancy.  So

18  from the federal tables, I reduce each year's future income by

19  the probability of the odds of survival, and I include those in

20  my tables, and that compensates for the possible contingency

21  that a person will not live to their life expectancy.  It

22  reduces the loss, and I think that's appropriate to handle that

23  contingency.

24         Then I also look at work-life expectancy.  The

25  work-life expectancy is given by the Department of Labor

1   tables, often summarized very well by economic publications,

2   and work-life expectancy means what is the average number of

3   years remaining in the labor force for a person based on

4   current age, gender, and level of education.  And for Ms. Ivie

5   her work-life expectancy, holding a master's degree at age 51

6   when she was terminated, is 14 years, to age 65 in the year

7   2033.  Those are the first things that I look at.

8           The second thing that I look at is the monetary

9   income, fringe benefits, fringe benefits both absent

10  termination and post-termination.  Very simply, I typically

11  will look at a person's previous income prior to the

12  termination and average those past figures, convert it to

13  dollars in the year in which they were terminated, in which

14  case it is 2018.  I found that usually W-2s in the past, that

15  Ms. Ivie's average income from 2014 through 2018 was $223,271,

16  and that figure, again, is her prior year's monetary income

17  converted to 2019 and averaged.

18          In addition, I look at the fringe benefits.  Fringe

19  benefits are those kind of benefits we get on a job that won't

20  show up in the paystub as monetary income.  For example, there

21  may be the employer's contribution for payment of health

22  insurance premiums.  There may be the employer's matching

23  contribution for the funding of 401(k) retirement savings

24  program.  In this case we also have the use of a car for around

25  4,100 miles per year.  All of those things are fringe benefits

R. Edelman - D

1  that often are not taxable ever, or at least at the point while

2  a person is in the workforce.

3         So all of that is included in the monetary income

4  absent.  I subtract from that each year the income that she has

5  and is anticipated to earn, given this termination, and the

6  current information I have is a job that she holds at BYU, at

7  Brigham Young University, at $27 an hour part-time that is

8  anticipated to convert to a full-time job at $50,000 per year

9  beginning in August.  So the difference is the income she would

10  have made plus the income that she is anticipated to make.

11         Also, with regard to the BYU income, I add to it any

12  employer contributions for fringe benefits, and the only one at

13  BYU that is indicated is a 2 percent contribution for the

14  funding of her 401(k).  So each year I have a difference what

15  she would have earned at AstraZeneca and BYU.  Now, in the

16  future, that income will grow.  It could grow due to

17  promotions.  Mr. Sevart indicated, had she remained at AZ,

18  there would have been a promotion in 2020 that would have

19  increased her salary between 50- and $60,000.  That promotion

20  is included in my analysis.

21         In addition to that, there would be wage increases

22  that would perhaps be for merit, perhaps compensation for just

23  plain inflation.  I don't make any assumption regarding merit.

24  I only increase wages given her point in her career to

25  compensate for inflation, and those increases are about

R. Edelman - D

1  2.4 percent per year.

2        And finally, as I mentioned earlier, all of these

3  future income figures, both at AstraZeneca and at BYU, are

4  reduced by the odds of being alive.  If, for example, she was

5  anticipated to make, say in round numbers, $200,000, and in

6  five years there is only, say, an 80 percent chance of her

7  being alive according to the life tables to make that money,

8  then what goes into the analysis is not $200,000, only

9  80 percent of that, 160-, and that lowers it.

10        So all of that is the first two steps.

11        Then the final step, which I already explained, is

12  the present values.  I convert all of those future lost income

13  figures to their 2021 value and add them up, and I come up with

14  a total lump sum loss.

15  Q    Thank you.  So let's talk about front pay.  Can you

16  explain what that is and how it is calculated.

17  A    Well, basically with front pay, what we're looking at are

18  these differences between the salary and benefits that she

19  would have earned at AstraZeneca had she remained there through

20  her work-life expectancy of 65, less the income she is

21  anticipated to make at BYU, also through age 65.  That amount

22  begins on June 14th, 2021, at the instruction of counsel.

23  Q    Okay.  Peter, can we show just the witness

24  Plaintiff's Exhibit 3.

25        Dr. Edelman, we are looking at Plaintiff's Exhibit 3.

R. Edelman - D

1   The jury hasn't seen it yet, but can you tell me generally what
2   this is.
3   A    Yes.  This is a table of front loss pay and the difference
4   between her AstraZeneca salary and her BYU salary, beginning on
5   June 14th, 2021, and extending through her 65th birthday on
6   January 14th, 2033.
7   Q    And you created this table based on the document you
8   previously described in your testimony and your professional
9   experience; is that right?
10  A    Yes, ma'am, I did.
11          MS. CHAMBERS:  Judge, I would like to move
12  Plaintiff's Exhibit 3 into evidence.
13          MS. TALCOTT:  No objection.
14          THE COURT:  Thank you.  It will be received.
15          MS. CHAMBERS:  Thank you.  Can we publish this to the
16  jury.
17  BY MS. CHAMBERS:
18  Q    Dr. Edelman, we are now all looking at your table about
19  front pay.  So can you walk us through what this table shows
20  and what the total amount of loss is that you calculated.
21  A    Yes.  Going from left top right, we have obviously the
22  year.  2021 is the first year; 2033 is the last.
23          The second column to the right is her age within that
24  year, 53 through 65.
25          Then the third column is labeled "Survival

R. Edelman - D

1    Probabilities," and that shows from the federal life tables the

2    odds of being alive in each year.  They decline over time,

3    although the odds of being alive are fairly high.  99.59

4    percent next year in 2022 out to, in 2033, 92.65 percent.

5         The fourth column, from left to right, is the current

6    interest rates that I used calculate the present value.

7    Interest rates are at a historic low.  These are based on

8    U.S. Treasury securities.  I elected to use interest rates on

9    U.S. Treasury securities because they are risk-free.  The

10   Government always pays interest on principal, and they are

11   default-free.  That is, they will continue to exist, pay

12   interest, and eventually principal over their life.

13        The fifth column is a column labeled

14   "Income/No Incident."  This is income -- monetary income -- and

15   fringe benefits had she remained at AstraZeneca.  Included in

16   there from June 14th, 2021, this year, is the monetary income

17   plus the fringe benefits.  And in 2021, we have the

18   following -- subsequently, the following fringe benefits:  We

19   have 7 percent employer contribution for the funding of

20   Ms. Ivie's 401(k) retirement savings program.  A tenth of a

21   percent of that monetary income is an additional amount for the

22   funding of a group life insurance.

23        There is, in addition to that, 4,100 miles of driving

24   for personal use that's a benefit that she gets.  She can use

25   the company car in lieu of a personal car, and that is priced

R. Edelman - D

1   at 56 cents a mile, and that's based on the IRS cost.

2          There is a small amount for insurance, the employer's

3   contribution for health insurance.  That will end on

4   August 1st, if she becomes a full employee, and I assume she

5   will, a full-time employee at BYU, and then she will be

6   eligible for insurance at BYU, and that element will no longer

7   be lost.

8          In addition to that, we have what is called

9   prejudgment interest.  None of that applied, because the first

10  line is 2021, and that's for that year.  Each year subsequent

11  to that is calculated with the same elements but growing at

12  this 2.4 percent per year, which is the federal forecast for

13  the growth in the Consumer Price Index -- inflation.

14         Next to that is the "Income/Post-Incident."  Now, the

15  income post-incident is the income earned at BYU, and we are

16  going to have a couple of months here in this table where she

17  is earning $27 an hour -- maybe about a month and a half,

18  working an average of 20 hours a week.  When you divide 20

19  hours per week, based on some prior paystubs, it shows on the

20  average how many hours per week she was working.

21         Then on August 1st, it jumps at full-time job at

22  $50,000 per year.  In addition, she becomes eligible to

23  participate in the BYU 401(k) retirement savings plan, and as

24  indicated through her and through documents at BYU, BYU will do

25  a match of 2 percent of her contribution.

R. Edelman - D

1    And finally, I reduced the amounts here by the

2    anticipated unemployment rate.  Even though she has the job,

3    there could be periods of unemployment for various reasons.

4    Sometimes it is personal reasons; sometimes it may be a

5    situation where an employer gives people leave for some reason

6    for a while.  At the time the report was done, the predicted

7    unemployment rate for 2021 was six-and-a-half percent.  So that

8    six-and-a-half percent is taken out on both sides, AstraZeneca

9    and BYU.

10    Then that process continues, again, year by year.  At

11    BYU she is earning $50,000 per year, plus a 2 percent

12    contribution toward the funding of her 401(k), to get

13    2.4 percent per year, reduced by the survival probabilities,

14    and then discounted.

15    Q    Okay.

16    A    The next column --

17    Q    Sorry.  Go ahead.

18    A    The next column says, "Net Annual Lost Income."  This is

19    just the difference between the AstraZeneca no incident/income

20    and benefits and the BYU post-incident/income and benefits.  In

21    2020, from June 14th forward, it was 129,626.

22    The final column is labeled "Cumulative Lost Income,"

23    and all that last column is the total loss sum year by year.

24    For example, the first year, from June 14th, 2020, through the

25    end of the year, the loss is 129,626, and we see that in the

R. Edelman - D

1   cumulative column.

2           The next year, we calculate a loss of 258,700, and

3   that we will add to the 129-.  Then the cumulative lost income

4   column is 388,326.

5           I include a cumulative lost income column, because if

6   there is evidence -- and I don't present this -- but if there

7   is evidence that she might recover to her prior level of

8   income, were she 65, at any age between now and then, you can

9   look at the cumulative lost income column and see what the loss

10  is from the point the table began on June 14th, 2021, through

11  whatever age, out to 65.

12          So if you go down to the very bottom here, to the

13  line that is in bold print and labeled "Totals."  Had she

14  remained at AstraZeneca, she would have earned, going left to

15  right, $3,598,642.

16          Next, she was anticipated at BYU to earn 593,620.  So

17  her loss, after offsetting or mitigation, would be $3,005,021

18  between June 14th, 2021, and age 65 on January 14th, 2033.

19  That's, of course, based on the information provided to me.

20  Q    Thank you, Dr. Edelman.

21          So we just talked about front pay and your analysis

22  that is shown in this chart.  So now can you tell me about --

23  Peter, could you pull up and show to Dr. Edelman

24  Plaintiff's Exhibit 2.  Doctor, can you explain to the jury

25  what is backpay?

R. Edelman - D

1    A    Yes.  Backpay is the reverse concept.  That's the best way

2    to put it.  It is, again, the lost net income, the difference

3    between income and what she would have earned at AstraZeneca

4    had she remained there, and the income that she has actually

5    made in the past from the point of termination -- in this case

6    through June 14th, 2021.

7    Q    And you created a table to show backpay; is that right?

8    A    Yes, ma'am, I did.

9            MS. CHAMBERS:  I would like to move to admit

10   Plaintiff's Exhibit 2.

11           THE COURT:  Thank you.

12           MS. TALCOTT:  No objection.

13           THE COURT:  Thank you.  It will be received.

14           MS. CHAMBERS:  Thank you.

15   BY MS. CHAMBERS:

16   Q    Can we publish this to the jury, Peter.

17           Dr. Edelman, we are now all looking at your table

18   that shows backpay.  Can you walk us through what this shows.

19   A    Yes.  The general format here is the same as the front pay

20   table that we just did.  We have the year.  She was terminated

21   on June 6th, 2019, and so we begin on that date.  She was 51

22   years old at the time.  And because that has passed and she is

23   still here with us, the survival probability is 100 percent

24   obviously.

25           The next column, the fourth column over, it says,

R. Edelman - D

1    "February 2021."  That's when I did the update on prejudgment

2    interest rates.  Basically that prejudgment interest rate is

3    interest on past losses partially in compensation for

4    inflation.  In some places it's partially in compensation for

5    missed investment opportunities.  Counsel instructs me what

6    rate to use based on the jurisdiction that we're in, and the

7    annual interest rate applied here for prejudgment rates was

8    8 percent.

9         Then the next column, "Income/no incident," is the

10   AstraZeneca monetary income, which was 223,271, as was

11   anticipated, minus the income she was actually paid in 2019.

12   Her W-2 shows she was paid 130,250.

13        With the front pay table, there is an initial 7.1

14   percent --

15   Q    Dr. Edelman, we lost you for a minute.  Would you please

16   repeat what you were saying.

17   A    At what point?

18   Q    I think you were talking about how much she earned in

19   2019.

20   A    Okay.  Sorry.  We anticipated, based on the discussion

21   earlier on her prior income, that she should have earned

22   223,271.  That was the average of her past income converted to

23   2019 dollars and averaged.  She actually earned, according to

24   her 2019 AstraZeneca W-2, $130,215.  So the lost monetary

25   income is the difference between those two, a little over

R. Edelman - D

1  $93,000; specifically 93,056.

2        In addition, there are employer contributions toward

3  the funding of fringe benefits.  7.1 percent is the total

4  contribution for the 401(k) and the group life insurance.

5  There is 4,100 miles of personal driving at 58 cents a mile in

6  2019, plus she lost her insurance.  And we look at the

7  difference between the total cost of family insurance and the

8  amount that she was paying from her paystub for the pay period,

9  which was $171, and we have about $9,300 of lost employer

10  contributions for the funding of her insurance.

11        All of that comes out to a little over $110,000,

12  110,583.  Then there is, in addition, two years of prejudgment

13  interest, which at 8 percent per year, which takes the total

14  from 110,583, to 128,984.

15        In the next column, it says, "Income Post-Incident."

16  I'm told -- and the information does seem to verify this -- she

17  had no income for the remainder of 2019 after her termination,

18  and so the offset is zero.  The net annual lost income was

19  128-.

20        Like the earlier table, I have a cumulative table on

21  the far right and the cumulative income lost income up to the

22  end of 2019 is 128,980.  The remaining numbers there are

23  calculated with the same concept.

24  Q    Thank you.  So this is showing the backpay.  Did you

25  calculate the total value of her damages, which would include

R. Edelman - D

1  the backpay and the front pay?

2  A    Yes.

3  Q    Peter, could we show Dr. Edelman Plaintiff's Exhibit 4.

4         MS. CHAMBERS:  Judge, I would like to move to admit

5  Plaintiff's Exhibit 4?

6         THE COURT:  Any objection?

7         MS. TALCOTT:  No objection.

8         MS. CHAMBERS:  Thank you.

9  BY MS. CHAMBERS:

10 Q    Peter, can we publish to the jury.

11        Okay.  Dr. Edelman, we are looking at

12 Plaintiff's Exhibit 4.  What does this table show?

13 A    Folks, this is just putting together the backpay in 2019

14 through June 14th, 2021, and the front pay table, June 14th,

15 2021, to January 14th, 2033, together in one place.

16 Q    And so what is the total loss with the back pay and the

17 front pay?

18 A    The total loss, back pay and front pay, based on the

19 information I have, is $3,581,003.

20        Again, folks, what that means is if you had that lump

21 sum amount in hand, a portion of it would immediately replace

22 past loss, backpay, and the remainder could be invested in U.S.

23 Treasury securities.  Then year-by-year, you could withdraw the

24 net annual lost income.  And at the end of Ms. Ivie's work-life

25 expectancy, at age 65, there would be nothing left in the

R. Edelman - D

1    investment.  So financially, either having $3,581,003 in hand

2    or having remained at AstraZeneca and earned the income we

3    anticipated her to earn, are exactly the same.

4    Q    Thank you, Dr. Edelman.  If we could put Dr. Edelman back

5    on the screen.  Just a few remaining questions.

6            Did you consider Ms. Ivie's efforts to mitigate her

7    damages?

8    A    I don't consider those explicitly.  That really is more of

9    the role of the vocational expert.  I did see that between his

10   first report and the second report, a large number of job

11   interviews that were in an attempt to mitigate a much higher

12   level of income were not successful.

13   Q    Did you factor this into your valuation?

14   A    Yes, I did.  And I did that by using a job she actually --

15   that she has actually been able to hold, which is the BYU job.

16   I don't -- I'm not a vocational expert, so I can't tell you

17   whether or not one of these days she would go back to earning

18   the higher amount of income that she enjoyed in the past.  But

19   I do know that the vocational expert opines that that will

20   never happen.  So I relied on the opinion from the vocational

21   expert to do my report, and I have her working the BYU job out

22   for the remainder of her career, and that was shown, of course,

23   in the total loss table and in the lost front pay table.

24   Q    Thank you.  Has any data or information changed since you

25   completed your report?

R. Edelman - D

1  A    Yes.  We changed a couple of things here.  The 6 percent,

2  I believe, RSUs -- the restricted stock units -- were taken

3  out, because as we determined, the income from the restricted

4  stock units -- the stock that is granted to an employee was

5  included in the W-2 income.  So we took it out, because to

6  leave it in would have been double-counting.  It would have

7  overstated the loss.  So that is gone.

8         Second, there was an issue that came up regarding

9  these miles of personal driving that replaced her having to buy

10  a car, and that specific issue had to do with value.  We

11  lowered the loss to reflect the fact that, while she doesn't

12  have to buy a car, the loss should consider not only what the

13  value of a new car is every few years but also the amount she

14  would get had she traded a car in.

15  Q    And do your opinions and valuations in your report still

16  stand today?

17  A    Yes, they do.  The active report would be the June 7th,

18  2021 report.

19  Q    And are the opinions that you expressed related to these

20  subjects within a reasonable degree of economic certainty or

21  probability?

22  A    Yes, ma'am, they are, based on the information that I've

23  been provided.

24         MS. CHAMBERS:  Thank you.  No further questions.

25         THE COURT:  Thank you.  Cross, please.

R. Edelman - X

CROSS-EXAMINATION

BY MS. TALCOTT:

Q    Good morning, Dr. Edelman, my name is Anne Talcott.  I'm one of the lawyers representing AstraZeneca in this case.

So in coming to your opinion, you relied on the analysis of Scott Sevart for several assumptions, correct?

A    Yes, ma'am, I did.

Q    Okay.  Do you agree that if Mr. Sevart made a mistake in his assumptions, and you relied on those assumptions, there would be errors in your conclusions?

A    Yes.  They would all be different.  It would be a larger loss, if she lost this BYU job and unable to become reemployed, or it would be a smaller loss, if she was able to leave BYU for a higher paying job or they promoted her.

Q    And you did not review any depositions in this case; is that correct?

A    No, ma'am, I was not provided depositions.

Q    And you did not review Ms. Ivie's personnel file that was provided in this case?

A    No, I did not have a copy of that.

Q    And you didn't do any independent verification of the assumptions that Mr. Sevart made?

A    Well, I'm not a vocational expert.  I don't have an M.S. or Ph.D. in rehab counseling.  I don't have a certified rehab counseling certificate, and so I really can't do vocational

1  opinions without stepping outside my area of expertise.  The

2  only verification of the vocational expert's opinion that I can

3  do and stay within my field is basically to check his

4  arithmetic.  Now, there is not a lot of arithmetic in a

5  vocational report.  I did not find any mistakes in the little

6  arithmetic that he had.

7  Q    Okay.  Do you ever use the U.S. Bureau of Labor Statistics

8  in your work, Dr. Edelman?

9  A    Yes, I do.

10  Q    In your calculations did you adopt Mr. Sevart's assumption

11  that Ms. Ivie could reasonably be anticipated to obtain

12  replacement employment within 18 months of her termination in

13  your original report?

14  A    I believe in the original report there were several

15  scenarios.  I have got to go back to it.  He indicated in his

16  original report that she will begin to do sales or marketing,

17  and he quoted a salary of around 95,000 to 115-, as a sales

18  manager; 107-, as a marketing sales director.  Taking all those

19  three together, the offset averaged about 106,489.  That was

20  from my February 15th, 2020, report.

21  Q    Dr. Edelman, my question was:  In your calculations, did

22  you adopt Mr. Sevart's assumption that Ms. Ivie could

23  reasonably be anticipated to obtain replacement employment

24  within 18 months of her termination from AstraZeneca in your

25  original report?

R. Edelman - X

1    A    No.  My reading of his report was that the loss would

2    extend to the end of her career, and he indicated that it would

3    not be possible for her wages to catch up to the level of

4    compensation she earned at AstraZeneca.

5    Q    But you adopted his assumption that she would get some

6    employment within 18 months; is that correct?

7    A    Yes.  Again, that's a vocational assumption that's outside

8    my area of expertise.  I have to rely on that.

9    Q    Well, are you aware that, according to the U.S. Bureau of

10   Labor Statistics, which you do rely on in your profession, the

11   average length of unemployment in Utah in 2019 was 13 weeks?

12   A    That's a misleading statistic for this kind of analysis.

13   So that deals often with people who have lost their job because

14   the factory closed or there has been layoffs.  They can get

15   letters of recommendation, if they are going to look for a new

16   job.  They are not people who have been terminated from

17   employment typically in high-wage jobs who cannot get favorable

18   letters of recommendation.  So it is not a statistic that is

19   appropriate for a termination case.

20   Q    Well, those statistics include everyone who is looking for

21   a job regardless of why they lost their job.  Is that correct,

22   Dr. Edelman?

23   A    No, that's not correct.  Those are primarily heavily

24   weighted toward blue-collar occupations, as I say, where the

25   business is closed; the factory has shut down, the business

R. Edelman - X

1    went overseas, and the like.  We have been through this a lot

2    over the years in past cases.  It's not an appropriate

3    statistic for a termination case where there is not the ability

4    to get a favorable letter of recommendation, and, of course,

5    there is empirical evidence that these statistics are

6    inappropriate, because Ms. Ivie went and did 20 or 25 job

7    interviews in her area of expertise subsequent to when this

8    report was written and was unable to, for reasons she

9    explained, to get any job offers.

10   Q    Dr. Edelman, did you review any of the records that

11   pertained to Ms. Ivie's attempts at getting new employment?

12   A    No.  Those are vocational issues, and I'm sure the

13   vocational expert reviewed those records and his conclusion

14   that BYU is going to be -- the level of income at BYU is going

15   to be the best she can do is reflected in those incomes.

16   Q    So to be clear, you are relying on Mr. Sevart's assumption

17   that Ms. Ivie's job at BYU is the best job she can get?

18   A    Yes.  That seems to be in the second report -- what he

19   states.  Again, this is a vocational issue, not an economic

20   issue.  I'm not qualified as a vocational expert to question

21   that.

22   Q    In your first report, you accepted Mr. Sevart's assumption

23   about the replacement work that Ms. Ivie could get; is that

24   correct?

25   A    Yes.

R. Edelman - X

1    Q    And that assumption was based on her obtaining a job

2    commensurate with four to five years of experience as a sales

3    manager; is that correct?

4    A    I don't know about the four to five years.  I do know that

5    the salary he quoted as his output for Ms. Ivie was an

6    offsetting salary of around 106,489, and he expected that

7    salary to begin in December 2020.

8    Q    Do you understand what his assumptions were in concluding

9    that her potential replacement salary could only be $106,000 as

10   opposed to the salary that she earned at AstraZeneca?

11   A    Well, I'm sure I understand it.  I don't recall all of the

12   support.

13   Q    Okay.  In your report, you include an anticipated

14   promotion for Ms. Ivie in 2020 in your no-incident calculation

15   of her income; is that correct?

16   A    I did.  She mentioned it, and Mr. Sevart mentioned it

17   also.

18   Q    And did you review any records that would support that

19   Ms. Ivie would have gotten that promotion?

20   A    No, ma'am.  Again, that is a vocational issue.  Whether

21   she was qualified, based on experience and job performance and

22   how that would impact on her wages, is purely in the domain of

23   a vocational expert.  I took the numbers that the vocational

24   expert included and added them into my cost number.

25   Q    Did you assume that Ms. Ivie would receive this promotion

R. Edelman - X

1  with 100 percent certainty in your calculations?

2  A    Yes, I did.   That is what was given in the vocational

3  report.

4  Q    So you didn't make any independent determination that

5  Ms. Ivie was 100 percent certain to get that promotion; you

6  just relied on Mr. Sevart's conclusion?

7  A    I did, yes.   That verification would be a vocational

8  issue.   And again, that's outside my area of expertise.

9  Basically he said between 50- and 60,000 would be this

10  promotion, and I have averaged them at 55,000 and included it

11  in 2020.

12  Q    And by including that promotion, you raised the level of

13  her income with no incident; is that correct?

14  A    Yes, that is correct.

15  Q    Now, would you agree, Dr. Edelman, that there is always

16  some possibility that an anticipated promotion might not

17  happen?

18  A    Certainly there is.

19  Q    And would you agree that if the promotion was not a

20  certainty, the full amount of the supposed raise should not be

21  included in Ms. Ivie' assumed future income?

22  A    If there was a substantial probability that it would not

23  happen, I would agree with that.   I don't have that

24  information.

25  Q    Okay.   And is the typical approach for dealing with a pay

R. Edelman - X

1   raise that may or may not happen to be to assume that certain

2   probability for the promotion and then weight the expected

3   raise by that probability?

4   A     Yes, that could be done.  I don't have a probability, so I

5   couldn't do that.

6   Q     So you did not do that in your report?

7   A     I don't have a probability, so it's impossible to do it.

8   Q     And instead, you calculated with 100 percent certainty

9   that she would get that promotion?

10  A     Yes.  That's correct.

11  Q     As you testified, you assumed in your most recent report

12  that Ms. Ivie's reasonable replacement income should be her

13  part-time job at BYU; is that correct?

14  A     It is only part-time until August 1st and then it goes to

15  full-time with benefits.

16  Q     And you understand that's not a sales management position?

17  A     I'm sorry?  I didn't understand what you said.

18  Q     That position was not in sales management?

19  A     That's correct.  It is not.

20  Q     And sales management is the field that Ms. Ivie had 27

21  years of experience in?

22  A     That's what I understand, yes.

23  Q     And did you take into consideration that there has been no

24  evidence that Ms. Ivie's skills or experience as a sales

25  manager have changed?

R. Edelman - X

1   A    Well, the vocational person would take that into

2   consideration, and the output would be the anticipated salary

3   and duration of the anticipated salary.  I just do the numbers.

4   I don't make vocational decisions.

5   Q    Dr. Edelman, do you agree that the accepted method for

6   calculating expected earnings is to base it on the

7   qualification, experience, and labor market data?

8   A    I would defer that question to the vocational expert.  I

9   would assume those considerations were made by the vocational

10  expert, and I have incorporated them into my report.  Again, I

11  just do the numbers.  I do not go outside my area of expertise,

12  in this area of vocational analysis, and make assumptions.

13  Q    So again, if Mr. Sevart's assumptions are incorrect, and

14  you relied on them, then your numbers would also be incorrect.

15  Is that fair to say?

16  A    Yeah, that's correct.  Again, it could be higher.  It

17  could also be higher if she lost this job and couldn't replace

18  it with anything.  In fact, it could be lower if she does go

19  out and find a sales job at a higher rate than she is in.  I

20  have no information on that.

21  Q    Dr. Edelman, do you agree that using Ms. Ivie's actual

22  earnings at her current part-time job does not represent a

23  reasonable and objective calculation of the potential earnings

24  of a person with the same qualifications and experience as

25  Ms. Ivie?

R. Edelman - X

1    A    I'm not sure what that means and why that would be

2    even relevant.  We deal with the numbers that she is actually

3    doing.

4    Q    So you're not considering what a reasonable person could

5    have obtained with her experience and training; is that

6    correct?

7    A    Yeah, that's correct.  I know what she actually did, and

8    I'm told through Mr. Sevart what her job interview experience

9    was.  So what I have here is what really happened and not some

10   kind of speculation about what could have happened or might

11   have happened.

12   Q    But if we assume that someone with Ms. Ivie's experience

13   and education could obtain a job at the same level as Ms. Ivie

14   was at at AstraZeneca and with approximately the same pay --

15   A    I'm really confused with what you're asking.  I mean, she

16   is not able to do that, so she has a higher loss than she would

17   have if she could actually go out and do this.

18   Q    Let's assume for a moment that she can tomorrow go out and

19   obtain a job, because she has 27 years of experience in sales

20   management, and she is able to get a job with a similar salary

21   as what she was making at AstraZeneca.  What does that do to

22   your front pay calculation?

23   A    Okay.  If that information, which we don't have, became

24   available, and there was a likelihood that, yeah, she could go

25   out and earn the income that she was earning at AstraZeneca,

1    then the loss would be substantially lower.  It wouldn't be as

2    much, if she could go out and earn as much as she did for with

3    the same benefits prior at AstraZeneca, then, of course, the

4    loss would be confined to backpay.

5    Q    Correct.  So if we assume that Ms. Ivie could tomorrow

6    obtain a job with the same level of pay she was earning at

7    AstraZeneca, her front pay damages would be zero; is that

8    correct?

9    A    That would be correct.  Again, I have no information to

10   that effect.  The vocational person didn't indicate that she is

11   never going to be able to do that, and so I used this.

12   Q    And you didn't make an independent determination about

13   whether or not Ms. Ivie would be able to get replacement

14   employment at the same level of salary that she was earning at

15   AstraZeneca; you just relied on Mr. Sevart for that?

16   A    Absolutely.  That's totally outside my area of expertise,

17   and any vocational testimony that I would offer certainly would

18   be struck.  I'm not a vocational expert.

19   Q    Okay.  Just to be clear, if we were to assume that

20   Ms. Ivie tomorrow could go out and get a replacement job with

21   the same salary that she had at AstraZeneca, then the

22   approximately $3 million in front pay that was on Exhibit No. 3

23   and Exhibit No. 4, the front pay column, those would be wiped

24   out to zero.  Is that correct?

25   A    That's what I answered a little bit earlier.

R. Edelman - X

1  Q    Then if we looked at your backpay, which was

2  Exhibit No. 2, and we remove the possibility -- excuse me --

3  the certainty that you calculated into that figure for a

4  promotion, would you agree that her backpay number would be

5  reduced?

6  A    I'm sorry.  I think what you are asking is if there was no

7  promotion incorporated, would the backpay number be reduced?

8  Is that basically the question?

9  Q    That's my question, Dr. Edelman.

10 A    So, yes, it would certainly be reduced.

11 Q    And you mentioned when you were being questioned by

12 plaintiff that you made a couple of other changes in your

13 updated report.  Specifically is it correct that in your

14 initial opinion you double-counted the value of the AstraZeneca

15 stock Ms. Ivie would have earned had she stayed in that

16 position?

17 A    Yes.  It is not counted as income when it is sold.  It is

18 counted when there is vesting.  That's different than the

19 treatment of options that we've typically seen in the past, and

20 so it was taken out.

21 Q    And that was an error you made in your initial report?

22 A    Yes.  I'm not a tax expert.  Dr. Bierhanzl had indicated,

23 when he investigated it, found out that is the current IRS

24 treatment.

25 Q    So what you referred to is you received information from

R. Edelman - X

1   an expert, Dr. Bierhanzl, that indicated that you made that

2   mistake; that you had double-counted her stock?

3   A    Yes.  And I take responsibility for that and made that

4   correction for that in my June 7th report.

5   Q    And did Dr. Bierhanzl, the AstraZeneca expert, also point

6   out to you that you included the value of a new car for

7   Ms. Ivie every three year without accounting for the remaining

8   value of those cars?

9   A    Yes.  And I reduced the amount of the loss by taking out

10  the trade-in value.

11  Q    After AstraZeneca's expert pointed that out to you,

12  correct?

13  A    Yes, that's correct.

14  Q    Dr. Edelman, did you account for the recent announcement

15  that interest rates are going to rise?

16  A    Well, the answer to that is no, because we are not

17  investing in the future; we're investing now.  So we have to

18  use current interest rates.

19  Q    So is it correct, Dr. Edelman, that if interest rates go

20  up, as was announced today on the news, that Ms. Ivie would get

21  a windfall based on your calculation?

22  A    I don't think there would be a windfall, because the

23  increase in interest rates, according to the fed announcement,

24  is not expected to occur until 2023.

25          MS. TALCOTT:  I guess that depends on the definition

R. Edelman - ReD

1    of a "windfall," Dr. Edelman.  No further questions.

2              THE COURT:  Thank you.

3              Any redirect?

4              MS. CHAMBERS:  Just briefly.

5                      REDIRECT EXAMINATION

6    BY MS. CHAMBERS:

7    Q    Dr. Edelman, Ms. Talcott asked you a number of questions

8    that started with "if we assume."  For example, she said, "If

9    we assume Ms. Ivie gets a job tomorrow in her field."  I want

10   to clarify:  You were using actual numbers from Ms. Ivie's W-2

11   and her financial statements to calculate the lost backpay,

12   right?

13   A    Yes, ma'am, I did.

14   Q    And then for the front pay, you relied on

15   Mr. Scott Sevart's opinion, who is the certified vocational

16   expert, correct?

17   A    Yes, ma'am.

18   Q    And you also took into account her current job at BYU and

19   her current income, right?

20   A    Yes, ma'am.

21   Q    And then you also made the assumption that even though she

22   is a part-time, hopefully she will get to full-time, and she

23   will have a full-time salary; is that right?

24   A    That's right.  It was not an assumption I made.  It was

25   information that she provided, and it was also in Mr. Sevart's

L. Hinson - D

1  report.

2          MS. CHAMBERS:  Thank you.  No further questions.

3          MS. TALCOTT:  No questions.

4          THE COURT:  May this witness be excused?

5          MS. CHAMBERS:  Yes.

6          THE COURT:  Thank you, sir.  We appreciate your time

7  this morning.

8          THE WITNESS:  Thank you, Your Honor.

9          MS. CHAMBERS:  We would like to call

10  Mr. Larry Hinson.

11          THE COURT:  Okay.  Thank you.

12          Please step forward, sir.  When you get to the box,

13  you are welcome to remove your mask, if you are comfortable

14  doing so, and we will swear you.

15          THE WITNESS:  Okay.

16          (The witness was duly sworn.)

17          THE CLERK:  Thank you.  Be seated.  Would you please

18  state your name for the record, spelling your last.

19          THE WITNESS:  My name is Larry Hinson.  H-I-N-S-O-N.

20                  DIRECT EXAMINATION

21  BY MS. CHAMBERS:

22  Q    Good morning, Mr. Hinson.  Can you please introduce

23  yourself to the jury.

24  A    My name is Larry Hinson.  I am currently a retail

25  sales director with Grifols.  Prior to that, I was with

L. Hinson - D

1    AstraZeneca for approximately 17 years.  I have been in the

2    Oregon marketplace since -- I think I started my -- my oldest

3    daughter was born in '98, and so that's my reference.  So over

4    22 years in the Oregon marketplace.

5              My tenure with AstraZeneca was 17 years.  Over that

6    time, I was district sales manager.  I was a marketing field

7    readiness leader, a regional sales director, a hospital

8    district manager, an executive district sales manager.  I think

9    in my 17 years I had six -- seven promotions.

10   Q    Where do you live?

11   A    I live.  I currently live in Lake Oswego.  I have lived in

12   the Portland marketplace off and on over 20 years.

13   Q    So you said you worked 17 years at AstraZeneca?

14   A    That's correct.

15   Q    And you were a DSM?

16   A    My last role, when I left them, was an executive district

17   sales manager.

18   Q    That's the same role that Ms. Ivie had?

19   A    That's correct.

20   Q    Who was your first-line supervisor when you were an

21   executive DSM?

22   A    My supervisor I had when I left the organization was

23   Stephani DiNunzio.

24   Q    Okay.  And were you ever recognized for your performance

25   at AstraZeneca?

L. Hinson - D

1  A    I was.  In the span of my 17 years, I won three Circle of

2  Excellence Awards, which is a highest honor given for sales

3  awards.  2017, I was named the West's business unit sales coach

4  of the year.  But probably the thing I'm most proud of, in my

5  17 years, I won what you was call two -- well, two different

6  leadership excellence awards.  At the time, they gave it out

7  every year to approximately ten sales leaders in the

8  organization.  There are 60-some-thousand employees in the

9  organization.  They were given out to sales leaders and

10 commercial leaders.  You could have been research and

11 development.  There was a myriad of folks who had potential to

12 receive it, but they recognized up to ten every year.  When I

13 received my second one, I was told I was only the second person

14 in the entire organization that had won that award twice.

15 Q    And how do you know Suzanne Ivie?

16 A    Suzanne was part of the district we were aligned to.  It

17 may have been called the Northwest Region.  But over the course

18 of my 17 years with AstraZeneca, through various roles that I

19 had and even in the most recent role, we were aligned to the

20 same business unit; the same region.

21 Q    Okay.  So she was essentially your colleague or peer, both

22 reporting to Stephani DiNunzio?

23 A    That's correct.

24 Q    And you just worked in different regions -- districts

25 within the same region?

L. Hinson - D

1    A    That's correct.

2    Q    So what was your impression of Suzanne's performance?

3    A    Envious.  I mean, she had -- over the course of my 17

4    years, it was something that I always -- having had won two

5    leadership excellence awards, I was still -- she was the

6    benchmark.  My successor teams constantly had an impeccable

7    track record of performance.  I always admired her performance.

8    I would say she was internal motivator to myself and my team

9    that we were always trying -- if we beat Suzanne's team, we

10   were going to have a really good year.

11   Q    All right.  So I want to talk a little bit about coaching.

12   So as a DSM, you had to coach your subordinates, right?

13   A    That's correct.

14   Q    So we have talked a lot about coaching in this case.  To

15   your knowledge, does AstraZeneca have a policy or a requirement

16   about the number of field coaching days a DSM has to perform

17   with their subordinates?

18   A    Yeah.  In all of my years as a sales leader with the

19   organization, whether I was a district sales manager or

20   regional sales director that led a team of district sales

21   managers, there was never -- never a policy on field coaching

22   requirements.  We always had -- I would call it a scorecard

23   measurement.  I'm not sure with the terminology that they use

24   now.  But every year, at the beginning of the year, we would

25   have a scorecard on different benchmarks that we would try to

L. Hinson - D

1   strive for.  Field coaching for a sales manager was always in

2   that.  They would -- some years it would be 100; some years it

3   would be 110; some years it was 120.  But there was never a

4   policy that we had.  It was just a -- it was a guide.  It was a

5   scorecard measurement.

6   Q    Okay.  In fact -- well, have you ever heard of the 80/20

7   split?

8   A    I have.  So I would say before Stephani DiNunzio became my

9   commercial business director, her predecessor had come up with

10  this idea for virtual field coaching, and I'm going to give you

11  my opinion.  My opinion was to try and minimize some of the

12  expenses associated with traveling to connect with your folks.

13  So he had this creative idea that you would get on the phone.

14  It was presumed -- or it was pre-Team, sort of any kind of

15  virtual chat room.  You'd get on the phone with the sales

16  representative.  They walk you through what their day was.

17  They would go in the sales call.  They would make the call and

18  come back to their car and pick up the phone and call you, and

19  you would give them feedback.

20       I personally actually never did any personal

21  coaching.  I always wanted to sit in the front seat.  I was in

22  a place in my life where my children were old enough that -- I

23  had a stay-at-home wife who worked.  I didn't really have the

24  responsibility, and I really didn't need to manage to some

25  80/20 rule.  It was never even a policy.  It was never even a

L. Hinson - D

1    guideline.  It was just arbitrary number that somebody probably

2    said, "Let's try and shoot 80 percent face-to-face; 20 percent

3    virtual."  Some managers may -- across the country -- may have

4    done 75/25; some may have done 60/40.  But at the end of the

5    year, there was never any coaching to be in that 80/20 role.

6    Q    Thank you.  So we talked a little bit about

7    Stephani DiNunzio.  She was your supervisor before you left

8    AstraZeneca, right?

9    A    That's correct.

10   Q    Do you recall a time when Stephani DiNunzio talked to you

11   about your performance?

12   A    Every week I had the dubious honor of going through this.

13   BEVESPI was a product that we were in the launch stages, here

14   in the Oregon marketplace, and specifically the Pacific

15   Northwest, whether it is Oregon or Seattle, where it's

16   high-managed care opportunities, products just don't launch

17   that well compared to the rest of the nation.

18       So I would have these painful weekly performance

19   discussions about how BEVESPI was performing every week.  The

20   irony to all of this, which kind of made any normal person's

21   head spin, is, on the phone, she been was almost hostile,

22   intimidating, the repetitive nature of the calls.  I mean, they

23   were definitely disturbing and upsetting.  What made it -- even

24   compounded the situation is on late Friday or Saturday, we

25   would get this early view of performance data.  I had these

L. Hinson - D

1   calls with Stephani every Monday.  So I would peek at this

2   performance data.  And if the numbers weren't performing well

3   or growing, my weekend was completely ruined, because I knew I

4   was going to have the most painful, hostile conversation with

5   Stephani about the lack of market share growth with this launch

6   product.

7           Never once in that time did she ever discuss my

8   behaviors.  Early on in our discussions she would -- I would

9   talk about managed care obstacles or things like Providence,

10  which we had a closed physical access, or Legacy, which we have

11  closed physical access, which we couldn't actually speak to the

12  physicians.

13          Early on in our tenure of our relationship she would

14  listen to that.  As time evolved -- and when I mean "time," I'm

15  talking a few short weeks, she would say, "Those are excuses.

16  You have to remove yourself.  You have to think.  You have to

17  think you are a champion, Larry.  If you think you are a

18  champion, your team will follow you."

19          So I had these painful weekly calls and I had --

20  actually in March of 2018 I had actually done a statistical

21  analysis that our region -- well, our district was not going to

22  perform or not going to meet the expectations that Stephani

23  had; that the organization had.  It just was an impossible

24  factor to overcome.

25  Q   Can you tell me about a time when you were interviewing

L. Hinson - D

1   candidates in the spring of 2018 time frame.  If you could walk

2   me through that meeting about what happened and what you

3   recall.

4   A    Yeah.  So I believe that the time frame is May of 2018.  I

5   had on my district -- I had a vacant territory.  It was a

6   promotion to get into this.  It was a respiratory specialty

7   position.  The person that had the role had vacated it, and I

8   had to backfill it.  I interviewed young internal/external

9   candidates.  Stephani had come in to help me interview these

10  candidates, and it was -- actually it was a quite jovial day

11  that she and I had and how we were interviewing candidates.

12  But in the back of my mind, in the pit of my stomach, I never

13  knew what was going to come out of her mouth.  Literally when

14  we finished the interviews, when we talked and debriefed about

15  the candidates, internally I just said, "Okay, this day is

16  over.  She will get on an airplane, and she will head back to

17  her hometown."

18          And then all of a sudden she started attacking me on

19  my performance and specifically on field coaching.  And I'll

20  never forget this as long as I live.  She said, "The reason

21  your team is performing so poorly is how you are coaching your

22  team.  You are coaching to multiple behaviors, and you are

23  confusing your team.  Therefore, they are not performing,

24  because they are following your misguided leadership."

25          Keep in mind, I had won multiple leadership

1  excellence awards and multiple sales performance awards, but

2  she dismissed all of that.  So when she tried to start to use

3  words like "behavior," it is almost like a dog whistle that

4  instantly I knew that she was now trying to say it wasn't about

5  my performance; it was about my behaviors.  And that's a dog

6  whistle within AstraZeneca to -- okay, it's time to get rid of

7  this person, because their behaviors are not meeting

8  expectations.

9  Q    Larry, sorry to interrupt you.  Why is it a dog whistle?

10 Why is the word "behavior"?

11 A    So I learned a long time -- when I was in Stephani's role,

12 I had an underperforming sales representative, who for a myriad

13 of reasons, was not doing their job.  When I sat down with the

14 manager and human resources to put a plan together, a

15 performance improvement plan --

16 Q    And who was that at human resources?

17 A    Karen Belknap.  Karen made the statement to me at that

18 time, saying, "Larry, you cannot dismiss folks for poor

19 performance.  You can only dismiss them for poor behaviors."

20 And those words actually stuck true to me for the rest of my

21 leadership career, because I would coach my sales managers, or

22 I would coach my sales reps around their behaviors.  And so if

23 you had an individual who had been performing, all of a sudden

24 over course of time and the course of history, and the word

25 "behavior" -- if you'd have "poor behaviors" come up -- that's

L. Hinson - D

1    why I said it was a dog whistle to me and the experience I had

2    of saying, okay, she has now pushed my performance aside, and

3    she is personally attacking my behaviors.

4              MR. McCARTHY:  Judge, objection.  Relevance and

5    foundation to this continued line of questioning.

6              MS. CHAMBERS:  This is about his personal experience

7    with Ms. DiNunzio, and it goes right to the field coaching.

8              THE COURT:  Okay.  But please move it along.

9    BY MS. CHAMBERS:

10   Q    So we are back at this meeting with Stephani DiNunzio, and

11   you talked about what "behaviors" meant and how Karen Belknap

12   and you discussed that in the past.

13             So what does she say about your field coaching and

14   what do you do next?

15   A    So Stephani said that my field coaching was all over the

16   form; that it was confusing, misguided.  When you coach an

17   individual, you should be coaching to one or two behaviors.

18   There is just scientific proof.  It's clear.  It's concise.

19   It's repetitive.

20             She said I had multiple -- three or four things I was

21   coaching to; and therefore, I was confusing.  I knew that she

22   was actually fabricating the truth as soon as she said that.

23   And I knew she had never read any of my field coaching reports

24   when she said that, because I knew it was not true.

25             MR. McCARTHY:  Objection.  Lack of foundation.

L. Hinson - D

BY MS. CHAMBERS:

Q    Larry, continue if you could continue about why you thought that.

A    So I actually pulled open my computer, and I flipped it around to her.  I slid it across the table and said, "Stephani, you pick any field coaching form.  I'm not even going to guide you to it.  You pick a field coaching form, you open it up, and read it right here in front of me.  Then give me feedback on what is being misguided."

I slid the computer across.  She opened up a field coaching form.  She read it right there in front of me and said, "That's actually a pretty good field coaching form."  She turned my computer around, slid it back to me, and I said, "No, that's not good enough.  You're attacking my professional career here."  I slid my computer around said, "Pick another one."  And I slid my computer across the desk; and the same situation.  She randomly opened one and said, "That's actually a pretty good field coaching form too."

She slid it across.  And we repeated it again.  I slid my computer back.  I said, "Pick a third one.  I have been doing this for my life and you are attacking me personally, and you are actually falsifying what has taken place."  She said, "No, let's just leave it at that.  I guess you do coach really well."

I actually thought that was the end of it.  I was

L. Hinson - D

1    completely naive.  Then only to find out two days later she

2    emails this horrific email attacking how I was coaching my

3    individuals.  So again, not only did I earlier say that it was

4    a dog whistle about behaviors, but now she was trying to

5    document misguided behaviors that were taking place.

6    Q    Thank you, Larry.  So then after that, is it true that you

7    asked for a severance package and left AstraZeneca?

8    A    Yeah.  So shortly after that the -- I apologize, because

9    it definitely brings up some old wounds, because it was three

10   years ago today, the day before Father's Day, she called me --

11   Stephani DiNunzio called me and said, "Larry, you're going on a

12   performance plan, or you need to sign a severance package."

13        I had given my life to this company, and to have my

14   livelihood be attacked the way it was was the worst experience

15   that I have ever gone through.  So when I asked her -- I

16   apologize.

17   Q    That's okay.  Take your time.

18   A    When I asked her what behaviors, why are you putting me on

19   a performance plan, she said, "You need to pick.  Is it the

20   performance plan, or is it the severance package?"  And I said,

21   "I need to know the details behind each one of those, because

22   right now you are not giving me the information."  I said, "Can

23   you tell me the details of a severance package?"  And she said,

24   "Is that what you're choosing?"  I said, "I'm not choosing

25   anything until I know what I'm picking.  If I'm going on a

L. Hinson - D

1  performance plan, you need to tell me why I have bad

2  performance or bad behaviors and what those are.  You have

3  never documented that.  If you want me to pick a severance

4  package, you need to tell me the details."

5          And I'll never forget -- there are a couple of things

6  in life I'll never forget:  The day I proposed to my wife, the

7  day I married my wife, the birthing of my two children, the day

8  my father passed away, and that day with Stephani, because --

9  excuse my French -- in her smugness she had the gall to say,

10  "Happy Father's Day," and hung up the telephone.

11          So that weekend I drafted an email to human

12  resources, and I had been documenting emails, field coaching

13  forms, because from the beginning of January to that

14  Father's Day, the eve of Father's Day weekend, she actually

15  would use examples of great leadership that I was exuding and

16  she would share them.

17          And so I had stacked all of this stuff together, and

18  I had sent an email to Karen Belknap in human resources and

19  Mike Hartman, her boss, and had examples of harassment and had

20  examples of abuse that she had displayed.  It was pervasive.

21  It was weekly, I mean, it is the most horrific five months --

22  the month of June felt it was like freedom, because I actually

23  ended up leaving the organization.  But from January through

24  the end of May, it was awful.  Friday, three years ago, the

25  Friday before Father's Day, it was the worst phone call I

L. Hinson - X

1    have received from her.  Knowing that I somewhat kept it inside

2    to try to insulate my family, it was awful.  It was awful.

3              MS. CHAMBERS:  Thank you, Larry.

4              No further questions.

5              THE COURT:  Thank you.  I am wondering if we should

6    take maybe a ten-minute recess for the jury and then cross.

7              Is that fine?

8              MR. McCARTHY:  Sure.

9              THE COURT:  Ten minutes, Jury.

10             Thank you.

11             (Recess.)

12             (Open court; jury present:)

13             THE COURT:  Defendant's cross, please.

14             MR. McCARTHY:  Thank you, Judge.

15                          CROSS-EXAMINATION

16   BY MR. McCARTHY:

17   Q    Good morning, Mr. Hinson.

18   A    Good morning.

19   Q    I'm Ryan McCarthy.  I'm one of the lawyers for

20   AstraZeneca.  I think we met via Zoom maybe a year ago.  Good

21   to see you, sir, and thanks for appearing.

22             I want to start by talking a little bit about

23   coaching, the same way you started off before.  You were proud

24   of your coaching?

25   A    Absolutely.

L. Hinson - X

1   Q   And you were good at it, you thought?

2   A   I was great at it.

3   Q   In fact, you were named the sales coach of the year for

4  the West.  Was that in 2017?

5   A   I received my trophy in 2017, and so it could have been

6  2016 or 2017.

7   Q   You got a trophy for it?

8   A   I did get a trophy.  It is sitting on my desk right now.

9  A big trophy.

10  Q   How big?

11  A   (Indicating.)

12  Q   All right.  You did your field coaching in person almost

13  all the time?

14  A   I did.

15  Q   With the sales rep?

16  A   That's correct.

17  Q   In person; in the office?

18  A   Never in my office.

19  Q   Sorry.  In the doctor's office.  Then in the car, you are

20  riding with the rep?

21  A   That's correct.

22  Q   You are taking rides to the airport together sometimes?

23  A   I don't know if we took rides to the airport together.

24  Q   But not virtually, not over the phone?

25  A   No.

L. Hinson - X

1    Q    And you thought that virtual visits, that is, visits not

2    in person with the sales reps, you thought those were a waste

3    of time and energy?

4    A    I enjoyed face-to-face.

5    Q    And that's because you thought the virtual style, in other

6    words, not face-to-face -- you thought that was a waste of time

7    and energy?

8    A    I felt I was able to engage my sales team by eyeball to

9    eyeball.

10   Q    You mentioned your deposition before.  Do you recall being

11   deposed in this case?

12   A    I do.

13   Q    And that was about a year ago?

14   A    I do.

15   Q    That was a little closer to the time when you were at

16   AstraZeneca than when you are sitting here today.  I was there,

17   at least via Zoom, and you were put under oath and answered

18   questions?

19   A    Yes.

20   Q    And you did your best to be truthful and accurate?

21   A    Yes.

22   Q    There is a copy of your deposition transcript there next

23   to you on the table, I hope, on the corner maybe.

24   A    Yes.

25   Q    I just want to refer you to page 115, lines 2 to 3.  I'll

L. Hinson - X

1    wait until you are there.  Actually let's start at 114, line

2    25.  Let me know if you see it.

3    A    Okay.

4    Q    It starts:

5            "QUESTION:  Did he tell you specifically that

6    20 percent of ride-alongs could be done virtually?

7            "ANSWER:  I don't recall that.  I thought they were a

8    waste of time and a waste of energy."

9            That was your testimony, correct?

10   A    Yes.

11   Q    You thought that virtual field visits gave you a false

12   sense of what was going on?

13   A    Yeah.  Again, my history, because we weren't held to any

14   travel budget, and that was the intended reason for these

15   virtual -- maybe to save some money; they would probably

16   increase it -- but I personally enjoyed the face-to-face, and I

17   still do today.

18   Q    Is one of the reasons you enjoyed the face-to-face is

19   because you thought virtual -- not being face-to-face -- gave

20   you a false sense of what was going on?

21   A    I couldn't coach -- I couldn't see the physicians' body

22   language.  It was merely somebody replaying what they thought

23   took place and me coaching on that.

24   Q    And you didn't want to rely on that, because it could give

25   you a false sense of what was going on?

L. Hinson - X

1    A    I thought it was more effective face-to-face.

2    Q    Again, I'm going to read a few lines from your deposition.

3    Page 115, line 7.  Just let me know when you are there, sir.

4    A    Yes.

5    Q        "QUESTION:  What are some of the reasons you prefer

6    to do it face-to-face?

7            "ANSWER:  Well, I think you got a false sense of what

8    was going on."

9            That was your testimony?

10   A    Yes.

11   Q    You thought that virtual visits were a futile exercise?

12   A    Again, I preferred face-to-face.

13   Q    And you thought virtual visits were a futile exercise?

14   A    In my opinion.

15   Q    And you agree that coaching is hearing and seeing body

16   language?

17   A    I do.  But obviously for some reason AstraZeneca felt that

18   you could coach virtual, so they suggested this virtual field

19   coaching.

20   Q    Right.  Which you thought gave you a false sense of what

21   was going on?

22   A    Again, I thought I got more value out of face-to-face.

23   Q    You testified under oath in your deposition that it gave

24   you a false sense of what was going on if you are not

25   face-to-face, yeah?

L. Hinson - X

1    A    Yeah.

2    Q    Okay.  Let's talk about the face-to-face interaction that

3    you had.  Do you think that the feedback that you gave sales

4    reps helped develop their selling skills?

5    A    Do I think the feedback I gave the sales reps helped

6    develop their selling skills?  That's what we are paid to do as

7    coaches.

8    Q    Right.

9    A    So I would assume, based upon my history and the level of

10   engagement, that I was effective in how I coached my team.

11   Q    To take you back to -- maybe it will be clear in your mind

12   if you'd go back to 2017, the year with the nice-sized trophy.

13   If you could take yourself back to that time.  Can you think of

14   any examples to put a picture in the jury's mind of what kinds

15   of things did you see and hear when you were in person at the

16   doctor's office that allowed you to give the constructive

17   feedback to help the sales reps develop?

18   A    I don't think coaching is a single moment in time.  I

19   think I have coached my team over personal interactions;

20   professional interactions.  I personally tried to connect and

21   live the experience of my team.  This is, again -- Oregon is a

22   completely different marketplace than Utah.  It's extremely

23   tough in the challenges.  I felt I wanted to be with my sales

24   team side-by-side trying to assist them.

25              So to me it wasn't about the words I put on a sheet

1   of paper.  It was they knew I was sitting with them.

2   Q    I'm just trying to help you get back to that frame of

3   mind, sir.  Can you think of an example where maybe it is not

4   on a sheet of paper, but maybe you are walking out of a

5   doctor's office.  You want to give that good advice, and you

6   want to give it timely.  So what kind of stuff do you say to

7   the sales rep?

8   A    I'll give an example.  When I wasn't able to see somebody.

9   I would work with a sales representative face-to-face and went

10  into the call, and the physician asked me to be removed because

11  of patient confidentiality.  So I actually had to exclude

12  myself from the sales call.  The sales representative replayed

13  it to me.  Now, it wasn't a virtual call, because he came out

14  and we spoke about it.  But again, the individual

15  considerations that I would give that individual in coaching

16  and having him kind of replay the event, and he had seen the

17  call as a failure, and I was trying to lift him up.  I didn't

18  see it happen, but he saw the connectivity with myself.  Again,

19  AstraZeneca didn't have a policy on face-to-face or virtual.

20  It was up to the managers' discretion.

21  Q    So you can't think of an example of in-person feedback

22  that you gave for the trophy?

23  A    In all fairness, I was with AstraZeneca for over 17 years,

24  I would do approximately 120 field visits per year.  I can't

25  come up with one single instance face-to-face to provide you

L. Hinson - X

1    with an example.

2    Q    Not any?

3    A    No.

4    Q    Okay.  You testified a little bit about Suzanne Ivie's

5    performance.  Do you recall that?

6    A    I do.

7    Q    You would agree that Suzanne's district was in a

8    marketplace that allowed for a lot of success?

9    A    Yeah.  Our regional sales director, Stephani DiNunzio,

10   sometimes -- would often say, "You're never as good as the

11   numbers, and you're never as bad as the numbers."  Suzanne and

12   I were in completely different marketplaces.  However,

13   regardless of that, she was still measured on the same

14   performances and still -- I don't know how many Circle of

15   Excellence awards she won, but it was multiple.  Some people

16   don't even win one of them.  So that's pretty impressive.

17   Q    But you recall that, relative to your district, Suzanne

18   had better formulary access historically, meaning more ability

19   to get doctors to prescribe AstraZeneca's key drug SYMBICORT?

20   A    They're two totally different marketplaces.  The state of

21   Utah is primarily driven by commercial payer called

22   SelectHealth.  I'm totally guessing here, but I'm guessing that

23   it controls 60, 70 percent of all the commercial lines in the

24   state of Utah.  In a marketplace like Oregon, there is probably

25   ten different payers, 12 different Medicaid arms, and so it

L. Hinson - X

1   is -- it is night and day to try to compare marketplaces from

2   Oregon to a marketplace like Utah.

3   Q    Right.  So I guess if you try to boil it down, if you took

4   a district like yours and the kind of insurance companies that

5   were involved and a district like Ms. Ivie's, and if you kept

6   everything else equal about the quality of sales professionals

7   and the doctors that you are calling on, am I right, from a

8   numbers standpoint, you would rather be in a district like

9   Ms. Ivie's?

10  A    It's interesting that you asked me that question, because

11  I don't recall if you recall when I said in 1998, I became a

12  sales leader.  I was given the choice to be a sales leader in

13  the Portland marketplace or the Salt Lake marketplace, and I

14  chose Portland.  I don't regret that a bit.  It has shaped who

15  I am as a leader.  So I did have that chance several years ago

16  to make that choice, and I made the opposite of what you are

17  suggesting.

18  Q    Right.  All I'm asking, though, it's true that, relative

19  to Portland, where you were, in Ms. Ivie's territory it was

20  easier to get insurance companies to pay for SYMBICORT.  Do you

21  agree with that?

22  A    From a commercial insurance perspective, yes.  But

23  unfortunately, our goals and performance measurement wasn't

24  based on commercial insurance.  It was based on Medicare,

25  Medicaid.  There was a whole series of things that took place

1  into that.

2          AstraZeneca, as an organization, you know, every

3  year, we have re-established goals, and your goals would be

4  established based upon your marketplace.  They would establish

5  goals based upon what they thought your market potential.  So

6  while she may have had a higher market share, she probably had

7  a tougher hill to climb because maybe she couldn't grow her

8  share more than someone like myself.

9  Q    You would agree that Suzanne's sales team -- Ms. Ivie's

10  sales team had an advantage over a marketplace like Portland or

11  Seattle who had high controlling high-managed market care

12  places?

13  A    I would say they had an advantage when it came to

14  launching products.  Again, a marketplace like Oregon who

15  has -- again, I'm guessing here -- I apologize -- maybe 20.

16  They are called CCOs.  They manage the Medicaid lives in the

17  state of Oregon.  They spread across all different counties.

18  If you are not on those Medicaid formularies, you are

19  completely limited and completely shut out on promoting your

20  product.  You could promote it, but the physicians wouldn't

21  prescribe it, versus a marketplace like Suzanne's, who had a

22  higher percentage of commercial insurance and an organization

23  invested in trying to get formulary at SelectHealth.  So again,

24  I feel like you are comparing apples and oranges.

25  Q    You just talked about the advantage at the time of a

L. Hinson - X

1    product launch?

2    A    That's correct.

3    Q    When did SYMBICORT launch?

4    A    Oh, my goodness.  You are making me go back in time.  I am

5    going through the calendar in my head here.  So I started in

6    2001 with AstraZeneca, and I would be safe to say 2004, 2005.

7    Q    By 2017, SYMBICORT had been on the market for a while,

8    right?

9    A    That is correct.

10   Q    Even though it had been on the market for a while, you

11   would agree that there was still a big advantage with insurance

12   companies in Utah versus where you are?

13   A    In commercial insurance.

14   Q    Mr. Hinson, you haven't ever seen any of Ms. Ivie's

15   performance evaluations?

16   A    I have not.

17   Q    You have never witnessed Ms. Ivie coaching in the field?

18   A    I have not.

19   Q    You weren't aware that Suzanne's district performance

20   declined in 2018?

21   A    During my tenure, I could -- in 2018, based upon what I

22   had seen, it wasn't what -- again, if you are using a Circle of

23   Excellence as a measurement, it wasn't what she had been

24   accustomed to.

25   Q    At the time you got involved in this case, you weren't

1  aware that Suzanne's district was in the bottom 17 percent for

2  Circle of Excellence in 2018?  Fair to say you didn't know that

3  detail?

4  A    No.  But it is also fair to say that if, based upon

5  Suzanne's performance, had she not already been in an executive

6  district sales manager, they would have had to actually promote

7  Suzanne, because of her performance -- because our performance

8  was never measured on one year.  They looked at our performance

9  over a period of three years.  If, as a manager you were the

10  top 45 percent over a three-year period, you got promoted.  If

11  you were to even take that bad year that you just stated, she

12  would have actually got a promotion if she hadn't been to the

13  highest level.

14  Q    And you didn't have any involvement in evaluating district

15  sales managers for promotions, right?

16  A    I did not.  Suzanne was selected in 2018.  Every year

17  AstraZeneca would do what they call a leadership summit, and it

18  was put on by sales managers.  Sales managers created the

19  agenda.  It was probably a four- or five-day meeting.  Suzanne

20  was selected to lead that summit during my tenure while I was

21  there.  I remember being a bit disappointed, because I was

22  hoping to have been a part and try to lead that summit.  And

23  they only picked the best to lead that summit and create that

24  agenda, and you're highlighted in front of your peers.

25  Stephani at that time had picked Suzanne to lead that

L. Hinson - X

1  leadership summit.

2  Q    I know there is a lot what you want to say.  Out of

3  respect for everyone's time, we're trying to move through this,

4  Mr. Hinson.  The question I had for you:  You didn't have any

5  role in evaluating district sales managers for promotion?

6  A    No.  But I was trying to say, based on her behaviors and

7  track record, Stephani thought quite highly of her and had her

8  lead that leadership summit.

9         MR. McCARTHY:  Judge, I move to strike the last

10  answer.

11         Speculation.

12         THE COURT:  Sustained.

13  BY MR. McCARTHY:

14  Q    You testified a lot about Stephani DiNunzio today, but you

15  didn't say any interaction you saw between Ms. DiNunzio and

16  Ms. Ivie, correct?

17  A    That's correct.

18  Q    Let's talk a little bit about your performance.  In your

19  year-end 2017 review, just the top line rating, you got a two

20  out of five?

21  A    That is correct.

22  Q    And that was the second lowest rating?

23  A    Yeah.  A two rating is considered a value

24  performance/needs improvement.

25  Q    It is the second lowest?

L. Hinson - X

1    A    A two rating is a value performance and needs improvement.

2    Q    Is it also the second lowest?

3    A    That's correct.

4    Q    Through October 2017, the Portland district was ranked

5    107.  That's your district.  It was ranked 107 out of 110

6    nationally, right?

7    A    What are your you measuring?

8    Q    COE; is that right?

9    A    I have no idea.  I don't have an October Circle of

10   Excellence report.

11   Q    I'll refresh your recollection.  Look at your deposition,

12   page 60.  I'm at line 14.

13   A    Okay.

14   Q    If you would just go ahead and read to yourself line 14

15   through page 61, line 2.

16        Does that your refresh your recollection that you

17   were ranked 107 out of 110 -- that is your district -- and

18   that's the bottom 10 percent?

19   A    Do you mind if I read this?

20   Q    I thought you were done.

21   A    No.

22   Q    Did you read it?

23   A    I did.

24   Q    Did that refresh your recollection that through

25   October 2017 your district was ranked 107 out of 110 nationally

1    and in the bottom 10 percent?

2    A    That is correct.

3    Q    Now, that's through October of 2017, correct?

4    A    Correct.

5    Q    Do you recall that Stephani DiNunzio became the commercial

6    business director right around October of 2017?

7    A    Yeah.  I would guess the September/October time frame.

8    Q    Is it fair to say, the numbers we're talking about here

9    for the first three quarters of 2017, at that time you were

10   reporting to a different commercial business director?

11   A    That is correct.

12   Q    So the bad three-quarters that led to the bottom ten

13   percent rating, that wasn't under Ms. DiNunzio?

14   A    That is correct.

15   Q    Had you even met Ms. DiNunzio during that bad three

16   quarters?

17   A    Sure.

18   Q    When did you first meet her?

19   A    I met her at various sales meetings.

20   Q    She hadn't been supervising you ever before that?

21   A    No.

22   Q    You talked about the word "behaviors," and you called it a

23   dog whistle?

24   A    Yes.

25   Q    You get an annual performance review at AstraZeneca?

L. Hinson - X

1    A    That is correct.

2    Q    And there are two major categories in a performance

3    review -- performance and behaviors?

4    A    That's correct.

5    Q    Performance is 60 percent; behaviors is 40?

6    A    That's correct.

7    Q    And you have a bonus, like an incentive compensation at

8    AZ?

9    A    Yes.

10   Q    Or you did?

11   A    Yes.

12   Q    The bonus incentive, it can be a pretty big percentage?

13   When I say "pretty big," maybe like 20 percent, 30 percent of

14   your total annual compensation -- the goal?

15   A    That seems fair.

16   Q    And part of that incentive compensation is based on

17   performance and some of it is based on behaviors?

18   A    That is correct.

19   Q    And the behavior section is an official part of the

20   AstraZeneca review form?

21   A    That is correct.

22   Q    And in the past you have been highly rated sometimes for

23   behaviors?

24   A    Highly rated for behaviors and sales performance.  You

25   don't get rated on one or the other.

1  Q    Of course.  But in some years you've gotten really good

2  marks for behaviors?

3  A    And sales performance.  They are never mutually exclusive

4  of one another.  They are always together.

5  Q    Always together.  But you would agree, if you'd think back

6  to some of your performance reviews, people have said good

7  things about your behaviors?

8  A    When I had -- the year 2017 in question, what Stephani

9  stated about my behaviors was something that will put a smile

10  on anyone's face.

11  Q    Right.  There were some years when that 40 percent, the

12  behaviors, was positive for you?

13  A    My recollection, in my 17 years, my behavioral performance

14  was always quite positive.

15  Q    Right.  So because that's like 40 percent of your

16  incentive comp, you got more money because of the good

17  behaviors you had?

18  A    I can't say if I would agree with that, because every year

19  our incentive comp plans changed, and I don't believe -- I

20  don't recall that our incentive comp was 40 percent based upon

21  my leadership.

22  Q    But you will agree with me at some point it was

23  40 percent, right?

24  A    Our rating -- our performance rating -- not our incentive

25  comp.  Those are two different things.

L. Hinson - X

1    Q    Behavior is a part of what goes into your incentive comp?

2    A    No, that's incorrect.

3    Q    No part of your incentive comp is driven by behavior at

4    all?

5    A    No.

6    Q    When you saw the positive commentary about your behaviors,

7    which you testified that you recall, did you think it was a dog

8    whistle?

9    A    No.  I thought it was a true reflection of -- keep in

10   mind, I didn't receive the commentary of my 2017 review until

11   March of 2018.  I thought the commentary on that was spot on

12   accurate.  The irony of it is, when I actually saw my

13   performance review, is when you delivered it to me in my

14   testimony at my deposition.  Because Stephani never delivered

15   it to me.

16            MR. McCARTHY:  I'm going to move to strike the answer

17   as nonresponsive, Judge.

18            THE COURT:  It will be stricken.  Thank you.

19   BY MR. McCARTHY:

20   Q    Mr. Hinson, I want to take you back to the year when you

21   got the trophy for coaching.  And coaching is part of

22   behaviors?

23   A    Coaching is behavior, right.

24   Q    So do you think you got some positive comments about

25   behavior that year?

L. Hinson - X

1   A    Absolutely.

2   Q    Did you think that was a dog whistle when you got those?

3   A    No.  But it was a dog whistle when it was unfounded; that

4   they started falsifying what the behaviors were and how they

5   were changing.

6   Q    Can we switch the exhibit?

7        Mr. Hinson, you are aware that one of Ms. Ivie's

8   claims in the case is age discrimination.  You have seen the

9   complaint in the case, and generally you are aware of her

10  claims?

11  A    Generally I'm aware.

12  Q    You know that one of her claims is that she felt

13  discriminated against based on her age because of her nickname,

14  which was "Benatar"?

15  A    That's correct.

16  Q    You didn't have a nickname, right?

17  A    I did not.

18  Q    And that's because you said you didn't want one?

19  A    That's correct.  I thought they were unprofessional.

20  Q    You told Ms. DiNunzio you didn't want a nickname, and so

21  you didn't get one?

22  A    That's correct.

23  Q    And you were satisfied with that?

24  A    Yeah.  She wasn't giving me a nickname, because I told her

25  I thought they were unprofessional.

L. Hinson - X

1  Q    You accepted her decision -- you -- well, strike that.

2  You didn't think that the "Benatar" nickname had anything to do

3  with Ms. Ivie's age; is that right?

4  A    Well, certainly it was a reference to an old rock star

5  back in my high school age, and so going back to the '80s.  So

6  it certainly was a reference to Suzanne and her age -- her

7  history.  I don't know if the picture was from high school or

8  college age.  I definitely remember the picture, and I

9  definitely remember Stephani.

10  Q    And you thought at the time -- you did think it had

11  something to do with her age at the time?

12  A    At the time I would say -- I want to say no.

13  Q    You never thought the "Benatar" nickname was a commentary

14  on her age, right?

15  A    That's not entirely true.

16  Q    Pick up your deposition.  I'm going to look at page 82.

17  We are going to go to line 14.  I'm going to read from it.  Let

18  me know when you are there?

19  A    What page?

20  Q    82, line 14.

21  A    Okay.

22  Q    You were under oath, just like you are today.  Line 14:

23       "QUESTION:  Did you think that -- I mean, did you

24  have an impression that the 'Pat Benatar' nickname had

25  something to do with Suzanne's age?

L. Hinson - X

1      "ANSWER:  No."

2      That was your testimony?

3  A    Yes.

4  Q    And you didn't hear anyone else make any comments or

5  suggested in any way that the "Benatar" nickname had something

6  to do with Suzanne's age?

7  A    Not that I can recall.

8  Q    Do you recall I showed you a photograph of Ms. Ivie in

9  your deposition?

10 A    I don't recall that, but if you say you did.

11 Q    We will see if this refreshes your recollection.  Do you

12 see what's on the screen?

13 A    Yes.

14 Q    Do you recall that you chuckled when I showed this at your

15 deposition?

16 A    I'm chuckling now.

17 Q    Because you think it is funny?

18 A    It is interesting to look at all three of those

19 individuals in that form.

20 Q    And you agree with me that she looked like an '80s rocker

21 in the photo?

22 A    I would agree with that.

23 Q    And you would agree with me --

24 A    It makes it help when you reference -- when you say "Pat

25 Benatar," then you can make that connection.

L. Hinson - X

1   Q    Maybe everybody knows this, but Pat Benatar was an '80s

2   rocker?

3   A    That's right.

4   Q    Were you on a group text message chain with the other DSMs

5   and Stephani DiNunzio?

6   A    I'm assuming that there was.

7   Q    Do you know if you were on it, again, early 2018?

8   A    Again, I have no recollection, but I'm assuming that

9   Stephani probably had a text message chain.

10  Q    Do you recall Ms. Ivie texting the whole group to say that

11  she loved the nickname and wanted it on her company car license

12  plate?

13  A    I do not.

14  Q    Let's talk about this 80/20 issue.  You told the jury

15  under oath a half an hour ago that 80/20 wasn't the policy?

16  A    That's correct.

17  Q    It wasn't even a guidance?

18  A    It was -- as I said earlier, it was part of a scorecard

19  measurement, but it was not a policy.

20  Q    You don't recall testifying that it wasn't even a

21  guidance, about half an hour ago?

22  A    What I said was it was part of our scorecard measurement,

23  but it was not a policy.

24  Q    And you said it wasn't even a guidance?

25  A    It was -- at the end of the year, when they reviewed my

L. Hinson - X

1  field coaching form, they never looked at 80/20.  They looked

2  at my number of field coaching forms.

3  Q    You don't recall whether you just testified whether it was

4  even a guidance?

5  A    You would have to read back the exact words.  But what I'm

6  saying is, it was not a policy.  It was a year-end scorecard

7  measurement.

8  Q    Okay.  Did you testify this morning that it was just an

9  arbitrary number?

10  A    It was.

11  Q    Okay.  What does "arbitrary" mean?

12  A    It means somebody just came up with 80/20, 75/25.  There

13  was no -- there was no policy to substantiate this live versus

14  virtual field coaching.  That's why I say it was arbitrary.

15  Q    When you were at -- so there was no source to go to know

16  what the split was?

17  A    I could not pull up any policy handbook to find field

18  coaching guidance or something like that.  It didn't exist.

19  Q    You never saw a written document that talked about how

20  much -- let me finish the question.

21  A    I wasn't going to interrupt you.

22  Q    You never saw a document that talked about 80 percent with

23  a customer and 20 percent not?

24  A    I don't recall that.  What I always recall was in my

25  year-end performance review, which was back to the scorecard,

L. Hinson - X

1    was on the number of field coaching days that we did in a year.

2    I don't recall -- I'm assuming you probably have a copy of my

3    performance review.  I don't ever recall if it said 80 percent

4    was face-to-face; 20 percent was virtual.  It always talked

5    about the number of field coaching forms I did.

6    Q    When you would get instructions from your commercial

7    business director -- and I'm not just referring to

8    Stephani DiNunzio but all the people you reported to at AZ --

9    did you think it was important to comply with those

10   instructions?

11   A    I thought it was important to comply with a policy, that's

12   correct.

13   Q    You would.  But if a commercial business director sent you

14   an email and said, "Here is how we are going to do our job with

15   respect to coaching," it is something you would read?

16   A    Certainly I would read it.

17   Q    And if you had a concern or an issue with the direction

18   you were given, you would raise a question about that?

19   A    You would have to give me an example.

20   Q    Sure.  We will look at one.  My question for you is if you

21   were given direction by your manager, you would think it was

22   important to follow that direction?

23   A    I would use my professional opinion that I had displayed

24   over the years that I would make that decision.  I'm not just

25   going to just blindly follow someone's direction.

L. Hinson - X

1   Q    Okay.  Let's look at -- this is Defendant's Exhibit 522.

2   Mr. Hinson, I'm showing you an email.  This is an email from

3   April 4th, 2018.  I'll blow it up so we can see it.

4          The subject line is, "4/4 leadership call agenda."

5   You see it is from Stephani DiNunzio, and you see your name in

6   there as one of the recipients?

7   A    I do.

8   Q    And she is referring to an upcoming meeting in the email.

9   One of the subjects is "DSM coaching days."

10         Do you see that?

11  A    I do.

12  Q    And there is an attachment to the email that I want to

13  show you.

14         Do you recognize this?

15  A    I don't recognize it, but it looks familiar.

16  Q    Do you see it sets forth seven categories that count

17  towards coaching days?  That's here on No. 2.  It says at the

18  top, "150 days," right?  That's what you were referring to

19  earlier?

20  A    That number changed.  Sometimes it may have been 100.  If

21  you went back year after year, that was a moving target.

22         MR. McCARTHY:  Judge, I want to be mindful of the

23  lunch break.  I'm not going to finish before the lunch break.

24  I don't have a lot after the lunch break.  But if the jurors

25  would prefer to break now for lunch, that's fine.

1          THE COURT:  Are we looking at ten minutes?

2          MR. McCARTHY:  I think more than ten minutes.

3          THE COURT:  Why don't we go ahead and take our noon

4    recess now, Jury.

5          Thank you very much.

6          Be back, ready to go, by one o'clock, please.

7          (Recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Afternoon session; open court; jury present:)

2        THE COURT:  Please be seated.

3        Thank you again, Jury, for being so prompt.  We

4   appreciate it.

5                    CROSS-EXAMINATION

6   BY MR. McCARTHY:

7   Q    Mr. Hinson, before lunch, we were discussing Defendant's

8   Exhibit 522.  It is back up on the screen.  This was an

9   April 2018 email from Stephani DiNunzio to you and the other

10  DSMs in the region at that time?

11  A    Yes.  That's correct.

12  Q    We were just on the attachment, which was here, and then

13  the title, "Capturing Time Allocation in Veeva; Frequently

14  Asked Questions."  Then just scrolling down, it refers to the

15  150 days here coaching goal.  That's the same 150 days that you

16  referenced earlier in your testimony, which you understood was

17  the annual coaching requirement?

18  A    I think I probably said 120, but that is correct.

19  Q    There are seven categories here.  You can see the first

20  one is called "Coaching With Customer Engagement; use this

21  option when you are in the field with a PSS making calls on

22  targeted HCPs; completing IPN work," et cetera.

23        Do you see that?

24  A    Yes.

25  Q    "Use this option when completing business reviews or

1  coaching check-ins, debriefs, or re-focus activities when you

2  are not in the field with the PSS."

3         Do you see that?

4  A    I do.

5  Q    And then No. 3 says, "What percentage of our total

6  coaching days should be under our new category, coaching

7  without customer engagement?  Coaching without customer

8  engagement and business development both count toward the total

9  coaching days but combined they should not equal more than

10  20 percent of your total coaching days."

11         Do you see that?

12  A    I do see that.

13  Q    Mr. Hinson, you were one of the recipients of this

14  document?

15  A    I was on that attachment, so, yes, I was, but I don't

16  recall.

17  Q    Did you read it?

18  A    Did I read it just now?

19  Q    Did you read it at the time?

20  A    I'm assuming that I did.

21  Q    Did you understand if you had to comply with the

22  requirements in this document?

23  A    My understanding is compliance is under No. 1; that I had

24  150 coaching days.  And that's what is stated in my performance

25  review.

L. Hinson - X

1    Q    Did you read No. 3?

2    A    I did.

3    Q    Did you have an understanding that that was a requirement

4    that you were subject to as a DSM at AstraZeneca?

5    A    Can I ask what -- is this a policy that you're pulling out

6    or is it something --

7    Q    I'm not characterizing it, sir.  I'm showing the document

8    to you.  We read the title.  You said you believed you read

9    it -- you assumed you read it.  My question for you is do you

10   think that No. 3 -- did you understand that No. 3 contains

11   requirements that applied to you as a DSM at AstraZeneca?

12   A    Yeah.  I'll answer that in my year-end performance

13   reviews, I was only evaluated on field coaching forms.  They

14   never separated the two.

15   Q    Sir, the question is:  As to this No. 3 which discusses no

16   more than 20 percent of total coaching days as coaching without

17   customer engagement, did you understand this was a requirement

18   that applied to you as a DSM at AstraZeneca?

19   A    I would say I would probably ignore this, because what I

20   said in my earlier testimony is I didn't do virtual field

21   coaching time.  It was never an issue.

22   Q    It wasn't an issue for you, right, but -- for example, if

23   you decided that you had a different preference and wanted to

24   do some virtual coaching, you understood that it couldn't add

25   up to more than 20 percent of your total coaching days?

L. Hinson - X

1    A    Again, I don't know how other regional directors coached

2    to this, because it is not a policy.  I don't know how they

3    coached Suzanne to it.  As I said in my earlier testimony, I

4    have no idea how she was reviewed, rated.  I would assume it

5    was similar to mine.  It would just say, "Field coaching

6    forms."

7    Q    So the reason you ignored this was because you weren't

8    doing very much of your coaching virtually anyway?

9    A    I wouldn't say that I ignored it.  I would say I didn't

10   apply to it, because it wasn't an issue with me.

11   Q    So you didn't think about whether it was a requirement or

12   not?

13   A    No.  But I know it wasn't part of our policy.

14   Q    You're saying that you remember thinking about whether

15   No. 3 that we just read was part of the policy even though you

16   ignored it?

17   A    If I said "policy," I apologize.  I do not think what you

18   are sharing with me is a policy document.

19   Q    I understand that, sir.  Let me try to ask it in a better

20   way.  You just testified that you know that what's in No. 3

21   here about no more than 20 percent of coaching days, you just

22   told the jury that you know it is not a policy.

23   A    What you are sharing with me looks like some type of

24   guidance.

25   Q    You testified -- oh, it is a guidance?

L. Hinson - X

1    A     Yeah.

2    Q     Okay.

3    A     Or suggested.  But again, I don't know how CBDs coached to

4    it.  I just know at the end of the year what we were reviewed

5    upon was our field coaching time.  They never got into how many

6    interviews did you do, how many sick days, how many field

7    meets.  At the end of the year they would say, "You hit 120 of

8    150," or "you hit 150 of 150."  It was never you were

9    80 percent field coaching; 20 percent virtual.

10   Q   So you never considered whether the requirement of

11   20 percent -- no more than 20 percent of coaching days counting

12   toward the coaching without customer engagement, counting

13   toward total coaching, you just never considered whether that

14   was a requirement or not?

15   A    No.  Again, based upon how our performance reviews were

16   written to us, I don't ever recall it being a requirement.

17   Q   Mr. Hinson, you were once in a regional sales director

18   position?

19   A    That's correct.

20   Q    Is that currently at the same level known as CBD?

21   A    That's correct.

22   Q    And that's the same level position that Stephani DiNunzio

23   was in?

24   A    That's correct.

25   Q    And that's higher than a DSM?

L. Hinson - X

1    A    That is correct.

2    Q    Was there a time at AstraZeneca where you were demoted

3    from the regional sales director spot?

4    A    No.

5    Q    You weren't?

6    A    Never.  No.

7    Q    You weren't demoted to a lower position from a RSD spot?

8    A    No.  When I was a regional sales director, I had the

9    opportunity to move on to a rotational regional account

10   director, which actually was a promotion.  Then once that

11   rotational assignment was finished, they extended it for a

12   brief period of time.  Then an opening in Portland came up as a

13   district sales manager, and I volunteered to go into that role,

14   because I did want to get my family back to Portland.

15   Q    You've kept in touch with Suzanne Ivie for the last couple

16   of years?

17   A    I frequently check in with her to see how she is doing.

18   Q    So you email her?  Text her?

19   A    Yeah.  Call her.

20   Q    You've given Ms. Ivie some guidance in trying to find a

21   job?

22   A    I think she may have asked me if I would ever be a

23   reference.  I don't recall specifically.

24   Q    Do you know that Ms. Ivie falsely told companies that she

25   had not been fired?

L. Hinson - X

1   A    I'm unaware of what Ms. Ivie told any future employers.

2   Q    You agree that would be wrong to do?

3   A    To say that you weren't fired?

4   Q    If somebody asked you if you were fired in an employment

5   application, and you were fired, but you said no, do you agree

6   with me that's the wrong thing to do?

7   A    Sure.

8   Q    Do you believe that if Stephani DiNunzio had not become

9   your supervisor, you would have stayed with AstraZeneca?

10  A    I would agree with that assessment.

11  Q    And you called Stephani DiNunzio "horrible"?

12  A    One of the worst leaders I have worked for.  It was a

13  horrible five months that I had with her in 2018.

14  Q    And you called her a "horrible person"?

15  A    She is a horrible leader.

16  Q    And you left AstraZeneca with a bitter taste in your

17  mouth?

18  A    I did not want to leave AstraZeneca.  I thought I would

19  retire there for a very long time.  I was even a stockholder of

20  AstraZeneca up until just a few months ago.

21  Q    You agree with me that you left with a bitter taste in

22  your mouth?

23  A    How it was handled was -- it definitely put a scar on me.

24  Q    Okay.  Let's look at your -- take a look at your

25  deposition, page 130.  This is line 15 to 16.  I'll read in

L. Hinson - X

1  page 130, line 15.

2       "Certainly, you know, while I had a mutual consent, I

3  left with a bitter taste in my mouth."

4       Is that your testimony?

5  A    Yes.

6  Q    And that's one of the reasons why you decided to help

7  Suzanne Ivie with her case?

8  A    No.

9  Q    Take a look, sir, up at line 9.  Page 130, line 9.  This

10 was the question you were answering when you said, "I left with

11 a bitter taste in my mouth."  I will read from there.

12       "Why did you decide to assist by providing a

13 declaration?

14       "ANSWER:  My personal experience with Stephani, based

15 upon my track record, I thought I had a long history and a

16 track record of success, and I finished my career with one

17 horrible sales director.  Certain, you know, while I had mutual

18 consent, I left a bitter taste in my mouth."

19       Is that your testimony?

20 A    That's correct.

21 Q    You understand that Ms. Ivie is making a number of

22 allegations against Stephani DiNunzio in this case?

23 A    Yes.

24 Q    And you know that some of those are based on Ms. Ivie's

25 word against Ms. DiNunzio's?

L. Hinson - X

1  A    I'm not sure what her assertions are.  I have not listened

2  to any testimony.

3  Q    But you're testifying on behalf of Ms. Ivie, correct?

4  A    Yes.

5  Q    It was your decision to leave AstraZeneca?

6  A    That's an interesting question.  Yes.  It was ultimately

7  my decision to leave.

8  Q    You left in July of 2018?

9  A    That's correct.

10 Q    You didn't personally see or hear anything at AstraZeneca

11 after July of 2018?

12 A    No.

13 Q    You accepted a mutual consent package otherwise known as a

14 "severance"?

15 A    That's correct.

16 Q    You thought the mutual consent was fair and equitable?

17 A    I thought it was more than fair and equitable, based upon

18 my circumstances.

19 Q    Sure.  When you were offered the mutual consent, you were

20 offered a 30-day period of paid leave to consider whether you

21 wanted to accept that?

22 A    Let me qualify.  I was not offered a mutual consent from

23 HR.  Based upon my earlier discussion with Stephani DiNunzio,

24 she said, "Would you take a mutual consent?"  When I addressed

25 my situation with Karen Belknap with human resources a couple

L. Hinson - X

1  of days after Father's Day, Karen Belknap had asked, based upon

2  the things that I had outlined, that if I would take 30 days,

3  consider going into a different role and still being paid, and

4  at that time I said, "Let's end this conversation. I want to

5  take the severance package."

6  Q   But you understood that Karen was trying to help you find

7  a way to stay with AstraZeneca if you wanted to?

8  A   That is correct.

9  Q   After you decided to take the mutual consent, do you

10 remember Karen also helping you extend your end date of service

11 so that you would get a greater bonus?

12 A   Well, I remember when we were negotiating at the time, you

13 know, both myself and Mike Hartman wanted my end date to be

14 like June 30th, because this is, again, Father's Day. It is

15 the middle of June. Karen said, "Let's extend it into July.

16 Definitely that way you'll get health benefits."

17 Q   And you said like you felt they were rolling out the red

18 carpet for you when you left?

19 A   Yes, I do, because I think Karen realized how wrong they

20 were and how I was being treated.

21 Q   And you felt like at the time AstraZeneca was trying to

22 both help you stay with the company, if you wanted to, but also

23 give you more credit for your time to extend your health

24 benefits, correct?

25 A   I do. I think based upon the documentation I provided to

L. Hinson - ReD

1  Karen, she felt like I was unjustly treated.

2          MR. McCARTHY:  Objection.  Speculation, Judge.  Move

3  to strike.

4          THE COURT:  It will be stricken.  Move on, please.

5          MR. McCARTHY:  Nothing further, Your Honor.

6          THE COURT:  Thank you.  Redirect.

7          MS. CHAMBERS:  Just a few questions.

8                    REDIRECT EXAMINATION

9  BY MS. CHAMBERS:

10 Q    Mr. McCarthy talked about your performance.  Stephani

11 DiNunzio told you to go on a PIP or get after mutual consent,

12 right?

13 A    That's correct.

14 Q    Did you ever learn why you had to go on a PIP?

15 A    I did not.  It was never discussed with me.

16 Q    Mr. McCarthy asked about your 2017 performance review.

17 A    That's correct.

18 Q    When is the first time you saw 2017 performance review?

19 A    When Mr. McCarthy shared it with me approximately a year

20 ago.

21 Q    So your year 2017 performance review was never delivered

22 to you by Stephani DiNunzio?

23 A    No.

24 Q    And finally, you testified about the 80/20 split for

25 coaching and the fact that AstraZeneca, prior to

L. Hinson - ReX

1  Stephani DiNunzio, had implemented virtual coaching.  So is it

2  correct that AstraZeneca must have thought that there was at

3  least some value in virtual coaching even if it wasn't your

4  preference?

5          MR. McCARTHY:  Objection.  Calls for speculation.

6          MR. OSWALD:  He had 17 years of experience.

7          THE COURT:  Overruled.

8          THE WITNESS:  Absolutely.  I, again, recall speaking

9  to one of the commercial business directors who came up with

10  the idea.  Again, just because my opinion was I didn't want to

11  use them, that I believed in coaching a certain way, doesn't

12  mean that somebody else who wanted to maximize virtual field

13  coaching time, that their way wasn't effective as well.  I

14  mean, both of us can get to the end game.

15          MS. CHAMBERS:  Thank you.  No further questions.

16          THE COURT:  Thank you.

17                     RECROSS-EXAMINATION

18  BY MR. McCARTHY:

19  Q   Mr. Hinson, again, you agreed with me that you received

20  and you think you read the April 2018 email from Stephani

21  DiNunzio where she attached the written requirements for

22  coaching.

23  A   Well, again, as I said earlier, I don't believe those are

24  any type of a requirement.  It looks like it is just a

25  frequently asked question.

L. Hinson - ReX

1   Q    Sure.  My question was:  You recall that you think that

2   you received it and read it?

3   A    That is correct.

4   Q    You just didn't think it applied to you?

5   A    Well, based upon how our year-end reviews were done, they

6   only talked about total field coaching days.  They never

7   referenced that April email.

8   Q    You think the rule didn't apply to you?

9   A    Based upon how district sales managers were coached, what

10  was put in our year-end performance review.

11             MR. McCARTHY:  Nothing further.

12             MS. CHAMBERS:  Nothing further.

13             THE COURT:  Thank you, sir.

14             MS. CHAMBERS:  Ms. Ivie rests.

15             MS. TALCOTT:  Your Honor, the defense wants to put on

16  the record, although we have agreed to hear argument this

17  afternoon, that we are moving for a judgment as a matter of law

18  on some of Ms. Ivie's claims.

19             THE COURT:  Okay.  Thank you.

20             MS. TALCOTT:  And we will defer all argument,

21  Your Honor; is that correct?

22             THE COURT:  Yes.  We will defer all argument until

23  we've recessed this afternoon.

24             Thank you.

25             MR. McCARTHY:  AstraZeneca calls Genie Hamilton.

G. Hamilton - D

1      THE COURT:  Just hold there for a moment, ma'am.

2      Okay.  Ma'am, please come have a seat.  You may

3  remove your mask if you are comfortable, and we will swear you.

4      (The witness was duly sworn.)

5      THE CLERK:  Thank you.  Would you please state your

6  name for the record, spelling your last.

7      THE WITNESS:  It is Genie Yu Hamilton.  Genie is

8  G-E-N-I-E; middle name spelled Y-U; last name H-A-M-I-L-T-O-N.

9                    DIRECT EXAMINATION

10 BY MR. McCARTHY:

11 Q    Good afternoon, Ms. Hamilton.

12 A    Hi.

13 Q    Thanks for coming.  Introduce yourself to the jury and

14 tell them a little bit about where you are from and what you

15 do.

16 A    Sure.  I'm Genie Hamilton.  I live in Parker, Colorado,

17 which is a south suburb.  I've worked for AstraZeneca the last

18 seven years.  I started as a sales professional with Diabetes.

19 Now I am a sales manager, as of 2016.  I'm a mom of two kids, a

20 13-year-old girl and an almost 11-year-old boy, and I'm a

21 married to a gentleman named Jason.

22 Q    Thank you.

23      Do you know the plaintiff, Suzanne Ivie?

24 A    Yes, I do.

25 Q    Are you a former colleague of hers?

G. Hamilton - D

1    A    Yes, I am.

2    Q    Were you a district sales manager like Ms. Ivie was?

3    A    Correct.

4    Q    During your time as a district sales manager starting in

5    2016, did you report to Stephani DiNunzio starting in 2017?

6    A    Starting in, I think late 2016, is when I started to

7    report to Stephani DiNunzio.

8    Q    Stephani DiNunzio was a new supervisor for you at that

9    time?

10   A    Correct.

11   Q    You describe initially what it was like working with

12   Stephani?

13   A    I think that we didn't necessarily start off on the right

14   foot.  It was just really difficult to transition at first on

15   getting to understand how she held the standards at

16   AstraZeneca.  But it became very clear that she was very much

17   holding all of us accountable to the standards of the

18   organization when it comes to performance, behaviors, and

19   things of that nature.

20   Q    So was her approach different in some ways from the prior

21   manager you had?

22   A    I would say yes, as far as the approach or the feeling,

23   because she was newer and didn't know anything about me when

24   she became our sales leader, whereas the previous leader had

25   hired me.

G. Hamilton - D

1   Q    So that's how you found the first period of time with her.

2   Did things change going forward after that?

3   A    Yes.  I think at first, she was asking me questions like I

4   need to be able to coach you.  She wasn't sure if I was going

5   to be coachable.  Then upon having further conversations, I was

6   definitely embraced to becoming as best of a sales leader as I

7   could be and leaned into the guidance that I was being given,

8   because I knew the intent was to make things better.  Sometimes

9   she would share feedback with me that I didn't always like, but

10  I knew the intent was to make a better leader and to serve my

11  team better, and so I leaned into it.

12  Q    Do you feel that has happened over time; that you've

13  improved?

14  A    Yes.  Definitely.  The performance of the team I was

15  leading also improved over the time I have been working with

16  her.

17  Q    I would like to talk to you a little bit about coaching,

18  which the jury has heard a lot about, but not so much from

19  those who have actually done it.  I want to ask you to just

20  describe for me, when you do coaching in the field with a sales

21  rep, what do you do?

22  A    So when I'm coaching in the field, I tend to prepare for

23  the day based on previous interactions with the sales

24  professional, trying to look at where our conversation left off

25  and what we aligned on as their goals for this day.  I look at

G. Hamilton - D

1    performance, to get a feel for that, and the customers that we

2    are going to be calling on that day.  We start our day with a

3    morning conversation typically, unless we have an appointment

4    with a doctor or with an office.  We have a conversation

5    aligning about what we are trying to accomplish during our time

6    together, which customers we are going to meet, what we

7    anticipate, and then making time for a meeting so that we can

8    debrief between customer interactions as well as on a broader

9    scale of the business.  That's typically what happens.  Then we

10   go see customers during the day; then we stop and debrief.  We

11   prepare for the next call; then stop and debrief, until the

12   end.

13   Q    You mentioned the part where you see customers during the

14   day.  What's that like and what are you looking for when you

15   are going in to see the customer with the sales rep?

16   A    So we have a conversation before we see the customer in

17   terms of what are our objectives that we're trying to

18   accomplish, what we're trying to anticipate, and we plan out

19   kind of an approach of what we hope to learn, and then I'm

20   there to observe and watch them execute on it.

21        I talk with them about whether or not I'll be

22   participating in the call beforehand, whether I will serve as a

23   partner in sales so that I can potentially model for them, or

24   if the time frame is not going to allow for that.

25        Then I watch their interactions and I participate.

G. Hamilton - D

1   Then I observe the doctors and the staff that they talk to and
2   then might suggest things along the way.  Then we complete the
3   call and go outside or in the car or to a coffee place or
4   somewhere to discuss and debrief what happened.
5   Q    When you are giving them feedback, is your feedback based
6   on your personal observation looking -- seeing and hearing
7   them -- seeing and hearing the doctor?
8   A    Yes.  I tend to ask them for their own self-reflection
9   based on my own observations first.  Then if I notice that they
10  didn't see what I saw, then I'll provide my observations in
11  terms of verbal observations as well as body language of either
12  themselves on what they did or what their customers did and
13  opportunities missed and strengths that they did well.
14  Q    Can you think of an example of the kind of feedback that
15  you've provided to a sales rep relationship based on seeing and
16  hearing them and the doctor in the doctor's office?
17  A    Sure.  It's like what we do all the time.  I would say
18  that one that sticks out in my mind is that the sales
19  professional went through the sales call and did a lot of the
20  parts of the call and closed the doctor on the business, but
21  they didn't notice that the doctor was trying to move away
22  during the interaction, and they were backing up, because they
23  were uncomfortable in the conversation.  They didn't see that,
24  and so that was something that I had a conversation with them
25  after the call in terms of their influence and their

G. Hamilton - D

1    effectiveness with that customer.  While they may have said,

2    "Yes, I'm going write this product for the patient," his body

3    language didn't signal that.  Then I would ask for their

4    reflection on if they truly believed that they influenced the

5    business.

6    Q    And the feedback that you just described is feedback that

7    you could not have given if you were not there in person.  Is

8    that fair?

9    A    Correct.  I would not have been able to see the body

10   language of the customer, and based on the situation, the sales

11   professional was unaware of their behaviors and their

12   surroundings.

13   Q    Do you have an understanding of around 2017 whether

14   AstraZeneca sent around requirements on how much of coaching

15   should be with customer engagement versus without?

16   A    I believe -- we always had a coaching requirement from

17   when I started, even with Mike Roth as my leader.  Then I think

18   we increased the number of days.  At some point, it may have

19   been in 2017 from like 140 to 150 per year as far as in-person

20   coaching days, where I think at least 80 percent of those days

21   we were expected to be in the field with the sales

22   professional, and the other 20 percent -- there was a variety

23   of categories.  We were supposed to categorize them in our CRM

24   system called Veeva by marking how we spent our other times of

25   the day.

G. Hamilton - D

1    Q    I'm showing you Defendant's Exhibit 522.  Do you happen to

2    recognize that?

3    A    Yes.  That was the document that made it very clear when

4    we needed to start to mark the days in Veeva, because previous

5    to this we would just do coaching reports, and that would feed

6    into our coaching execution.  But with this document, it was

7    clear that we needed to mark how we spent every single day.

8    Q    And I'm showing you an excerpt here of what percentage of

9    the total days should be under the new category, coaching

10   without customer engagement, and it says, "Coaching without

11   customer engagement and business development both count towards

12   total coaching days, but combined they should not equal more

13   than 20 percent of your total coaching days."

14             Do you see that?

15   A    Correct.

16   Q    Is that consistent with your understanding of the

17   requirements for coaching during your time as a DSM?

18   A    Correct.  That was my understanding.  And if there was

19   going to be any exceptions to that based on your market, that

20   would be a conversation that you would have with your sales

21   leader on why you wouldn't be able to reach that for

22   extenuating circumstances.  Then that would be documented and

23   approved.

24   Q    Switching gears a little bit, do you recall being

25   interviewed by HR and compliance in connection with an

G. Hamilton - D

1    investigation regarding Stephani DiNunzio?

2    A    Yes, I remember.

3    Q    And you recall someone had brought certain allegations

4    about statements they alleged Ms. DiNunzio had made?

5    A    I mean, I recall I had a conversation.  I don't recall all

6    of the details.

7    Q    Do you recall questions about whether Ms. DiNunzio had

8    made comments -- derogatory comments about Ms. Ivie's age,

9    suggesting that using the nickname "Benatar," for example?

10   A    I believe that was included in the questions I was asked.

11   Q    Do you recall being asked questions about whether

12   Ms. DiNunzio had spoken about an "old bus" or a "new bus"?

13   A    I do remember that conversation.

14   Q    Do you have any recollection of Ms. DiNunzio ever making

15   any comments at all about Ms. Ivie's age?

16   A    No, I do not.

17   Q    Do you recall Ms. DiNunzio speaking about "old pharma" and

18   "new pharma"?

19   A    I do.

20   Q    What was your understanding of that?

21   A    We were having -- we were talking about the evolution of

22   sales, and we were talking about how we as sales professionals

23   need to have a growth mindset and evolve as our marketplaces

24   are evolving to stay relevant so that we can have the level of

25   influence that we do.  So some of the techniques that we used

G. Hamilton - D

1   for that sell when maybe some of us first started -- for myself

2   it was in the early 2000s -- it looked different in terms of

3   where we needed to focus our efforts and selling with -- I

4   guess opening with insights was the more relevant technique

5   that was incorporated into our AZ selling framework and how we

6   needed to shift and help our sales professionals grow into our

7   AZ selling framework style of selling because that's what we

8   understood was now going to have influence in the business and

9   with our customers.

10  Q    Do you recall also being asked some questions in that

11  investigation about some allegations that Ms. DiNunzio had

12  given off-label direction?

13  A    I remember being asked.

14  Q    And some of those questions related to the drug DALIRESP?

15  A    Yes.  Some of the questions were about DALIRESP.

16  Q    And in your experience in reporting to Stephani DiNunzio,

17  did you ever witness Stephani DiNunzio give any direction to

18  promote off-label?

19  A    No, I do not.

20  Q    Do you feel comfortable that you and the sales

21  representatives you work with understand AstraZeneca's policy

22  with respect to off-label promotion?

23  A    I do.  We have regular compliance training.

24  Q    And what's your understanding in general about whether

25  off-label promotion is permitted at AstraZeneca?

G. Hamilton - X

1  A    Off-label promotion is prohibited.

2         MR. McCARTHY:  Thanks.  No further questions.

3         THE COURT:  Cross.

4                    CROSS-EXAMINATION

5  BY MS. CHAMBERS:

6  Q    Ms. Hamilton, you are still employed at AstraZeneca,

7  right?

8  A    Correct.

9  Q    And AstraZeneca is paying your salary right now?

10 A    Correct.

11 Q    And it is paying you to be here today, right?

12 A    Correct.

13 Q    And it paid for your flight up here to testify?

14 A    Yes.

15 Q    And you intend on remaining at the company, right?

16 A    Yes.

17 Q    You were never Ms. Ivie's supervisor, right?

18 A    Correct.

19 Q    And you personally never raised any issues regarding her

20 performance?

21 A    Regarding whose performance?

22 Q    Regarding Suzanne's performance.

23 A    Correct.  I never raised any issues.

24 Q    And you knew of other DSMs who didn't reach the objectives

25 for field coaching, right?

G. Hamilton - X

1    A    I do not.

2    Q    I'm sorry.  So you knew that other DSMs didn't always

3    reach the objectives for field coaching, right?

4    A    I do not know of other DSMs not reaching their coaching

5    objectives.  I just paid attention to mine, and we regularly

6    would have updates on coaching execution, and I would mostly

7    pay attention to mine.  Then there were -- sometimes there were

8    anomalies.

9    Q    Okay.  Do you remember taking a deposition in this matter?

10   A    Yes.

11   Q    In August 2020?

12   A    Correct.

13   Q    So I just gave you a copy of your deposition.  Could you

14   go to page 18, line 19.

15   A    Page 18 has a bunch of, like, words.

16   Q    Okay.

17   A    Oh, these little mini pages?

18   Q    Yes.

19   A    Yes.

20   Q    Okay.  So starting there, it says:

21           "QUESTION:  Are you aware of any DSMs not reaching

22   their objectives for coaching days?"

23   A    Yes.

24   Q           "ANSWER:  There is an execution report that shows if

25   people are meeting obligation.

1    "QUESTION:  In reviewing that, did you find that some

2  people were not on track to meet their goals?

3    "ANSWER:  Yes."

4    Did I read that correctly?

5  A    Yes.

6  Q    Okay.  Thank you.  You can set that aside.  But you didn't

7  know of anyone else other than Ms. Ivie who was disciplined for

8  not meeting required coaching days, right?

9  A    I didn't know of anyone being disciplined for not meeting

10  coaching days in general.  I didn't know Ms. Ivie was.

11  Q    And when you learned that Suzanne was separated from

12  AstraZeneca, you sent her a text message, an Emoji of a crying

13  face, right?

14  A    Uh-huh.

15  Q    You said you did that because you care about Suzanne as

16  well as other people on your team?

17  A    Yes.

18  Q    And were you not part of the decision to terminate

19  Suzanne, correct?

20  A    Correct.

21    MS. CHAMBERS:  No further questions.

22                        REDIRECT EXAMINATION

23  BY MR. McCARTHY:

24  Q    Ms. Hamilton, you were just asked about a document -- a

25  type of document that you reviewed called -- I think it is

G. Hamilton - ReD

1  called a monthly coaching execution report.

2          Do you recall that?

3  A    Yes.

4  Q    Is that sort of a monthly snapshot of where people are in

5  terms of being on track to meet their coaching goals for the

6  year?

7  A    Correct.  So we would get it in -- the format would be

8  automatically pushed through to us from the company, and then

9  Stephani would send out an email highlighting it periodically.

10 Q    When you said that you could see whether people were on

11 track, you mean if you sort of annualized where they were, are

12 they going to meet the goal at the end of the year.  Is that

13 sort of what you were referring to?

14 A    Correct.  So typically I would say to hit 150 days, I

15 think mentally I remember -- I was thinking to myself that I

16 needed to get about 12 days of coaching in per month to hit the

17 120.  I don't even know if my math is right, or 130 to get

18 80 percent of those.

19 Q    And you saw some people who were close to being on track

20 but not quite on track?

21 A    Correct.

22 Q    And do you recall seeing in that report anyone who was not

23 close to being on track?

24 A    Yes.

25 Q    And who was that?

G. Hamilton - ReD

1   A    It was Suzanne Ivie's name, at least on the report.

2             MR. McCARTHY:  Thanks.  No further questions.

3                      RECROSS-EXAMINATION

4   BY MS. CHAMBERS:

5   Q    Ms. Hamilton, is it your testimony that it was only

6   Suzanne Ivie who it was not on track to meet all of the

7   coaching days?

8   A    No.  I'm saying more like when there was somebody that was

9   sticking out as far as the report that I would notice that they

10  weren't on track, it was Suzanne.  And I didn't pay that close

11  of attention, because most of them were closer.

12  Q    But you didn't say that in your deposition that we just

13  read, right?  You didn't mention Suzanne sticking out?

14  A    I did in my deposition mention that Suzanne stuck out --

15  Q    Where is that?

16  A    -- from what I remember.  I think it was the last

17  question.

18  Q    I just want to confirm, to save the jurors' time, that it

19  is correct that what I read you from your deposition that said:

20             "QUESTION:  In reviewing that, you did find that some

21  people were not on track to meet their goals?

22             "ANSWER:  Yes."

23             Is that right?

24  A    Yes.

25             MS. CHAMBERS:  No further questions.

G. Hamilton - Further

1          THE WITNESS:  I just --

2          MR. McCARTHY:  Maybe I can help.

3                    FURTHER EXAMINATION

4    BY MR. McCARTHY:

5    Q    Ms. Hamilton, would it refresh your recollection if we

6    look at the page of deposition that you are thinking of?

7    A    Yes.

8    Q    Okay.  So it is page 26 -- apologies.  I got that wrong.

9    Page 41, up in the right-hand corner.  You can read it to

10   yourself.  But if you'd start with -- just let me know when you

11   are there.  Start on page 41, line 19.  Then read into page 42.

12   A    You would like me to read it out loud?

13   Q    Sure, starting at line 19.

14   A    So the question was:

15             "Okay.  And did you testify you recalled some DSMs in

16   certain reports who were on track to meet the requirement and

17   some who were not?

18             "ANSWER:  Yes.

19             "QUESTION:  Okay.  And you recall some individuals

20   who were close to but not on track?

21             "ANSWER:  Yes.

22             "QUESTION:  Okay.  Do you recall anyone who was not

23   close to being on track?

24             "ANSWER:  Yes.

25             "QUESTION:  And who was that?

G. Hamilton - Further

1          "ANSWER:  Suzanne Ivie."

2    Q    Does that refresh your recollection from the deposition?

3    A    That's the conversation that I remember.

4          MR. McCARTHY:  Thank you.  Nothing further.

5          THE COURT:  Anything further?

6                    FURTHER EXAMINATION

7    BY MS. CHAMBERS:

8    Q    Just one question.  I just want to confirm that you were

9    never in charge of evaluating Suzanne Ivie's coaching days?

10   A    Correct.

11         MS. CHAMBERS:  Nothing further.

12         THE COURT:  May this witness be excused?

13         MR. McCARTHY:  Yes, Judge.

14         THE COURT:  Thank you very much.

15         Call your next witness, please.

16         MR. McCARTHY:  AstraZeneca calls Craig Barnes.

17         THE COURT:  Good afternoon, Mr. Barnes.  Please have

18   a seat.  You may remove your mask if you are comfortable and we

19   will swear you.

20         (The witness was duly sworn.)

21         THE CLERK:  Thank you.  Would you please state your

22   name for the record, spelling your last.

23         THE WITNESS:  Craig Morris Barnes.  B-A-R-N-E-S.

24

25

C. Barnes - D

DIRECT EXAMINATION

BY MR. McCARTHY:

1
2
3   Q    Good afternoon, Mr. Barnes.  Thanks for coming.

4   A    Yes.

5   Q    Would you just introduce yourself to the jury.  Tell them

6   who you are and where you are from.

7   A    Craig Barnes.  From Salt Lake City, Utah, and I have been

8   with AstraZeneca 20 years -- 21 years almost.  I am a father of

9   four, and my oldest is 18.  Then our youngest two are twins,

10  and there is a reason why we stopped at twins.  I highly

11  recommend not going the twin route, but that's just me.  Then

12  we have a 15-year-old.

13  Q    Do you know the plaintiff, Suzanne Ivie?

14  A    I do.

15  Q    How do you know her?

16  A    She was my district manager, I think, a total of 40

17  months.  There was a little bit of break in between.  But I

18  think between the time periods, I think I added it up, and it

19  was 40 months.

20  Q    How many other managers have you had during your time at

21  AstraZeneca, if you could estimate?

22  A    As I was looking at that, a total of eleven.

23  Q    I would like to talk to you a little bit about coaching.

24  Now, we just heard from a district sales manager who does

25  coaching.  Now, do you do the coaching, or are you on the

C. Barnes - D

1    receiving end of coaching?

2    A    I'm on the receiving end of coaching.

3    Q    Is that always a pleasant thing?

4    A    Typically, no.

5    Q    Why do you say that?

6    A    Well, I shouldn't say that.  Sometimes it's great.

7    Sometimes it -- as salespeople, sometimes we have exaggerated

8    egos of ourselves, and sometimes when you hear things that

9    maybe you don't necessarily agree with, sometimes it hurts a

10   little bit, but most of the time it turns out being the truth.

11   Q    If we are being tactful, is that constructive feedback?

12   A    Yes, constructive feedback.

13   Q    I want to ask you about some of that constructive feedback

14   that you've gotten.  It would be great if you could help us

15   paint a picture of what it's like to be in that -- for example,

16   you go into a doctor's office, right, and are you dealing with

17   busy healthcare professionals there?

18   A    Yes.  So Utah is a little different in comparison to like

19   the Portland area and even the Seattle area.  Our access to

20   providers is still pretty good, and it's really typically a

21   majority of the time not challenging to be able to see a doctor

22   and to have a conversation with a doctor.  So typically a day

23   would be seeing maybe three to four doctors.  I was always one

24   of those individuals who did a lot of lunches, so because of

25   the lunches, you felt you could get a little bit more time with

C. Barnes - D

1    the doctors, with the providers, and obviously that would be

2    during the lunch hour.

3    Q    Sure.

4    A    But, yeah, when your manager is there, it creates a little

5    bit of a different dynamic.  There are some managers that

6    contribute to the conversation when you're having those

7    conversations.  There are some managers that do not.  Either

8    way, obviously me being the rep, it's my responsibility to

9    carry that conversation.  But the managers -- yeah,

10   typically -- doctors, they see how many reps a day -- they are

11   used to seeing managers.

12   Q    Mr. Barnes, if you could -- can you think of an example of

13   the kind of feedback that you've gotten from the manager when

14   the manager is there in the field with you, observing you,

15   maybe talks to you afterwards about what he or she saw and

16   heard.  Could you give an example to the jury of something like

17   that?

18   A    Yes.  So one that stands out pretty easy is I had a

19   manager that would come in from Denver, Colorado -- this was

20   when I was on a specialty team.  So I would have a manager come

21   in, and she was one of those individuals that she truly desired

22   what was best for you as a representative.  For example, when I

23   moved over to this new position, she was the one -- even though

24   she is not with AstraZeneca anymore, I would reach out to her,

25   and she kind of helped me prepare for that role -- neither here

1   nor there.  She really pushed me hard.  I had been calling on

2   these particular providers for -- at this time -- probably

3   eight years.  So I had some pretty good relationships with the

4   doctors.

5           She always pushed me that I need to be really a

6   little bit more professional instead of going in and having a

7   little chit-chat.  She really tried to push me to really set

8   the expectation as a respect for their time that I would be

9   taking and then just kind of what I wanted to accomplish when I

10  was in the office.  So the doctor would kind of know what the

11  objective was of the call.  Then it kind of created a little

12  bit more of a flow.  Then after every call, when we would go

13  back to the car, she would ask, "How did it go?"  Sometimes I

14  was good at it; sometimes I was not.

15  Q    Was that feedback always enjoyable to hear?

16  A    No.

17  Q    You're familiar with a field coaching report?

18  A    Yes.

19  Q    What is a field coaching report?

20  A    A field coaching report is -- now -- and back in the day,

21  probably ten-plus years ago, it was a physical document.  It is

22  an electronic document where they go in and give you feedback

23  from the day that they spent.  Many times they would include

24  very specific examples, and so "Dr. So & So said this and this;

25  this is how you responded," or "this particular doctor, working

C. Barnes - D

1   on what we were working on with me, you didn't set up the

2   call," and then would point out the difference between that

3   call that maybe didn't go as well versus the other call that

4   went well when I set up the call.

5   Q    I want to show you Defense Exhibit 555.  Since it is an

6   Excel spreadsheet, I'm just showing a native version here for

7   the record.

8            Do you recognize generally from the format of this

9   what it is?

10  A    Yes.  Ours doesn't appear in a spreadsheet.  It is more of

11  a bulleted-type format.

12  Q    And if I tell you that this is an excerpt from some of the

13  field coaching report information for you, does that sound

14  right to you?

15  A    I see the bullet point as you are going down.

16  Q    We are looking right now at line 5.  I'll to my best to

17  make it bigger.  So line 5 says, "Suzanne Ivie" and "Craig

18  Barnes."  Then there is a column for "Employee Ivie," and then

19  it says "KTNJ400."

20           Is that you?

21  A    Yes.

22  Q    It says, "Review date, 12-15-16."

23  A    Correct.

24  Q    Okay.  Then if we scroll over to where the content is

25  here, it looks like there are three columns where there is

C. Barnes - D

1    commentary here.  There is one for performance assessment, one

2    for field ride summary and next steps, and the third one for

3    manager comments on skill development.

4              Do you see that?

5    A    Yes.

6    Q    So this looks like it reflects a field coaching report

7    that Suzanne Ivie wrote for you.

8              Is that fair?

9    A    Right.

10   Q    Can you tell from the field ride summary and next steps,

11   just looking at it, can you tell whether Suzanne Ivie was

12   actually with you in the field?

13   A    Yeah.  Can I take a moment to read it?

14   Q    Sure.  Take your time.

15   A    Okay.

16   Q    The question is:  Can you tell from reading that, does it

17   appear to you that she was in the field with you or not?

18   A    So as I'm looking at this, a majority of the time when I

19   would meet with Suzanne, a priority discussion was performance.

20   And if you look at this, obviously we have performance reports.

21   And as you can see highlighted here, especially under

22   "performance assessment," obviously that's very specific

23   information we can get from the performance reports.

24             The "field ride summary and next steps," that would

25   be information obviously me sharing kind of where they are at,

1   and I am targeting on those particular providers.

2   Q    The column for "field ride summary" doesn't describe any

3   personal interactions that she observed between you and the

4   providers?

5   A    That's correct.

6   Q    Can you tell the jury in general what Suzanne's approach

7   was in terms of visiting you in person in the field versus over

8   the phone?

9   A    So a majority of the time, when I met with Suzanne, it

10  would be at a corner bakery or a restaurant or an

11  establishment.  We would spend two to three hours.  A priority

12  of that conversation was always performance, as you can see.

13               Can they see this?

14  Q    I believe so.  The print may be small, but they can see

15  it.

16  A    A priority discussion was always performance, and that was

17  the discussion.  The majority of the discussion was around

18  performance.  Many times it was discussing the different

19  reports that we had available to us and/or it could also

20  include maybe where different doctors are on some of those

21  reports -- whether they're using the product, whether they're

22  not using the product, and maybe even some things that myself

23  or my counterpart are trying to do to help them recognize the

24  benefit of the product for the patient.

25  Q    Can you recall how many times Ms. Ivie actually came to a

C. Barnes - D

1   doctor's office with you?

2   A    So I was trying to really think about that.  Again, you

3   would have to look at the coaching forms, but nine times out of

4   ten we would just meet at an establishment.  The only reason I

5   remember this is -- it's actually kind of a funny story.  We

6   got stuck in St. George -- and Suzanne will remember this -- on

7   an airplane that was 123-degrees.  She flew into St. George,

8   and we got stuck on the tarmac in a 123 degree airplane for

9   about 45 minutes, which was not a good experience.  I can

10  remember that.

11          I can remember one other time when it was a very

12  small elevator in the office building.  Suzanne didn't want to

13  get in that elevator, and so we went around the other way,

14  which is kind of a funny story.  I can remember one other time.

15  Specifically I can remember three times when I had a chance to

16  meet doctors with Suzanne.

17  Q    Let's take a look back at this spreadsheet.  I promise we

18  won't look at it much longer.  Now, line 8 refers to a

19  different manager, right, Deanna Olson?

20  A    Correct.

21  Q    When was Deanna your manager?

22  A    So Deanna was my manager when I left Suzanne's team for a

23  respiratory specialty team that they created that we'd call on

24  specialty docs -- allergists, pulmonologists -- and not so much

25  on family medicine docs.  So that team lasted a year and a

C. Barnes - D

1    half.  That was not the original goal, but nationally they

2    dissolved that particular team.  So I was the only one selected

3    in Utah to be on that team.  My manager, Deanna Olson, was out

4    of Denver, Colorado.

5    Q    She was in Denver; you were in Salt Lake?

6    A    Denver.  I was in Salt Lake.  At that time I had just the

7    specialists in the state of Utah.

8    Q    As compared to when Suzanne Ivie was your manager, were

9    you in Salt Lake, and she was where?

10   A    So I was in Salt Lake, and Suzanne at the time was in

11   Lehi, which was about 20 miles from where I lived.

12   Q    Closer than Denver?

13   A    Yes.

14   Q    How often did Deanna visit you from Denver?

15   A    Deanna would visit me from Denver on a very regular basis

16   every four weeks.  Deanna was the one who kind of -- so I have

17   a Mountain Dew drinking problem, and I had to drink even more

18   Mountain Dew when I was with Deanna Olson just to try to keep

19   up with her.  But yes, she was in town, and it was for two days

20   every four weeks.

21   Q    So she would stay overnight in the Salt Lake area?

22   A    Yes.

23   Q    Let's look at this now.  There is a lot here.  We are not

24   going to read all of this.  This says, "Field visit summary and

25   next steps."  So I want to try to highlight this.  It says,

C. Barnes - D

1    "When you opened the call, you caught yourself asking a

2    closed-ended question and then corrected yourself in the moment

3    by restating as HGQ, which led to her opening up on her

4    thinking.  When we debriefed in the car, we talked about the

5    time that it took to write down what you committed to the

6    notebook.  We then discussed that while you may have initially

7    started off with a close-ended question, you immediately

8    changed it in the moment, because of our pre-call plan goal and

9    how that was a great self-awareness moment."

10           Is this feedback that Ms. Olson gave you?

11   A    Yes.  In fact, that was many times the feedback in which I

12   caught myself, because I didn't want to have the conversation

13   and that I didn't set out my goal.

14   Q    A question about the process here.  You would receive

15   these field coaching reports through some kind of electronic

16   system?

17   A    Yes.

18   Q    Was there a requirement for you to acknowledge having

19   received and reviewed them?

20   A    Yes.

21   Q    Just a second.  As to that process of receiving and

22   acknowledging in the system, did your practice with Ms. Ivie

23   differ at all from your practice with other district sales

24   managers?

25   A    Each district sales manager is a little different.

C. Barnes - D

1   Sometimes they would text you and say, "Hey, I just submitted a

2   field coaching form, if you could go out and approve."  That

3   was not always the case with Ms. Ivie.  But any time we would

4   go and obviously see providers, yeah, I would go out and

5   acknowledge that.  Because the way I always looked at it, if

6   I'm seeing providers, I would like to see what I am doing well

7   and maybe what I am not doing well.  I can see how I am doing

8   on a performance by looking at the reports.

9   Q    Were there times when you received an FCR from Ms. Ivie

10  when she had not been in the field with you?

11  A    Yeah.  When we would meet up, like at the Corner Bakery,

12  yes.

13  Q    And were there times that you did not acknowledge those in

14  the system?

15  A    Yes.

16  Q    Why was that?

17  A    I just -- the way I looked at it, it wasn't really a true

18  field coaching opportunity.

19  Q    If we take a look back at line 5, that was the field

20  coaching excerpt from Ms. Ivie.  I am going to scroll us over

21  to a column.  This is column AA -- well, column Z says, "I

22  confirm that I reviewed this form."

23        Is that where the sales rep confirms or acknowledges

24  they reviewed it, to your knowledge?

25  A    Again, I'm not used to the spreadsheet, but kind of the

1    bullet point, the little radius button we would click on, yes,

2    that is the wording.

3    Q    Then the next column says, "Confirmed

4    representative/employee PRID."

5    A    Correct.

6    Q    Whose ID would you expect to appear there from your

7    experience?

8    A    That would be myself.

9    Q    The one in here says KRFT972.  Is that yours?

10   A    No, it is not.

11   Q    Do you know who that is?

12   A    I do not.

13            MR. McCARTHY:  Nothing further.

14                     CROSS-EXAMINATION

15   BY MS. CHAMBERS:

16   Q    So Suzanne was your supervisor for about 40 months; is

17   that right?

18   A    Yes.

19   Q    And you performed successfully under her supervision,

20   right?

21   A    Yes.  I really -- and you can go back and look.  I was

22   very successful before Suzanne Ivie; I was very successful

23   during Suzanne Ivie; and I continue to be successful after

24   Suzanne Ivie.  I'm one of those individuals that takes my

25   career serious.  In fact, in this new role that I have been in

1  since 2017, out of 150 territories, I am currently ranking

2  No. 4 in the nation.

3  Q    That's impressive.  In the defense exhibit that we just

4  looked at with Mr. McCarthy, Suzanne notes that you were top

5  five in the region and top five nationally, right?

6  A    Right.

7  Q    So obviously a stronger performer?

8  A    You don't survive in pharma anymore if you are not a

9  strong performer.

10  Q    Yes, I understand.  Suzanne issued you strong performance

11  reviews, right?

12  A    Yes.

13  Q    And when you worked with Suzanne, she promoted you twice,

14  right?

15  A    Well, as far as she promoted me, the way that works -- for

16  example, when I went to the biologic respiratory team, it was

17  my choice to be able to go from that promotion.

18  Q    Okay.

19  A    That was something I chose to do.  Obviously I wouldn't

20  choose to do it if I did not have the performance numbers to

21  justify that.  But yes, that is something I was promoted, but

22  you aren't just selected.  You have to interview.  Other people

23  were interviewed even outside of AstraZeneca.  So the hiring

24  manager would interview you and then determine if you were the

25  candidate to be selected.

C. Barnes - X

1   Q    Certainly.  You earned your promotions, right?

2   A    You earned the right to interview.

3   Q    But my question is just that those promotions occurred

4   when Suzanne was your supervisor?

5   A    Correct.

6   Q    You would agree that managers often coach and supervise

7   their teams differently, right?

8   A    Yeah.  Everyone has their different style, just like every

9   rep would be different.

10  Q    Right.  And that was your experience at AstraZeneca?

11  A    Yes.

12  Q    Okay.  And you never raised any concerns about Suzanne's

13  performance or her coaching prior to 2019, right?

14  A    So my concern in my job and my role was my territory.  And

15  many times, with the expectation of performance, that is kind

16  of where I focused.  I didn't worry about focusing or worrying

17  about the district.  That was not my role.  I think an

18  advantage that comes from that, you'll be successful if you can

19  focus on what you control, which is my territory.  I can't

20  control the district.

21  Q    So is that, no, that you never raised concerns about

22  Suzanne's performance or issues with her field coaching; is

23  that right?

24  A    No.  I might have said something, like this Deanna Olson,

25  she came in for two days.  I might have jokingly said, "I'm not

C. Barnes - X

1    used to that anymore," when I picked her up in between.  I also

2    had the privilege of having another individual by the name of

3    Linda Craig.  And when she did field ride-alongs, it was also

4    two days back-to-back.  And those are tiring.  They are hard.

5    It is hard to be on stage two days back-to-back with your

6    customers.

7    Q    I understand.  Could you take a look at your deposition.

8    It should be there on the stand.  If you could turn to page 13.

9    I'm looking at line 5.

10          That is the deposition -- your sworn deposition that

11   you took in this matter on August 27, 2020, right?

12   A    Correct.

13   Q          "QUESTION:  Did you ever talk to another supervisor

14   about any concerns you had about Ms. Ivie's performance?

15          "ANSWER:  No."

16          Did I read that correctly?

17   A    Yes.

18   Q    Now, can we move to page 14.

19   A    Yeah.  But I think it is important that if you look

20   further back in this deposition, I made the exact comment that

21   I might have told a manager that this is something that I'm not

22   used to.  In fact, I know it is in the deposition further back.

23   Q    But my question was if you raised any concerns to any

24   other supervisor about Suzanne's performance or coaching, and

25   the answer is no?

C. Barnes - X

1  A    The answer is no.  My response is did I bring that to

2  anyone's attention in human resources?  The answer is also no,

3  because that's not my responsibility.

4  Q    I understand.  But you flew in here today from Utah,

5  right, to testify about Ms. Ivie's field coaching?

6  A    Right.

7  Q    And AstraZeneca paid for your flight here?

8  A    I hope so.

9  Q    And you're currently employed at AstraZeneca?

10  A    Yes.

11  Q    And you expect to continue your career with AstraZeneca?

12  A    I hope so.

13  Q    Okay.  You can put that down.  Thank you.

14        You also stated previously that Suzanne was a good

15  supervisor, right?

16  A    Suzanne was a good supervisor, yeah.

17  Q    And when she was your supervisor, your team attended two

18  circles of excellence, right?

19  A    That's correct.

20  Q    And you were not part of the decision to terminate

21  Suzanne?

22  A    No.  In fact, I don't remember the exact date.  But I do

23  know that when I left the team was September of 2017.

24  Q    And you never spoke to Stephani DiNunzio about

25  Suzanne Ivie, right?

C. Barnes - ReD

1  A    No.  I haven't had -- I never had a conversation with

2  Stephani DiNunzio.

3  Q    And the defendant's exhibit that we looked at with

4  Mr. McCarthy, you never provided that to anyone -- to Stephani

5  DiNunzio or Karen Belknap or Dawn Ceaser?

6  A    I don't know who Karen Belknap is, and I don't know who

7  Dawn Ceaser is, and I have not met Stephani DiNunzio.  It is

8  kind of funny how it worked out.  I left September 5th, 2017,

9  and I believe Stephani started within that same month.

10            MS. CHAMBERS:  No further questions.  Thank you.

11                    REDIRECT EXAMINATION

12  BY MR. McCARTHY:

13  Q    Craig, you were asked some questions by Ms. Chambers about

14  your sales performance under Ms. Ivie.  Did Ms. Ms. Ivie have a

15  particular method to kind of alerting you when the sales

16  numbers would come out?

17  A    Yes.  It was kind of a joke amongst the team that you

18  never wanted to receive an "ouch" email.

19  Q    What do you mean by that?

20  A    The email would have the performance numbers, and then it

21  would have written across the top "ouch," O-U-C-H.

22  Q    Who would that go to?

23  A    The entire district.

24  Q    Focused on one person?

25  A    Focused on one territory, which typically was two people.

A. Welch - D

1    Q    She would send that email to the district focused on the

2    bad performance of two people?

3    A    Correct.

4              MR. McCARTHY:  Nothing further.

5              MS. CHAMBERS:  Nothing further.

6              THE COURT:  May this witness be excused?

7              MR. McCARTHY:  Yes, Your Honor.

8              THE COURT:  Thank you, sir.  You are excused.

9              Call your next witness.

10             Ma'am, if you could hold one moment, please.  Thank

11   you.

12             Please step forward.  You may remove your mask, if

13   you are comfortable.

14             (The witness was duly sworn.)

15             THE CLERK:  Thank you.  Would you please state your

16   name for the record, spelling your last.

17             THE WITNESS:  Amy Welch.  W-E-L-C-H.

18                        DIRECT EXAMINATION

19   BY MS. RIECHERT:

20   Q    Ms. Welch, the jury might recognize you, although it has

21   been a few days.  You were the second witness in this case.

22   Plaintiff's counsel played 30 minutes of your deposition.  But

23   now you are back as part of our case, okay?

24   A    Okay.

25   Q    By whom are you currently employed?

A. Welch - D

1    A      AstraZeneca.

2    Q      And how long have you been at AstraZeneca?

3    A      A little over 23 years.

4    Q      What is your job title?

5    A      Human resources business partner.

6    Q      And what does a human resources business partner do?

7    Please tell the jury.

8    A      So a human resources business partner -- we call it HR

9    business partner -- they are assigned to a certain part of the

10   company as a HR point of contact to all of the employees in

11   that partnership of the organization.  We work with that part

12   of the organization and all of the employees.  If they have

13   inquiries, issues, questions, they can come and work that

14   through me, and I can work and escalate it, as needed, to the

15   global HR organization and work with them to work through

16   whatever their issue may be; for example, payroll concerns, if

17   there is an issue with their pay, or benefit concerns, employee

18   relations concerns, that sort of thing, and I can help to

19   escalate that, as necessary.

20          I also work with the global HR organization and the

21   business on various projects; work projects, human resources

22   projects, and so on.

23   Q      Where do you live?

24   A      I live in Wilmington, Delaware.

25   Q      How long have you lived there?

A. Welch - D

1  A    Wilmington, Delaware, I have lived there about 21 years.

2  Q    Do you have a college degree?

3  A    I do.  I have a bachelor of science in education.

4  Q    And do you have any HR certificates?

5  A    Yes.  I have a professional certificate in human resources

6  from Cornell.

7  Q    Are you married?

8  A    I am.  I have been married for 26 years.

9  Q    Any kids?

10 A    Two children.  I have a 25-year-old son and a 20-year-old

11 daughter.

12 Q    Can you remember your first interactions with Ms. Ivie?

13 A    So I first met Suzanne in person, I believe, at a sales

14 meeting that was out in the field.  We had met through that

15 interaction at the meeting.

16 Q    Do you remember when that was?

17 A    I believe -- I want to say around 2017, maybe '18.

18 Q    Were you the human resources business partner for the

19 respiratory team Seattle region at some point in time?

20 A    Yes.  Yes, there were other regions, but Seattle was one

21 of them.

22 Q    When did the Seattle region become part of your group that

23 you -- for the HR business partner for?

24 A    So I started to have responsibility for the sales

25 organization, that respiratory sales organization, about the

A. Welch - D

1   end of 2016; more specifically in 2017.

2   Q    How long did you continue to support the respiratory part

3   of the business sales organization?

4   A    I am still with the respiratory organization today.

5   Q    Were you involved with the issues that Ms. DiNunzio had

6   with Ms. Ivie in the 2018-2019 time period?

7   A    Yes, I was aware.  As my role as the HR business partner,

8   I'm often kept advised when there are issues that come up.

9   Q    Now, Ms. Ivie was an executive DSM.  What's the difference

10  between an executive DSM and a DSM?

11  A    So the district sales manager, or DSM, and the executive

12  DSM or executive district sales manager, they essentially have

13  the same roles and responsibilities.  The executive DSM is

14  essentially a promoted level.  Promotion is over time and

15  deemed through experience and through different levels of

16  success, if you will, that a person can become eligible for

17  promotion consideration, if you will, to the next level.  In

18  terms of responsibilities and roles and responsibilities, the

19  DSM and executive DSM have the same responsibilities.

20  Q    Let's look at Exhibit 510, which is Ms. Ivie's performance

21  review for the year 2018.  Are performance reviews available

22  for employees to see once they've been entered into the system?

23  A    Yes.

24  Q    And about when do they get finally entered into the

25  system?

A. Welch - D

1    A    So they're entered into the system realtime, but the

2    visibility of the performance evaluation becomes available in

3    April, so April 1st.  So we complete the performance cycle in

4    March and visibility happens on April 1 to the employee.

5    Q    How does the employee access their own performance review?

6    A    In the system.  The system we use is Work Day.  Every

7    employee has access to their profile in Work Day, and they can

8    pull up their performance reviews.

9    Q    This one says Ms. Ivie got a two.  Can you explain the

10   review scale for review at AstraZeneca.

11   A    So at this time the performance rating scale was one to

12   five, with one being the lowest and five being the highest.  So

13   a two in the lower range of the scale.

14   Q    Below that it says "COE October."  Can you explain what

15   that is.

16   A    "COE" stands for Circle of Excellence.  It's the ranking

17   system that they use for sales performance.  So our sales

18   operations organization tracks a person's success related to

19   their sales objectives.  Every person has sales objectives they

20   have each year, and their success against the actual targets

21   are tracked, and they are ranked.  Now, in COE, the higher it

22   is -- you want it to be lower.  So higher is not good.

23   Q    So 106 out of 128 is not so good?

24   A    Not so good.

25   Q    Let's switch topics.  There has been testimony in this

A. Welch - D

1   case about how Ms. Ivie had been on the leadership academy and

2   had been a compliance champion.  Would taking away those

3   special projects impact Ms. Ivie negatively?

4   A     No.

5   Q     Would the fact that Ms. Ivie had been issued a written

6   warning prevent her from applying for other jobs within

7   AstraZeneca?

8   A     No, it would not.

9   Q     Let's look at Plaintiff Exhibit No. 67.  Looking at

10  Exhibit 67, is this an email that you wrote to Ms. McCullough

11  on June 5th, 2019?

12  A     Yes.  Can you scroll down a little bit more?

13  Q     Let's look at this attachment to the exhibit.  What we're

14  looking at now, there was an attachment to the email that you

15  sent to Ms. McCullough?

16  A     Right.

17  Q     Did you write this attachment?

18  A     I wrote it in consultation and assistance with Dawn Ceaser

19  and Mike Pomponi.

20  Q     And did you provide this to Ms. McCullough?

21  A     Yes.

22  Q     Why did you provide it to her?

23  A     As part of Barb McCullough's role, her role is to keep

24  senior leadership informed.  So she asked me to prepare a

25  summary for her to be able to have available, if she needed it,

1    to be able to help answer questions or inform.

2    Q    Did Ms. McCullough ever express any concerns to you about

3    the termination of Ms. Ivie's employment?

4    A    No.

5    Q    Look at Exhibit 58.  Are these emails between you and

6    Ms. McCullough and some other people added to it as well?

7    A    Yes.

8    Q    Was Ms. McCullough asking you why AstraZeneca gave

9    Ms. Ivie a severance package?

10   A    No.

11   Q    Were you talking to her about the severance package and

12   why the company gave her one?

13   A    I think she was -- my understanding or my recollection was

14   she was just trying to get clarification.

15   Q    Did you explain to her why a company had given Ms. Ivie a

16   severance package?

17   A    I believe I did.  I don't see it on this particular email,

18   at least not the chain, but I do know why.

19            Thank you.  Yes, I did.

20   Q    And what was the explanation that you gave to

21   Ms. McCullough about why it was that the company was giving

22   Ms. Ivie a severance package?

23   A    Because at the original time, when the warning was being

24   delivered, Suzanne had asked for a package, and we reviewed it

25   with business leadership, and they approved a package to be

A. Welch - D

1    given to her at the time.  She decided not to take the package.

2    So since that was offered previously, at this point in time we

3    offered it again.

4    Q    Now, was Ms. DiNunzio consistently enforcing the field

5    ride obligation across her team?

6    A    Yes.

7    Q    Was Ms. Ivie being singled out by Ms. DiNunzio for

8    coaching by phone as opposed to doing actual physical rides?

9    A    No.

10   Q    Does AstraZeneca have policies on discrimination and

11   retaliation?

12   A    Yes.

13   Q    Where are they located?

14   A    They are located on the HR portal as well on other online

15   available systems.

16   Q    Do employees have access to that?

17   A    Yes.

18   Q    And you have access to it too?

19   A    Yes.

20   Q    Let's look at Exhibit 526 -- and I'm going to go through

21   these very quickly.  Is this the human resources USA standards

22   of conduct?

23   A    Yes.

24   Q    And is that one of the things that's available to

25   employees on this portal?

A. Welch - D

1    A    Yes.

2    Q    Let's look at 527.  Is this the AstraZeneca code of

3    ethics?

4    A    Yes.

5    Q    And is that something that's available to AstraZeneca's

6    employees?

7    A    Yes.

8    Q    Let's look at 528.  This is a very long document.  I'm not

9    going to make you look at everything.  Is this the AstraZeneca

10   U.S. policy handbook?

11   A    Yes.

12   Q    And then let's look at 529.  Is this the human resources

13   USA EEO or Equal Employment Opportunity policy?

14   A    Yes.

15   Q    And that's also a policy that's available to AstraZeneca

16   employees to review if they want to do so?

17   A    Yes.

18   Q    And then let's look at Exhibit 530.  Is that the HR USA

19   open-door procedure?

20   A    Yes, it is.

21   Q    What's essentially the purpose of an open-door procedure?

22   A    So the open-door procedure takes an employee through what

23   their options are, if they have any concerns or complaints.

24   They have a range of opportunities in terms of how they can

25   reach out and escalate those questions or complaints.

A. Welch - D

1          So one of the options is to their manager.  If they

2    are not comfortable going to the manager, they can go to the

3    next-level manager.  Again, if they are not comfortable with

4    either of those options, they can reach out to human resources,

5    either through employee relations or HR of business partner.

6    Again, if they are not comfortable with that option, there is

7    the anonymous ethics hotline that they can contact anonymously.

8    Q     How do these employees know about all of these various

9    options available?

10   A     Through the policy documents.  We also communicate that

11   through training as well.

12   Q     Then after an employee makes the complaint, then what

13   happens?

14   A     The complaints will be reviewed by the appropriate party,

15   typically employee relations or compliance, and it will be

16   investigated.

17   Q     And who does the investigation of the complaints if they

18   are HR-related?

19   A     If they are HR-represented, it is employee relations.

20   Q     Are you, as the HR business partner, involved in doing

21   these investigations?

22   A     No.

23   Q     Why does employee relations do it instead of you?

24   A     That would be because, in employee relations, that's the

25   duties of the job.  They are considered the experts in that

A. Welch - D

1    area of investigation, and they are not directly with the

2    business area, and so therefore they are an outside party, if

3    you will.

4    Q    Does AstraZeneca train its employees on discrimination and

5    harassment?

6    A    Yes.

7    Q    And how does it do that?

8    A    Through regular training that the employees would receive.

9    Q    How often do they get this training?

10   A    Typically yearly.  It depends on the state requirements as

11   well that they are living in.

12   Q    Do employees also get compliance training?

13   A    Yes.

14   Q    How often is that?

15   A    Again, clearly as well.

16   Q    What kind of things does it include in the compliance

17   training?

18   A    So compliance ranges -- there is also differences,

19   depending on the person's job.  It is how we engage with

20   customers; how we engage properly with regulators in terms of

21   distributing our materials properly and appropriately as well

22   as just conduct and how you would appropriately behave and

23   conduct your roles.

24   Q    Switching topics to references --

25   A    Okay.

A. Welch - D

1   Q      -- what is AstraZeneca's policy on references?

2   A      So you're talking about employment references?

3   Q      Right.  So if somebody calls and says, "Hey, I would like

4   to get a reference on Suzanne Ivie."

5   A      So if somebody -- if an employer of a former employee

6   calls AstraZeneca, AstraZeneca just confirms the information or

7   data that the person -- the former employee has given to that

8   potential employer.

9           So, for example, the dates of service, how long they

10  were employed by the company, what their role was.  If they

11  authorized it, we can even tell them their salary, but we have

12  to authorize it.  Those are the types of questions we

13  authorize.

14  Q      Do you provide any information on performance reviews?

15  A      No, do we do not provide performance reviews.  That would

16  come from the employees themselves if they choose to provide

17  them to the employer.

18  Q      That is not something that AstraZeneca does?

19  A      No.  We don't provide that as part of the reference.

20  Q      Does AstraZeneca say whether the employee is eligible for

21  rehire?

22  A      No.

23  Q      Does AstraZeneca say whether the employee was terminated

24  or not?

25  A      No.

A. Welch - D

1  Q    Does AstraZeneca say why the employee was terminated?

2  A    No.

3  Q    Now, Ms. Ivie's expert, who came in here yesterday to

4  testify, claimed she would not be able to get another job

5  because a Google search of her name would show that she is a

6  whistleblower.  Even if this was true, does AstraZeneca's HR

7  department do Google searches of job applicants?

8  A    No.

9  Q    Does the recruiting department do Google searches of job

10 applicants?

11 A    No.

12 Q    Have you worked with Ms. DiNunzio?

13 A    Yes.

14 Q    For approximately how long?

15 A    So I started working with her, I would say actually in the

16 2016 time frame when she had -- when I had joined the

17 respiratory area in a prior role, and she was a commercial

18 alignment leader, so prior to her CBD role.

19 Q    Did you work with her in her CBD role until she left that

20 CBD role?

21 A    Yes.

22 Q    Do you remember when that was?

23 A    When she left the CBD role?

24 Q    Yes.

25 A    So she left the CBD role at the end of -- gosh -- at the

1  end of 2020, she moved into a different part of the business.

2  Q    Do you know if that was a promotion?

3  A    It was.  So she was part of the respiratory inhale team as

4  a CBD.  Then she was promoted to the diabetes specialty team,

5  and so it was a specialty role and therefore considered a

6  promotion.

7  Q    Have you had an opportunity to observe her as a manager?

8  A    I have, for the most part through -- at business meetings

9  as well as seeing her present to the teams and such.  So I have

10  seen her interact with her team.

11  Q    Have you also had an opportunity to work with her on any

12  performance issues she might have with her team?

13  A    Yes.  I have worked with her on performance issues.  I

14  have worked with her, as I said, in interacting with her team

15  as well as her counterparts and leadership team as well.

16  Q    What have you observed about her?

17  A    So I observed her to be a fair and ethical leader in terms

18  of making sure that her people have the opportunity to grow, to

19  develop, and making sure that they have regular feedback, and

20  she is also very specific about -- and I would say consistent

21  about making sure that how she approaches and the requests that

22  she has for her team are following the guidelines and making

23  sure that everybody has an opportunity to understand and make

24  sure what those guidelines are.

25  Q    Let's talk about promotions at AstraZeneca.  So what would

A. Welch - D

1    the next level up after DSM be?

2    A    So if we're talking about specifically the sales

3    organization, the next level after a district sales manager

4    would be a CBD.  It stands for commercial business director.

5    Q    So was Ms. Ivie already at the highest level of a DSM?

6    A    Yes.

7    Q    The CBD, which is the next level up in the sales

8    organization, was that Ms. DiNunzio's job?

9    A    That was Stephani's job as a CBD, yes.

10   Q    Do you have any reason to believe that Ms. Ivie would have

11   gotten Stephani DiNunzio's job?

12   A    No.

13   Q    Ms. Ivie testified she was on track to be promoted at

14   AstraZeneca, or if she didn't, I think her experts certainly

15   did.  Was she on track to be promoted?

16   A    Not that I'm aware of.

17   Q    Is there like a group of high performers at AstraZeneca?

18   A    So, yes.  I mean, we do talk on a regular basis with

19   leadership teams and in human resources to talk about something

20   called succession planning, like how do we prepare and know if

21   there are people who are ready for the next role, that sort of

22   thing.  So in those conversations, we do review people, who are

23   in current roles, typically roles that will be the next role

24   up.

25   Q    Was Ms. Ivie, as part of this succession planning,

A. Welch - D

1   discussed as someone who would be ready to move up?

2   A    No, not in the conversations I was a part of.

3   Q    Now, Ms. Ivie was saying that she -- or her expert was

4   saying that she would be promoted to a training and development

5   role in the CL&D department.  Remind us what the CL&D

6   department stands for.

7   A    It CL&D stands for commercial learning and development.

8   Q    Does AstraZeneca have commercial learning and manager

9   roles in that department?

10  A    They do.

11  Q    How many people are there in such roles?

12  A    There are five people in the commercial.

13  Q    Where are they located in?

14  A    In the Wilmington headquarters offices.

15  Q    Would Ms. Ivie need to move to take such a role?

16  A    Yes.

17  Q    And if she wanted to apply for a role, how would that go

18  about?  What would she need to do?

19  A    So all of the internal openings and vacancies that come up

20  are published on our internal job boards; in this case the job

21  boards are posted on Work Day.  She and any employee would have

22  to apply for the job via there.

23  Q    And would outside people also apply to the job?

24  A    Yes.  Usually jobs are posted internally and externally at

25  the same time.  So it would be all candidates that would come

A. Welch - D

1    in and apply for the role.

2    Q    So even if there had been an opening for this commercial

3    learning manager, and even if Ms. Ivie had applied, she might

4    not have gotten the job, right?

5    A    Right.  Yes.

6    Q    And if she had got this commercial learning manager role,

7    would that have been a promotion?

8    A    No.  It would have been considered a lateral role -- I'll

9    use -- so we grade levels that are different roles.  So the

10   district sales manager is grade level E; a commercial learning

11   manager is a grade level E.  And so it is considered a lateral

12   role.

13   Q    Did you look at the market pay for an executive DSM at

14   AstraZeneca?

15   A    Yes.

16   Q    Did you look at the market pay for a commercial learning

17   manager at AstraZeneca?

18   A    Yes.

19   Q    Which one paid more?

20   A    The district sales manager.

21   Q    Do you remember by how much?

22   A    It was approximately $15,000 more in terms of the market

23   pay point.

24   Q    So Ms. Ivie would have been paid less generally as a

25   commercial learning manager --

A. Welch - D

1  A    It would have been a lesser market reference point, so

2  yes, the range would be less.

3  Q    So Ms. Ivie told him, her expert, that these commercial

4  learning roles paid 50,000 to 60,000 per year more than the DSM

5  role.  Is that true?

6  A    No.

7  Q    So we just heard from the last witness something called a

8  PRID?

9  A    Yes.

10 Q    Can you tell me what a PRID is in AstraZeneca-speak.

11 A    Yes.  I don't know what PRID stands for, but it is

12 essentially a computer identifier -- an identifier in terms of

13 somebody's log-on number.

14 Q    And so it is used by employees to do what?

15 A    To log into their computer.  It is a PRID.  That's how we

16 identify -- not we -- but the company's computer systems know

17 who is on the system.

18 Q    And do you have to have a PRID to basically get onto these

19 computer systems?

20 A    Yes.

21 Q    And in your position do you have access to a database with

22 everybody's PRID in it?

23 A    Yes.

24 Q    Have you been able to identify the PRID for Suzanne Ivie?

25 A    Yes.

A. Welch - D

1   Q    What was that PRID?

2   A    It was KRFT972.

3   Q    If we look at Exhibit 555, which is the exhibit we just

4  looked at with Mr. Barnes, column AA says, "Confirmed

5  representative/employee PRID," and Mr. Barnes testified that it

6  was supposed to be his number that went in there, but it wasn't

7  his number.  Based on what you just testified to, whose number

8  was that?

9   A    Suzanne's.

10   Q    Now, did the company have a reduction in force in 2020?

11   A    Yes.

12   Q    What was your role in connection with it?

13   A    So I was the lead HR business partner that managed the

14  project.

15   Q    And approximately how many employees were let go as a

16  result of that?

17   A    Approximately 430 or so.

18   Q    Did it impact the sales organization?

19   A    Yes.

20   Q    Did it impact district sales managers in the region where

21  Ms. Ivie worked?

22   A    Yes.

23   Q    And was one of the DSMs in that region let go?

24   A    Yes.

25   Q    Who was that?

A. Welch - X

1  A    Andrew Maratas.

2         MS. RIECHERT:  No further questions.

3         THE COURT:  Thank you.

4                     CROSS-EXAMINATION

5  BY MS. CHAMBERS:

6  Q    Ms. Welch, you would agree that -- we talked -- you talked

7  with Ms. Riechert about AstraZeneca's policies and procedures,

8  right?  Would you agree in a AstraZeneca cannot retaliate

9  against an employee who raises a concern?

10 A    Yes.

11 Q    And Ms. Riechert also asked you about Stephani DiNunzio

12 and her rise within the company.  When did you first learn that

13 Stephani DiNunzio had never completed -- had never been

14 retrained in accordance to the global compliance report from

15 May 2019?

16 A    I'm not sure -- so when did I learn of her not completing

17 a training?

18 Q    Correct.

19 A    I don't recall.

20 Q    Do you know if she was ever trained?

21 A    All employees are expected to be trained on the

22 compliance.

23 Q    So there was a compliance report in relation to Ms. Ivie's

24 complaints.  Are you aware of that?

25 A    So I'm not aware of what you are talking -- I'm not aware

A. Welch - X

1  of what you are talking about, no.

2  Q    Okay.  So do you know if Stephani DiNunzio ever completed

3  training or was monitored in connection to a compliance

4  investigation?

5  A    If she was monitored?

6  Q    And retrained.

7  A    So related to -- are you talking about in relation to the

8  complaint?

9  Q    Yes, to Suzanne Ivie's complaint and the subsequent

10 compliance investigation and findings.

11 A    So I know there was a review.  I wasn't involved in the

12 retraining efforts, and so I'm not aware of the progress there.

13 Q    Okay.  We talked about some more -- you talked about the

14 policies and procedures.  Is it typical for an HR practice to

15 have the manager at an OTR meeting even if there is a

16 retaliatory complaint about the manager?

17 A    So I don't -- I'm not usually involved in the OTR

18 meetings, the opportunity-to-respond meetings.  However, what I

19 would say it is common to have the manager there, because the

20 manager is responsible for coaching and guiding the employee.

21 So if the OTR is in relation to an employee that's being looked

22 at and needs to review a situation to get their insight, a

23 manager would be involved.

24 Q    Even if that employee has complained about retaliation

25 from that manager?

A. Welch - X

1  A    So again, I'm not familiar with the practices, because I

2  don't typically schedule or get involved in the OTR meetings,

3  so I can't comment on that.

4              MS. CHAMBERS:  Thank you.  No further questions.

5              MS. RIECHERT:  No further questions.

6              THE COURT:  May the witness be excused?

7              MS. RIECHERT:  Yes.

8              THE COURT:  Thank you very much.

9              Call your next witness, please.

10             MS. TALCOTT:  Your Honor, the defense calls

11  Dr. Edward Bierhanzl.

12             MR. McCARTHY:  Just a moment, Your Honor.

13             MS. RIECHERT:  You will be pleased to hear we are

14  going faster than we expected, and we didn't tell him to be

15  back till 3:00.  We have another witness lined up.

16             THE COURT:  Let's take our afternoon break right now.

17             MS. RIECHERT:  Okay.

18             THE COURT:  Thank you, members of the jury.  Remember

19  not to discuss this case with one another, please.  I will see

20  you back at three o'clock.

21             MS. TALCOTT:  Thank you, Your Honor.

22             (Recess.)

23             (Open court; jury present:)

24             THE COURT:  Good afternoon.  Please be seated.

25             Defendant, call your next witness, please.

E. Bierhanzl - D

1        MS. TALCOTT:  The defense calls Dr. Edward Bierhanzl.

2        THE COURT:  Thank you.  Raise your right hand and be

3  sworn.

4        (The witness was duly sworn.)

5        THE CLERK:  Thank you.  Would you please state your

6  name for the record, spelling your last.

7        THE WITNESS:  Edward Joseph Bierhanzl.

8                    DIRECT EXAMINATION

9  BY MS. TALCOTT:

10  Q    Dr. Bierhanzl, what do you do for a living?

11  A    I am a director in the Washington, D.C. Office of

12  Resolution Economics, which is an economic consulting firm.

13  Q    Are you an economist?

14  A    Yes.

15  Q    Can you describe your educational background for the

16  jury.

17  A    I have got a bachelor's degree in economics and a master's

18  and Ph.d in economics from Florida State University.

19  Q    Were you an economics professional for a number of years?

20  A    For eleven years I was a professional of economics at

21  Florida A&M.

22  Q    And were you tenured there?

23  A    Yes.

24  Q    And do you have an area of specialization?

25  A    Labor and employment economics.

E. Bierhanzl - D

1   Q    And do you publish on the topic of labor and employment?

2   A    I have, yes.

3   Q    And do you speak on that topic?

4   A    Yes.

5   Q    And do you regularly analyze economic damages related to

6  lost wages and other compensation?

7   A    Yes.

8   Q    And have you consulted as an expert witness in other legal

9  cases?

10  A    Yes.

11  Q    Can you give us an approximation of how many times?

12  A    In all types of labor and employment cases?

13  Q    Correct.

14  A    Several hundred.

15  Q    And can you tell us what do you do in your role now as a

16  consultant?

17  A    For this case in particular?

18  Q    No, just generally.

19  A    Well, it covers reviewing material and legal documents, if

20  it happens to be a case of litigation.  Many cases we work on

21  are compensation valuations, which don't involve litigation.

22  So for all of those, I review the data, do data analytics,

23  review relevant economic statistics, and provide opinions and

24  results to our clients.

25  Q    Are there some cases that you have worked on where you

E. Bierhanzl - D

1    have used a vocational rehabilitation expert to work with you

2    on the case?

3    A    Yes.

4    Q    What types of cases would those be?

5    A    Typically they are wrongful termination cases, where an

6    employee has either left an employer or they've had to

7    discontinue employment because of some injury or incapacity.

8    Q    Is there anything in this case where the claims are age

9    discrimination, wrongful termination in retaliation,

10   whistleblower claims, anything there that you think that would

11   require the use of a vocational rehab expert?

12   A    No, this isn't the type of case that we typically would

13   see a vocational rehabilitation expert employed.

14   Q    Do you feel comfortable with your doctorate in economics

15   to do all the analysis necessary to come to an opinion

16   regarding Ms. Ivie's damages in this case?

17   A    Yes.

18   Q    And are you being paid for your time here today by

19   AstraZeneca?

20   A    Yes.

21   Q    What's your hourly rate?

22   A    $575 per hour.

23   Q    Approximately how many hours have you spent on this case?

24   A    Prior to this week, about 28.

25   Q    And is your opinion influenced at all by the fact that

E. Bierhanzl - D

1  AstraZeneca is paying you?

2  A    No.

3  Q    And are your opinions offered today to a reasonable degree

4  of economic certainty?

5  A    Yes.

6         MS. TALCOTT:  Your Honor, AstraZeneca offers

7  Dr. Bierhanzl as an expert witness on the topic of damages.

8         THE COURT:  Any objection?

9         MS. CHAMBERS:  Just to clarify, just as an economic

10  expert on damages?

11         MS. TALCOTT:  Yeah, and mitigation.  Economic -- her

12  amount of damages and mitigation.

13         MS. CHAMBERS:  We object on mitigation, but economic

14  damages, no objection.

15         THE COURT:  Counsel?

16         MS. TALCOTT:  He is a doctorate-level economist who

17  has testified that he has done damages estimates in numerous

18  cases in the past, including lost wages.

19         MS. CHAMBERS:  Your Honor, he is not a vocational

20  rehab expert.  I have no objection to him testifying about

21  damages, but in terms of what type of job Ms. Ivie might obtain

22  or her mitigation of those efforts, we object.

23         MS. TALCOTT:  Your Honor, I can ask a few more

24  questions.

25

E. Bierhanzl - D

1    BY MS. TALCOTT:

2    Q    Dr. Bierhanzl, have you testified in the past on the issue

3    of mitigation of damages of a party in a case?

4    A    Any time we work on a case that involves economic damages,

5    the question of mitigation is involved.

6    Q    How do you do that calculation?

7    A    Mitigation involves making an assessment or an evaluation

8    of someone's earnings in the labor market or potential earnings

9    in the labor market.

10   Q    And in a case where there is not an issue regarding

11   someone's disability, is there anything that you would not be

12   qualified to do as a doctorate-level economist in terms of

13   preparing a damage assessment for a party's mitigation damages?

14   A    No.  That's what labor economics is.  It is about

15   understanding and describing how people are paid and what wages

16   prevail in the market and how jobs work.

17              MS. TALCOTT:  Your Honor, AstraZeneca offers

18   Dr. Bierhanzl on the topic of Ms. Ivie's mitigation of damages

19   as well.

20              THE COURT:  Thank you.  I will find him so qualified

21   as to both damages and mitigation.

22              Thank you.

23   BY MS. TALCOTT:

24   Q    Dr. Bierhanzl, before we get to the substance of your

25   opinion, can you explain to the jury how damages should be

E. Bierhanzl - D

1    calculated in an employment termination case?

2    A    Sure.  Damages are basically a two-part process.  One part

3    is understanding what someone's earnings would have been had

4    they not been terminated from an employer and what they would

5    look like going into the future.  The other part is

6    understanding what someone's earnings may look like once

7    they've left their former employer going into the future.

8              The difference between those two numbers, if it

9    exists, would be considered economic damages.  If the

10   mitigating or offset earnings that they could earn after having

11   left are less than what they could have earned had they stayed,

12   then that would be considered economic damages.

13   Q    In essence, it is a subtraction calculation?

14   A    Right.  The "but for" earnings minus the offset earnings

15   are what are considered economic damages.

16   Q    Dr. Bierhanzl, can you explain for the jury what should be

17   considered in calculating a plaintiff's "but for" income.

18   A    So that's the income that we would expect them to earn had

19   they stayed employed, and it is basically determined by what

20   they actually were earning along with any benefits, other types

21   of compensation besides salary, and then also based on how long

22   they could be expected to remain employed.

23   Q    Would you also include inflation and raises in the

24   "but for" income?

25   A    Sure.  That would be part of anticipating or projecting

E. Bierhanzl - D

1  what they could be expected to earn in the future.

2  Q    What should be considered in calculating a plaintiff's

3  offset income?

4  A    Well, it is a similar calculation, but instead of their

5  actual earnings with their employer, it is an effort to project

6  what could reasonably we be expected for them to earn given

7  their skills, their experiences, given the state of the job

8  market, and how long we would expect them to work in other

9  positions.

10 Q    Is it necessary in making these calculations to make

11 certain assumptions?

12 A    Yes.

13 Q    Why is that?

14 A    Well, we're talking about projecting what might happen in

15 the future, which, of course, we don't know with certainty, and

16 so we have to make some reasonable assumptions about what is

17 likely to happen given what we know about the employee that

18 we're looking at and their abilities and what the state of the

19 labor market is.

20 Q    Is it necessary that those assumptions be supported by

21 some evidence?

22 A    Certainly.

23 Q    Did we ask you to calculate plaintiff's reasonable damages

24 in this case?

25 A    Yes.

E. Bierhanzl - D

1    Q    Did we also ask you to review the opinions of plaintiff's

2    experts, Mr. Sevart and Dr. Edelman, and tell us if you

3    disagreed with their opinions in any respect?

4    A    Yes.

5    Q    What documents did you review in this case?

6    A    I reviewed Mr. Sevart's reports; both of Mr. Edelman's

7    reports; I believe I reviewed the original complaint in the

8    case; Ms. Ivie's deposition testimony and parts of her

9    personnel file; possibly some payroll records, and, of course,

10   also Bureau of Labor Statistics data on the relevant labor

11   markets and salaries.

12   Q    Did you feel that you had sufficient documents provided to

13   you to make a reasonable calculation of Ms. Ivie's damages?

14   A    Yes.

15   Q    What was Mr. Sevart's role in calculating Ms. Ivie's

16   damages?

17   A    Well, he essentially projected what he believed to be

18   her -- what her earnings would have been at AstraZeneca.  Then

19   he projected what he believed she would be able to earn after

20   having left the company.

21   Q    Let's talk about some of the specifics of Mr. Sevart's

22   opinion.  Are there any assumptions that he made that you

23   disagree with?

24   A    Yes.

25   Q    What are those?

E. Bierhanzl - D

1   A    Well, the first one, he assumed that had she remained

2   employed with AstraZeneca, she would have certainly received a

3   promotion to a higher level job with a considerable increase in

4   pay.  I believe he said 50- to $60,000 per year.  But he didn't

5   provide any evidence of that or cite any details.  In fact, it

6   wasn't even a specific job.  He said it might have been a

7   training job or it might have been marketing job, I believe.

8   But there were no details at all and nothing that could be used

9   as a basis to say, "This is what it definitely would be, and

10  this is how much it would pay."

11  Q    In your opinion, was it appropriate for Mr. Sevart to

12  include that potential promotion in her calculation of damages?

13  A    No.  It was much too speculative.

14  Q    Does that mean that Mr. Sevart's estimate of Ms. Ivie's

15  earnings had she not been terminated or her "but for" earnings

16  were higher than what the objective evidence supported?

17  A    Yes.  They are higher by the amount of this supposed

18  promotion.

19  Q    Are there other assumptions in Mr. Sevart's report that

20  you disagree with?

21  A    There are, yes.

22  Q    And what were those?

23  A    When he attempts to project what he believes she could

24  reasonably earn after having left AstraZeneca, he says he

25  believes that she is qualified for jobs as a district sales

E. Bierhanzl - D

1  manager or a regional sales manager, which is appropriate,

2  given her previous job.  But then he says that she is only

3  capable of earning as much as someone with, I believe he said

4  four or five years' experience, which doesn't give her credit

5  for the full 19 or 20 years of experience that she had in a

6  sales management role.  As a result, he comes up with an

7  expected amount of earnings that is way too low, because it,

8  again, doesn't credit her actual experience in those jobs.

9  Q    So in our subtraction problem, Mr. Sevart came up with a

10 figure for the upper number, which is too high, and the lower

11 number in a subtraction problem that's too low, meaning the

12 difference would be larger than you would have anticipated?

13 A    Right.  The result of that calculation is a number that is

14 much larger than it should be.

15 Q    So by not giving her credit for her years of experience,

16 he also significantly undervalued her potential earnings; is

17 that correct?

18 A    Yes.  That's correct.

19 Q    Can you explain to the jury why those errors are

20 important?

21 A    Well, again, the idea of calculating economic damages is a

22 two-part process.  One part is what you expect someone could

23 reasonably have earned had they remained working with their

24 former employer, and the second part is what they could

25 reasonably be expected to earn in the labor market after having

E. Bierhanzl - D

1  left.  And if those numbers aren't accurately projected or

2  calculated, then your economic damages number is going to be

3  wrong.

4  Q    Based on the jobs selected by Mr. Sevart, once the correct

5  experience is factored in, how does plaintiff's estimated

6  offset income compare to her compensation at AstraZeneca?

7  A    Well, fortunately, the tables that Mr. Sevart used to

8  estimate earnings actually have a place where you can find

9  someone with 16 or 18 years' worth of experience.  When you use

10  those actual experience numbers and look at the earnings that

11  you would expect in those jobs with that level of experience,

12  they are, if I recall, about $60,000 higher per year than the

13  numbers he used.

14  Q    Am I correct you looked at the salary data from the Bureau

15  of Labor Statistics for sales manager?

16  A    Mr. Sevart used salary data from a private survey company,

17  which was fine.  But I also checked the data from the Bureau of

18  Labor Statistics, which is the Department of Labor agency.

19  They produce public data -- reams and reams of public data.  So

20  I looked their data, and I saw that their data was consistent

21  with the data he used and was also consistent with what

22  Ms. Ivie had been earning at AstraZeneca and what someone with

23  her level of experience could be expected to earn in the

24  district manager or regional manager role.

25  Q    So does that mean that someone with Ms. Ivie's training

E. Bierhanzl - D

1  and experience would be expected to earn approximately the same

2  amount in a new job as she earned at AstraZeneca if she made an

3  appropriate effort to try to find that new job?

4  A    Yes.

5  Q    Mr. Sevart testified yesterday that it was reasonable for

6  him to use comparable salaries for someone with only four to

7  five years of experience in sales management rather than giving

8  her credit for 19 years of experience, because Ms. Ivie was a

9  whistleblower who would be unlikely to get a comparable job.

10        Is that a reasonable assumption, in your opinion?

11  A    No.  Well, first of all, the idea of the whistleblower

12  component being related to years of experience, well, it's not

13  something that he asserted in his report, and so I didn't

14  evaluate it there.  But in any case, that's not how the tables

15  that he uses work.  It is a simple table that says for a given

16  job someone with a certain amount of experience can expect to

17  earn a certain salary.  Of course, this is an average over

18  hundreds of thousands of employees.  They may differ in

19  respects other than their experience, but the point of the

20  table and the point of him using it is to show the relationship

21  between years of experience and salary.  So it is appropriate

22  to use what her actual years of experience are.

23  Q    Mr. Sevart also testified that he took into consideration

24  the fact that Ms. Ivie had applied for and had been

25  interviewed for over 140 jobs without success when he decided

E. Bierhanzl - D

1   to discount her years of experience and estimating her offset

2   income.  Would that be reasonable, in your opinion, if he did

3   not review the qualifications necessary for the jobs she was

4   applying for?

5   A    Her experience is her experience.  Her qualifications and

6   skills and experience don't go away depending upon how many

7   jobs she applied for.  She should get credit for all of them.

8   Q    Dr. Bierhanzl, what was Dr. Edelman's role in calculating

9   plaintiff's damages?

10   A    Well, Mr. Sevart came up with basic numbers for "but for"

11   and offset earnings.  Dr. Edelman took those numbers, added

12   some additional assumptions about benefits, and then he put it

13   all into a calculation framework so it could be valued at one

14   number at one point in time.

15   Q    Are there any parts of Dr. Edelman's approach or

16   assumptions that you disagree with?

17   A    Yes.

18   Q    And what are they?

19   A    Well, the main one is that he accepted Mr. Sevart's

20   assumptions about earnings very uncritically.  He didn't do any

21   of his own work to determine whether they were consistent with

22   the data available in the case or whether they were consistent

23   with what's actually seen in the labor market.

24   Q    So Dr. Edelman accepted, for example, that Mr. Sevart used

25   a salary for someone who was a district sales manager with 15

E. Bierhanzl - D

1   years less experience than Ms. Ivie had?

2   A    Right.

3   Q    Do you have any criticism of the way Dr. Bierhanzl treated

4   Ms. Ivie's promotion in his calculation -- the prospect of a

5   promotion?

6   A    Well, the criticism is that he accepted -- as labor

7   economists, we are expected to rely on data and numbers, but

8   there wasn't anything related to that promotion.  I mean, the

9   way a labor economist is to approach it is to say -- if there

10  is a supposed promotion, you say, "Let's take a look at the

11  posting.  What was the job description?  What were the

12  requirements?  Was this person qualified?  Who else applied to

13  the posting?  What were their qualifications?"  And with that

14  information you can make a judgment about, "Well, we think it

15  is likely or not likely that this person would have been

16  selected."  But none of that was involved here at all.

17  Q    So if you correct for what you believe is an improper

18  assumption of taking into account Ms. Ivie's prospect for a

19  promotion, how does that affect the calculation of "but for"

20  income?

21  A    Well, the correct number to use is what her actual

22  earnings were, which would be $55,000 less than what

23  Dr. Edelman had.  In fact, the number I had is Dr. Edelman's

24  number just before he added the $55,000 promotion.

25  Q    And does Dr. Edelman also accept Mr. Sevart's assessment

E. Bierhanzl - D

1    that Ms. Ivie's potential earnings should be based on job

2    tables that assume four or five years of experience?

3    A    Yes.  He used the numbers that Mr. Sevart provided.

4    Q    And as a result, are the damages lower for her

5    replacement -- potential replacement income?

6    A    Yes.

7    Q    And did Dr. Edelman use the same formulation when he

8    provided his updated report in terms of his calculation of her

9    replacement income or front pay?

10   A    Well, for his second report, he did a different projection

11   or prediction.  He initially adopted Mr. Sevart's assessment of

12   what projected income might be.  For a second report, he

13   accepted a different number from Mr. Sevart about what her

14   predicted future income would be.  In that report, I believe he

15   used what Mr. Sevart projected she could earn if her job turned

16   into a full-time one.

17   Q    In your opinion was it appropriate for Dr. Edelman to use

18   Ms. Ivie's current salary as her potential earning amount?

19   A    For her offset job?

20   Q    Correct.

21   A    No.  The way the calculation of economic damages goes, we

22   need to use what we think a person with those qualifications

23   and that experience could reasonably be expected to earn in the

24   labor market.

25   Q    So if you look at the labor market data for someone with

E. Bierhanzl - D

1    Ms. Ivie's qualifications and experience and Mr. Sevart's

2    tables, what would Ms. Ivie's lost front pay be, to use

3    Dr. Edelman's terminology, the front pay?

4    A    Well, to calculate it correctly her economic damages would

5    not exceed $410,000.

6    Q    And what about her offset income?

7    A    Well, that would include her offset income.

8    Q    And Dr. Edelman talked about her front pay for the jury.

9    So did you review the tables that Dr. Edelman included in his

10   report?

11   A    Yes.

12   Q    And do you agree with the damage figure for Ms. Ivie's

13   front pay?

14   A    No.

15   Q    Can you explain to the jury what your disagreement is with

16   those calculations.

17   A    Sure.  Let me just back up real quick to go back to the

18   calculation of economic damages to start with.  It is a

19   two-part process.  One part is estimating what someone could

20   have likely earned had they remained employed.  The second part

21   is estimating what they likely could have earned in a different

22   job after they leave the first one:  That's the offset

23   earnings.  If those offset earnings are less than the original

24   "but for" earnings, that's the source of economic damages.  If

25   those offset earnings are equal to or greater than the

E. Bierhanzl - D

1    "but for" earnings, then there are no economic damages.

2           So once Mr. Sevart assumed that Ms. Ivie was capable

3    of finding a job, which he put at the end of 2020, and using

4    his numbers to project what someone with those qualifications

5    could likely have earned, then her projected mitigated earnings

6    or offset earnings would be pretty much the same as what she

7    earned at AstraZeneca; and therefore, economic damages would be

8    zero at that point.  So 2020 going forward, there are no

9    economic damages.

10   Q    So just to make sure we are clear, in your opinion,

11   Dr. Bierhanzl, Ms. Ivie should not recover any front pay -- any

12   damages from the date of the trial forward?

13   A    Yes.

14   Q    And that's because her training and experience indicate

15   that she should be able to obtain a replacement job at the same

16   approximate salary that she had at AstraZeneca?

17   A    Yes.

18   Q    And you accepted in your calculation the premise that

19   Ms. Ivie would not be able to find replacement work until the

20   end of 2020; is that correct?

21   A    Yes.  It is a very long period of job search.  It is much

22   longer than is typical.  But for purposes of comparison, I

23   used, yeah, that same period that Mr. Sevart used.

24   Q    Did Mr. Sevart use 18 months for the period of time it

25   would take for Ms. Ivie to find comparable replacement

E. Bierhanzl - D

1  employment?

2  A    He just said that she would be able to find a job by the

3  end of 2020.

4  Q    And did you look at the Bureau of Labor Statistics for

5  Utah to determine how long the average unemployed worker took

6  to find a job in that geographic region?

7  A    In 2019, yes.

8  Q    How long did it take for the average unemployed worker to

9  find a job in the Salt Lake City, Utah, area?

10  A    I believe it was for the state of Utah.  I believe it was

11  13 weeks.

12  Q    What was the median amount of time that it took for an

13  unemployed worker to find a job in the state of Utah?

14  A    I believe it was four or five weeks.  Median is the time

15  when half of the people would have found work by that time.

16  Q    Now, assuming that the jury finds that Ms. Ivie is

17  entitled to recover economic damages in this case, what do you

18  estimate her lost income to be?

19  A    $410,000.

20  Q    And can you explain what is included in that.

21  A    Sure.  So we are talking about a period from when she was

22  terminated up until the end of 2020.  During that time

23  Mr. Sevart assumed, and I accepted, that she wouldn't be

24  earning any offset earnings at all.  So her loss is -- her

25  offset is zero.  Her losses are what she would have been

E. Bierhanzl - D

1  expected to earn during that time at AstraZeneca.  So it is her

2  base salary, the other components of compensation, which are

3  bonus, I believe some stock options, as well as the value of

4  other benefits and then increased by the appropriate interest

5  rate to bring it up to the end of 2020.

6  Q    Did Mr. Edelman make some errors in his initial report?

7  A    He did, yes.

8  Q    And what were those errors?

9  A    One was in calculating benefits.  One of the benefits for

10  employees at AstraZeneca was some restricted stock units, a

11  restricted stock benefit.  What he did is he said that we will

12  look at her compensation, which he got from her W-2, which is

13  total compensation.  To that, he added the value of the

14  restricted stock units.  But the way those are reported, the

15  employers actually report the value of that stock benefit on

16  the W-2.  It was already in the total value, and he added it

17  on, essentially double-counting.

18  Q    Did Dr. Edelman make any other errors in the initial

19  report?

20  A    Yes.  Another one was with transportation, a car benefit.

21  The employees had use -- Ms. Ivie had the use of a car, which

22  she used for some personal travel, and that has a value.

23  Dr. Edelman calculated the value of that personal travel, but

24  then he also calculated the value of the entire car and assumed

25  that Ms. Ivie would have the value of a new car each year for

E. Bierhanzl - D

1    three years -- every three years -- in addition to the value of

2    the personal travel.  That's just the wrong calculation.  You

3    don't get to calculate new cars as a part of the benefit; you

4    just get personal use.

5    Q    But did Dr. Edelman correct those errors in his

6    supplemental report?

7    A    In his most recent tables he just backed out the amounts

8    that he should not have included in the first place.

9    Q    And can you explain to the jury why -- let me back up.  Do

10   you also think it was an error for Dr. Edelman to use

11   Ms. Ivie's replacement salary as part of that calculation for

12   the offset income?

13   A    Yes.  That's not the approach that we typically take when

14   determining mitigation or offset.  The idea is that this is a

15   projection about what's likely to happen in the future.  Also,

16   we -- none of us -- not Dr. Edelman nor I nor any other

17   expert -- is able to know all of the individual decisions that

18   go into a job search; all the choices that are made along the

19   way.  We can't ever see all of that.  So what we have to do is

20   say, well, what's the most likely scenario?  Given what we can

21   see, we can observe someone's qualification and experience.  We

22   can observe what the jobs are paying in the labor market, and

23   then given that information, what's the most likely outcome we

24   would expect if someone has an effective job search process and

25   is successful.

E. Bierhanzl - D

1    Q    Just to wrap up, Dr. Bierhanzl, for the jury -- and I know

2    you don't have the tables in front of you -- but Dr. Edelman's

3    table, which is Exhibit No. 3, which addresses front pay of

4    $3 million, it's your opinion, Dr. Bierhanzl, that Ms. Ivie

5    should recover no front pay because her training and experience

6    indicate that she should be able to find a replacement job with

7    a comparable salary to her salary at AstraZeneca?

8    A    Yes.

9    Q    And Exhibit No. 2 was plaintiff's backpay table where he

10   calculated her lost backpay as $575,982.  Is it your opinion

11   that that backpay amount should be how much?

12   A    If I recall his table correctly, his backpay calculation

13   goes into 2021.  Is that right?

14   Q    Yes, that's correct.

15   A    So my calculation of backpay ends at the end of 2020,

16   which is the time Mr. Sevart assumes she would be able to

17   become reemployed.  So for that period, up until the end of

18   2020 -- sorry -- you asked what my calculation was.

19   Q    Right.

20   A    Up to the end of 2020, it is just under $410,000.

21   Q    And you stopped that backpay calculation at 2020.  Why?

22   A    Because it was the opinion of the vocational expert that

23   by the end of 2020 Ms. Ivie would be able to find a job -- a

24   district manager or regional manager job -- by the end of that

25   time period.

E. Bierhanzl - D

1   Q    We talked at the beginning of your deposition about the

2   concept of mitigation.  I know that's part of your report.  Can

3   you just explain to the jury exactly how the concept of

4   mitigation comes into your opinion.

5   A    You mean mathematically, or why we include mitigation as

6   part of the damages calculation?

7   Q    Why you include mitigation and why you need to be

8   objective, not what they did earn, but what they could have

9   earned if they used their reasonable efforts.

10   A    Well, the process of calculating economic damages is -- in

11   this case it is part of an allegation of some wrongful act by

12   an employer, and the damages are damages that can be attributed

13   to that allegedly wrongful act.  So in the event that

14   Ms. Ivie's employer is found liable, we want to get some

15   measure of what economic harm there was as a result of that

16   action.

17        That's why when we use offset earnings or mitigating

18   earnings, we want to project what a reasonable person could

19   expect to earn, given their qualifications and experience and

20   given the state of the job market, because, as I said a moment

21   ago, all of the individual decisions and choices and

22   circumstances that go into a person's actual job search, we

23   don't know what they are going to be.  There's no way to say

24   whether or not each individual choice is related to something

25   that a previous employer allegedly did.  So we want to know,

1    well, what's the reasonable circumstance that is likely to

2    occur if this person makes a diligent and successful job

3    search.

4    Q    What is your understanding of the skills required for the

5    job that Ms. Ivie currently has at Brigham Young University?

6    A    The only information I have about that is what was

7    contained in Mr. Sevart's reports.  It is a very different job

8    than the one that she held.  It's a different industry, a

9    different level of responsibility, and a different schedule.  I

10   understand that it is located in one place, whereas her

11   previous work involved some travel.  It is just a very

12   different job.

13   Q    And it is not a sales manager job?

14   A    I don't believe so, no.  I don't think it has anything to

15   do with sales.

16        MS. TALCOTT:  No further questions.

17        THE COURT:  Thank you.

18                    CROSS-EXAMINATION

19   BY MS. CHAMBERS:

20   Q    Dr. Bierhanzl, are you a national certified vocational

21   rehab expert?

22   A    No.

23   Q    Are you a national certified rehab counselor?

24   A    I'm not.

25   Q    Are you a diplomate with the American Board of Vocational

E. Bierhanzl - X

1    Experts?

2    A    No.

3    Q    Are you a part of the International Association of Rehab

4    Professionals?

5    A    No.

6    Q    Have you authored any publications in vocational rehab?

7    A    No.

8    Q    But Mr. Sevart is all those things; is that right?

9    A    I don't know about the specific qualifications, but yes,

10   he is a certified vocational rehabilitation expert.

11   Q    And since you are opining on mitigation, you know that you

12   have the right to meet directly with the plaintiff to interview

13   her, right?

14   A    A right based on what?

15   Q    If you would have asked, you could have met directly with

16   Ms. Ivie about her job search efforts?

17   A    Okay.

18   Q    Do you know that?

19   A    I hadn't thought about it.

20   Q    So you didn't meet with her directly, right?

21   A    No.

22   Q    So you never interviewed her; is that correct?

23   A    That's correct.

24   Q    You never interviewed her about her job search?

25   A    That's correct.  I relied on Mr. Sevart's

E. Bierhanzl - X

1  information.

2  Q    And you didn't interview her about her employment history?

3  A    Well, I reviewed her personnel file, and so I'm familiar

4  with her employment history with AstraZeneca.

5  Q    That's not my question.  You didn't interview her?

6  A    I didn't interview her.

7  Q    Did you review her job search records?

8  A    They weren't made available to me.

9  Q    You didn't ask for them?

10  A    I did ask for them.

11  Q    I'm sorry?

12  A    I did ask for them.

13  Q    Did you review -- well, they were actually produced in the

14  discovery of this case?

15  A    I asked for all of the back-up from Mr. Sevart's report,

16  and I was told that none was produced.

17  Q    They were all produced to AstraZeneca's counsel.

18        Do you know how many interviews Ms. Ivie went on?

19  A    I believe Mr. Sevart said approximately 117 between her

20  termination in February of 2020 and then 37 in the following

21  nine months.

22  Q    Can you name one or two interviews she went on?

23  A    In the first six months or until February of 2020, her

24  interviews, as I recall, were primarily with pharmaceutical

25  companies, and they involved jobs that were essentially the

E. Bierhanzl - X

1    same as the job that he she had previously held in sales
2    management.
3    Q    Did she get a job from any of those interviews?
4    A    No.
5    Q    And you talked about Mr. Sevart making some assumptions,
6    right?
7    A    Yes.
8    Q    But you also assumed that Ms. Ivie would get another job
9    in the pharmaceutical sales industry at the same salary by
10   December of 2020, right?
11   A    Yes.  Well, December of 2020 was not my assumption; that
12   was Mr. Sevart's assumption.
13   Q    But you assumed she would find a job in the same field
14   making the same money?
15   A    Yes.
16   Q    And that assumption was wrong?
17   A    I assumed she was capable of finding a job.
18   Q    But you assumed she would find that job, and that's why
19   your front pay table stops at December 2020, right?
20   A    That is what I was explaining before.  It is not the
21   actual income that someone earns.  It is the mitigation offset
22   has to depend on what could reasonably be expected for someone
23   with those qualifications and that experience.
24   Q    Okay.  Did you know that Ms. Ivie went on an interview for
25   a district sales manager even after she got her position at

E. Bierhanzl - ReD

1    BYU?

2    A    I did not.

3    Q    And that wasn't in your report, right?

4    A    No.  My report, I believe, was before then.

5    Q    And you don't know that she was declined -- she didn't get

6    the job even though she interviewed for a district sales

7    manager earlier this year, right?

8    A    I have no way of knowing.

9         MS. CHAMBERS:  No further questions.

10             REDIRECT EXAMINATION

11   BY MS. TALCOTT:

12   Q    Dr. Bierhanzl, to the best of your knowledge, did

13   Dr. Edelman interview Ms. Ivie?

14   A    No.  I believe he relied entirely on Mr. Sevart's

15   material.

16   Q    And you reviewed Ms. Ivie's deposition?

17   A    Yes.

18   Q    And Ms. Ivie's counsel asked whether the reference you

19   used was for pharmaceutical sales reps when you were looking at

20   comparable salaries.  Was it actually for all district sales

21   managers across industries or was it limited to pharmaceutical

22   sales?

23   A    Sorry.  Could you repeat the question?

24   Q    Sure.  Ms. Chambers asked you whether you used a reference

25   point for a comparable offset job in pharmaceutical sales, a

E. Bierhanzl - ReD

1    pharmaceutical sales district manager.  And my question is:

2    Was it limited to pharmaceutical sales, or did you look at

3    comparable salaries for district managers across all

4    industries?

5    A    It wasn't limited.  Both Mr. Sevart's tables for sales

6    managers and the Bureau of Labor Statistics data that I

7    reviewed were just for sales managers across all industries.

8    Q    Is sales management a portable skill?

9    A    Well, it's portable in the economic sense, which is it is

10   transferable from one industry to another.

11   Q    And so the skills that Ms. Ivie has in selling

12   pharmaceuticals would be attractive and marketable for her

13   selling something else?

14   A    Yeah.  In the labor market, we consider sales and

15   management as well, because I believe she has substantial

16   management experience.  The skills are more attached to the

17   sales and management function than they are to the particular

18   item in the industry.

19            MS. TALCOTT:  Okay.  Thank you.

20            MS. CHAMBERS:  No further questions.

21            THE COURT:  May this witness be excused?

22            MS. TALCOTT:  Yes, Your Honor.  Thank you.

23            THE COURT:  Thank you, sir.  I appreciate your time

24   this afternoon.

25            Call your next witness, please.

R. Stickle - D

1        MS. TALCOTT:  Your Honor, we call Robert Stickle.

2        THE COURT:  Thank you.

3        THE COURT:  Good afternoon, sir.  Please step forward

4   and take a seat.  You are welcome to remove your mask, if you

5   are comfortable.

6            (The witness was duly sworn.)

7        THE CLERK:  State your full name and spell your last

8   name for the record.

9        THE WITNESS:  Robert Glen Stickle.  S-T-I-C-K-L-E.

10                        DIRECT EXAMINATION

11  BY MS. TALCOTT:

12  Q    Good afternoon, Mr. Stickle.  Can you introduce yourself

13  to the jury and tell them about yourself.

14  A    Sure.  I'm Bob Stickle.  I live in Salt Lake City, Utah.

15  I have -- I am married.  I have got four girls, ten grandkids.

16  I have been in Utah about 23 years, and I have been with

17  AstraZeneca that whole time.

18  Q    How old are you, Mr. Stickle?

19  A    I am 66; soon to be 67 in October.

20  Q    And I missed it.  How long have you worked for

21  AstraZeneca?

22  A    23 years.

23  Q    What is your current position?

24  A    I am called a senior executive pharmaceutical sales

25  specialist.

R. Stickle - D

1    Q    What territory do you cover?

2    A    I cover right now the Provo territory, which is kind of

3    the lower end of Salt Lake Valley all the way down to

4    St. George, Utah.

5    Q    Was Ms. Ivie your manager at some point?

6    A    Yes, I think for about seven, seven-and-a-half years.

7    Q    And was she your manager at the time of her termination

8    from AstraZeneca?

9    A    She was.

10   Q    How far geographically was your Salt Lake City territory

11   from where Ms. Ivie lives?

12   A    She actually lives within my territory at present.

13   Q    So when you worked with Ms. Ivie, were you geographically

14   the closest sales rep she managed?

15   A    Probably.  There were some people that lived in Sandy, but

16   yeah, probably pretty close.

17   Q    When Ms. Ivie was your manager, did she coach you in

18   person?

19   A    She did.

20   Q    How frequently?

21   A    I don't know.  There was probably -- in seven years, I'm

22   guessing there is a potentiality of 70 visits, but I don't

23   think it was anywhere near that.  I would guess maybe once

24   every several months.

25   Q    That she would coach you in person?

R. Stickle - D

1   A    Yes.

2   Q    What did those live coaching sessions look like?

3   A    Oftentimes they were, "I'll meet you for breakfast," and

4   then we would visit for a minute.  Then she would say, "Okay, I

5   have got some stuff I need to do."  So she would stay there in

6   the restaurant where we visited, and I would go make calls.

7   Q    When you say "make calls," do you mean visits with

8   doctors' offices?

9   A    Yes.  That's the more vernacular, yes.

10  Q    So when you were calculating that you probably had 70 live

11  coaching sessions with Ms. Ivie over seven years, how many of

12  those live coaching sessions would you estimate would be with

13  her going with you on a sales call?

14  A    I don't think there were 70.  There was a potentiality of

15  about 70.  I don't know how many there were.  I don't know.  I

16  would have a hard time guessing how many.  It was much less

17  than 70.  Of those, live coaching, going to see customers,

18  20 percent of the time maybe.  That's a shot in the dark.  I

19  don't remember.  It wasn't frequent, no.

20  Q    As we sit here today, can you recall any live coaching

21  sessions with Ms. Ivie where she went with you to call on

22  physicians?

23  A    Yeah.  I remember a time early on when we were in

24  Tooele.  I remember that day.  And then I remember -- let's

25  see -- towards the end, she made a comment, and I can't

R. Stickle - D

1  remember which office it was.  She said she liked the way I

2  verbalize something.  And then there was one trip to St. George

3  where she came down, and we made some calls.

4  Q    Where is St. George?

5  A    It is about four hours from the south end of by

6  territory -- four hours from where I live.

7  Q    Are there flights from Salt Lake City to St. George?

8  A    Yeah.

9  Q    How long did you cover the St. George territory?

10  A    When Suzanne was my manager?

11  Q    Correct.

12  A    About two years, something like that.

13  Q    How often did Ms. Ivie coach you live in St. George?

14  A    Once.

15  Q    Once in that period of time.

16       I want to go back to again the number of coaching

17  sessions that you estimate that you had live with Ms. Ivie

18  because I think there was some confusion in our communication.

19  You said there was a potentiality of 70 live coaching sessions

20  in seven years.

21  A    I'm just guessing.  You had to figure out that if you had

22  more than -- if you have more reps, you might not be able to

23  get in one per month.  So I figured with vacations and holidays

24  and things like that, probably ten a year would be the target

25  over seven years, and that's why I came up with 70.

R. Stickle - D

1  Q    Let's use that as a base number.  If at most -- and that's

2  what you mean -- at most there were ten coaching sessions a

3  year, live with Ms. Ivie?

4  A    There were never ten a year, to my knowledge.

5  Q    Okay.  And of the number of live coaching sessions you had

6  with Ms. Ivie, what percentage of those did she go to a

7  physician's office with you?

8  A    20 percent maybe.  Maybe 20, 30.

9  Q    Do you recall ever spending a full day in the field with

10 Ms. Ivie on visiting physicians' offices?

11 A    I can't remember a full day.  So if you kind of decide

12 what a full day would be, you'd meet in the morning, plan, make

13 calls until lunch, and then have lunch, then go back and make

14 calls to three or four or five o'clock, that, maybe once.  That

15 Tooele ride-along that stands out in my mind might have been

16 one of those.  That might be the only time I remember.

17 Q    In seven years?

18 A    Uh-huh.

19 Q    How was your performance in 2017?

20 A    Good.  I was able to -- I was the number one rep in the

21 country that year.

22 Q    And how was your performance in 2018?

23 A    Not quite so good.

24 Q    Tell us about that.

25 A    For a number of factors.  We weren't performing, so I

R. Stickle - D

1    ended up probably in the bottom 30 perhaps in the country that

2    year.

3    Q    And what ranking did you receive on your annual review at

4    the end of 2018?

5    A    There is a spectrum from one to five.  I was a two.

6    Q    And one is the bottom?

7    A    One is the bottom.

8    Q    So two was not a good ranking for you?

9    A    Not good, no.

10   Q    That was the year after you had been the number one

11   salesperson in the country?

12   A    Right.

13   Q    When your performance declined in 2018, did Ms. Ivie help

14   you identify the issues in your territory that were making it a

15   challenge?

16   A    Not really, no.

17   Q    Did Ms. Ivie help you come up with a strategy to turn

18   things around?

19   A    No.

20   Q    In 2018, when you were having performance struggles, did

21   Ms. Ivie increase the amount of time that she coached you in

22   the field?

23   A    No.

24   Q    Did Ms. Ivie help you to work on your selling skills in

25   2018?

1   A    No.  Not specifically, no.

2   Q    Now in 2018, you had been a pharmaceutical sales rep for

3   over 25 years; is that correct?

4   A    I started in 1985.

5   Q    Did you feel like in 2018 you could benefit by coaching

6   from your manager?

7   A    Absolutely, yeah.

8   Q    Who became your manager after Ms. Ivie left?

9   A    His name is Chris Thomsen.

10  Q    How often did Mr. Thomsen coach you in the field?

11  A    At least once a month; sometimes two days a month.

12  Q    And when Mr. Thomsen coached you in the field, what did

13  that look like?

14  A    So the nice thing about Chris is that he would take a look

15  at the data, and he helped me better understand one way to look

16  at it, so where there were opportunities that I may have been

17  missing the previous year.  The thing I liked about Chris was

18  that he was -- it was an environment that you felt like you

19  could actually fail and be okay.  So if you go in and you make

20  the call, if you like it or not, you're going to come out, and

21  he would say, "What did you like about that call?"  And

22  inevitably I would say, "I liked this thing about it."  And he

23  would say, "Yeah, but I also like this that you did."  So he

24  kind of would pull things out and make you realize that you did

25  a decent job.  Then he would say, "Okay, if there is anything

1  that you could do better next time, kind of a replay, what

2  would you do better?  What would you do differently?"  Then we

3  would talk about that, and he would say, "Okay, what does that

4  sound like?"  Then we would practice it, and we would go make

5  another call.

6  Q    Did you feel like you benefited from the live coaching

7  from Mr. Thomsen?

8  A    Absolutely.  Yeah.

9  Q    Did Mr. Thomsen help you analyze the issues in your

10  territory that contributed to your performance challenges?

11  A    Yeah.  Yeah.  Like I said, there were things that I think

12  we maybe overlooked that he recognized, "Oh, this is an

13  opportunity that you may want to pursue."

14  Q    Did your performance improve after Mr. Thomsen became your

15  manager?

16  A    Performance?  Yes, absolutely.

17  Q    I want to shift gears.  Have you met Stephani DiNunzio?

18  A    I have.

19  Q    Would it be fair to say that she is your boss's boss?

20  A    She was, yes.

21  Q    And that's because she has moved into a different role?

22  A    She is now.

23  Q    Did Ms. DiNunzio attend any sales calls with you?

24  A    Yeah.  I had her in my car twice, if I remember right --

25  twice -- and did lunches with her and made calls with her,

R. Stickle - D

1    yeah.

2    Q    And how was that?  How was your experience going on sales

3    calls with Stephani DiNunzio?

4    A    Very similar to Chris.  Afterwards, "What did you like

5    about that call?"  Then she would be point out things that she

6    liked.  Then the same thing.  "If you could do a replay, is

7    there anything you'd want to change?"  Sometimes it was, "No."

8    Other times it was, "Yeah, I want to do this."  And she would

9    either agree or disagree and say, "No, I think you did a good

10   job."

11   Q    Did you feel that she was honest with her constructive

12   criticism?

13   A    Absolutely.

14   Q    Was she direct with her constructive criticism?

15   A    Yeah.

16   Q    Did you find that constructive criticism from

17   Ms. DiNunzio, though, to be helpful?

18   A    Absolutely.

19   Q    Have you observed Ms. DiNunzio say or do anything that you

20   would interpret as age discrimination?

21   A    No.  I'm 66 years old, and she was fully supportive of me.

22   Q    Did Ms. Ivie ever discuss Stephani DiNunzio with you?

23   A    Yeah.

24   Q    What did Ms. Ivie tell you about Stephani DiNunzio?

25   A    I think there was a running concern in my territory that

R. Stickle - X

1  Steph was kind of on the war path to get rid of older reps.

2  That was kind of the impression that I was getting from Suzanne

3  to my counterpart and also to me.

4  Q    And so that came from Ms. Ivie?

5  A    Uh-huh.

6  Q    Did Ms. Ivie ever comment to you about choosing sides

7  between her and Ms. DiNunzio?

8  A    Well, yeah, just towards the end.  She said, "Which team

9  are you on, Bob?  Mine or Steph's?"  It is kind of an untenable

10  situation to be in.  I didn't know what to really say, so I

11  just kind of played along with it.

12  Q    And both of them were your --

13  A    Immediate supervisor and then second supervisor.

14       MS. TALCOTT:  Okay.  Thank you.  No further

15  questions.

16       THE COURT:  Thank you.

17                    CROSS-EXAMINATION

18  BY MS. CHAMBERS:

19  Q    Mr. Stickle, you are still employed at AstraZeneca?

20  A    I am.

21  Q    And you plan to retire there?

22  A    I hope so.

23  Q    And Chris Thomsen is currently your supervisor?

24  A    No.  Aaron Griffith is mine.

25  Q    Aaron Griffith.  But Chris Thomsen is a current employee?

R. Stickle - ReD

1  A    Yeah.

2  Q    And he was your supervisor?

3  A    He was.

4  Q    And you were never contacted by anyone about your personal

5  experience for field coaching for Ms. Ivie, right?

6  A    I don't know what you mean.

7  Q    Did anyone ever -- prior to Ms. Ivie's termination, did

8  anyone ever reach out to you to get your first-hand account of

9  how Ms. Ivie coached in the field?

10  A    I don't remember.  I don't recall anybody doing that, no.

11  Q    Did you ever file a complaint of off-label marketing

12  against Stephani DiNunzio?

13  A    Me?

14  Q    Yes.

15  A    No.

16        MS. CHAMBERS:  No further questions.  Thank you.

17                REDIRECT EXAMINATION

18  BY MS. TALCOTT:

19  Q    I have one.  Mr. Stickle, did you ever observe

20  Ms. DiNunzio say or do anything that you would interpret as

21  off-label marketing?

22  A    No.

23  Q    Thank you.

24  A    Not at all.

25        THE COURT:  May this witness be excused?

1          MS. TALCOTT:  Yes, Your Honor.  Thank you.

2          THE COURT:  Thank you, Mr. Stickle.  I appreciate it.

3          Call your next witness, please.

4          MR. McCARTHY:  AstraZeneca calls Christopher Thomsen.

5          THE COURT:  Thank you.

6          Mr. Thomsen, please step forward.  You may remove

7  your mask, if you are comfortable, once you are in the box, and

8  we will swear you.

9          (The witness was duly sworn.)

10          THE CLERK:  Thank you.  Would you please state your

11  name for the record, spelling your last.

12          THE WITNESS:  Yes.  Christopher Thomsen.

13  T-H-O-M-S-E-N.

14                   DIRECT EXAMINATION

15  BY MR. McCARTHY:

16  Q    Good afternoon, Mr. Thomsen.  Thank you for coming.  Would

17  you introduce yourself to the jury and just tell them a little

18  bit about you.

19  A    My name is Christopher Thomsen.  I'm from Utah, the

20  Salt Lake area.  I have worked with AstraZeneca for about 16

21  years.  I have been in the DSM -- district sales manager --

22  role for about four years at this point.

23  Q    Previous to being a DSM, were you what they call a PSS or

24  a sales rep?

25  A    Yeah.  I started my career as a sales rep in Reno, Nevada,

1    and then had an opportunity to move back to Utah after about

2    six years there, and I spent several years in Utah as a PSS,

3    and then I moved into a role called a health systems

4    specialist.  I worked there and then got to spend a couple of

5    years at our headquarters supporting that team nationally as

6    well.

7    Q    We have heard some about coaching today.  So am I right,

8    as a DSM and a sales professional, you have been on both ends

9    of coaching; is that right?

10   A    That's correct.

11   Q    Do you know the plaintiff, Ms. Ivie?

12   A    Yes, I do.

13   Q    How do you know her?

14   A    Suzanne was my manager for about two years, 2012 to 2014.

15   Q    So when she was your manager, am I right that you were a

16   sales rep, and Ms. Ivie was a DSM at that time?

17   A    That's correct.

18   Q    Where about was your territory when you were a sales

19   rep?

20   A    I covered northern Utah and southern Idaho.  So I went

21   from Ogden, Utah, to Idaho Falls or the Rexburg, Idaho, area.

22   Q    My western geography is not great.  So in relation to

23   Salt Lake, where are those places?

24   A    So Ogden would be the southernmost part of my territory.

25   From Salt Lake, that would be about a half hour from Salt Lake.

C. Thomsen - D

1   Idaho Falls from Salt Lake is about three-and-a-half to four

2   hours.

3   Q    Apologies for the personal question.  How old are you?

4   A    I am 47.  I will be 48 this fall.

5   Q    When Ms. Ivie was with AstraZeneca working with you, did

6   you know how old she was or what age she was?

7   A    I did not.

8   Q    Did you know whether she was older or younger than you?

9   A    I did not.  I always assumed we were similar in age.  I

10  know my kids are a little bit older than her kids, so I figured

11  we were kind of around the same age.

12  Q    How many kids do you have?

13  A    I have three kids.

14  Q    So I want to talk to you a little bit about the coaching

15  experience that you had when you were on the receiving end of

16  coaching, and that was in that 2012 to 2014 time frame with

17  Ms. Ivie as your DSM.  Over that two-year period, I guess, can

18  you first tell us how many times did Ms. Ivie come and ride

19  with you in person on sales calls to doctors' offices?

20  A    I've tried to remember.  I've really thought about this.

21  I can only remember four times she was with me in the field and

22  saw doctors with me.

23  Q    Four times in two years?

24  A    Uh-huh.

25  Q    Can you generally describe what field coaching looked like

C. Thomsen - D

1  with Ms. Ivie as your manager.

2  A    Yeah.  It was different.  So in my first ten years with

3  the organization, I had nine different managers.  So I had a

4  lot of different experiences.  But with Suzanne, generally she

5  arrived in my geography after ten o'clock.  We would usually

6  see maybe one, two offices.  Usually there was a lunch in

7  there, and then we would have lunch.  Then she would leave for

8  the day.  There wasn't a whole lot of coaching as far as my

9  sales would go.  We wouldn't do a lot of territory planning,

10 diagnosing my business, or anything like that.  It was usually

11 spend a couple of hours together and then she went home.

12 Q    Did she know your customers?

13 A    Not very well, no.

14 Q    Now, when Ms. Ivie was your supervisor, you had been with

15 the company six, seven years at that point?

16 A    A little over seven years at that point.

17 Q    So you had some experience?

18 A    Uh-huh.

19 Q    Did you feel like since you had been a rep -- and you were

20 pretty successful as a rep?

21 A    Yes.

22 Q    Did you feel like because you had been a rep for six or

23 seven years that you didn't need to be coached in person?

24 A    You know, it was different than when I first started.  I

25 developed skills.  I had been successful.  I knew how to do the

1   day-to-day stuff.  But a lot of what you look for from your

2   manager is helping you to continue to develop and grow.  I had

3   aspirations of moving into leadership roles and aspirations of

4   being successful in my territory.  So that's a lot what your

5   manager does -- provide coaching and feedback.  So I definitely

6   wanted to be developed.  I definitely wanted to continue to

7   grow in my role and have future opportunities as well.

8   Q    You mentioned you had nine other managers.  Is there a way

9   for you to generally compare the coaching that you received

10  with some of those other managers versus the coaching that you

11  experienced when you were reporting to Ms. Ivie?

12  A    A couple of things.  So Suzanne was my manager when I was

13  in the field for the longest period of time, but I spent the

14  least amount of time in the field with her.  And I probably had

15  the least amount of consistent communication and coaching with

16  her.  So, for example, the manager I had right before her,

17  while we would spend time in the field, we also spent a lot of

18  time on my personal development.  I was working, as I said, to

19  become a district sales manager, and so we would work on

20  different skill sets that I needed to develop there --

21  capabilities; connecting with other people.  My manager after

22  Suzanne, I had moved into a health system role, which is a

23  little more specialized role.  I worked with InterMountain

24  Healthcare exclusively.  That manager spent a lot of time

25  working with me on strategic account planning, networking, how

C. Thomsen - D

1    you work in different parts of the system.  So with most of my

2    other managers, I spent a lot of time on not only the

3    development of my selling skills but also my personal and

4    professional development as well.

5    Q    At some point in 2019 did Stephani DiNunzio reach out to

6    you and ask you any questions about your experience with

7    coaching when you were reporting to Suzanne?

8    A    There was one conversation where she just asked me about

9    the frequency of the coaching experiences in the amount of time

10   she spent time with me in the field.

11   Q    Did you share information with her generally consistent

12   with what you just described?

13   A    Yes.

14   Q    Now, I want to talk to you about your coaching approach

15   generally now that you are a DSM.  What does coaching look like

16   when you do coaching now?

17            We just heard from Mr. Stickle.  Maybe you passed in

18   the hallway.  Maybe you can find a different example or think

19   of a different example of a sales rep that you've worked with.

20   Describe to the jury what you are trying to accomplish when you

21   are with them in the field and how you do that.

22   A    Yeah.  So as pharmaceutical sales representatives, our

23   responsibility is to have meaningful conversations with doctors

24   that are beneficial for patients.  We want to help them

25   understand our medicines, both the pros and cons.  So as a

1   field sales leader, what my responsibility is is to help my

2   people have those effective conversations.  So I spent every

3   week, three to four days a week out in the field with my

4   people, and part of that is being able to observe how they

5   interact with the doctors.  You can get feedback in those

6   specific interactions.

7        We practice together, going through different

8   scenarios, things of that nature.  We do business diagnoses

9   together, look at where there is opportunities.  So we spent a

10   lot of time on those things.  But also, one of the other things

11   that you bring as a manager, especially by being out in the

12   field, is you get to see a number of different people interact

13   with a number of different kinds of doctors.  So you learn.

14   You learn from the other doctors.  You learn from the other

15   reps.  You're able to bring that experience and share with the

16   other PSSs.  So you become that connector that helps forward

17   information on.

18        Another real key is being able to spend time on their

19   personal development, like we talked about a little bit.  An

20   example, earlier this week I worked with one of my

21   representatives in Utah.  We were working in kind of central

22   rural Utah.  So I left my home at 6:00 in the morning.  I drove

23   about three-and-a-half hours to meet him.  We went to the first

24   doctor's office.  We had great interactions.  But like during

25   one of the interactions, he forget a real key part of our

C. Thomsen - D

1    selling model.  And so we talked about that.  How could you

2    utilize that next time?  Let's practice it together.  What

3    would be a better question to ask the doctor?  Then we went to

4    the next office, and he used some of those things, and he

5    improved the conversation we had.

6            This particular rep I was working with is interested

7    in moving into a sales leadership role, and so we talked about

8    where some gaps in his development; where are some people he

9    needed to network with?  And then we developed a specific plan

10   on some things for him to work on for the next few weeks.  So

11   that's kind of a typical kind of day you have with a

12   representative out in the field.

13   Q    And when you do field coaching like that out in the field,

14   do you also document or write down that in a field coaching

15   report?

16   A    Yeah.  So after each field ride, you have a field coaching

17   report.  It is a form they give us.  There are usually

18   different categories you fill out.  You usually focus on one or

19   two areas.  You talk about specific experiences you had

20   together.  You usually align before the day, like what you are

21   going to be working on.  Then at the end of the day, you align

22   on one or two specific things they are going to work on, and

23   you set a time frame to follow up and work with the rep on

24   those specific items.

25   Q    Now, when you became a DSM, am I right that you began

C. Thomsen - D

1    reporting to Stephani DiNunzio at some point?

2    A    Right.  I was hired by a different commercial business

3    director.  He transitioned out, and Stephani came in, as I

4    finished training.  For all intents and purposes, I worked with

5    her the entire time.

6    Q    I want to talk more about that time that you had as a DSM.

7    First, you recall being interviewed in 2019 as part of an

8    investigation into some human resources and compliance

9    complaints?

10   A    Yes.

11   Q    And those complaints related to allegations about

12   Stephani DiNunzio?

13   A    Correct.

14   Q    And you were asked questions about the HR issues as well

15   as some allegations that Ms. DiNunzio was encouraging off-label

16   promotion?

17   A    Correct.

18   Q    Do you recall the HR issues related to allegations of age

19   discrimination?

20   A    Yes.

21   Q    One of the claims put forward was that Ms. DiNunzio had

22   assigned a nickname to Ms. Ivie that was "Benatar"?

23   A    Uh-huh.

24   Q    Do you recall that?

25   A    Yes, I do.

C. Thomsen - D

1  Q    And you knew that Ms. Ivie was nicknamed "Benatar"?

2  A    Yeah.  So when Stephani became our CBD, she was trying to

3  build some camaraderie and was trying to give us some names.

4  "Benatar" was mentioned.  It was there for a couple of weeks or

5  maybe a month or two.

6  Q    Did you associate the "Benatar" nickname in any way with

7  Ms. Ivie's age?

8  A    No.  It was based on a picture that Suzanne shared with us

9  where she was dressed looking like Pat Benatar.  I think it was

10  from high school, and it didn't have anything to do with age,

11  in my opinion.

12  Q    Did you have a nickname?

13  A    They tried but never came up with a good one.  I think

14  they said stuff about me behind my back maybe but not up front.

15  Q    Do you remember another allegation was that Stephani had

16  used some presentation or discussion materials that referred to

17  "old pharma" and "new pharma" or an "old bus" and a "new bus"?

18  A    I do.

19  Q    And you were interviewed about that as well by HR?

20  A    Correct.

21  Q    Do you recall the concept of "old pharma" and "new

22  pharma"?

23  A    Yes.  It was very much about mindset, what we were

24  discussing.  In the past with pharma, we would get a call plan.

25  These are the doctors you are supposed to call on, and these

C. Thomsen - D

1    are the calls you make.  "Old pharma" is you get up and every

2    week you go to the same offices and talk to the same doctors;

3    same thing.  The mindset shift we were talking about, the

4    "new pharma" was that the world has changed, and we needed to

5    approach our business differently.  We needed to be more

6    strategic.  We needed to more -- align more with the customer's

7    needs.  We needed to have a plan and not just a routine.  So

8    "old pharma/new pharma" wasn't maybe the best wording, but it

9    was really intent on a growth mindset versus a fixed mindset.

10    Shortly thereafter, that's what the verbiage changed to -- a

11    growth mindset versus a fixed mindset.

12    Q    Did you think the "old pharma/new pharma" had anything to

13    do with age?

14    A    No.

15    Q    Did you hear anybody else say that it did?

16    A    No.

17    Q    There were some compliance allegations.  As I mentioned,

18    there was an allegation that Ms. DiNunzio was encouraging

19    people to share inappropriate insights.

20         Do you recall that?

21    A    Yes.

22    Q    Did you ever witness or hear Ms. DiNunzio encouraging

23    anyone to use any improper insights?

24    A    No.

25    Q    Did you ever hear Ms. DiNunzio give any direction that was

C. Thomsen - D

1   to promote off-label?

2   A    No.  In fact -- and I stated this before.  It was always

3   the opposite.  We were always very clear that we needed to stay

4   on-label -- what's appropriate, what's not appropriate.  We

5   needed to not put the company at risk and needed to do the

6   right thing, and so it was the opposite of that.

7   Q    And did you ever see -- there were some times when you

8   were present with both Ms. DiNunzio and Ms. Ivie?

9   A    Uh-huh.

10  Q    Did you ever observe any interactions between the two of

11  them?

12  A    When you say -- I mean, I saw interactions.

13  Q    Did you ever see Ms. DiNunzio mistreating Ms. Ivie or

14  treating her in not a positive way?

15  A    No.

16  Q    Did there come a time when you were asked to take over as

17  an interim DSM in the Salt Lake area?

18  A    Yes.

19  Q    Was that in early March of 2019?

20  A    That is correct.

21  Q    And did that happen during a time when Ms. Ivie was on

22  leave?

23  A    Yes.

24  Q    So am I correct then, during the time that Ms. Ivie was on

25  leave, from about early March until mid-April, you were sort of

C. Thomsen - D

1  the acting DSM for that --

2  A    That is correct.

3  Q    -- district?

4        Tell me about your experience when you came into that

5  role as an interim DSM.  What was it like taking on that role

6  and what did you learn about how the district was doing?

7  A    Yeah.  At that time I was actually managing two other

8  districts as well, and so this was my third district that I was

9  helping to cover, but I lived in Salt Lake.  So I was just

10  asked to treat that district just like my other two

11  districts -- to help coach the people, help them with their

12  plans, and make sure they got the information that was there.

13  So I did that.

14        I did some ridings with some of the people in the

15  field.  During that time frame we had been working on the

16  AstraZeneca selling model.  It was kind of an update to what we

17  had been doing.  Some of my observations were the Salt Lake

18  team was not utilizing that framework.

19        It really consists of sharing an insight, asking good

20  discovery questions, listening, and then talking about our

21  product in an appropriate way and creating the need.  So there

22  was a lot of -- it was pretty clear that that hadn't been

23  coached a whole lot, and so I started to coach to that.

24        Then also just coaching to the same standards I was

25  with the other two teams I was managing at the time, and also I

C. Thomsen - D

1  just helped to provide some insight regarding their reports and

2  their opportunities to grow their business.

3          When I did take over -- not "take over" -- when I was

4  helping at that time, the Salt Lake district had been

5  underperforming for a little while and was underperforming

6  during the first quarter of the year.

7  Q    When you came in as the interim DSM, did you review some

8  of the documentation that Ms. Ivie had created from her

9  coaching of the reps and what did you observe there?

10 A    Yeah.  So I wasn't able to observe that when I was the

11 interim DSM.  I was able to later when I became the full DSM.

12 Q    We will get there.  Now, when Ms. Ivie returned from leave

13 in mid-April, she resumed the position of DSM?

14 A    That's correct.

15 Q    Now, when she returned from leave, did Stephani DiNunzio

16 ask you to help in any way -- help review things with Suzanne?

17 A    Yeah.  There were two requests.  We had an update to our

18 reporting tool.  I was just asked to provide that -- an update

19 to Suzanne so she was aware of the new capabilities there.

20 Then to provide some feedback on her team, what we had been

21 working on together and what I observed as I covered her team,

22 so that she could hit the ground running when she got back.

23 Q    And who asked you to do that?

24 A    That was Stephani DiNunzio.

25 Q    Did Ms. Ivie want to meet with you to go over all of that?

C. Thomsen - D

1    A    She wasn't real excited to meet, but we did meet for a few

2    minutes over the phone.

3    Q    Over the phone?

4    A    Yeah.

5    Q    So what was your purpose in having that discussion with

6    Ms. Ivie?  Did you also update her on what was happening in the

7    district?

8    A    Yeah, the district.  That was the primary reason.  It was,

9    again, to help her be aware of what I observed, what the team

10   was working on, and where the opportunities were while she had

11   been out so that she could continue to coach the team and help

12   the team be successful.

13   Q    When she returned from leave, did you retrain her on

14   anything she had already been trained on?

15   A    No.  Again, it was just a quick conversation with a

16   highlight of a new tool update to our reporting tool so that

17   she was aware of the different capabilities that were now

18   available to her.

19   Q    So now, fast forwarding in time to June of 2019, did you

20   again get asked to come into Salt Lake and cover that district?

21   A    Yes.

22   Q    Was it Stephani DiNunzio who asked you to do that?

23   A    Correct.

24   Q    Was there a time when you permanently assumed the position

25   of the Salt Lake DSM?

C. Thomsen - D

1  A    Yes.  So later that summer, the job was posted.  To be

2  honest, it was a difficult decision for me.  I was covering the

3  Spokane district at that time.  That was one of the top

4  performing districts in the nation, and I really loved my team

5  and had been really committed to them.  But I live in Utah.  My

6  son was going to be a senior that year and played on the

7  basketball team.  So as I looked at it, I felt that was the

8  right decision for our family.  So I applied for the job when

9  it posted.  There was both internal and external candidates.

10 So the recruiters filtered us through.  I went through an

11 interview process and fortunately was selected to take over the

12 Salt Lake district on a full-time basis.

13 Q    Was Ms. DiNunzio the only person who interviewed you?

14 A    No.  When AstraZeneca interviews, you always have a panel

15 of at least two people.  So there was another commercial

16 business director named Kevin Garrity who was involved in the

17 interview process.  And that's to make sure it is a fair

18 process and there's no bias involved.

19 Q    So Mr. Garrity was in a different geography, didn't report

20 to Ms. DiNunzio, or have any relation to that region?

21 A    No.  He was a commercial business director, like

22 Stephani DiNunzio, and his region was Texas.

23 Q    And your understanding in the interview was they were both

24 going to agree on a candidate?

25 A    That's correct.

C. Thomsen - D

1   Q    So I want to talk about your time since June of 2019.  How

2   long did you serve in that role as the Salt Lake DSM from

3   June 2019 forward?

4   A    Until the end of 2020.  Then the organization went through

5   a restructure, and I was promoted to a specialty district sales

6   manager position.  So I now cover a team that covers Utah,

7   Idaho, Oregon, Washington, and Montana.

8   Q    What kind of providers do you visit now?

9   A    I visit primary care providers as well, but our main focus

10  is no respiratory specialists, so allergists and

11  pulmonologists.

12  Q    So I want to take you back to the pre-COVID times and ask

13  you about that time period from June 2019 to March of 2020.

14  I'm sure times got different.  But focusing on that period of

15  June of 2019 to about March of 2020, what was your approach to

16  field coaching during that time?

17  A    Yeah.  So as I talked about, as a manager, you always want

18  your team to be successful.  You want people to have success.

19  It makes their lives better, right, all the way around.  The

20  Salt Lake district had been underperforming.  Collectively we

21  talked about it as a team, and my diagnosis -- you know, you

22  can talk about performance, but it is really behaviors that

23  drive performance.  So the opportunity was to improve the

24  selling skills to really focus in on the AstraZeneca selling

25  framework.  So that was one of our priorities.  Then the other

C. Thomsen - D

1    one was strategic planning, so helping people better utilize

2    the reports, to analyze where were those opportunities, and

3    then to develop specific plans to help drive performance.

4           So just for perspective, in Q1 of 2019, one person on

5    the Salt Lake team was in the top 30 percent of the nation.

6    The majority were in the 45 range to 70 range, and there was

7    two that were in bottom 25 percent of the nation.  In Q4,

8    everybody -- it was the same representatives, all seven --

9    everyone finished in the top 30 percent in the nation for Q4.

10   Q    When you arrived in that role starting in June of 2019,

11   did you look at some of the coaching documents that Ms. Ivie

12   created.  And tell the jury what you observed.

13   A    Yes.  So now that I was a manager, I had access to the

14   previous coaching reports.  What I found -- again, on the

15   coaching reports, there are five categories or areas you can

16   coach to.  You rate the people one to five; five being the

17   highest.  Generally on a coaching field ride you focus on one

18   or maybe two areas.  Fives are rare to give out, because you

19   have to be doing everything at a very high level throughout the

20   whole day.

21          I was kind of surprised when I saw the reports,

22   because basically every time everyone got fours or fives across

23   the board for all five categories.  The report itself actually

24   says to only focus on one or two.  So I was a little surprised

25   to see that.  It did open my eyes.  When I started, I gave some

C. Thomsen - D

1    people threes, and they were freaking out about that.  It made

2    sense since they weren't used to getting that type of coaching.

3    So we had to kind of work through that to help them understand

4    that was for that day that's where they were at, that's great,

5    let's work on it, and this is where the opportunities were.

6    Q    And the time period when they were getting fours and fives

7    is during the time period when they weren't performing very

8    well?

9    A    Correct.

10   Q    Let's talk about how your travels looked in the time

11   period of June 2019 through about March 2020.

12   A    As I mentioned, I was covering three districts at that

13   time.  One of them was the Spokane district.  So that covered

14   eastern Washington and all of Montana as well as the Salt Lake

15   district, which was all of the Utah and most of Idaho going up

16   to Boise.  So about every week I was flying someplace, spending

17   a couple of days away from home, working with reps in their

18   areas and was able to mix in with Utah.  But I was spending

19   about four days a week out in the field with representatives.

20   Usually I would spend one or two days with each representative

21   when I was with them.

22   Q    So how many days a week would you be in your home office,

23   for example?

24   A    Usually one day a week; usually on Fridays.  Sometimes on

25   Mondays, you might do that, but that would be where you would

1  do some follow-up on previous ride days and coaching from that

2  point as well.

3  Q    Do you find that there are budget restrictions on

4  traveling to do field coaching?

5  A    We are advised to use the funds wisely, to be

6  conscientious stewards.  If it was your money, would you do it?

7  So I just found that if you book ahead, you can find affordable

8  rates.  You know, once or twice when I was going to Boise, for

9  example, we had to have a schedule change, and the flights were

10  too expensive, so I chose to drive rather than fly.  But I

11  never had any pushback on being able to fly or get hotel rooms

12  to visit my people.

13  Q    How long is that drive?

14  A    From Salt Lake, I think it is about six, six-and-a-half

15  hours.

16  Q    So it sounds like you were spending a lot of time on the

17  road and in the air.  One of the things that the jury has heard

18  about is in 2018 in the Utah area, there was a market

19  development that affected some sales performance involving this

20  thing called generic AirDuo and how it affected SYMBICORT.  Can

21  you talk about your experience with that and how, if at all, it

22  changed going into 2019.

23  A    Yeah.  Again, the health system team I was managing was

24  based in Utah as well, and so I was very familiar with this.

25  In Utah, the largest insurance plan is called SelectHealth, and

1   SelectHealth was one of the first insurance companies to bring

2   this generic AirDuo onboard.  Up to that point SYMBICORT had

3   been a sole and exclusive with SelectHealth, which means there

4   was another branded product competing against that.

5          So yes, that obviously was a challenge.  That type of

6   stuff always happens in pharmaceuticals.  To be honest, we

7   benefited the previous years when we had a market event, being

8   SelectHealth put SYMBICORT on as a sole and exclusive.  That

9   helped our performance those years.  Generic AirDuo came on.

10  It definitely was a challenge.  The uptake was a little bit

11  swifter in Utah than other places in the country.  And that's

12  why we get paid, right, is to figure out how to strategically

13  plan and maximize your opportunity within the market.

14  Q    And did you -- when you came into the DSM role, was there

15  anything you did to try to address the situation with the

16  generic AirDuo versus SYMBICORT?

17  A    Yeah.  There just seemed to be an attitude that, "We have

18  got market leadership.  We will get this.  It is not that big

19  of a deal."  But there was this perceptive -- that was

20  happening that was eroding the share.  So in that summer time

21  frame when I took over the district permanently, we started to

22  develop a specific plan.  I didn't see a lot of specific plans

23  on how to address the issue.  So we really focused in on what

24  the differences of SYMBICORT versus the generic AirDuo were,

25  what the benefits were, and really, again, emphasize that

1    SYMBICORT was still preferred with SelectHealth.  It was still

2    affordable for patients, and the savings cards that we actually

3    had, it was actually cheaper for patients.  So we made sure we

4    had a specific strategy that we pulled through on each and

5    every call.

6    Q    So when you left the role in December of 2020, how was the

7    district doing at that time?

8    A    The district was doing very, very well.  We finished 2019

9    on a strong note, with every territory finishing in the top

10   third of the nation, about 30 percent.  2020 was unusual.  With

11   COVID, we didn't have our normal reporting period, but we did

12   launch a new product in 2020 called Breztri that came out in

13   the fourth quarter.  The Salt Lake district finished No. 3 in

14   the nation with our Breztri performance.  We had a very strong

15   year in 2020 as well.

16              MR. McCARTHY:  Thank you.  No further questions.

17                        CROSS-EXAMINATION

18   BY MS. CHAMBERS:

19   Q    Mr. Thomsen, you reported to Suzanne Ivie for two years;

20   is that right?

21   A    That's correct.

22   Q    And you performed successfully under her supervision?

23   A    So -- yes, I met expectations those years.

24   Q    And you received performance ratings three out of five

25   while under Ms. Ivie's supervision, right?

1    A    That's correct.

2    Q    And you consider those to be fair and accurate?

3    A    Yes.

4    Q    And you never raised any performance or management

5    concerns while you were Ms. Ivie's subordinate, right?

6    A    I'm sorry.  Could you repeat that?

7    Q    Sure.  You never raised any performance or management

8    concerns about Ms. Ivie while you were her subordinate?

9    A    No.

10   Q    And you were not involved in the decision to terminate

11   Ms. Ivie?

12   A    No.

13   Q    Have you ever assigned any of your PSSs a nickname?

14   A    No.

15   Q    Why not?

16   A    I just don't know.  I haven't.

17   Q    AstraZeneca has a women in leadership team, right?

18   A    Correct.

19   Q    And Suzanne Ivie was previously part of that group?

20   A    Yes.  The women in leadership, it's not a formal group.

21   It is an employee support group that anyone can join.  I'm

22   assuming she is part of it.  It is not a formal assignment or

23   anything like that.

24   Q    Okay.  And are you aware that Stephani DiNunzio removed

25   Ms. Ivie from that women in leadership group?

C. Thomsen - X

1    A    I was not aware of it.

2    Q    But Stephani DiNunzio asked you to join the women in

3    leadership group?

4    A    I was asked by Stephani DiNunzio's supervisor,

5    Mike Hartman -- I was already part of the women in leadership.

6    You can join that.  But I was asked by Mike Hartman through

7    Stephani to be part of a steering committee for that group in

8    2019.

9    Q    In early 2019, right?

10   A    Correct.

11   Q    And then you took -- and then after you were part of the

12   women in leadership group in 2019, and Ms. Ivie was not, then

13   you later took over Ms. Ivie's district after she was

14   terminated?

15   A    That's correct.

16            MS. CHAMBERS:  No further questions.

17            MR. McCARTHY:  No questions.  Thanks.

18            THE COURT:  Thank you, sir.  You are finished.

19            Call your next witness.

20            MS. RIECHERT:  The defendant rests.

21            THE COURT:  Okay.  Thank you.

22            Ladies and gentlemen of the jury, you get to sneak

23   out a little bit early this evening.  I am going to remind

24   you -- obviously it is Friday.  You will be home for the

25   weekend.  It is critical that you follow my instruction not to

1   talk about this case with one another as you are exiting the

2   building, and, of course, with anybody else at home or friends,

3   family, anybody at all.

4           As I said in my preliminary instructions, the

5   evidence that you will decide the case, you will hear in the

6   courtroom and nowhere else.

7           So thank you very much for your attention all week.

8   I appreciate it.  And I know the parties really appreciate your

9   time and attention.

10          Be back on Monday at 9:00 a.m., please.

11          Thank you very much.

12          (Open court; jury not present:)

13          THE COURT:  Be seated.  Nice work.  I am impressed.

14  Good job, everybody.

15          MS. RIECHERT:  We were motivated.  I have been

16  tracking everyone's minutes.

17          THE COURT:  I know the defendant has a motion that

18  you would like to make.

19          Before we get to that, I want to read on to the

20  record the exhibits that are going to come in.  These are the

21  exhibits that will go to the jury on the JERS system.  So it

22  will all be electronic.  Mr. Magnuson will be in charge of

23  that.  I am going to read the exhibits that are received:

24          Plaintiff's Exhibits 1 through 36, 38 to 40, 42 to

25  108, 110 to 123, 125 to 148, 150 to 182, and 201.

1          Defendant's exhibits --

2          MR. OSWALD:  I'm sorry.  I just got my list out.  Can

3     you repeat that, please?

4          THE COURT:  1 to 36, 38 to 40, 42 to 108, 110 to 123,

5     125 to 148, 150 to 182, and 201.

6          Defendant's exhibits received are:  501 to 535, 538

7     to 550, 552, 553, and 555.

8          I would like to check with the parties on

9     Plaintiff's Exhibit 128.  Defendant had objected.  The parties

10    said they might figure out a stipulation.

11         MR. McCARTHY:  And we are working on it.  I think we

12    have seen a draft, and we have seen comments.  My hope is we

13    will resolve that, Judge.

14         THE COURT:  That's fine.  I wanted to check in.  I

15    will continue to defer that ruling.

16         I would like to now hear the motions, please.

17         MS. TALCOTT:  Your Honor, AstraZeneca is moving for a

18    judgment as a matter of law on the Oregon claims.  That's the

19    fifth, sixth, and seventh claims.  Under Oregon employment law,

20    it only applies to out-of-state residents if there has been an

21    act of discrimination which occurred in the state of Oregon.

22    No part of any of the alleged discriminatory or retaliatory

23    acts that we've heard about for the last week occurred in

24    Oregon.  Plaintiff received the written warning call and

25    termination call in Utah.  We heard about comments and things

1  that occurred in meetings in Utah and Idaho.  The AstraZeneca

2  employees, who made decisions related to plaintiff's

3  employment, made those decisions in Idaho, Delaware, and

4  Dallas, Texas, but absolutely nothing that we have heard about

5  this week occurred in Oregon.  For that reason, defendant is

6  entitled to a judgment as a matter of law on the Oregon claims.

7       THE COURT:  Thank you.

8       Mr. Oswald.

9       MR. OSWALD:  Your Honor, I think the defendant has

10 waived this.  The evidence is in in the case.  This is a

11 threshold issue.  They've failed to raise this at the outset.

12 This is the first I've heard of this.  If this were a defense,

13 Your Honor, it would have been properly raised in the answer to

14 the complaint.  In this case there was no defense that was

15 indicated on the defenses in the complaint.  Therefore, it is

16 waived.  So I think this is far too late under the

17 circumstances to raise this issue.

18      MS. TALCOTT:  Your Honor, part of the plaintiff's

19 prima facie case is to establish that these acts -- the

20 discriminatory acts happened in Oregon.  There is no waiver.

21 There is very little in the complaint at all that even refers

22 to Oregon, and the only allegations that addressed Oregon in

23 the complaint were paragraphs 4 and 13.  Those were denied.

24 Then we also denied in paragraph 123 of our answer anything

25 that was not specifically admitted.  At any time a defendant

1    can move against a claim.  We don't need to assert an

2    affirmative defense against these claims in order to, at this

3    stage, make this motion as a judgment as a matter of law.

4            MR. OSWALD:  Your Honor, it is not jurisdictional.

5    So the fact that they are raising this now, I think the

6    prejudice is there.  I do believe this should have been raised

7    in the answer initially or raised at any of the other points in

8    this case.  It was not raised at summary judgment.  This has

9    not been raised as part of the pretrial statement.  We are now

10   simply too far into the matter to raise it now.  I believe it

11   has been waived.

12           THE COURT:  Okay.

13           Go ahead, please.

14           MS. TALCOTT:  Your Honor, we just disagree.  This is

15   not a jurisdictional issue.  This is part of the prima facie

16   case under the Oregon statutes.  There had to have been a

17   discriminatory act in Oregon.  We didn't waive this argument by

18   not filing summary judgment.  We sat and listened to all of the

19   plaintiff's testimony, and they put on no evidence at all that

20   anything happened in Oregon that would allow a nonresident to

21   recover under these statutes.

22           THE COURT:  Okay.  Thank you.  I am going --

23           MS. TALCOTT:  Your Honor, we did submit a written

24   motion in support of this argument.

25           THE COURT:  When did you submit it?

1    MS. TALCOTT:  I think it is actually happening right

2    now.  We have copies that we can serve on plaintiff right now,

3    and you will get them electronically as well.

4        THE COURT:  Okay.  Thank you.  I will take a look at

5    the motion.

6        Mr. Oswald, are you interested in filing a response,

7    or is your oral response enough?

8        MR. OSWALD:  I'll file a response.

9        THE COURT:  All right.

10       We do have copies of the draft verdict form and

11   instructions.  I understand that your motion may change both of

12   those, but I do want to go ahead and pass those out.  You can

13   take them with you over the weekend and take a look.  Let's

14   plan on meeting at -- it would be nice to meet at 8:00 a.m.,

15   resolve the motion, and then move right into the instruction

16   conference and get the instructions finished so you folks can

17   go right into argument.  I'll then instruct the jury.  The jury

18   will have a copy of the instructions to take with them into the

19   jury room.  So I'll instruct, and then we will let them

20   deliberate.

21       MS. RIECHERT:  Will the instructions be before or

22   after the closing argument?

23       THE COURT:  After.  It's closing and instructions.

24   But you'll know exactly what the instructions are going to say.

25   In fact, I wish I had told the jury a little bit later to give

1    us a chance -- well, you'll know what the instructions say at

2    the completion of the jury conference.  Then we will give you a

3    hard copy as well.

4         MS. RIECHERT:  Your Honor, remember, the plaintiff

5    passed out a book of their exhibits.  We have a book to give to

6    the jurors on Monday with some of our exhibits too.

7         THE COURT:  Okay.

8         MS. RIECHERT:  There are so many exhibits in this

9    case, so I tried to narrow it down to the key ones.

10        THE COURT:  Mr. Oswald, best guess when you can file

11   your response?

12        MR. OSWALD:  Your Honor, it is late on a Friday.  I

13   will get to it soon.  This is the first we heard of this.  This

14   is the first inkling we had of this.  As I said, I think this

15   is way late in the process, for all the reasons I've gone over.

16   Obviously it's our priority.  We will get to it, and I'll get

17   to it as soon as I can.

18        THE COURT:  Okay.

19        MS. RIECHERT:  I was raised it in my opening

20   statement.  I said, "Nothing in this case has anything to do

21   with Oregon."  I didn't make the legal argument, because I'm

22   not allowed to in opening, but I made the factual statement

23   that there would be nothing related to Oregon in this case, and

24   I proved out to be right.

25        MS. TALCOTT:  We also indicated to plaintiff and the

1  Court yesterday and earlier today that this would be coming.

2          THE COURT:  Okay.  Thank you very much.

3          Have as good a weekend as possible.  I'll see you

4  folks here at eight o'clock Monday morning.

5          MR. OSWALD:  Could both sides have an electronic copy

6  of what was passed out?  Is it possible that we get a copy?

7          THE COURT:  Absolutely.  Do both sides want

8  electronic copies?

9          MS. TALCOTT:  Please, Your Honor.

10          THE COURT:  We will do it.  Court is in recess.

11          MR. OSWALD:  Your Honor, forgive me.  We also have a

12  motion as well for judgment as a matter of law now that they

13  are done with theirs.  Can we go with ours?

14          THE COURT:  Yes.

15          MR. OSWALD:  We are moving for a judgment as a matter

16  of law on the counts of the False Claims Act, the retaliation

17  claim, and also under the Age Discrimination Act, Oregon's

18  Family and Medical Leave Act, and on the federal Family and

19  Medical Leave Act, and finally, under the Age Discrimination in

20  Employment Act.

21          The reason for this, Your Honor, is that the

22  defendant cannot meet their obligation to identify a legitimate

23  business reason for the decision to fire Ms. Ivie.

24          Your Honor, the way that the statutes work, as you

25  know, the absence of -- on causation -- and that's where I'm

1  going to focus the Court's attention.  On the issue of

2  causation, Your Honor, in the absence of direct evidence of

3  discriminatory intent, and we concede that we don't have direct

4  evidence.  As an example, Your Honor, the decision-maker did

5  not say, as an example, "We are firing you because of your

6  age."

7           In that construct, the plaintiff demonstrates a

8  prima facie case.  Then the defendant must come forward with a

9  legitimate business reason for the decision to fire Ms. Ivie.

10  In this case, the defendant can't.  The reason really is

11  Plaintiff's Exhibit No. 67.  Plaintiff's Exhibit No. 67, on

12  page 4, indicates the rationale for why the defendant is saying

13  that it is firing Ms. Ivie.

14           What it says here under bullet point No. 2, which I'm

15  showing you on your screen here, is one of the reasons that is

16  given for the termination.  What we have is testimony from

17  Ms. Ceaser that these were all of the factors in the decision.

18  One of these factors was that Suzanne is not accepting the

19  results of the investigations that have occurred and continued

20  to raise complaints.

21           Now, AstraZeneca has indicated that it is not just a

22  requirement of their own policy, but, in fact, it is a matter

23  of law that an employee may, in fact, raise complaints in the

24  workplace at any time.  They are free to do so.  In fact,

25  whatever the result of the investigation, they can come forward

1   and complain and do so consistent with any of the routes that

2   AstraZeneca has identified -- a manager, for example, to human

3   resources and also using the ethics hotline.

4           What we have here is specifically an illegitimate

5   reason for the decision to fire her; that she is not accepting

6   the results of the investigation and continues to raise similar

7   complaints.  Remember, what they're saying is "similar

8   complaints," the fact that she is raising these complaints

9   relating to off-label marketing, relating to age, and relating

10  to potentially violations of the Family Medical Leave Act.

11          Importantly, Your Honor, Dawn Ceaser specifically

12  states that the complaints that Suzanne Ivie makes to her are

13  new complaints.  It's not the fact that they were old

14  complaints.  They were new complaints.  In fact, she identified

15  three new issues that Suzanne Ivie raised relating to age

16  discrimination.  Indeed, Ms. Ivie was raising complaints about

17  issues relating to compliance and family medical leave, which

18  she had never raised before.

19          So the fact that they are using these new complaints

20  as a basis for the decision to fire her itself is illegitimate,

21  and it is inextricably intertwined here with the other

22  rationale that they are providing:  The fact that she is not

23  willing to engage in business as usual at work; due to the

24  continued performance challenges.  The point is that all of

25  these are inextricably intertwined.  Therefore, the defendant

1    literally cannot meet their obligation to come forward with a

2    legitimate business reason for the termination.  So at that

3    point the case law is, that in the absence of being able to

4    come forward with a legitimate business reason, that the

5    judgment should be entered for the plaintiff on those counts.

6           So what we are asking the Court to do, consistent

7    with the case law, is, in fact, enter a judgment on behalf of

8    the plaintiff on the counts that relate to the Age

9    Discrimination in Employment Act, where the defendant agrees

10    that she made three new complaints for which she is now being

11    fired, inconsistent with their own policy and the law; the

12    Family Medical Leave Act complaint, which she had not made

13    before but, remember, was made on the 16th of May.  This was in

14    an email to Mr. Pomponi, who admitted he forwarded to Dawn

15    Ceaser, and then ultimately that was sent to Stephani DiNunzio.

16    Indeed that complaint was not investigated at all.  Ms. Ivie

17    was never interviewed about the Family Medical Leave Act aspect

18    of this.

19           So for those reasons, we ask the Court enter a

20    judgment on behalf of the plaintiff and for damages, that the

21    jury be permitted to make a ruling on and make a determination

22    on the amount of damages that would flow from those specific

23    counts.

24           Thank you.

25           THE COURT:  Thank you, sir.

1          MS. RIECHERT:  Your Honor, this is an issue for the

2   jury to decide.  The jury gets to decide why the employee was

3   terminated.  There are a number of reasons listed there.  They

4   get to pick the reason or reasons that they think that the

5   employee was terminated.  There only has to be one legitimate

6   nondiscriminatory, non-retaliatory reason, and there has been

7   plenty of evidence in this case about the reasons for the

8   termination.  There has been plenty of evidence in the case as

9   to why the plaintiff could not move forward and was not able to

10  interact with her boss and was not able to "put the past behind

11  her and move forward."  So that's the very issue for the jury

12  to decide.

13          The plaintiff is entitled to argue to the jury that

14  that was the reason that she was fired, and if the jury

15  believes that she was fired for an illegitimate reason, that's

16  for the jury to decide.  But that's the very issue in this

17  case.  It is not an issue for the Court to decide, given the

18  evidence on the subject.

19          MR. OSWALD:  Your Honor, to reply, McDonnell Douglas

20  v. Green states the opposite.  It says that, in fact, the

21  defendant must come forward with a legitimate nondiscriminatory

22  reason.  In this case, they have not done so.  So they cannot

23  meet their prima facie case under the law, and a judgment

24  should be entered for the plaintiff.

25          THE COURT:  Thank you.

1          Anything further?

2          MS. RIECHERT:  We have come forward with many

3     legitimate nondiscriminatory reasons for the termination.

4          THE COURT:  Okay.  Thank you again.  I appreciate

5     your arguments and thoughts.  I will rule first thing Monday

6     morning on both motions.

7          Anything further before I let Dennis go?

8          MR. OSWALD:  No, Your Honor.  Thank you.

9          THE COURT:  Defendant, anything further?

10         MS. RIECHERT:  Nothing further.

11         MR. OSWALD:  Other than to thank your staff for the

12    week.  We are grateful.  I know this is a new experience for

13    them, as it was for us.  I know that I speak for defendant's

14    counsel that we are grateful to everybody in the courtroom for

15    this week and appreciate it.

16         THE COURT:  I agree.  Thank you.

17

18

19

20

21

22

23

24

25

1

2                              --oOo--

3

4          I certify, by signing below, that the foregoing is a

5    correct transcript of the record of proceedings in the

6    above-entitled cause.  A transcript without an original

7    signature, conformed signature, or digitally signed signature

8    is not certified.

9
     /s/ Dennis W. Apodaca                    September18, 2021
10   DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"ANSWER: [11] 813/6 814/6 829/25 843/13 860/2 862/21 863/17 863/20 863/23 863/25 879/14

"QUESTION: [6] 813/4 829/22 862/19 863/18 863/21 863/24

BY MR. McCARTHY: [11] 810/15 822/12 827/18 836/5 847/17 849/9 860/22 863/3 865/1 881/11 943/14

BY MS. CHAMBERS: [18] 761/14 766/23 773/16 778/14 781/8 796/5 797/20 806/8 806/25 846/8 858/4 862/3 864/6 876/14 901/4 926/18 941/17 964/17

BY MS. RIECHERT: [1] 882/18

BY MS. TALCOTT: [7] 784/1 904/8 907/24 908/22 930/10 932/10 942/17

MR. McCARTHY: [27] 806/3 806/24 810/7 810/13 822/8 827/15 834/21 835/1 846/1 846/4 847/4 848/10 848/24 851/1 862/1 863/1 864/3 864/12 864/15 876/12 882/3 882/6 903/11 943/3 964/15 966/16 968/10

MR. OSWALD: [13] 761/11 847/5 968/1 969/8 970/3 971/7 972/11 973/4 973/10 973/14 977/18 978/7 978/10

MS. CHAMBERS: [34] 761/6 761/8 766/18 766/22 773/10 773/14 778/8 778/13 781/3 781/7 783/23 796/3 797/1 797/4 797/8 806/5 810/2 846/6 847/14 848/11 848/13 860/20 862/24 864/10 881/9 882/4 903/3 907/8 907/12 907/18 930/8 931/19 942/15 966/15

MS. RIECHERT: [14] 901/1 903/4 903/6 903/12 903/16 966/19 967/14 971/20 972/3 972/7 972/18 976/25 978/1 978/9

MS. TALCOTT: [29] 766/21 773/12 778/11 781/6 795/24 797/2 848/14 848/19 903/9 903/20 903/25 907/5 907/10 907/15 907/22 908/16 926/15 931/18 931/21 931/25 941/13 942/25 968/16 969/17 970/13 970/22 970/25 972/24 973/8

THE CLERK: [7] 797/16 849/4 864/20 882/14 904/4 932/6 943/9

THE COURT: [80] 761/3 761/7 766/20 773/13 778/10 778/12 781/5 783/24 796/1 797/3 797/5 797/10 806/7 810/4 810/8 810/12 822/11 827/17 834/25 835/2 836/1 846/3 846/5 847/6 847/15 848/12 848/18 848/21 848/25 858/2 864/4 864/11 864/13 864/16 882/5 882/7 901/2 903/5 903/7 903/15 903/17 903/23 904/1 907/7 907/14 908/19 926/16 931/20 931/22 932/1 932/2 941/15 942/24 943/1 943/4 966/17 966/20 967/12 967/16 968/3 968/13 969/6 970/11 970/21 970/24 971/3 971/8 971/22 972/6 972/9 972/17 973/1 973/6 973/9 973/13 976/24 977/24 978/3 978/8 978/15

THE WITNESS: [11] 797/7 797/14 797/18 847/7 849/6 862/25 864/22 882/16 904/6 932/8 943/11

$

$106,000 [1] 788/9
$110,000 [1] 780/11
$130,215 [1] 779/24
$15,000 [1] 898/22
$171 [1] 780/9
$200,000 [2] 772/5 772/8
$223,271 [1] 770/15
$27 [2] 771/7 775/17
$3 [2] 793/22 924/4
$3 million [2] 793/22 924/4
$3,005,021 [1] 777/17
$3,581,003 [2] 781/19 782/1
$3,598,642 [1] 777/15
$400 [1] 765/5
$410,000 [3] 919/5 921/19 924/20
$50,000 [3] 771/8 775/22 776/11
$55,000 [2] 917/22 917/24
$575 [1] 906/22
$575,982 [1] 924/10
$60,000 [3] 771/19 912/4 914/12
$9,300 [1] 780/9
$93,000 [1] 780/1

,

'18 [1] 884/17
'80s [3] 829/5 830/20 831/1
'98 [1] 798/3

'Pat [1] 829/24

-

--oOo [1] 979/2

/

/s [1] 979/9

1

10 [2] 823/18 824/1
100 [6] 778/23 789/1 789/5 790/8 801/2 834/20
1000 [1] 759/22
106 [1] 886/23
106,489 [2] 785/19 788/6
107 [5] 785/18 823/5 823/5 823/17 823/25
108 [2] 967/25 968/4
11-year-old [1] 849/20
110 [6] 801/3 823/5 823/17 823/25 967/25 968/4
110,583 [2] 780/12 780/14
1110 [1] 759/4
114 [1] 813/1
115 [3] 785/17 812/25 814/3
117 [1] 928/19
12 [3] 765/14 817/25 861/16
12-15-16 [1] 869/22
120 [5] 801/3 816/24 836/18 840/7 861/17
1211 [1] 759/12
123 [4] 872/8 967/25 968/4 969/24
123-degrees [1] 872/7
125 [3] 763/18 967/25 968/5
128 [3] 780/19 886/23 968/9
128,980 [1] 780/22
128,984 [1] 780/14
129 [1] 777/3
129,626 [2] 776/21 776/25
13 [4] 786/11 879/8 921/11 969/23
13-year-old [1] 849/20
130 [4] 842/25 843/1 843/9 861/17
130,250 [1] 779/12
13th [1] 767/23
14 [7] 770/6 823/12 823/14 829/17 829/20 829/22 879/18
140 [2] 854/19 915/25
1400 [1] 759/7
148 [2] 967/25 968/5
14th [12] 772/22 773/5 773/6 774/16 776/24 777/10 777/18 777/18 778/6 781/14 781/14 781/15
15 [4] 768/12 842/25 843/1 916/25
15-year-old [1] 865/12
150 [12] 834/18 836/15 836/15 837/24 840/8 840/8 840/8 854/19 861/14 877/1 967/25 968/5
15th [1] 785/20
16 [4] 842/25 869/22 914/9 943/20
160 [1] 772/9
16th [1] 768/11
16th of [1] 976/13
17 [11] 798/1 798/5 798/9 798/13 799/1 799/5 799/18 800/3 816/23 826/13 847/6
17 percent [1] 821/1
1701 [1] 759/10
1717 [1] 759/4
18 [10] 758/5 761/1 785/12 785/24 786/6 859/14 859/15 865/9 914/9 920/24
182 [2] 967/25 968/5
19 [5] 859/14 863/11 863/13 913/5 915/8
1900 [1] 759/12
19103 [1] 759/10
1968 [1] 763/1
1970 [1] 763/3
1975 [1] 763/4
1978 [1] 763/24
1985 [1] 938/4
1992 [1] 764/2
1998 [1] 818/11

**1**

**1st [4]** 775/4 775/21 790/14 886/3

**2**

**2 percent [3]** 771/13 775/25 776/11
**2.4 percent [3]** 772/1 775/12 776/13
**20 [18]** 761/22 775/18 775/18 787/16 798/12 801/6 801/25 802/5 819/15 831/14 831/15 832/1 832/12 846/24 865/8 873/11 913/5 936/8
**20 percent [16]** 802/2 813/6 825/13 832/23 833/4 837/10 838/16 838/25 839/21 840/9 840/11 840/11 854/22 855/13 934/18 936/8
**20-year-old [1]** 884/10
**20006 [1]** 759/4
**2000s [1]** 857/2
**2001 [1]** 820/6
**2004 [1]** 820/6
**2005 [1]** 820/6
**201 [2]** 967/25 968/5
**2012 [2]** 944/14 945/16
**2014 [4]** 767/24 770/15 944/14 945/16
**2016 [6]** 811/6 849/19 850/5 850/6 885/1 894/16
**2017 [26]** 799/3 811/4 811/5 811/6 815/12 820/7 822/19 823/4 823/25 824/3 824/6 824/9 826/8 827/10 846/16 846/18 846/21 850/5 854/13 854/19 877/1 880/23 881/8 884/17 885/1 936/19
**2018 [27]** 767/24 770/14 770/15 803/20 804/1 804/8 820/20 820/21 821/2 821/16 827/11 831/7 834/3 836/9 842/13 844/8 844/11 847/20 885/21 936/22 937/4 937/13 937/20 937/25 938/2 938/5 962/18
**2018-2019 [1]** 885/6
**2019 [34]** 767/25 768/11 770/17 778/21 779/11 779/19 779/23 779/24 780/6 780/17 780/22 781/13 786/11 878/13 885/6 887/11 901/15 921/7 948/5 951/7 954/19 957/19 959/1 959/3 959/13 959/15 960/4 960/10 961/11 962/22 964/8 966/8 966/9 966/12
**2020 [37]** 767/24 768/11 771/18 776/21 776/24 785/20 788/7 788/14 789/11 859/11 879/11 895/1 900/10 920/3 920/8 920/20 921/3 921/22 922/5 924/15 924/18 924/20 924/21 924/23 928/20 928/23 929/10 929/11 929/19 959/4 959/13 959/15 961/11 964/6 964/10 964/12 964/15
**2021 [21]** 758/5 761/1 768/11 768/13 772/13 772/22 773/5 773/22 774/16 774/17 775/10 776/7 777/10 777/18 778/6 779/1 781/14 781/15 783/18 924/13 979/9
**2022 [1]** 774/4
**2023 [1]** 795/24
**2033 [6]** 770/7 773/6 773/22 774/4 777/18 781/15
**2052 [1]** 769/13
**21 [3]** 765/13 865/8 884/1
**22 [1]** 798/4
**223,271 [2]** 779/10 779/22
**23 [3]** 883/3 932/16 932/22
**239 [2]** 765/12 765/12
**24 [1]** 765/7
**25 [6]** 765/7 787/6 802/4 813/2 832/12 938/3
**25 percent [1]** 960/7
**25-year-old [1]** 884/10
**258,700 [1]** 777/2
**26 [2]** 863/8 884/8
**27 [3]** 790/20 792/19 879/11
**28 [1]** 906/24
**29th [1]** 768/12
**2s [1]** 770/14

**3**

**30 [4]** 845/2 882/22 936/8 937/1
**30 percent [4]** 825/13 960/5 960/9 964/10
**30-day [1]** 844/20
**301 [1]** 759/22
**30th [1]** 845/14
**31 [1]** 765/14
**326-8182 [1]** 759/23
**33 [1]** 769/12

**35 [1]** 762/10
**36 [2]** 967/24 968/4
**37 [1]** 928/20
**38 [2]** 967/24 968/4
**388,326 [1]** 777/4
**3:00 [1]** 903/15
**3:19-cv-01657-JR [1]** 758/4

**4**

**4,100 [1]** 774/23
**4,100 miles [2]** 770/25 780/5
**4/4 [1]** 834/4
**40 [7]** 802/4 825/5 865/16 865/19 876/16 967/24 968/4
**40 percent [4]** 826/11 826/15 826/20 826/23
**401 [7]** 768/13 770/23 771/14 774/20 775/23 776/12 780/4
**41 [2]** 863/9 863/11
**42 [3]** 863/11 967/24 968/4
**43 [1]** 761/24
**430 [1]** 900/17
**45 [3]** 821/10 872/9 960/6
**47 [1]** 945/4
**48 [1]** 945/4
**4th [1]** 834/3

**5**

**50 [4]** 765/11 771/19 789/9 912/4
**50,000 [1]** 899/4
**501 [1]** 968/6
**503 [1]** 759/23
**51 [2]** 770/5 778/21
**510 [1]** 885/20
**522 [3]** 834/1 836/8 855/1
**526 [1]** 889/20
**527 [1]** 890/2
**528 [1]** 890/8
**529 [1]** 890/12
**53 [1]** 773/24
**530 [1]** 890/18
**535 [1]** 968/6
**538 [1]** 968/6
**55,000 [1]** 789/10
**550 [1]** 968/7
**552 [1]** 968/7
**553 [1]** 968/7
**555 [3]** 869/5 900/3 968/7
**56 [1]** 775/1
**58 [2]** 780/5 888/5
**593,620 [1]** 777/16
**5th [2]** 881/8 887/11

**6**

**60 [2]** 817/23 823/12
**60 percent [1]** 825/5
**60,000 [2]** 789/9 899/4
**60-some-thousand [1]** 799/8
**60/40 [1]** 802/4
**61 [1]** 823/15
**65 [9]** 763/16 770/6 772/20 772/21 773/24 777/8 777/11 777/18 781/25
**65th [1]** 773/5
**66 [2]** 932/19 940/21
**67 [5]** 887/9 887/10 932/19 974/11 974/11
**6:00 [1]** 949/22
**6th [1]** 778/21

**7**

**7 percent [1]** 774/19
**7.1 [1]** 779/13
**7.1 percent [1]** 780/3
**70 [8]** 933/22 934/10 934/14 934/15 934/17 935/19 935/25 960/6
**70 percent [1]** 817/23
**75/25 [2]** 802/4 832/12

## 7

**761** [1] 760/4
**784** [1] 760/4
**796** [1] 760/4
**797** [1] 760/5
**7th** [2] 783/17 795/4

## 8

**8 percent** [2] 779/8 780/13
**80 percent** [8] 772/6 772/9 802/2 832/22 833/3 840/9 854/20 861/18
**80/20** [8] 801/6 801/25 802/5 831/14 831/15 832/1 832/12 846/24
**810** [1] 760/5
**8182** [1] 759/23
**82** [2] 829/16 829/20
**83** [2] 765/12 765/13
**84** [1] 769/13
**846** [1] 760/5
**847** [1] 760/5
**848** [1] 760/6
**849** [1] 760/8
**858** [1] 760/8
**860** [1] 760/8
**862** [1] 760/9
**865** [1] 760/9
**876** [1] 760/9
**881** [1] 760/9
**882** [1] 760/10
**8:00 a.m** [1] 971/14

## 9

**901** [1] 760/10
**904** [1] 760/11
**92.65 percent** [1] 774/4
**926** [1] 760/11
**93,056** [1] 780/1
**930** [1] 760/11
**932** [1] 760/12
**941** [1] 760/12
**942** [1] 760/12
**943** [1] 760/13
**94304** [1] 759/7
**95,000** [1] 785/17
**964** [1] 760/13
**966** [1] 760/14
**968** [1] 760/15
**97204** [2] 759/13 759/22
**99.59** [1] 774/3
**9:00** [1] 967/10

## A

**a.m** [2] 967/10 971/14
**AA** [2] 875/21 900/4
**AAA** [1] 765/16
**Aaron** [2] 941/24 941/25
**abilities** [1] 910/18
**ability** [2] 787/3 817/18
**able** [37] 782/15 784/13 792/16 792/20 793/11 793/13 812/8 816/8 851/4 854/9 855/21 866/21 877/17 887/25 888/1 894/4 899/24 911/19 920/15 920/19 921/2 923/17 924/6 924/16 924/23 935/22 936/20 944/9 949/15 949/18 956/10 956/11 961/18 962/11 976/3 977/9 977/10
**about** [228]
**above** [1] 979/6
**above-entitled** [1] 979/6
**absence** [3] 973/25 974/2 976/3
**absent** [2] 770/9 771/4
**absolutely** [13] 764/21 765/1 793/16 810/25 828/1 847/8 938/7 939/8 939/16 940/13 940/18 969/4 973/7
**abuse** [1] 809/20
**academic** [2] 762/2 762/6

**academically** [1] 763/11
**academy** [1] 887/1
**accept** [2] 844/21 917/25
**accepted** [10] 787/22 791/5 829/1 844/13 916/19 916/24 917/6 918/13 920/18 921/23
**accepting** [2] 974/18 975/5
**access** [10] 803/10 803/11 817/18 866/19 886/5 886/7 889/16 889/18 899/21 960/13
**accomplish** [4] 852/5 852/18 868/9 948/20
**accordance** [2] 764/21 901/14
**according** [4] 772/7 779/23 786/9 795/23
**account** [6] 795/14 796/18 841/9 917/18 942/8 947/25
**accountable** [1] 850/17
**accounting** [1] 795/7
**accurate** [4] 768/7 812/20 827/12 965/2
**accurately** [1] 914/1
**accustomed** [1] 820/24
**acknowledge** [3] 874/18 875/5 875/13
**acknowledges** [1] 875/23
**acknowledging** [1] 874/22
**across** [12] 802/3 807/5 807/10 807/16 807/19 819/17 881/21 889/5 930/21 931/3 931/7 960/22
**act** [13] 925/11 925/13 968/21 970/17 973/16 973/17 973/18 973/19 973/20 975/10 976/9 976/12 976/17
**acting** [1] 955/1
**action** [1] 925/16
**active** [4] 762/1 762/6 762/10 783/17
**activities** [1] 837/1
**acts** [3] 968/23 969/19 969/20
**actual** [11] 791/21 796/10 886/20 889/8 910/5 913/8 914/10 915/22 917/21 925/22 929/21
**actually** [46] 778/4 779/11 779/23 782/14 782/15 792/2 792/7 792/17 801/20 803/11 803/20 803/20 804/10 805/20 806/22 807/4 807/12 807/17 807/22 807/25 809/14 809/22 813/1 816/11 821/6 821/12 827/12 841/10 851/19 870/12 871/25 872/5 894/15 909/20 914/8 916/23 922/15 928/13 930/20 933/12 938/19 955/7 960/23 964/2 964/3 971/1
**add** [4] 771/11 772/13 777/3 838/24
**added** [7] 788/24 865/18 888/6 916/11 917/24 922/13 922/16
**addition** [8] 770/18 771/21 774/23 775/8 775/22 780/2 780/12 923/1
**additional** [3] 768/14 774/21 916/12
**address** [2] 963/15 963/23
**addressed** [2] 844/24 969/22
**addresses** [1] 924/3
**adjustments** [1] 769/3
**administration** [1] 763/3
**admired** [1] 800/7
**admit** [2] 778/9 781/4
**admitted** [2] 969/25 976/14
**adopt** [2] 785/10 785/22
**adopted** [2] 786/5 918/11
**advantage** [5] 819/10 819/13 819/25 820/11 878/18
**advice** [1] 816/5
**advised** [2] 885/8 962/5
**affect** [1] 917/19
**affected** [2] 962/19 962/20
**affirmative** [1] 970/2
**affordable** [2] 962/7 964/2
**after** [35] 777/17 780/17 795/11 808/6 808/8 834/21 834/24 844/11 845/1 845/9 846/11 851/2 853/25 868/12 876/23 891/12 896/1 896/3 909/10 911/19 912/24 913/25 919/22 929/25 937/10 938/8 939/14 944/1 946/5 947/21 950/16 966/11 966/13 971/22 971/23
**afternoon** [12] 836/1 848/17 848/23 849/11 864/17 865/3 903/16 903/24 931/24 932/3 932/12 943/16
**afterwards** [2] 867/15 940/4
**again** [54] 768/14 770/16 776/10 778/2 781/20 786/7 787/19 788/20 789/8 791/10 791/13 791/16 793/9 807/19 808/3 813/13 814/2 814/12 814/22 815/21 816/14 816/18 819/14 819/15 819/23 820/22 831/7 831/8 836/3 839/1 840/3 840/15 845/14 847/8 847/10 847/19 847/23 872/2 875/25 889/3 891/3 891/6 892/15 903/1 913/8 913/21 935/16 957/9 957/15 957/20 960/14

**A**

**again... [3]** 962/23 963/25 978/4
**against [9]** 828/13 843/22 843/25 886/20 901/9 942/12 963/4 970/1 970/2
**age [39]** 769/9 769/11 769/13 770/4 770/5 770/6 772/21 773/23 777/8 777/11 777/18 781/25 828/8 828/13 829/3 829/5 829/6 829/8 829/11 829/14 829/25 830/6 856/8 856/15 906/8 940/20 945/6 945/9 945/11 951/18 952/7 952/10 953/13 973/17 973/19 974/6 975/9 975/15 976/8
**agency [1]** 914/18
**agenda [3]** 821/19 821/24 834/4
**ago [11]** 808/10 809/24 810/20 812/13 818/15 831/15 831/21 842/20 846/20 868/21 925/21
**agree [30]** 784/8 789/15 789/19 789/23 791/5 791/21 794/4 814/15 817/7 818/21 819/9 820/11 826/5 826/18 826/22 830/20 830/22 830/23 842/2 842/5 842/10 842/21 866/9 878/6 901/6 901/8 919/12 940/9 958/24 978/16
**agreed [2]** 847/19 848/16
**agrees [1]** 976/9
**ahead [6]** 776/17 823/14 835/3 962/7 970/13 971/12
**air [1]** 962/17
**AirDuo [5]** 962/20 963/2 963/9 963/16 963/24
**airplane [1]** 804/16 872/7 872/8
**airport [2]** 811/22 811/23
**alerting [1]** 881/15
**align [3]** 950/20 950/21 953/6
**aligned [3]** 799/16 799/19 851/25
**aligning [1]** 852/5
**alignment [1]** 894/18
**alive [4]** 772/4 772/7 774/2 774/3
**all [92]** 761/12 762/5 764/9 764/11 764/25 768/5 768/23 770/25 771/3 772/2 772/10 772/12 773/18 776/23 778/17 780/11 784/11 785/18 788/11 800/11 800/18 802/20 804/18 805/2 805/23 806/15 809/17 811/12 811/13 816/23 817/23 818/18 819/17 827/4 830/18 833/8 848/20 848/22 850/17 853/17 856/5 856/15 862/6 873/24 874/23 883/10 883/12 891/8 897/19 897/25 901/21 905/12 905/25 906/15 906/25 912/8 915/11 916/7 916/13 917/16 921/24 923/17 923/18 923/19 925/21 927/8 928/15 928/17 930/20 931/3 931/7 933/3 942/24 951/4 956/25 959/19 960/8 960/23 961/14 961/15 962/21 967/3 967/7 967/22 969/21 970/18 970/19 971/9 972/15 974/17 975/24 976/16
**allegation [3]** 925/11 952/15 953/18
**allegations [8]** 843/22 856/3 857/11 951/11 951/15 951/18 953/17 969/22
**alleged [2]** 856/4 968/22
**allegedly [2]** 925/13 925/25
**allergists [2]** 872/24 959/10
**Allocation [1]** 836/13
**allow [2]** 852/24 970/20
**allowed [3]** 815/16 817/8 972/22
**almost [6]** 761/22 802/21 805/3 811/12 849/20 865/8
**along [6]** 806/8 853/2 909/20 923/18 936/15 941/11
**alongs [2]** 813/6 879/3
**already [8]** 764/23 765/1 772/11 821/5 896/9 922/16 957/14 966/5
**also [66]** 761/22 763/2 763/10 763/18 764/14 768/9 769/1 769/24 770/24 771/11 772/21 783/13 788/17 791/14 791/17 795/5 796/18 796/21 796/25 821/4 823/2 845/10 845/22 851/15 857/10 871/19 879/1 879/3 880/2 880/14 883/20 890/15 891/10 892/12 892/18 895/11 895/20 897/23 901/11 909/21 909/23 911/1 911/10 913/16 914/17 914/21 915/23 922/24 923/10 923/15 929/8 938/23 941/3 947/17 948/3 949/10 950/14 955/24 955/25 957/6 969/24 972/25 973/11 973/17 975/3
**alter [2]** 764/19 766/9
**although [3]** 774/3 848/16 882/20
**Alto [1]** 759/7
**altogether [1]** 765/8
**always [30]** 774/10 789/15 800/4 800/7 800/9 800/22 801/1 801/21 826/4 826/5 826/14 832/24 833/4 851/9 854/16 859/2 866/3 866/23 868/5 868/15 871/12 871/16 875/3 875/5 945/9 954/2 954/3 958/14 959/17 963/6

**am [35]** 761/20 762/1 762/3 762/5 797/24 810/5 818/7 818/15 820/4 849/19 850/1 865/8 871/1 875/6 875/7 875/7 875/20 877/1 884/8 885/4 904/11 914/14 932/15 932/19 932/24 941/20 944/7 944/15 945/4 950/25 954/24 966/23 967/13 967/23 970/22
**American [5]** 761/21 763/8 763/8 763/24 926/25
**amongst [1]** 881/17
**amount [25]** 767/10 767/14 772/21 773/20 774/21 775/2 780/8 781/21 782/18 783/13 789/20 795/9 907/12 912/17 913/7 915/2 915/16 918/18 921/12 924/11 937/21 947/14 947/15 948/9 976/22
**amounts [2]** 776/1 923/7
**Amy [2]** 760/10 882/17
**analysis [14]** 762/13 762/15 763/12 765/4 767/1 767/19 771/20 772/8 777/21 784/6 786/12 791/12 803/21 906/15
**analytics [1]** 905/22
**analyze [3]** 905/5 939/9 960/2
**and/or [1]** 871/19
**Andrew [1]** 901/1
**Anita [1]** 759/2
**Anne [2]** 759/11 784/3
**announced [1]** 795/20
**announcement [2]** 795/14 795/23
**annual [8]** 776/18 779/7 780/18 781/24 824/25 825/14 836/17 937/3
**annualized [1]** 861/11
**anomalies [1]** 859/8
**anonymous [1]** 891/7
**anonymously [1]** 891/7
**another [16]** 807/15 826/4 879/2 879/13 894/4 903/15 903/19 922/20 929/8 931/10 939/5 949/18 952/15 958/15 963/4 967/1
**answer [12]** 816/1 822/10 827/16 838/12 859/24 879/25 880/1 880/2 888/1 969/13 969/24 970/7
**answered [2]** 793/25 812/17
**answering [1]** 843/10
**answers [2]** 768/4 768/14
**anticipate [2]** 852/7 852/18
**anticipated [17]** 771/5 771/8 771/10 772/5 772/21 776/2 777/16 779/11 779/20 782/3 785/11 785/23 788/13 789/16 791/2 791/3 913/12
**anticipating [1]** 909/25
**any [100]** 762/8 762/9 762/19 763/14 763/21 764/20 766/9 766/12 767/7 767/18 771/11 771/23 777/8 781/6 782/24 784/15 784/21 785/5 787/9 787/10 788/18 789/4 793/17 796/3 801/14 801/20 802/5 802/20 806/23 807/6 813/13 815/14 817/2 820/14 821/14 822/4 822/15 830/4 830/5 832/17 842/1 844/2 847/24 855/19 856/14 856/15 857/17 858/19 858/23 859/21 871/2 875/3 878/12 879/14 879/23 879/23 884/4 884/9 888/2 890/23 893/14 895/11 896/10 897/21 907/8 908/4 909/20 911/3 911/22 912/5 912/5 915/14 916/15 916/20 917/3 920/11 920/11 921/24 922/18 923/16 927/6 929/3 934/20 939/23 948/6 952/6 953/23 953/25 954/10 956/16 958/20 962/11 965/4 965/7 965/13 968/22 969/25 970/7 974/24 975/1
**anybody [4]** 942/10 953/15 967/2 967/3
**anymore [3]** 867/24 877/8 879/1
**anyone [11]** 830/4 860/7 860/9 861/22 863/22 881/4 942/4 942/7 942/8 953/23 965/21
**anyone's [2]** 826/10 880/2
**anything [27]** 791/18 808/25 829/2 844/10 850/23 864/5 906/8 906/10 908/11 917/8 926/14 938/25 940/7 940/19 942/20 946/10 952/10 953/12 957/14 963/15 965/23 969/24 970/20 972/20 978/1 978/7 978/9
**anyway [1]** 839/8
**anywhere [1]** 933/23
**Apodaca [3]** 759/21 979/9 979/10
**apologies [2]** 863/8 945/3
**apologize [4]** 808/8 808/16 819/15 839/17
**appear [3]** 869/10 870/17 876/6
**APPEARANCES [1]** 759/1
**appearing [1]** 810/21
**apples [1]** 819/24
**applicants [2]** 894/7 894/10
**application [1]** 842/5

**A**

**applied [10]** 775/9 779/7 838/11 838/18 848/4 898/3 915/24 916/7 917/12 958/8
**applies [1]** 968/20
**apply [6]** 839/10 848/8 897/17 897/22 897/23 898/1
**applying [2]** 887/6 916/4
**appointment [1]** 852/3
**appreciate [8]** 797/6 836/4 931/23 943/2 967/8 967/8 978/4 978/15
**approach [11]** 789/25 850/20 850/22 852/19 871/6 916/15 917/9 923/13 948/14 953/5 959/15
**approaches [1]** 895/21
**appropriate [13]** 769/22 786/19 787/2 891/14 912/11 913/1 915/3 915/21 918/17 922/4 954/4 954/4 955/21
**appropriately [2]** 892/21 892/22
**approve [1]** 875/2
**approved [2]** 855/23 888/25
**approximate [1]** 920/16
**approximately [13]** 792/14 793/22 798/1 799/7 816/24 846/19 894/14 898/22 900/15 900/17 906/23 915/1 928/19
**approximation [1]** 905/11
**April [9]** 834/3 836/9 847/20 848/7 886/3 886/3 886/4 954/25 956/13
**April 1 [1]** 886/4
**April 1st [1]** 886/3
**April 2018 [2]** 836/9 847/20
**April 4th [1]** 834/3
**arbitrary [4]** 802/1 832/9 832/11 832/14
**are [272]**
**area [24]** 763/1 763/4 763/12 763/16 766/20 785/1 786/8 787/7 789/8 791/11 791/12 793/16 866/19 866/19 873/21 892/1 892/2 894/17 904/24 921/9 943/20 944/21 954/17 962/18
**areas [4]** 950/19 960/15 960/18 961/18
**aren't [2]** 877/22 914/1
**argue [1]** 977/13
**argues [2]** 767/11 767/13
**argument [8]** 848/16 848/20 848/22 970/24 971/17 971/22 972/21
**arguments [1]** 978/5
**arithmetic [3]** 785/4 785/4 785/6
**arms [1]** 817/25
**around [18]** 762/10 763/16 770/24 785/17 788/6 805/22 807/5 807/13 807/15 824/6 854/13 854/14 871/17 872/13 884/17 937/18 945/11 959/19
**arrived [2]** 946/5 960/10
**articles [1]** 763/16
**as [227]**
**aside [2]** 806/2 860/6
**ask [18]** 838/5 839/19 851/19 853/8 854/3 866/13 868/13 907/23 910/23 911/1 928/9 928/10 928/12 948/6 950/3 956/16 959/12 976/19
**asked [42]** 764/5 766/13 767/2 767/4 768/4 796/7 808/7 808/15 808/18 816/10 818/10 838/14 841/22 842/4 842/5 846/16 847/25 856/10 856/11 857/10 857/13 860/24 881/13 887/24 888/24 901/11 924/18 927/15 928/15 930/18 930/24 948/8 951/14 954/16 955/10 956/18 956/23 957/20 957/22 966/2 966/4 966/6
**asking [8]** 792/15 794/6 818/10 851/18 851/3 874/1 888/8 955/19 976/6
**aspect [1]** 976/17
**aspirations [2]** 947/3 947/3
**assert [1]** 970/1
**asserted [1]** 915/13
**assertions [1]** 844/1
**assessment [8]** 768/25 842/10 870/1 870/22 908/7 908/13 917/25 918/11
**assigned [3]** 883/9 951/22 965/13
**assignment [2]** 841/11 965/22
**assist [2]** 815/24 843/12
**assistance [1]** 887/18
**associate [1]** 952/6
**associated [1]** 801/12
**Association [4]** 763/8 763/9 763/10 927/3

**associations [1]** 763/9
**assume [13]** 775/4 788/25 790/1 791/9 792/12 792/18 793/5 793/19 796/8 796/9 815/9 839/4 918/2
**assumed [12]** 789/21 790/11 838/9 912/1 920/2 921/23 922/24 929/8 929/13 929/17 929/18 945/9 957/24
**assumes [1]** 924/16
**assuming [6]** 831/6 831/8 833/2 837/20 921/16 965/22
**assumption [15]** 771/23 785/10 785/22 786/5 786/7 787/16 787/22 788/1 796/21 796/24 915/10 917/18 929/11 929/12 929/16
**assumptions [16]** 784/6 784/9 784/9 784/22 788/8 791/12 791/13 910/11 910/16 910/20 911/22 912/19 916/12 916/16 916/20 929/5
**ASTRAZENECA [137]** 758/6 767/16 767/24 767/25 767/25 768/1 768/11 771/15 772/3 772/19 773/4 774/15 776/8 776/19 777/14 778/3 779/10 779/24 782/2 784/4 785/24 786/4 788/10 792/14 792/21 792/25 793/3 793/7 793/15 793/21 794/14 795/5 798/1 798/5 798/13 798/25 799/18 800/15 802/8 805/6 808/7 810/20 812/16 814/17 816/19 816/23 819/2 820/6 821/17 824/25 825/20 838/4 838/11 838/18 841/2 842/9 842/16 842/18 842/20 844/5 844/10 845/7 845/21 846/25 847/2 848/25 849/17 850/16 854/14 857/25 858/6 858/9 860/12 864/16 865/8 865/21 867/24 877/23 878/10 880/7 880/9 880/11 883/1 883/2 886/10 887/7 888/8 889/10 890/2 890/9 890/15 892/4 893/6 893/6 893/18 893/20 893/23 894/1 895/25 896/14 896/17 897/8 898/14 898/17 899/10 901/8 906/19 907/1 907/6 908/17 911/18 912/2 912/24 914/6 914/22 915/2 920/7 920/16 922/1 922/10 924/7 928/4 932/17 932/21 933/8 941/19 943/4 943/20 945/5 955/18 958/14 959/24 967/17 968/17 969/1 974/21 975/2
**AstraZeneca's [8]** 795/11 817/19 857/21 890/5 893/1 894/6 901/7 928/17
**AstraZeneca-speak [1]** 899/10
**attached [2]** 847/21 931/16
**attachment [6]** 834/12 836/12 837/15 887/13 887/14 887/17
**attacked [1]** 808/14
**attacking [5]** 804/18 806/3 807/14 807/21 808/2
**attempt [1]** 782/11
**attempts [2]** 787/11 912/23
**attend [2]** 762/4 939/23
**attended [1]** 880/17
**attention [7]** 859/5 859/7 862/11 880/2 967/7 967/9 974/1
**attitude [1]** 963/17
**attractive [1]** 931/12
**attributed [1]** 925/12
**August [6]** 771/9 775/4 775/21 790/14 859/11 879/11
**August 1st [3]** 775/4 775/21 790/14
**August 2020 [1]** 859/11
**August 27 [1]** 879/11
**authored [2]** 763/14 927/6
**authorize [2]** 893/12 893/13
**authorized [1]** 893/11
**automatically [1]** 861/8
**available [16]** 762/19 767/7 767/14 792/24 871/19 885/21 886/2 887/25 889/15 889/24 890/15 891/9 916/22 928/8 957/18
**Avenue [2]** 759/12 759/22
**average [11]** 769/10 770/2 770/12 770/15 775/18 775/20 779/22 786/11 915/17 921/5 921/8
**averaged [4]** 770/17 779/23 785/19 789/10
**award [4]** 763/23 763/25 764/2 799/14
**awarded [3]** 762/25 763/2 763/4
**awards [8]** 763/21 799/2 799/3 799/6 800/5 805/1 805/1 817/15
**aware [18]** 786/9 820/19 821/1 828/7 828/9 828/11 859/21 885/7 896/16 901/24 901/25 901/25 902/12 956/19 957/9 957/17 965/24 966/1
**awareness [1]** 874/9
**away [5]** 809/8 853/21 887/2 916/6 961/17
**awful [3]** 809/24 810/2 810/2
**AZ [8]** 767/12 767/15 767/16 771/17 825/8 833/8 857/5 857/7

**B**

**B-A-R-N-E-S [1]** 864/23
**bachelor [2]** 762/25 884/3
**bachelor's [1]** 904/17

**B**

back [51] 781/16 781/18 782/4 782/17 785/15 801/18 804/12 804/16 806/10 807/13 807/20 815/11 815/12 815/13 816/2 820/4 826/5 827/20 829/5 829/5 832/5 832/25 834/21 835/6 836/8 841/14 868/13 868/20 872/17 875/19 876/22 878/4 879/4 879/5 879/5 879/20 879/22 882/23 903/15 903/20 919/17 919/17 923/9 928/15 935/16 936/13 944/1 952/14 956/22 959/12 967/10

back-to-back [2] 879/4 879/5
back-up [1] 928/15
backed [1] 923/7
backfill [1] 804/8
background [2] 766/25 904/15
backing [1] 853/22
backpay [19] 777/25 778/1 778/7 778/18 780/24 781/1 781/13 781/22 793/4 794/1 794/4 794/7 796/11 924/9 924/10 924/11 924/12 924/15 924/21
bad [7] 809/1 809/2 817/11 821/11 824/12 824/15 882/2
bakery [2] 871/10 875/11
balance [1] 765/15
banks [1] 766/17
Barb [1] 887/23
Barnes [10] 760/9 864/16 864/17 864/23 865/3 865/7 867/12 869/18 900/4 900/5
base [3] 791/6 922/2 936/1
based [47] 770/3 773/7 774/7 775/1 775/19 777/19 779/6 779/20 781/18 783/22 788/1 788/21 795/21 815/9 818/24 818/24 819/4 819/5 820/21 821/4 822/6 825/16 825/17 826/20 828/13 840/15 843/14 843/24 844/17 844/3 845/1 845/15 848/5 848/9 851/23 853/5 853/9 853/15 854/10 855/19 900/7 909/21 914/4 918/1 927/14 952/8 962/24
basic [1] 916/10
basically [14] 762/15 766/4 767/4 767/20 769/4 772/17 779/2 785/3 789/9 794/8 899/18 909/2 909/19 960/22
basis [5] 873/15 896/18 912/9 958/12 975/20
basketball [1] 958/7
be [245]
beat [1] 800/9
became [11] 792/23 801/8 818/11 824/5 850/16 850/24 938/8 939/14 950/25 952/2 956/11
because [81] 774/9 775/9 777/5 778/22 783/3 783/5 786/13 787/6 792/19 795/16 795/22 803/3 804/24 805/7 805/21 806/24 808/8 808/9 808/21 809/8 809/13 809/22 812/5 813/13 813/19 813/24 816/10 816/13 818/10 819/7 821/7 821/7 821/21 826/15 826/16 826/18 827/14 828/13 828/18 828/24 830/17 838/19 839/2 839/7 839/10 841/14 845/14 845/19 847/10 850/23 851/8 853/22 855/4 857/7 860/15 862/11 866/24 874/8 874/12 875/5 880/3 888/23 891/24 894/5 902/19 903/1 906/7 913/7 915/8 920/14 924/5 924/22 925/20 931/15 935/18 939/21 946/22 960/18 960/22 972/21 974/5
become [7] 784/12 842/8 884/22 885/16 924/17 947/19 949/16
becomes [3] 775/4 775/22 886/2
becoming [1] 851/6
been [94] 763/20 764/3 764/11 765/1 765/22 771/18 782/15 783/6 783/23 786/14 786/16 787/1 790/23 798/1 799/10 799/17 802/21 805/23 807/20 809/12 811/5 820/7 820/10 820/23 821/5 821/12 821/22 824/20 825/22 834/20 841/25 851/15 854/9 854/19 865/7 868/1 875/10 876/25 882/21 883/2 884/8 885/22 886/25 887/1 887/2 887/5 898/2 898/7 898/8 898/24 899/1 899/24 901/13 909/3 909/4 911/1 912/6 912/7 912/15 914/22 915/24 917/15 921/25 932/16 932/16 936/15 937/10 938/2 938/16 943/21 944/8 946/14 946/19 946/22 946/25 955/15 955/17 955/22 956/4 956/20 957/11 957/14 958/5 959/20 963/3 967/15 968/20 969/13 970/6 970/9 970/11 970/16 977/6 977/8
before [24] 758/11 801/8 802/7 808/10 809/25 810/23 812/10 824/20 834/23 836/7 852/16 876/22 908/24 917/24 929/20 930/4 947/16 950/20 954/2 967/19 971/21 975/18 976/13 978/7
beforehand [1] 852/22
began [2] 777/10 950/25
begin [3] 778/21 785/16 788/7
beginning [5] 771/9 773/4 800/24 809/13 925/1
begins [1] 772/22

behalf [4] 765/9 844/3 976/7 976/20
behave [1] 892/22
behavior [8] 805/3 805/10 805/25 825/19 827/1 827/3 827/23 827/25
behavioral [1] 826/13
behaviors [32] 803/8 804/22 805/5 805/7 805/19 805/22 805/25 806/3 806/11 806/17 808/4 808/5 808/18 809/2 822/6 824/22 825/3 825/5 825/17 825/23 825/24 826/2 826/7 826/9 826/12 826/17 827/6 827/22 828/4 850/18 854/11 959/22
behind [3] 808/21 952/14 977/10
being [45] 765/2 772/4 772/7 774/2 774/3 794/11 807/9 812/10 813/19 821/21 836/3 840/16 845/3 845/20 851/7 855/24 856/11 857/10 857/13 860/9 861/5 861/19 861/23 863/23 866/10 866/11 867/8 886/12 886/12 888/23 889/7 902/21 906/18 915/12 943/23 947/4 949/4 949/11 949/18 951/7 960/16 962/11 963/7 976/3 976/16
believe [31] 783/2 785/14 804/4 826/19 842/8 847/23 854/16 856/10 871/14 881/9 884/13 884/17 888/17 896/10 911/7 912/4 912/7 913/3 917/17 918/14 921/10 921/10 921/14 922/3 926/14 928/19 930/4 930/14 931/15 970/6 970/10
believed [5] 838/8 847/11 854/4 911/17 911/19
believes [3] 912/23 912/25 977/15
Belknap [7] 805/17 806/11 809/18 844/25 845/1 881/5 881/6
belong [1] 763/10
below [2] 886/14 979/4
Benatar [12] 828/14 829/2 829/13 830/5 830/25 831/1 856/9 951/22 952/1 952/4 952/6 952/9
Benatar' [1] 829/24
benchmark [1] 800/6
benchmarks [1] 800/25
beneficial [1] 948/24
benefit [9] 768/20 774/24 871/24 883/17 922/11 922/15 922/20 923/3 938/5
benefited [2] 939/6 963/7
benefits [26] 767/5 769/2 770/9 770/9 770/18 770/19 770/19 770/25 771/12 772/18 774/15 774/17 774/18 776/20 776/20 780/3 790/15 793/3 845/16 845/24 909/20 916/12 922/4 922/9 922/9 963/25
besides [1] 909/21
best [11] 778/1 787/15 787/17 812/20 821/23 851/6 867/22 869/16 930/12 953/8 972/10
better [11] 817/18 839/19 851/8 851/10 851/11 938/15 939/1 939/2 950/3 959/19 960/1
between [25] 771/19 772/18 773/4 776/19 777/8 777/18 778/3 779/25 780/7 782/9 789/9 822/15 852/8 865/17 865/18 869/2 871/3 879/1 885/10 888/5 909/8 915/21 928/19 941/7 954/10
BEVESPI [2] 802/13 802/19
beyond [2] 769/9 769/16
bias [1] 958/18
Bierhanzl [20] 760/11 794/22 795/1 795/5 903/11 904/1 904/7 904/10 907/7 908/2 908/18 908/24 909/16 916/8 917/3 920/11 924/1 924/4 926/20 930/12
big [6] 811/9 811/10 820/11 825/12 825/13 963/18
bigger [1] 869/17
biologic [1] 877/16
birthday [1] 773/5
birthing [1] 809/7
bit [29] 762/23 768/22 768/24 793/25 800/11 802/6 810/22 817/4 818/14 821/21 822/18 849/14 851/17 855/24 865/17 865/23 866/10 866/25 867/5 868/6 868/12 887/12 943/18 945/10 945/14 949/19 963/10 966/23 971/25
bitter [5] 842/16 842/21 843/3 843/11 843/18
blindly [1] 833/25
blow [1] 834/3
blue [1] 786/24
blue-collar [1] 786/24
board [2] 926/25 960/23
boards [2] 897/20 897/21
Bob [2] 932/14 941/9
Bockius [2] 759/6 759/9
body [5] 813/21 814/15 853/11 854/2 854/9
boil [1] 818/3
Boise [2] 961/16 962/8

**B**

**bold [1]** 777/13
**bono [1]** 766/18
**bonus [4]** 825/7 825/12 845/11 922/3
**book [3]** 962/7 972/5 972/5
**born [1]** 798/3
**boss [3]** 809/19 939/19 977/10
**boss's [1]** 939/19
**both [25]** 762/11 765/4 768/6 770/9 772/3 776/8 799/21 837/8 845/13 845/22 847/14 855/11 908/21 911/6 931/5 941/12 944/8 948/25 954/8 958/9 958/23 971/11 973/5 973/7 978/6
**bottom [9]** 777/12 821/1 823/18 824/1 824/12 937/1 937/6 937/7 960/7
**box [2]** 797/12 943/7
**boy [1]** 849/20
**branded [1]** 963/4
**break [6]** 834/23 834/23 834/24 834/25 865/17 903/16
**breakfast [1]** 934/3
**Breztri [2]** 964/12 964/14
**brief [1]** 841/12
**briefly [1]** 796/4
**Brigham [3]** 768/12 771/7 926/5
**Brigham Young [1]** 768/12
**bring [5]** 880/1 922/5 949/11 949/15 963/1
**brings [1]** 808/9
**broader [1]** 852/8
**brought [1]** 856/3
**budget [2]** 813/14 962/3
**build [1]** 952/3
**building [2]** 872/12 967/2
**bullet [3]** 869/15 876/1 974/14
**bulleted [1]** 869/11
**bulleted-type [1]** 869/11
**bunch [1]** 859/15
**Bureau [7]** 785/7 786/9 911/10 914/14 914/17 921/4 931/6
**bus [4]** 856/12 856/12 952/17 952/17
**business [48]** 763/3 764/6 786/25 786/25 799/3 799/20 801/9 824/6 824/10 833/7 833/13 836/25 837/8 847/9 852/9 853/20 854/5 855/11 857/8 883/5 883/6 883/8 883/9 883/21 884/18 884/23 885/3 885/7 888/25 891/5 891/20 892/2 895/1 895/8 896/4 900/13 946/10 949/8 951/2 953/5 956/2 958/16 958/21 973/23 974/9 975/23 976/2 976/4
**businessperson [1]** 766/15
**busy [1]** 866/17
**but for [2]** 909/24 920/1
**button [1]** 876/1
**buy [2]** 783/9 783/12
**BYU [29]** 767/13 768/13 771/6 771/11 771/13 771/15 772/3 772/21 773/4 775/5 775/6 775/15 775/23 775/24 775/24 776/9 776/11 776/20 777/16 782/15 782/21 784/12 784/13 787/14 787/14 787/17 790/13 796/18 930/1

**C**

**CA [1]** 759/7
**calculate [11]** 762/15 762/18 767/4 769/4 774/6 777/2 780/25 796/11 910/23 919/4 923/3
**calculated [11]** 772/16 773/20 775/11 780/23 790/8 794/3 909/1 914/2 922/23 922/24 924/10
**calculating [9]** 791/6 909/17 910/2 911/15 913/21 916/8 922/9 925/10 934/10
**calculation [24]** 788/14 791/23 792/22 795/21 908/6 909/13 910/4 911/13 912/12 913/13 916/13 917/4 917/19 918/8 919/21 919/18 920/18 923/2 923/11 924/12 924/15 924/18 924/21 925/6
**calculations [5]** 785/10 785/21 789/1 910/10 919/16
**calendar [1]** 820/5
**call [52]** 761/9 767/5 797/9 799/5 800/22 801/17 801/17 801/18 809/25 816/10 816/12 816/13 816/17 821/17 834/4 841/19 852/11 852/22 853/3 853/19 853/20 853/25 864/15 868/11 868/12 869/2 869/3 869/3 869/4 872/23 874/1 874/8 882/9 883/8 903/9 903/25 931/25 932/1 934/13 934/21 938/20 938/21 939/5 940/5 943/3 943/23 952/24 952/25 964/5 966/19 968/24

**C** (col. 2)

968/25
**called [20]** 775/8 799/17 808/10 808/11 817/21 819/16 824/22 836/20 842/11 842/14 854/24 860/25 861/1 896/20 899/7 932/24 944/3 962/20 962/25 964/12
**calling [3]** 818/7 852/2 868/1
**calls [22]** 802/22 803/1 803/19 836/21 847/5 848/25 864/16 893/3 893/6 903/10 904/1 934/6 934/7 935/3 936/13 936/14 939/23 939/25 940/3 943/4 945/19 953/1
**camaraderie [1]** 952/3
**came [21]** 783/8 816/13 819/13 832/12 841/12 847/9 871/25 878/25 894/3 913/9 916/10 935/3 935/25 941/4 951/3 952/13 955/4 956/7 963/9 963/14 964/12
**can [124]** 761/12 761/16 762/4 762/5 762/13 762/23 767/10 768/6 768/25 772/15 772/22 773/1 773/15 773/19 774/24 777/8 777/22 777/24 778/16 778/18 781/10 785/2 786/14 787/15 787/17 792/18 797/22 803/25 805/19 808/22 815/13 816/3 825/12 828/6 830/7 830/25 834/3 836/19 838/5 847/14 852/7 852/23 853/14 856/24 860/6 863/2 863/9 867/12 870/10 870/11 870/13 870/16 870/21 870/23 871/6 871/12 871/13 871/14 871/25 872/9 872/11 872/14 872/15 875/7 876/21 878/18 879/18 880/13 883/13 883/14 883/18 884/12 885/16 886/7 886/9 886/14 887/12 890/24 891/2 891/4 891/7 893/11 899/10 904/15 905/11 905/15 907/23 908/25 909/16 913/19 914/8 915/16 917/14 919/15 921/20 923/9 923/20 923/21 923/22 925/2 925/12 928/22 932/12 934/20 945/17 945/21 945/25 948/18 949/5 959/22 960/15 962/7 962/20 965/21 966/6 968/2 970/1 971/2 971/12 971/16 972/10 972/17 973/13 974/25
**can't [11]** 782/16 784/25 816/21 816/24 826/18 878/19 903/3 923/19 934/25 936/11 974/10
**candidate [2]** 877/25 958/24
**candidates [7]** 804/1 804/9 804/10 804/11 804/15 897/25 958/9
**cannot [6]** 786/17 805/18 901/8 973/22 976/1 977/22
**capabilities [3]** 947/21 956/19 957/17
**capable [3]** 913/3 920/2 929/17
**capacity [1]** 765/10
**captured [1]** 768/5
**Capturing [1]** 836/13
**car [19]** 770/24 774/25 774/25 783/10 783/12 783/13 783/14 795/6 801/18 811/19 831/11 853/3 868/13 874/4 922/20 922/21 922/24 922/25 939/24
**cards [1]** 964/2
**care [5]** 802/16 803/9 819/11 860/15 959/9
**career [9]** 771/24 782/22 786/2 805/21 807/15 843/16 876/25 880/11 943/25
**carpet [1]** 845/18
**carry [1]** 867/9
**cars [2]** 795/8 923/3
**case [67]** 762/22 764/13 764/25 766/2 766/3 766/9 767/2 767/22 770/14 770/24 778/5 784/4 784/15 784/19 786/19 787/3 800/14 812/11 820/25 828/8 828/9 843/7 843/22 875/3 882/21 882/23 887/1 897/20 903/19 905/17 905/20 906/2 906/8 906/12 906/16 906/23 908/3 908/4 908/10 909/1 910/24 911/5 911/8 915/14 916/22 921/17 925/11 928/14 967/1 967/5 969/10 969/14 969/19 970/8 970/16 972/9 972/20 972/23 974/8 974/10 976/3 976/7 977/7 977/18 977/17 977/22 977/23
**cases [13]** 762/17 762/17 762/18 765/14 765/20 787/2 905/9 905/12 905/20 905/25 906/4 906/5 907/18
**catch [1]** 786/3
**categories [7]** 825/2 834/16 836/19 854/23 950/18 960/15 960/23
**categorize [1]** 854/23
**category [2]** 837/6 855/9
**caught [2]** 874/1 874/12
**causation [2]** 973/25 974/2
**cause [1]** 979/6
**CBD [11]** 840/20 894/18 894/19 894/20 894/23 894/25 895/4 896/4 896/7 896/9 952/2
**CBDs [1]** 840/3
**CCOs [1]** 819/16
**Ceaser [6]** 881/5 881/7 887/18 974/17 975/11 976/15
**central [1]** 949/21
**cents [2]** 775/1 780/5
**certain [10]** 789/5 790/1 843/17 847/11 856/3 863/16 883/9

# C

certain... [3]  910/11 915/16 915/17
certainly [11]  789/18 793/17 794/10 829/4 829/6 833/16 843/2 878/1 896/14 910/22 912/2
certainty [7]  783/20 789/1 789/20 790/8 794/3 907/4 910/15
certificate [2]  784/25 884/5
certificates [1]  884/4
certified [6]  784/24 796/15 926/20 926/23 927/10 979/8
certify [1]  979/4
cetera [1]  836/22
chain [3]  831/4 831/9 888/18
challenge [3]  937/15 963/5 963/10
challenges [3]  815/23 939/10 975/24
challenging [1]  866/21
Chambers [4]  759/2 761/5 881/13 930/24
champion [3]  803/17 803/18 887/2
chance [4]  772/6 818/5 872/15 972/1
change [4]  851/2 940/7 962/9 971/11
changed [9]  782/24 783/1 790/25 826/19 834/20 874/8 953/4 953/10 962/22
changes [2]  768/15 794/12
changing [1]  828/5
characterizing [1]  838/7
charge [2]  864/9 967/22
chart [1]  777/22
chat [2]  801/15 868/7
cheaper [1]  964/3
check [5]  785/3 837/1 841/17 968/8 968/14
check-ins [1]  837/1
checked [1]  914/17
children [3]  801/22 809/7 884/10
chit [1]  868/7
chit-chat [1]  868/7
choice [4]  818/12 818/16 877/17 925/24
choices [2]  923/18 925/21
choose [2]  877/20 893/16
choosing [3]  808/24 808/24 941/6
chose [3]  818/14 877/19 962/10
Chris [6]  938/9 938/14 938/17 940/4 941/23 941/25
Christopher [4]  760/13 943/4 943/12 943/19
chuckled [1]  830/14
chuckling [1]  830/16
Circle [6]  799/1 817/14 820/22 821/2 823/9 886/16
circles [1]  880/18
circumstance [1]  926/1
circumstances [3]  844/18 855/22 925/22 969/17
cite [1]  912/5
City [5]  865/7 921/9 932/14 933/10 935/7
CL [3]  897/5 897/5 897/7
claim [2]  970/1 973/17
claimed [1]  894/4
claims [12]  828/8 828/10 828/12 848/18 906/8 906/10 951/21 968/18 968/19 969/6 970/2 973/16
clarification [1]  888/14
clarify [3]  764/24 796/10 907/9
clear [10]  787/16 793/19 806/18 815/11 850/16 855/3 855/7 920/10 954/3 955/22
clearly [1]  892/15
click [1]  876/1
clients [2]  766/6 905/24
climb [1]  819/7
close [7]  861/19 861/23 862/10 863/20 863/23 874/7 933/16
close-ended [1]  874/7
closed [6]  786/14 786/25 803/10 803/11 853/20 874/2
closed-ended [1]  874/2
closer [3]  812/15 862/11 873/12
closest [1]  933/14
closing [2]  971/22 971/23
coach [19]  799/3 800/12 805/21 805/22 806/16 807/23 811/3 813/21 814/18 851/4 878/6 933/17 933/25 935/13 938/10 955/11 955/23 957/11 960/16
coachable [1]  851/5

coached [11]  815/10 815/19 839/1 839/3 840/3 848/9 937/21 938/12 942/9 946/23 955/23
coaches [1]  815/7
coaching [162]  800/11 800/14 800/16 800/21 801/1 801/10 801/21 802/5 804/19 804/21 804/22 806/7 806/13 806/15 806/17 806/21 806/23 807/6 807/7 807/11 807/12 807/18 808/2 809/12 810/23 810/24 811/12 813/23 814/15 814/19 815/18 816/15 820/17 827/21 827/21 827/23 832/1 832/2 832/14 832/18 833/1 833/5 833/15 834/9 834/17 836/15 836/17 836/20 837/1 837/6 837/7 837/9 837/10 837/24 838/13 838/16 838/16 838/21 838/24 838/25 839/5 839/8 839/21 840/5 840/9 840/11 840/12 840/13 846/25 847/1 847/3 847/11 847/13 847/22 848/6 851/17 851/20 851/22 854/14 854/16 854/20 855/5 855/6 855/9 855/10 855/12 855/13 855/17 858/25 859/3 859/4 859/6 859/22 860/8 860/10 861/1 861/5 861/16 862/7 864/9 865/23 865/25 865/25 866/1 866/2 868/17 868/19 868/20 869/13 870/6 872/3 874/15 875/2 875/18 875/20 878/13 878/22 879/24 880/5 889/8 902/20 934/2 934/11 934/12 934/17 934/20 935/16 935/19 936/2 936/5 938/5 939/6 942/5 944/7 944/9 945/14 945/16 945/25 946/8 947/5 947/10 947/15 948/7 948/9 948/14 948/15 948/16 950/13 950/14 950/16 955/24 956/9 959/16 960/11 960/14 960/15 960/17 961/2 962/1 962/4
code [1]  890/2
COE [4]  823/8 886/14 886/16 886/21
coffee [1]  853/3
collar [1]  786/24
colleague [2]  799/21 849/25
Collectively [1]  959/20
college [3]  762/4 829/8 884/2
Colorado [3]  849/16 867/19 873/4
column [25]  773/23 773/25 774/5 774/13 774/13 776/16 776/18 776/22 776/23 777/1 777/4 777/5 777/9 777/9 778/25 778/25 779/9 780/15 793/23 869/18 871/2 875/21 875/21 875/21 876/3 900/4
columns [1]  869/25
combined [2]  837/9 855/12
come [29]  772/13 801/9 801/18 804/9 804/13 805/25 816/25 849/2 867/19 867/20 881/16 883/13 885/8 893/16 897/19 897/25 906/15 937/17 938/20 945/18 954/16 957/20 967/20 974/8 974/25 976/1 976/4 977/21 978/2
comes [5]  780/11 850/18 878/18 913/6 925/4
comfortable [12]  768/6 797/13 849/3 857/20 864/18 882/13 891/2 891/3 891/6 906/14 932/5 943/7
coming [5]  784/5 849/13 865/3 943/16 973/1
commensurate [1]  788/2
comment [4]  879/20 903/3 934/25 941/6
commentary [5]  827/6 827/10 827/11 829/13 870/1
comments [8]  827/24 830/4 856/8 856/8 856/15 870/3 968/12 968/25
commercial [27]  799/10 801/9 817/21 817/23 818/22 818/24 819/22 820/13 824/5 824/10 833/6 833/13 847/9 894/17 896/4 897/7 897/8 897/12 898/2 898/6 898/10 898/25 899/3 951/2 958/15 958/21
committed [2]  874/5 958/5
committee [1]  966/7
common [1]  902/19
communicate [1]  891/10
communication [2]  935/18 947/15
comp [6]  826/16 826/19 826/20 826/25 827/1 827/3
companies [6]  818/4 818/20 820/12 841/24 928/25 963/1
company [17]  774/25 808/13 831/11 845/22 858/15 861/8 883/10 888/12 888/15 888/21 893/10 900/10 901/12 911/20 914/16 946/15 954/5
company's [1]  899/16
comparable [7]  915/6 915/9 920/25 924/7 930/20 930/25 931/3
compare [3]  818/1 914/6 947/9
compared [2]  802/17 873/8
comparing [1]  819/24
comparison [2]  866/18 920/22
compensate [1]  771/25
compensates [1]  769/20
compensation [14]  771/22 779/3 779/4 786/4 825/7 825/16 825/16 905/6 905/21 909/21 914/6 922/2 922/12 922/13
competing [1]  963/4

**C**

complain [1] 975/1
complained [1] 902/24
complaint [14] 768/4 828/9 891/12 902/8 902/9 902/16 911/7 942/11 969/14 969/15 969/21 969/23 976/12 976/16
complaints [19] 890/23 890/25 891/14 891/17 901/24 951/9 951/11 974/20 974/23 975/7 975/8 975/8 975/12 975/13 975/14 975/14 975/16 975/19 976/10
complete [2] 853/2 886/3
completed [3] 782/25 901/13 902/2
completely [6] 803/3 808/1 815/22 817/12 819/19 819/19
completing [3] 836/22 836/25 901/16
completion [1] 972/2
compliance [16] 837/23 855/25 857/23 887/2 891/15 892/12 892/16 892/18 901/14 901/22 901/23 902/3 902/10 951/8 953/17 975/17
comply [3] 833/9 833/11 837/21
component [1] 915/12
components [1] 922/2
compounded [1] 802/24
computer [10] 807/4 807/10 807/13 807/15 807/16 807/20 899/12 899/15 899/16 899/19
concede [1] 974/3
concept [5] 778/1 780/23 925/2 925/3 952/21
concern [4] 833/17 878/14 901/9 940/25
concerning [1] 764/3
concerns [11] 878/12 878/21 879/14 879/23 883/16 883/17 883/18 888/2 890/23 965/5 965/8
concise [1] 806/18
concluding [1] 788/8
conclusion [2] 787/13 789/6
conclusions [1] 784/10
conduct [3] 889/22 892/22 892/23
conference [3] 761/11 971/16 972/2
conferences [1] 763/12
confidentiality [1] 816/11
confined [1] 793/4
confirm [3] 862/18 864/8 875/22
Confirmed [2] 876/3 900/4
confirms [2] 875/23 893/6
conformed [1] 979/7
confused [1] 792/15
confusing [3] 804/23 806/16 806/21
confusion [1] 935/18
connect [2] 801/12 815/20
connecting [1] 947/21
connection [4] 830/25 855/25 900/12 902/3
connectivity [1] 816/18
connector [1] 949/16
cons [1] 948/25
conscientious [1] 962/6
consent [9] 843/2 843/18 844/13 844/16 844/19 844/22 844/24 845/9 846/11
conservative [2] 766/3 768/6
consider [7] 782/6 782/8 783/12 844/20 845/3 931/14 965/2
considerable [1] 912/3
consideration [4] 790/23 791/2 885/17 915/23
considerations [2] 791/9 816/15
considered [12] 822/23 840/10 840/13 891/25 895/5 898/8 898/11 909/9 909/12 909/15 909/17 910/2
considering [2] 766/14 792/4
consistent [11] 766/3 855/16 895/20 914/20 914/21 916/21 916/22 947/15 948/11 975/1 976/6
consistently [1] 889/4
consists [1] 955/19
constantly [1] 800/6
construct [1] 974/7
constructive [7] 815/16 866/11 866/12 866/13 940/11 940/14 940/16
consultant [1] 905/16
consultation [2] 766/16 887/18
consulted [2] 764/3 905/8

consulting [2] 766/12 904/12
Consumer [1] 775/13
contact [2] 883/10 891/7
contacted [2] 767/23 942/4
contained [1] 926/7
contains [1] 838/10
content [1] 869/24
contingency [2] 769/20 769/23
contingent [2] 764/12 764/24
continue [10] 774/11 807/2 807/2 876/23 880/11 885/2 947/2 947/6 957/11 968/15
continued [3] 806/5 974/19 975/24
continues [2] 776/10 975/6
contribute [1] 867/6
contributed [1] 939/10
contribution [8] 770/21 770/23 771/13 774/19 775/3 775/25 776/12 780/4
contributions [4] 768/13 771/12 780/2 780/10
control [2] 878/19 878/20
controlling [1] 819/11
controls [1] 817/23
conversation [21] 803/4 845/4 851/24 852/3 852/4 852/16 853/23 853/24 855/20 856/5 856/13 864/3 866/22 867/6 867/9 871/12 874/12 881/1 948/8 950/5 957/15
conversations [6] 851/5 867/7 896/22 897/2 948/23 949/2
convert [3] 770/12 771/8 772/12
converted [2] 770/17 779/22
copies [3] 971/2 971/10 973/8
copy [12] 768/3 768/3 768/9 768/10 784/20 812/22 833/2 859/13 971/18 972/3 973/5 973/6
Cornell [1] 884/6
corner [4] 812/23 863/9 871/10 875/11
correct [133] 784/6 784/16 786/6 786/21 786/23 787/24 788/3 788/15 789/13 789/14 790/10 790/13 790/19 791/16 792/6 792/7 793/5 793/8 793/9 793/24 794/13 795/12 795/13 795/19 796/16 798/14 798/19 799/23 800/1 800/13 802/9 811/16 811/21 813/9 820/2 820/9 822/16 822/17 822/21 823/3 824/2 824/3 824/4 824/11 824/14 825/1 825/4 825/6 825/18 825/21 828/15 828/19 828/22 831/16 833/12 836/11 836/18 840/19 840/21 840/24 841/1 843/20 844/3 844/9 844/15 845/8 845/24 846/13 846/17 847/2 848/3 848/21 850/3 850/10 854/9 855/15 855/18 858/8 858/10 858/12 858/18 858/23 859/12 860/19 860/20 861/7 861/14 861/21 862/19 864/10 869/23 871/5 872/20 876/5 878/5 879/12 880/19 882/3 901/18 905/13 913/17 913/18 914/4 914/14 917/17 917/21 918/20 920/20 923/5 924/14 927/22 927/23 927/25 935/11 938/3 944/10 944/17 951/13 951/17 952/20 954/20 954/24 955/2 956/14 957/23 958/25 961/9 964/21 965/1 965/18 966/10 966/15 979/5
corrected [1] 874/2
correction [1] 795/4
correctly [4] 860/4 879/16 919/4 924/12
cost [3] 775/1 780/7 788/24
could [83] 762/3 762/20 762/20 762/21 771/16 776/3 777/23 781/3 781/22 781/23 782/4 785/11 785/22 787/23 788/9 790/4 791/16 791/17 791/18 792/4 792/10 792/13 792/17 792/24 793/2 793/5 793/20 799/10 804/1 807/2 811/5 813/6 813/24 814/18 815/13 819/20 820/21 832/17 851/7 854/7 859/13 861/10 865/21 866/14 866/25 867/12 867/16 871/19 875/2 879/7 879/8 882/10 909/10 909/11 909/22 910/1 910/6 912/8 912/23 913/22 913/24 914/23 916/13 918/15 918/23 919/19 919/21 920/5 925/8 925/18 927/15 929/22 930/23 938/5 938/19 939/1 940/6 950/1 956/22 957/11 965/6 973/5 977/9
couldn't [7] 790/5 791/17 803/11 813/21 813/21 819/7 838/24
counsel [8] 769/6 772/22 779/5 882/22 907/15 928/17 930/18 978/14
counseling [2] 784/24 784/25
counselor [1] 926/23
count [3] 834/16 837/8 855/11
counted [4] 794/14 794/17 794/18 795/2
counterpart [2] 871/23 941/3
counterparts [1] 895/15
counties [1] 819/17
counting [4] 783/6 840/11 840/12 922/17

## C

**country [5]** 802/3 936/21 937/1 937/11 963/11
**counts [4]** 973/16 976/5 976/8 976/23
**couple [11]** 775/16 783/1 794/12 809/5 841/15 844/25 944/4 946/11 947/12 952/4 961/17
**course [13]** 777/19 782/22 787/4 793/3 799/17 800/3 805/24 805/24 826/1 910/15 911/9 915/17 967/2
**courses [3]** 762/8 762/9 762/11
**court [14]** 758/1 758/12 759/21 761/3 801/12 836/1 903/23 967/12 973/1 973/10 976/6 976/19 977/17 979/10
**Court's [1]** 974/1
**Courthouse [1]** 759/21
**courtroom [2]** 967/6 978/14
**courts [1]** 765/16
**cover [6]** 933/1 933/2 935/9 955/9 957/20 959/6
**covered [3]** 944/20 956/21 961/13
**covering [2]** 958/2 961/12
**covers [2]** 905/19 959/6
**COVID [2]** 959/12 964/11
**Craig [7]** 760/9 864/16 864/23 865/7 869/17 879/3 881/13
**create [1]** 821/23
**created [7]** 773/7 778/7 821/18 868/11 872/23 956/8 960/12
**creates [1]** 867/4
**creating [1]** 955/21
**creative [1]** 801/13
**credit [6]** 845/23 913/4 913/8 913/15 915/8 916/7
**critical [1]** 966/25
**criticism [5]** 917/3 917/6 940/12 940/14 940/16
**CRM [1]** 854/23
**cross [14]** 760/3 783/25 784/1 810/6 810/13 810/15 836/5 858/3 858/4 876/14 901/4 926/18 941/17 964/17
**CROSS-EXAMINATION [9]** 784/1 810/15 836/5 858/4 876/14 901/4 926/18 941/17 964/17
**CRR [2]** 759/21 979/10
**crying [1]** 860/12
**cumulative [7]** 776/22 777/1 777/3 777/5 777/9 780/20 780/21
**current [13]** 767/9 770/4 771/6 774/5 791/22 794/23 795/18 796/18 796/19 896/23 918/18 932/23 941/25
**currently [8]** 797/24 798/11 840/20 877/1 880/9 882/25 926/5 941/23
**customer [14]** 832/23 836/20 837/7 837/7 838/17 840/12 852/8 852/15 852/16 854/1 854/10 854/15 855/10 855/11
**customer's [1]** 953/6
**customers [10]** 852/1 852/6 852/10 852/13 853/12 857/9 879/6 892/20 934/17 946/12
**cv [1]** 758/4
**cycle [1]** 886/3

## D

**D.C [2]** 761/21 904/11
**DALIRESP [2]** 857/14 857/15
**Dallas [1]** 969/4
**damage [2]** 908/13 919/12
**damages [46]** 762/16 767/3 780/25 782/7 793/7 905/5 906/16 907/7 907/10 907/12 907/14 907/17 907/21 908/3 908/4 908/13 908/18 908/21 908/25 909/2 909/9 909/12 909/15 910/23 911/13 911/16 912/12 913/21 914/2 916/9 918/4 918/21 919/4 919/18 919/24 920/1 920/7 920/9 920/12 921/17 925/6 925/10 925/12 925/12 976/20 976/22
**dark [1]** 934/18
**data [21]** 782/24 791/7 802/25 803/2 893/7 905/22 905/22 911/10 914/14 914/16 914/17 914/19 914/14 914/20 914/21 916/22 917/7 918/25 931/6 938/15
**database [1]** 899/21
**date [8]** 769/10 778/21 845/10 845/13 869/22 880/22 920/12 979/10
**dated [1]** 768/10
**dates [1]** 893/9
**daughter [2]** 798/3 884/11
**Dawn [5]** 881/5 881/7 887/18 975/11 976/14
**day [46]** 801/16 804/10 804/15 808/10 808/10 809/6 809/7 809/7 809/8 809/10 809/14 809/14 809/25 818/1 821/19 844/20

845/1 845/14 851/23 851/25 852/2 852/2 852/10 852/14 854/25 855/7 866/22 867/10 868/20 868/23 886/6 886/7 897/21 934/24 936/9 936/11 936/12 946/8 947/1 947/1 950/11 950/20 950/21 960/20 961/4 961/24
**day-to-day [1]** 947/1
**days [47]** 782/17 800/16 808/1 833/1 834/9 834/17 834/18 836/15 836/15 837/6 837/9 837/10 837/24 838/16 838/25 839/21 840/6 840/11 845/1 845/2 848/6 854/18 854/20 854/20 855/4 855/9 855/12 855/13 859/22 860/8 860/10 861/14 861/16 862/7 864/9 873/19 878/25 879/4 879/5 882/21 938/11 949/3 961/17 961/19 961/20 961/22 962/1
**DC [1]** 759/4
**deal [2]** 792/2 963/19
**dealing [5]** 762/22 763/20 766/17 789/25 866/16
**deals [3]** 767/22 768/18 786/13
**Deanna [9]** 872/19 872/21 872/22 873/3 873/14 873/15 873/16 873/18 878/24
**death [1]** 762/17
**debrief [4]** 852/8 852/10 852/11 853/4
**debriefed [2]** 804/14 874/4
**debriefs [1]** 837/1
**decades [2]** 763/15 763/19
**December [5]** 788/7 929/10 929/11 929/19 964/6
**December 2020 [2]** 788/7 929/19
**December of [2]** 929/10 929/11
**decent [1]** 938/25
**decide [8]** 843/12 936/11 967/5 977/2 977/12 977/16 977/17
**decided [5]** 838/23 843/6 845/9 889/1 915/25
**decision [15]** 829/1 833/24 844/5 844/7 860/18 880/20 958/2 958/8 965/10 973/23 974/4 974/9 974/17 975/5 975/20
**decision-maker [1]** 974/4
**decisions [5]** 791/4 923/17 925/21 969/2 969/3
**declaration [1]** 843/13
**decline [1]** 774/2
**declined [3]** 820/20 930/5 937/13
**deemed [1]** 885/15
**default [1]** 774/11
**default-free [1]** 774/11
**defendant [19]** 758/7 759/6 760/7 760/14 903/25 966/20 967/17 968/9 969/5 969/9 969/25 973/24 974/8 974/10 974/12 975/25 976/9 977/21 978/9
**defendant's [8]** 810/13 834/1 836/7 855/1 881/3 968/1 968/6 978/13
**defense [10]** 765/24 766/3 848/15 869/5 877/3 903/10 904/1 969/12 969/14 970/2
**defenses [1]** 969/15
**defer [4]** 791/8 848/20 848/22 968/15
**definitely [12]** 802/23 808/9 829/8 829/9 842/23 845/16 851/6 851/14 912/9 947/5 947/6 963/10
**definition [1]** 795/25
**degree [7]** 762/25 770/5 783/20 872/8 884/2 904/17 907/3
**degrees [1]** 872/7
**Delaware [3]** 883/24 884/1 969/3
**deliberate [1]** 971/20
**delivered [4]** 827/13 827/14 846/21 888/24
**demonstrates [1]** 974/7
**demoted [2]** 841/2 841/7
**denied [3]** 765/22 969/23 969/24
**Dennis [4]** 759/21 978/7 979/9 979/10
**Denver [7]** 867/19 873/4 873/5 873/6 873/12 873/14 873/15
**department [8]** 762/4 769/25 894/7 894/9 897/5 897/6 897/9 914/18
**depend [1]** 929/22
**depending [3]** 762/21 892/19 916/6
**depends [2]** 795/25 892/10
**deposed [1]** 812/11
**deposition [26]** 812/10 812/22 814/2 814/23 823/11 827/14 829/16 830/9 830/15 842/25 859/9 859/13 862/12 862/14 862/19 863/6 864/2 879/7 879/10 879/10 879/20 879/22 882/22 911/8 925/1 930/16
**depositions [2]** 784/15 784/17
**derived [1]** 769/7

**D**

derogatory [1]  856/8
describe [8]  762/13 762/24 850/11 851/20 871/2 904/15 945/25
948/20
described [3]  773/8 854/6 948/12
describing [1]  908/15
description [1]  917/11
desired [1]  867/21
desk [2]  807/16 811/8
detail [1]  821/3
details [6]  808/21 808/23 809/4 856/6 912/5 912/8
determination [3]  789/4 793/12 976/21
determine [4]  768/15 877/24 916/21 921/5
determined [2]  783/3 909/19
determining [1]  923/14
develop [8]  815/4 815/6 815/17 895/19 947/2 947/20 960/3
963/22
developed [3]  946/25 947/6 950/9
development [12]  799/11 837/8 855/11 870/3 897/4 897/7
947/18 948/3 948/4 949/19 950/8 962/19
Dew [2]  873/17 873/18
diabetes [2]  849/18 895/4
diagnoses [1]  949/8
diagnosing [1]  946/10
diagnosis [1]  959/21
did [223]
didn't [69]  784/21 789/4 790/17 793/10 793/12 801/23 801/24
813/24 816/17 816/19 821/2 821/14 822/4 822/15 827/10
828/16 828/18 828/20 828/21 829/2 830/4 832/18 838/20 839/9
839/11 844/10 847/10 848/4 848/8 850/13 850/23 851/9 853/10
853/21 853/23 854/3 858/24 859/2 860/6 860/9 860/10 862/10
862/12 862/13 869/1 869/3 872/12 874/12 874/13 878/16
896/14 903/14 912/4 915/13 916/20 927/20 928/2 928/5 928/6
928/9 930/5 941/10 946/23 952/10 958/19 963/22 964/11
970/17 972/21
differ [2]  874/23 915/18
difference [11]  771/9 771/14 773/3 776/19 778/2 779/25 780/7
869/2 885/9 909/8 913/12
differences [3]  772/18 892/18 963/24
different [53]  784/11 794/18 799/5 799/24 800/25 815/22
817/12 817/20 817/25 817/25 819/17 824/10 826/25 838/23
845/3 850/20 857/2 866/18 867/5 871/18 871/20 872/19 874/25
878/8 878/9 885/15 895/1 898/9 918/10 918/13 919/21 926/7
926/8 926/9 926/9 926/12 939/21 946/2 946/3 946/4 946/24
947/20 948/1 948/18 948/19 949/7 949/12 949/13 950/18 951/2
957/17 958/19 959/14
differently [3]  878/7 939/2 953/5
difficult [2]  850/14 958/2
digitally [1]  979/7
diligent [1]  926/2
diminished [1]  767/11
DiNunzio [80]  798/23 799/22 801/8 802/7 802/10 806/7 806/10
808/11 817/9 822/14 822/15 824/5 824/13 824/15 828/20 831/5
833/8 834/5 836/9 840/22 842/8 842/11 843/22 844/23 846/11
846/22 847/1 847/21 850/5 850/7 850/8 856/1 856/4 856/7
856/12 856/14 856/17 857/11 857/16 857/17 880/24 881/2
881/5 881/7 885/5 889/4 889/7 894/12 901/11 901/13 902/2
939/17 939/23 940/3 940/17 940/19 940/22 940/24 941/7
942/12 942/20 948/5 951/1 951/12 951/15 951/21 953/18
953/22 953/25 954/8 954/13 956/15 956/15 956/24 957/22 958/13
958/20 958/22 965/24 966/2 976/15
DiNunzio's [4]  843/25 896/8 896/11 966/4
diplomate [1]  926/25
direct [12]  760/3 761/14 797/20 849/9 865/1 882/18 904/8
932/10 940/14 943/14 974/2 974/3
direction [7]  833/17 833/21 833/22 833/25 857/12 857/17
953/25
directly [4]  892/1 927/12 927/15 927/20
director [20]  785/18 797/25 798/7 800/20 801/9 817/9 824/6
824/10 833/7 833/13 840/17 841/3 841/8 841/10 843/17 896/4
904/11 951/3 958/16 958/21
directors [2]  839/1 847/9

disability [1]  908/11
disagree [5]  911/23 912/20 916/16 940/9 970/14
disagreed [1]  911/3
disagreement [1]  919/15
disappointed [1]  821/21
disciplined [2]  860/7 860/9
discontinue [1]  906/7
discount [1]  916/1
discounted [1]  776/14
discovery [2]  928/14 955/20
discretion [1]  816/20
discriminated [1]  828/13
discrimination [11]  828/8 889/10 892/4 906/9 940/20 951/19
968/21 973/17 973/19 975/16 976/9
discriminatory [4]  968/22 969/20 970/17 974/3
discuss [4]  803/7 853/4 903/19 940/22
discussed [4]  806/12 846/15 874/6 897/1
discusses [1]  838/15
discussing [3]  836/7 871/18 952/24
discussion [8]  779/20 844/23 870/19 871/16 871/17 871/17
952/16 957/5
discussions [2]  802/19 803/8
dismiss [2]  805/18 805/19
dismissed [1]  805/2
displayed [2]  809/20 833/23
dissolved [1]  873/2
distributing [1]  892/21
district [76]  758/1 758/2 758/12 759/21 765/18 798/6 798/8
798/8 798/16 799/16 800/19 800/20 803/21 804/5 817/7 817/17
818/4 818/5 818/8 820/19 821/1 821/6 821/14 822/5 823/4
823/5 823/17 823/25 841/13 848/9 850/2 850/4 865/16 865/24
874/23 874/25 878/17 878/20 881/23 882/1 885/11 885/12
896/3 898/10 898/20 900/20 912/25 914/24 916/25 924/24
929/25 930/6 930/20 931/1 931/3 943/21 947/19 955/3 955/6
955/8 955/10 956/4 957/7 957/8 957/20 958/3 958/12 959/5
959/20 961/13 961/15 963/21 964/7 964/8 964/13 966/13
districts [5]  799/24 955/8 955/11 958/4 961/12
disturbing [1]  802/23
divide [1]  775/18
do [250]
docs [2]  872/24 872/25
doctor [11]  777/24 852/4 853/7 853/16 853/20 853/21 866/21
866/22 868/10 868/25 950/3
doctor's [7]  811/19 815/16 816/5 853/16 866/16 872/1 949/24
doctorate [4]  763/3 906/14 907/16 908/12
doctorate-level [2]  907/16 908/12
doctors [16]  817/19 818/7 853/1 866/23 867/1 867/10 868/4
871/20 872/16 945/22 948/23 949/5 949/13 949/14 952/25
953/2
doctors' [2]  934/8 945/19
document [16]  773/7 808/5 832/19 832/22 837/14 837/22 838/7
839/18 855/3 855/6 860/24 860/25 868/21 868/22 890/8 950/14
documentation [2]  845/25 956/8
documented [2]  809/3 855/22
documenting [1]  809/12
documents [8]  767/18 768/23 775/24 891/10 905/19 911/5
911/12 960/11
does [39]  764/19 766/9 766/11 780/16 781/12 791/18 791/22
792/21 800/15 806/13 823/16 832/11 864/2 865/24 869/13
870/16 883/6 886/5 889/10 891/17 891/23 892/4 892/7 892/16
893/18 893/20 893/23 894/1 894/6 894/9 897/8 912/14 914/5
914/25 917/19 917/25 939/3 947/5 948/15
doesn't [7]  766/2 783/11 847/11 869/10 871/2 913/4 913/8
dog [9]  805/3 805/5 805/9 806/1 808/4 824/23 827/7 828/2
828/3
doing [19]  763/20 764/7 792/3 797/14 805/13 807/21 839/8
841/17 875/6 875/7 875/7 889/8 891/20 942/10 955/6 955/17
960/19 964/7 964/8
dollars [3]  767/6 770/13 779/23
domain [1]  788/22
don't [80]  762/7 769/17 771/23 777/6 782/8 782/16 784/23
784/24 788/4 788/11 789/23 790/4 790/7 791/4 792/23 795/22
802/16 811/23 813/7 815/18 817/14 817/16 818/11 818/14

**D**

**don't... [56]** 823/9 825/25 826/19 826/20 829/7 830/10 831/20 832/3 832/24 833/2 833/3 834/15 834/24 835/3 837/15 839/1 839/2 840/3 840/16 841/23 847/23 856/5 861/17 866/9 877/8 880/22 881/6 881/6 888/17 893/19 899/11 901/19 902/17 903/2 905/21 910/15 916/6 923/3 924/2 925/23 926/14 926/14 927/9 930/5 933/21 933/22 934/14 934/15 934/15 934/19 942/6 942/10 942/10 965/16 970/1 974/3
**done [13]** 764/11 776/6 790/4 802/4 802/4 803/20 813/6 823/20 848/5 851/19 907/17 973/13 977/22
**door [3]** 890/19 890/21 890/22
**double [4]** 783/6 794/14 795/2 922/17
**double-counted [2]** 794/14 795/2
**double-counting [2]** 783/6 922/17
**Douglas [1]** 977/19
**down [13]** 777/12 786/25 805/13 818/3 836/14 869/15 874/5 880/13 887/12 933/3 935/3 950/14 972/9
**Dr [3]** 779/15 794/22 916/8
**Dr. [64]** 761/9 761/16 761/19 766/20 766/25 772/25 773/18 777/20 777/23 778/17 781/3 781/11 782/4 782/4 784/3 785/8 785/21 786/22 787/10 789/15 791/5 791/21 794/9 795/1 795/5 795/14 795/19 796/1 796/7 868/24 903/11 904/1 904/10 907/7 908/2 908/18 908/24 909/16 911/2 916/8 916/11 916/15 916/24 917/3 917/23 917/23 917/25 918/7 918/17 919/3 919/8 919/9 920/11 922/18 922/23 923/5 923/10 923/16 924/1 924/2 924/4 926/20 930/12 930/13
**Dr. Bierhanzl [15]** 795/1 795/5 904/10 907/7 908/2 908/18 908/24 909/16 916/8 917/3 920/11 924/1 924/4 926/20 930/12
**Dr. Edelman [41]** 761/16 761/19 766/20 766/25 772/25 773/18 777/20 777/23 778/17 781/3 781/11 782/4 782/4 784/3 785/8 785/21 786/22 787/10 789/15 791/5 791/21 794/9 795/14 795/19 796/1 796/7 911/2 916/11 916/24 917/23 917/25 918/7 918/17 919/8 919/9 922/18 922/23 923/5 923/10 923/16 930/13
**Dr. Edelman's [4]** 916/15 917/23 919/3 924/2
**Dr. Edward [2]** 903/11 904/1
**Dr. Richard [1]** 761/9
**Dr. So [1]** 868/24
**draft [2]** 968/12 971/10
**drafted [1]** 809/11
**dressed [1]** 952/9
**drink [1]** 873/17
**drinking [1]** 873/17
**drive [4]** 959/23 960/3 962/10 962/13
**driven [2]** 817/21 827/3
**driving [3]** 774/23 780/5 783/9
**drove [1]** 949/22
**drug [2]** 817/19 857/14
**DSM [40]** 798/15 798/21 800/12 800/16 834/9 838/4 838/11 838/18 840/25 855/17 885/9 885/10 885/10 885/11 885/12 885/13 885/19 886/1 896/5 898/13 899/4 943/21 943/23 944/8 944/16 945/17 948/15 950/25 951/6 954/17 955/1 955/5 956/7 956/11 956/11 956/13 957/25 959/2 963/14
**DSMs [8]** 831/4 836/10 858/24 859/2 859/4 859/21 863/15 900/23
**dubious [1]** 802/12
**due [2]** 771/16 975/23
**duly [8]** 761/10 797/16 849/4 864/20 882/14 904/4 932/6 943/9
**duration [1]** 791/3
**during [21]** 820/21 821/20 824/15 850/4 852/5 852/10 852/13 853/22 855/17 865/20 867/2 876/23 921/22 922/1 949/24 954/21 954/24 955/15 956/6 959/16 961/7
**duties [2]** 762/13 891/25
**dynamic [1]** 867/5

**E**

**each [13]** 769/18 771/4 771/14 774/2 775/10 808/21 874/25 886/20 922/25 925/24 950/16 961/20 964/4
**earlier [16]** 766/1 772/2 779/21 780/20 793/25 808/3 831/18 834/19 836/16 838/20 839/3 844/23 847/23 930/7 949/20 973/1
**early [10]** 802/25 803/8 803/13 831/7 857/2 934/23 954/19 954/25 966/9 966/23
**earn [20]** 771/5 777/16 782/3 792/25 793/2 909/10 909/18

**E**

910/1 910/6 911/19 912/24 913/25 914/23 915/1 915/17 918/15 918/23 922/1 925/8 925/19
**earned [23]** 767/12 771/15 772/19 775/14 777/14 778/3 779/18 779/21 779/23 782/2 786/4 788/10 794/15 878/1 878/2 909/11 913/23 915/2 919/20 919/21 920/5 920/7 925/9
**earning [11]** 775/17 776/11 782/17 792/25 793/6 793/14 909/20 913/3 914/22 918/18 921/24
**earnings [32]** 791/6 791/22 791/23 908/8 908/8 909/3 909/6 909/10 909/14 909/14 910/5 911/18 912/15 912/15 913/7 913/16 914/8 914/10 916/11 916/20 917/22 918/1 919/23 919/23 919/24 919/25 920/1 920/5 920/6 921/24 925/17 925/18
**earns [1]** 929/21
**easier [1]** 818/20
**eastern [1]** 961/14
**easy [1]** 867/18
**economic [35]** 762/13 762/15 763/12 764/3 764/22 764/22 766/4 767/3 770/1 783/20 787/19 904/12 905/5 905/23 907/4 907/9 907/11 907/13 908/4 909/9 909/12 909/15 913/21 914/2 918/21 919/4 919/18 919/24 920/1 920/7 920/9 921/17 925/10 925/15 931/9
**economics [16]** 761/20 761/23 763/4 763/8 763/11 763/17 763/17 766/20 904/12 904/17 904/18 904/19 904/20 904/25 906/14 908/14
**economist [6]** 765/24 765/25 904/13 907/16 908/12 917/9
**economists [1]** 917/7
**Edelman [46]** 760/4 761/9 761/16 761/18 761/19 766/20 766/25 772/25 773/18 777/20 777/23 778/17 779/15 781/3 781/11 782/4 782/4 784/3 785/8 785/21 786/22 787/10 789/15 791/5 791/21 794/9 795/14 795/19 796/1 796/7 911/2 916/11 916/24 917/23 917/25 918/7 918/17 919/8 919/9 922/6 922/18 922/23 923/5 923/10 923/16 930/13
**Edelman's [6]** 911/6 916/8 916/15 917/23 919/3 924/2
**education [4]** 762/23 770/4 792/13 884/3
**educational [2]** 762/24 904/15
**Edward [4]** 760/11 903/11 904/1 904/7
**EEO [1]** 890/13
**effect [1]** 793/10
**effective [5]** 814/1 815/10 847/13 923/24 949/2
**effectiveness [1]** 854/1
**effort [2]** 910/5 915/3
**efforts [6]** 782/6 857/3 902/12 907/22 925/9 927/16
**egos [1]** 866/8
**eight [2]** 868/3 973/4
**eight o'clock [1]** 973/4
**either [8]** 767/13 782/1 853/11 867/7 891/4 891/5 906/6 940/9
**elected [1]** 774/8
**electronic [5]** 868/22 874/15 967/22 973/5 973/8
**electronically [1]** 971/3
**element [4]** 767/21 768/16 768/17 775/6
**elements [2]** 767/21 775/11
**elevator [2]** 872/12 872/13
**eleven [2]** 865/22 904/20
**eligible [4]** 775/6 775/22 885/16 893/20
**else [9]** 818/6 830/4 847/12 860/7 917/12 931/13 953/15 967/2 967/6
**email [20]** 808/2 809/11 809/18 833/14 834/2 834/2 834/8 834/12 836/9 841/18 847/20 848/7 861/9 881/18 881/20 882/1 887/10 887/14 888/17 976/14
**emails [3]** 808/2 809/12 888/5
**embraced [1]** 851/6
**emeritus [3]** 761/20 761/25 762/1
**Emoji [1]** 860/12
**emphasize [1]** 963/25
**empirical [1]** 787/5
**employed [11]** 767/15 858/6 880/9 882/25 893/10 906/13 909/19 909/22 912/2 919/20 941/19
**employee [34]** 775/4 775/5 783/4 869/18 876/4 883/17 886/4 886/5 886/7 890/22 891/5 891/12 891/15 891/19 891/23 891/24 893/5 893/7 893/20 893/23 894/1 897/21 900/5 901/9 902/20 902/21 902/24 906/6 910/17 941/25 965/21 974/23 977/2 977/5
**employees [20]** 799/8 883/10 883/12 885/22 889/16 889/25 890/6 890/16 891/8 892/4 892/8 892/12 893/16 899/14 900/15 901/21 915/18 922/10 922/21 969/2

# E

**employer [16]** 771/12 774/19 776/5 780/2 780/9 893/5 893/8 893/17 906/6 909/4 909/7 910/5 913/24 925/12 925/14 925/25
**employer's [3]** 770/21 770/22 775/2
**employers [2]** 842/1 922/15
**employment [27]** 759/3 762/17 764/9 765/14 766/7 785/12 785/23 786/6 786/17 787/11 793/14 842/4 888/3 890/13 893/2 904/25 905/1 905/12 906/7 909/1 921/1 928/2 928/4 968/19 969/3 973/20 976/9
**encompasses [1]** 762/17
**encouraging [3]** 951/15 953/18 953/22
**end [46]** 775/3 776/25 780/22 781/24 786/2 802/4 807/25 809/24 822/19 831/25 832/6 832/25 838/12 840/4 840/7 845/4 845/10 845/13 847/14 848/5 848/10 852/12 861/12 866/1 866/2 885/1 894/25 895/1 920/3 920/20 921/3 921/22 922/5 924/15 924/17 924/20 924/23 924/24 933/3 934/25 935/5 937/4 941/8 945/15 950/21 959/4
**ended [4]** 809/23 874/2 874/7 937/1
**ends [2]** 924/15 944/8
**energy [3]** 812/3 812/7 813/8
**enforcing [1]** 889/4
**engage [4]** 812/8 892/19 892/20 975/23
**engagement [9]** 815/10 836/20 837/7 837/8 838/17 840/12 854/15 855/10 855/11
**enjoyable [1]** 868/15
**enjoyed [4]** 782/18 812/4 813/16 813/18
**enough [3]** 801/22 807/14 971/7
**enter [2]** 976/7 976/19
**entered [5]** 885/22 885/24 886/1 976/5 977/24
**entire [4]** 799/14 881/23 922/24 951/5
**entirely [2]** 829/15 930/14
**entitled [4]** 921/17 969/6 977/13 979/6
**Envious [1]** 800/3
**environment [1]** 938/18
**equal [5]** 818/6 837/9 855/12 890/13 919/25
**equitable [2]** 844/16 844/17
**eroding [1]** 963/20
**error [2]** 794/21 923/10
**errors [6]** 784/10 913/19 922/6 922/8 922/18 923/5
**escalate [3]** 883/14 883/19 890/25
**especially [2]** 870/21 949/11
**essence [1]** 909/13
**essentially [9]** 767/6 799/21 885/12 885/14 890/21 899/12 911/17 922/17 928/25
**establish [2]** 819/4 969/19
**established [2]** 819/3 819/4
**establishment [2]** 871/11 872/4
**estimate [6]** 865/21 912/14 914/8 921/18 934/12 935/17
**estimated [1]** 914/5
**estimates [1]** 907/17
**estimating [3]** 916/1 919/19 919/21
**et [1]** 836/22
**et cetera [1]** 836/22
**ethical [1]** 895/17
**ethics [3]** 890/3 891/7 975/3
**evaluate [1]** 915/14
**evaluated [1]** 838/13
**evaluating [3]** 821/14 822/5 864/9
**evaluation [3]** 767/3 886/2 908/7
**evaluations [1]** 820/15
**eve [1]** 809/14
**even [36]** 776/2 792/2 796/21 799/19 801/25 801/25 802/23 807/6 817/16 820/10 821/11 824/15 831/17 831/20 831/24 832/4 839/15 842/19 847/3 854/17 861/17 866/19 867/23 871/22 873/17 877/23 893/11 894/6 898/2 898/3 902/15 902/24 912/6 929/25 930/6 969/21
**evening [1]** 966/23
**event [3]** 816/16 925/13 963/7
**eventually [1]** 774/12
**ever [34]** 765/18 765/22 771/1 785/7 798/24 801/6 803/7 808/15 820/14 824/20 833/3 840/16 841/22 846/14 856/14 857/17 879/13 888/2 901/20 902/2 923/19 936/9 940/22 941/6 942/7

942/8 942/11 942/19 953/22 953/25 954/7 954/7 954/10 954/13 965/13
**every [26]** 783/13 795/7 799/7 799/12 800/24 802/12 802/19 803/1 819/2 821/16 826/18 855/7 868/12 873/16 873/20 878/8 886/6 886/19 923/1 933/24 949/2 953/1 960/22 961/16 964/5 964/9
**everybody [5]** 831/1 895/23 960/8 967/14 978/14
**everybody's [1]** 899/22
**everyone [4]** 786/20 878/8 960/9 960/22
**everyone's [2]** 822/3 967/16
**everything [4]** 763/17 818/6 890/9 960/19
**evidence [16]** 773/12 777/6 777/7 787/5 790/24 910/21 912/5 912/16 967/5 969/10 970/19 974/2 974/4 977/7 977/8 977/18
**evolution [1]** 856/21
**evolve [1]** 856/23
**evolved [1]** 803/14
**evolving [1]** 856/24
**exact [3]** 832/5 879/20 880/22
**exactly [4]** 767/15 782/3 925/3 971/24
**exaggerated [1]** 866/7
**EXAMINATION [27]** 761/14 784/1 796/5 797/20 810/15 836/5 846/8 847/17 849/9 858/4 860/22 862/3 863/3 864/6 865/1 876/14 881/11 882/18 901/4 904/8 926/18 930/10 932/10 941/17 942/17 943/14 964/17
**example [30]** 763/7 770/20 772/4 776/24 796/8 816/3 816/8 816/21 817/1 833/19 838/22 853/14 856/9 866/15 867/12 867/16 867/22 877/16 883/16 893/9 916/24 947/16 948/18 948/19 949/20 961/23 962/9 974/4 974/5 975/2
**examples [5]** 809/15 809/19 809/20 815/14 868/24
**exceed [1]** 919/5
**Excel [1]** 869/6
**excellence [10]** 799/2 799/6 800/5 805/1 817/15 820/23 821/2 823/10 880/18 886/16
**exceptions [1]** 855/19
**excerpt [3]** 855/8 869/12 875/20
**excited [1]** 957/1
**exclude [1]** 816/11
**exclusive [3]** 826/3 963/3 963/8
**exclusively [1]** 947/24
**excuse [2]** 794/2 809/9
**excused [7]** 797/4 864/12 882/6 882/8 903/6 931/21 942/25
**excuses [1]** 803/15
**execute [1]** 852/20
**execution [4]** 855/6 859/6 859/24 861/1
**executive [12]** 798/8 798/16 798/21 821/5 885/9 885/10 885/11 885/12 885/13 885/19 898/13 932/24
**exercise [2]** 814/11 814/13
**exhibit [32]** 772/24 772/25 773/12 777/24 778/10 781/3 781/5 781/12 793/22 793/23 794/2 828/6 834/1 836/8 855/1 869/5 877/3 881/3 885/20 887/9 887/10 887/13 888/5 889/20 890/18 900/3 900/3 924/3 924/9 968/9 974/11 974/11
**Exhibit 2 [1]** 778/10
**Exhibit 3 [1]** 772/25
**Exhibit No. 2 [1]** 794/2
**exhibits [9]** 967/20 967/21 967/23 967/24 968/1 968/6 972/5 972/6 972/8
**exist [2]** 774/11 832/18
**exists [1]** 909/9
**exiting [1]** 967/1
**expect [9]** 876/6 880/11 909/18 910/8 913/22 914/11 915/16 923/24 925/19
**expectancy [22]** 767/10 768/19 768/19 769/2 769/2 769/6 769/7 769/8 769/10 769/12 769/13 769/16 769/16 769/17 769/21 769/24 769/25 770/2 770/5 772/20 781/25
**expectation [2]** 868/8 878/15
**expectations [3]** 803/22 805/8 964/23
**expected [18]** 788/6 790/2 791/6 795/24 854/21 901/21 903/14 909/22 910/1 910/6 913/7 913/25 914/23 915/1 917/7 918/23 922/1 929/22
**expenses [2]** 762/21 801/12
**expensive [1]** 962/10
**experience [62]** 773/9 788/2 788/21 790/21 790/24 791/7 791/24 792/5 792/8 792/12 792/19 806/1 806/6 808/14 815/21

**E**

**experience...** [47] 843/14 847/6 857/16 872/9 876/7 878/10 885/15 913/4 913/5 913/8 913/15 914/5 914/9 914/10 914/11 914/23 915/1 915/7 915/8 915/12 915/16 915/19 915/21 915/22 916/1 916/5 916/6 916/6 917/1 918/2 918/23 919/1 920/14 923/21 924/5 925/19 929/23 931/16 940/2 942/5 945/15 946/17 948/6 949/15 955/4 962/21 978/12

**experienced** [1] 947/11

**experiences** [4] 910/7 946/4 948/9 950/19

**expert** [36] 762/14 762/15 765/10 765/20 765/22 782/9 782/16 782/19 782/21 784/23 787/13 787/20 788/23 788/24 791/8 791/10 793/18 794/22 795/1 795/5 795/11 796/16 894/3 897/3 899/3 905/8 906/1 906/11 906/13 907/7 907/10 907/20 923/17 924/22 926/21 927/10

**expert's** [1] 785/2

**expertise** [6] 785/1 786/8 787/7 789/8 791/11 793/16

**experts** [4] 891/25 896/14 911/2 927/1

**explain** [13] 769/1 772/16 777/24 886/9 886/14 888/15 908/25 909/16 913/19 919/15 921/20 923/9 925/3

**explained** [2] 772/11 787/9

**explaining** [1] 929/20

**explanation** [1] 888/20

**explicitly** [1] 782/8

**express** [1] 888/2

**expressed** [1] 783/19

**extend** [4] 786/2 845/10 845/15 845/23

**extended** [1] 841/11

**extending** [1] 773/5

**extenuating** [1] 855/22

**external** [2] 804/8 958/9

**externally** [1] 897/24

**extremely** [1] 815/22

**exuding** [1] 809/15

**eyeball** [2] 812/8 812/9

**eyes** [1] 960/25

**F**

**fabricating** [1] 806/22

**face** [34] 802/2 802/2 812/4 812/4 812/6 812/6 813/16 813/16 813/18 813/18 813/19 813/19 814/1 814/1 814/6 814/6 814/12 814/12 814/22 814/22 814/25 814/25 815/2 815/2 816/9 816/9 816/19 816/19 816/25 816/25 826/10 833/4 833/4 860/13

**face-to-face** [16] 802/2 812/4 812/6 813/16 813/18 813/19 814/1 814/6 814/12 814/22 814/25 815/2 816/9 816/19 816/25 833/4

**facie** [4] 969/19 970/15 974/8 977/23

**fact** [29] 764/19 766/9 783/11 791/18 801/6 811/3 846/25 874/11 876/25 879/22 880/22 887/5 906/25 912/5 915/24 917/23 954/2 970/5 971/25 974/22 974/24 974/24 975/8 975/13 975/14 975/19 975/22 976/7 977/20

**factor** [2] 782/13 803/24

**factored** [1] 914/5

**factors** [3] 936/25 974/17 974/18

**factory** [2] 786/14 786/25

**factual** [1] 972/22

**faculty** [3] 762/3 762/4 762/6

**fail** [1] 938/19

**failed** [1] 969/11

**failure** [1] 816/17

**fair** [13] 791/15 821/2 821/4 824/8 825/15 844/16 844/17 854/8 870/8 895/17 939/19 958/17 965/2

**fairly** [1] 774/3

**fairness** [1] 816/23

**fall** [1] 945/4

**Falls** [2] 944/21 945/1

**false** [7] 813/11 813/20 813/25 814/7 814/20 814/24 973/16

**falsely** [1] 841/24

**falsifying** [2] 807/22 828/4

**familiar** [5] 834/15 868/17 903/1 928/3 962/24

**family** [12] 780/7 810/2 841/14 872/25 958/8 967/3 973/18 973/18 975/10 975/17 976/12 976/17

**far** [9] 780/21 850/22 854/19 862/9 877/15 933/10 946/8 969/16

970/10

**fast** [1] 957/19

**faster** [1] 903/14

**father** [2] 809/8 865/8

**Father's** [7] 808/10 809/10 809/14 809/14 809/25 845/1 845/14

**Father's Day** [1] 809/14

**favorable** [2] 786/17 787/4

**FCR** [1] 875/9

**FCRR** [2] 759/21 979/10

**February** [7] 767/23 768/9 768/11 779/1 785/20 928/20 928/23

**February 13th** [1] 767/23

**February 15th** [1] 785/20

**February 16th** [1] 768/11

**February 2021** [1] 779/1

**fed** [1] 795/23

**federal** [8] 765/13 765/15 768/20 769/7 774/1 775/12 973/18

**fee** [1] 764/24

**feed** [1] 855/5

**feedback** [24] 801/19 807/8 815/3 815/5 815/17 816/21 851/9 853/15 853/5 853/14 854/6 854/6 866/11 866/12 866/13 867/13 868/15 868/22 874/10 874/11 895/19 947/5 949/5 956/20

**feel** [11] 819/24 851/12 852/1 857/20 906/14 911/12 938/5 939/6 940/11 946/19 946/22

**feeling** [1] 850/22

**felt** [11] 809/24 812/8 814/17 815/23 828/12 845/17 845/21 846/1 866/25 938/18 958/7

**few** [10] 782/5 783/13 803/15 814/2 842/20 846/7 882/21 907/23 950/10 957/1

**field** [100] 763/6 763/14 763/21 785/3 790/20 796/9 798/6 800/16 800/21 801/1 801/10 804/19 806/7 806/13 806/15 806/23 807/6 807/7 807/10 807/12 807/18 809/12 811/12 813/11 814/18 816/24 820/17 832/1 832/2 832/14 832/17 833/1 833/5 836/21 837/2 838/13 838/20 839/5 840/5 840/6 840/9 847/12 848/6 851/20 851/22 854/21 858/25 859/3 867/14 868/17 868/19 868/20 870/3 870/2 870/6 870/10 870/12 870/17 870/24 871/2 871/7 873/24 874/15 875/2 875/10 875/18 875/19 878/22 879/3 880/5 884/14 889/4 929/13 936/9 937/22 938/10 938/12 942/5 942/9 945/21 945/25 947/13 947/14 947/17 948/10 948/21 949/1 949/3 949/12 950/12 950/13 950/13 950/14 950/16 950/16 955/15 959/16 960/17 961/19 962/4

**fifth** [3] 759/12 774/13 968/19

**figure** [8] 769/10 770/16 794/3 913/10 919/12 935/21 963/12 968/10

**figured** [2] 935/23 945/10

**figures** [3] 770/12 772/3 772/13

**file** [6] 784/18 911/9 928/3 942/11 971/8 972/10

**filing** [2] 970/18 971/6

**fill** [1] 950/18

**filtered** [1] 958/10

**final** [2] 772/11 776/22

**finally** [5] 772/2 776/1 846/24 885/24 973/19

**finance** [3] 763/2 763/8 766/20

**financial** [6] 761/20 763/4 763/16 764/6 766/16 796/11

**financially** [2] 767/13 782/1

**find** [25] 785/5 791/19 808/1 832/17 841/20 845/6 860/1 862/20 908/20 914/8 915/3 920/19 920/25 921/2 921/6 921/9 921/13 924/6 924/23 929/13 929/18 940/16 948/18 962/3 962/7

**finding** [2] 920/3 929/17

**findings** [1] 902/10

**finds** [1] 921/16

**fine** [4] 810/7 834/25 914/17 968/14

**finish** [2] 832/20 834/23

**finished** [9] 804/14 841/11 843/16 951/4 960/9 964/8 964/13 966/18 971/16

**finishing** [1] 964/9

**fire** [4] 973/23 974/9 975/5 975/20

**fired** [7] 841/25 842/3 842/4 842/5 976/11 977/14 977/15

**firing** [2] 974/5 974/13

**firm** [1] 904/12

**first** [41] 767/21 767/23 768/16 769/5 770/7 772/10 773/22 775/9 776/24 782/10 787/22 798/20 824/9 824/18 836/19

**F**

**first... [26]** 846/18 850/14 851/1 851/3 853/9 857/1 884/12 884/13 901/12 912/1 915/11 919/22 923/8 928/23 942/8 945/18 946/2 946/24 949/23 951/7 956/6 963/1 969/12 972/14 978/5
**first-hand [1]** 942/8
**first-line [1]** 798/20
**five [23]** 772/6 788/2 788/4 809/21 821/19 822/20 842/13 877/5 877/5 886/12 886/12 897/12 913/4 915/7 918/2 921/14 936/14 937/5 960/15 960/16 960/16 960/23 964/24
**five o'clock [1]** 936/14
**five-day [1]** 821/19
**fives [3]** 960/18 960/22 961/6
**fixed [2]** 953/9 953/11
**flew [2]** 872/7 880/4
**flight [2]** 858/13 880/7
**flights [2]** 935/7 962/9
**flipped [1]** 807/4
**Florida [2]** 904/18 904/21
**flow [2]** 868/12 976/22
**fly [2]** 962/10 962/11
**flying [1]** 961/16
**focus [9]** 837/1 857/3 878/19 950/18 959/9 959/24 960/17 960/24 974/1
**focused [5]** 878/16 881/24 881/25 882/1 963/23
**focusing [2]** 878/16 959/14
**folks [7]** 781/13 781/20 799/11 801/12 805/18 971/16 973/4
**follow [6]** 803/18 833/22 833/25 950/23 962/1 966/25
**follow-up [1]** 962/1
**following [5]** 774/18 774/18 804/24 895/22 928/20
**foot [1]** 850/14
**force [2]** 770/3 900/10
**forecast [1]** 775/12
**foregoing [1]** 979/4
**forensic [2]** 761/22 763/10
**forget [4]** 804/20 809/5 809/6 949/25
**forgive [1]** 973/11
**form [13]** 806/16 807/6 807/7 807/11 807/12 807/18 825/20 830/19 832/1 875/2 875/22 950/17 971/10
**formal [2]** 965/20 965/22
**format [4]** 778/19 861/7 869/8 869/11
**former [5]** 849/25 893/5 893/7 909/7 913/24
**forms [7]** 767/25 809/13 832/2 833/5 838/13 839/6 872/3
**formularies [1]** 819/18
**formulary [2]** 817/18 819/23
**formulation [1]** 918/7
**forth [4]** 764/1 764/7 765/17 834/16
**fortunately [2]** 914/7 958/11
**forward [19]** 776/21 797/12 851/2 882/12 920/8 920/12 932/3 943/6 949/16 951/21 959/3 974/8 974/25 976/1 976/4 977/9 977/11 977/21 978/2
**forwarded [1]** 976/14
**forwarding [1]** 957/19
**found [7]** 770/14 794/23 851/1 921/15 925/14 960/14 962/7
**foundation [2]** 806/5 806/25
**four [22]** 788/2 788/4 806/20 821/19 865/9 866/23 873/16 873/20 913/4 915/6 918/2 921/14 932/15 935/5 935/6 936/14 943/22 945/1 945/21 945/23 949/3 961/19
**fours [2]** 960/22 961/6
**fourth [3]** 774/5 778/25 964/13
**frame [10]** 804/1 804/4 816/2 824/7 852/24 894/16 945/16 950/23 955/15 963/21
**framework [5]** 857/5 857/7 916/13 955/18 959/25
**freaking [1]** 961/1
**free [3]** 774/9 774/11 974/24
**freedom [1]** 809/22
**French [1]** 809/9
**frequency [1]** 948/9
**frequent [1]** 934/19
**frequently [5]** 764/5 836/13 841/17 847/25 933/20
**Friday [5]** 802/24 809/24 809/25 966/24 972/12
**Fridays [1]** 961/24

**friends [1]** 967/2
**fringe [12]** 768/19 769/2 770/9 770/9 770/18 770/18 770/25 771/12 774/15 774/17 774/18 780/3
**front [32]** 772/15 772/17 773/3 773/19 777/21 778/19 779/13 781/1 781/14 781/17 781/18 782/23 792/22 793/7 793/22 793/23 796/14 801/21 807/8 807/11 821/24 918/9 919/2 919/3 919/8 919/13 920/11 924/2 924/2 924/5 929/19 952/14
**full [17]** 765/2 771/8 775/4 775/5 775/21 789/20 790/15 796/22 796/23 913/5 918/16 932/7 936/9 936/11 936/12 956/11 958/12
**full-time [8]** 771/8 775/5 775/21 790/15 796/22 796/23 918/16 958/12
**fully [1]** 940/21
**function [1]** 931/17
**funding [7]** 770/23 771/14 774/19 774/22 776/12 780/3 780/10
**funds [1]** 962/5
**funny [4]** 830/17 872/5 872/14 881/8
**further [38]** 783/24 796/1 797/2 810/4 846/5 847/15 848/11 848/12 851/5 858/2 860/21 862/2 862/25 863/3 864/4 864/5 864/6 864/11 876/13 879/20 879/22 881/10 882/4 882/5 901/2 903/4 903/5 926/16 930/9 931/20 941/14 942/16 964/16 966/16 978/1 978/7 978/9 978/10
**futile [2]** 814/11 814/13
**future [16]** 762/19 767/9 769/18 771/16 772/3 772/12 789/21 795/17 842/1 909/5 909/7 910/1 910/15 918/14 923/15 947/7

**G**

**G-E-N-I-E [1]** 849/8
**gall [1]** 809/9
**game [1]** 847/14
**gaps [1]** 950/8
**Garrity [2]** 958/16 958/19
**gave [14]** 799/6 813/11 813/19 814/20 814/23 815/3 815/5 816/22 859/13 874/10 888/8 888/12 888/20 960/25
**gears [2]** 855/24 939/17
**gender [2]** 769/11 770/4
**general [4]** 778/19 857/24 860/10 871/6
**generally [12]** 773/1 828/9 828/11 869/8 898/24 905/18 945/25 946/4 947/9 948/11 948/15 960/17
**generic [5]** 962/20 963/2 963/9 963/16 963/24
**Genie [5]** 760/8 848/25 849/7 849/7 849/16
**gentleman [1]** 849/21
**gentlemen [1]** 966/22
**geographic [1]** 921/6
**geographically [2]** 933/10 933/13
**geography [3]** 944/22 946/5 958/19
**George [8]** 872/6 872/7 933/4 935/2 935/4 935/7 935/9 935/13
**get [85]** 766/5 770/19 776/12 783/14 786/5 786/14 786/17 787/4 787/9 787/17 787/23 789/5 790/9 792/20 793/13 793/20 795/20 796/22 797/12 801/13 801/15 802/25 804/6 804/16 805/6 811/8 816/2 817/19 818/20 819/23 824/25 825/25 828/21 833/6 841/14 845/11 845/16 846/11 847/14 852/1 861/7 861/16 861/17 866/25 870/23 872/13 885/24 888/14 892/9 892/12 893/4 894/4 899/18 902/22 903/2 908/24 915/9 916/7 923/3 923/4 925/14 929/3 929/8 930/5 935/23 941/1 942/8 949/5 949/12 952/24 953/1 956/12 957/20 962/11 963/12 963/18 966/22 967/19 971/3 971/16 972/13 972/16 972/16 973/6 977/4
**gets [3]** 774/24 796/9 977/2
**getting [5]** 787/11 850/15 941/2 961/2 961/6
**girl [1]** 849/20
**girls [1]** 932/15
**give [23]** 801/10 801/19 807/8 813/24 815/16 816/5 816/6 816/8 816/15 833/19 845/23 857/17 867/16 868/22 905/11 913/4 950/17 952/3 953/25 960/18 971/25 972/2 972/5
**given [35]** 762/9 763/18 764/2 769/10 769/11 769/12 769/25 771/5 771/24 789/2 799/2 799/9 808/13 818/12 833/18 833/21 841/20 851/7 854/7 857/12 888/15 889/1 893/7 910/6 910/7 910/17 913/2 915/15 923/20 923/23 925/19 925/20 974/16 977/17
**gives [1]** 776/5
**giving [6]** 808/22 828/24 853/5 888/21 913/15 915/7
**Glen [1]** 932/9
**global [4]** 768/1 883/15 883/20 901/14
**go [61]** 776/17 777/12 782/17 785/15 791/11 791/18 792/17

# G

**go... [54]** 792/18 792/24 793/2 793/20 795/19 801/17 815/12 820/4 823/14 829/17 832/15 835/3 835/6 841/13 846/11 846/14 852/10 853/3 859/14 866/16 868/12 868/13 868/22 869/3 875/2 875/4 875/4 876/21 877/17 881/22 889/20 891/2 897/17 900/15 900/23 916/6 919/17 923/18 925/22 934/6 935/16 936/6 936/13 938/19 939/4 946/9 953/2 956/25 967/21 970/13 971/12 971/17 973/13 978/7

**goal [6]** 825/14 836/15 861/12 873/1 874/8 874/13

**goals [8]** 818/23 819/3 819/5 851/25 860/2 861/5 862/21

**goes [6]** 772/8 790/14 806/7 827/1 918/21 924/13

**going [80]** 764/7 764/8 773/21 775/16 777/14 786/15 787/14 787/14 793/11 795/15 800/10 801/10 802/12 803/4 803/21 803/22 804/13 807/6 808/11 808/25 813/12 813/20 813/25 814/2 814/8 814/21 814/24 820/5 827/16 829/5 829/16 829/17 829/17 832/21 833/14 833/25 834/23 845/3 851/2 851/4 852/2 852/6 852/15 852/24 854/2 855/19 857/8 861/12 865/11 868/6 869/15 873/24 875/20 889/20 890/9 891/2 903/14 909/5 909/7 914/2 920/8 925/23 934/13 934/17 938/20 940/2 949/7 950/21 950/22 958/6 958/24 961/15 962/8 962/22 966/23 967/20 967/23 970/22 971/24 974/1

**gone [3]** 783/7 808/15 972/15

**good [45]** 761/4 761/5 761/16 764/21 766/4 784/3 797/22 800/10 807/12 807/14 807/18 810/17 810/18 810/20 811/1 816/5 817/10 826/1 826/6 826/16 849/11 864/17 865/3 866/20 868/3 868/14 872/9 880/14 880/16 886/22 886/23 886/24 903/24 932/3 932/12 936/20 936/23 937/8 937/9 940/9 943/16 952/13 955/19 967/14 973/3

**goodness [1]** 820/4

**Google [3]** 894/5 894/7 894/9

**gosh [1]** 894/25

**got [30]** 785/15 811/7 814/7 814/22 820/25 821/10 821/12 822/19 826/16 827/21 827/24 828/2 840/5 863/8 872/6 872/8 886/9 898/6 904/17 922/12 929/25 932/15 934/5 944/4 955/12 956/22 959/14 960/22 963/12 968/2

**gotten [6]** 788/19 826/1 866/14 867/13 896/11 898/4

**government [2]** 768/18 774/10

**grade [3]** 898/9 898/10 898/11

**grandkids [1]** 932/15

**granted [1]** 783/4

**grateful [2]** 978/12 978/14

**great [8]** 809/15 811/2 866/6 866/14 874/9 944/22 949/24 961/4

**greater [2]** 845/11 919/25

**Green [1]** 977/20

**Griffith [2]** 941/24 941/25

**Grifols [1]** 797/25

**ground [1]** 956/22

**group [15]** 759/3 766/7 774/22 780/4 831/4 831/10 884/22 896/17 965/19 965/20 965/21 965/25 966/3 966/7 966/12

**grow [8]** 771/16 771/16 819/7 857/6 895/18 947/2 947/7 956/2

**growing [2]** 775/11 803/3

**growth [7]** 768/20 768/21 775/13 803/5 856/23 953/9 953/11

**guess [9]** 767/20 795/25 807/23 818/3 824/7 857/4 933/23 945/17 972/10

**guessing [6]** 817/22 817/22 819/15 933/22 934/16 935/21

**guidance [9]** 831/17 831/21 831/24 832/4 832/18 839/24 839/25 841/20 851/7

**guide [2]** 801/4 807/6

**guideline [1]** 802/1

**guidelines [2]** 895/22 895/24

**guiding [1]** 902/20

# H

**H-A-M-I-L-T-O-N [1]** 849/8

**H-I-N-S-O-N [1]** 797/19

**had [219]** 763/20 767/12 771/17 772/19 774/15 777/13 778/4 780/17 781/20 783/10 783/14 785/6 790/20 793/21 794/15 794/22 795/2 798/9 798/18 798/22 799/11 799/14 799/19 800/3 800/4 800/6 800/12 800/22 801/4 801/9 801/13 801/23 802/12 802/25 803/10 803/19 803/19 803/20 803/23 803/23 804/5 804/5 804/7 804/7 804/8 804/9 804/11 804/25 805/12 805/23 805/23 806/1 806/20 806/23 808/13 809/9 809/12 809/17

# H

**809/18** 809/19 809/19 809/20 815/3 816/11 816/16 817/18 819/6 819/6 819/10 819/11 819/13 819/21 820/7 820/10 820/22 820/23 821/5 821/6 821/25 822/4 822/7 824/15 826/8 826/17 829/2 829/10 829/24 830/5 831/9 833/17 833/23 837/21 837/23 838/23 841/8 841/25 842/8 842/13 843/2 843/15 843/17 845/1 845/2 846/14 847/1 847/6 850/21 850/24 853/24 854/16 856/3 856/4 856/5 856/7 856/12 857/11 865/20 867/18 868/1 868/3 871/19 872/15 873/6 873/17 875/10 879/2 879/14 881/1 881/1 884/14 885/5 887/1 887/2 887/5 888/15 888/24 894/16 894/16 895/7 895/11 898/2 898/3 898/6 901/13 901/13 906/6 909/3 909/11 909/18 911/12 912/1 912/15 913/5 913/23 914/22 915/24 915/24 917/1 917/23 917/23 919/20 920/16 922/21 922/21 929/1 934/10 935/17 935/21 935/5 937/10 938/2 939/24 944/1 945/15 946/3 946/3 946/14 946/17 946/19 946/22 946/25 947/2 947/8 947/14 947/16 947/22 949/24 950/5 950/19 951/6 951/21 952/15 953/12 955/15 955/17 956/4 956/8 956/17 956/20 957/10 957/14 958/5 959/20 960/13 961/3 962/9 962/11 963/2 963/7 964/3 964/4 964/14 968/9 970/16 971/25 972/14 975/18 976/12

**hadn't [4]** 821/12 824/20 927/19 955/22

**half [13]** 763/15 775/17 776/7 776/8 831/15 831/21 873/1 921/15 933/6 944/25 945/1 949/23 962/14

**hallway [1]** 948/18

**Hamilton [9]** 760/8 848/25 849/7 849/11 849/16 858/6 860/24 862/5 863/5

**hand [5]** 781/21 782/1 863/9 904/2 942/8

**handbook [2]** 832/17 890/10

**handle [1]** 769/22

**handled [1]** 842/23

**happen [11]** 764/8 782/20 789/17 789/23 790/1 816/18 855/1 910/14 910/17 923/15 954/21

**happened [8]** 792/9 792/10 792/11 804/2 851/12 853/4 969/20 970/20

**happening [3]** 957/6 963/20 971/1

**happens [5]** 852/9 886/4 891/13 905/20 963/6

**Happy [1]** 809/10

**harassment [2]** 809/19 892/5

**hard [5]** 868/1 879/4 879/5 934/16 972/3

**harm [1]** 925/15

**Hartman [4]** 809/19 845/13 966/5 966/6

**has [53]** 771/4 776/2 778/4 778/22 782/15 782/24 786/14 786/25 790/23 792/16 792/19 800/16 806/2 807/22 818/14 819/15 851/12 851/18 859/15 878/8 882/20 886/7 886/19 886/25 893/7 895/22 895/23 902/24 906/6 907/17 907/17 922/22 923/24 926/5 926/14 929/22 931/11 931/15 939/21 953/4 962/17 965/17 967/17 968/20 969/9 970/8 970/11 972/20 974/21 975/2 977/5 977/6 977/8

**hasn't [1]** 773/1

**have [319]**

**haven't [3]** 820/14 881/1 965/16

**having [19]** 767/13 767/14 782/1 782/2 783/9 800/4 816/16 851/5 856/21 867/6 868/6 874/18 879/2 909/10 911/20 912/24 913/25 937/20 957/5

**Hawaii [1]** 763/24

**HCPs [1]** 836/22

**he [87]** 785/6 785/15 785/17 786/2 787/18 788/5 788/6 789/9 794/23 801/13 813/5 816/13 816/16 816/18 847/6 867/15 907/16 907/17 907/19 911/17 911/17 911/19 911/19 911/22 912/1 912/4 912/6 912/12 912/23 912/24 912/24 913/2 913/3 913/6 913/16 914/13 914/21 915/13 915/15 915/23 915/25 916/2 916/12 916/19 916/20 917/6 917/24 918/3 918/7 918/10 918/11 918/12 918/14 920/3 921/2 922/7 922/11 922/11 922/12 922/13 922/16 922/24 923/7 923/8 924/9 927/10 929/1 930/14 938/14 938/15 938/18 938/21 938/22 938/22 938/25 939/3 939/12 942/2 942/3 949/25 950/4 950/4 950/8 951/3 958/21 976/14

**head [3]** 802/21 804/16 820/5

**headquarters [2]** 897/14 944/5

**health [7]** 770/21 775/3 845/16 845/23 944/3 947/22 962/23

**healthcare [2]** 866/17 947/24

**hear [12]** 815/15 830/4 844/10 848/16 866/8 868/15 903/13 953/15 953/22 953/25 967/5 968/16

**heard [13]** 801/6 851/18 865/24 867/16 899/7 944/7 948/17

# H

**heard...** [6]  962/17 968/23 968/25 969/4 969/12 972/13
**hearing** [4]  814/15 853/6 853/7 853/16
**hearings** [1]  765/13
**heavily** [1]  786/23
**held** [5]  761/21 813/13 850/15 926/8 929/1
**help** [27]  804/9 815/17 816/2 830/24 843/6 845/6 845/22 857/6 863/2 866/14 871/23 883/18 888/1 937/13 937/17 937/24 939/9 948/24 949/1 955/11 955/11 956/16 956/16 957/9 957/11 960/3 961/3
**helped** [6]  815/4 815/5 867/25 938/15 956/1 963/9
**helpful** [1]  940/17
**helping** [5]  845/10 947/2 955/9 956/4 960/1
**helps** [1]  949/16
**her** [231]
**here** [45]  765/2 775/16 776/1 777/12 778/19 778/23 779/7 783/1 792/9 802/13 807/8 807/15 812/16 817/22 819/15 820/5 824/8 833/14 834/17 836/12 836/15 836/19 839/21 855/8 858/11 858/13 867/25 869/6 869/25 870/1 870/21 873/23 874/14 876/9 880/4 880/7 894/3 906/18 917/16 934/20 973/4 974/14 974/15 975/4 975/21
**hers** [1]  849/25
**Hey** [2]  875/1 893/3
**HGQ** [1]  874/3
**Hi** [1]  849/12
**high** [12]  763/1 774/3 786/17 802/16 819/11 819/11 829/5 829/7 896/17 913/10 952/10 960/19
**high-managed** [2]  802/16 819/11
**high-wage** [1]  786/17
**higher** [16]  782/11 782/18 784/14 791/16 791/17 791/19 792/16 819/6 819/22 840/25 886/21 886/22 912/3 912/16 912/17 914/12
**highest** [5]  799/2 821/13 886/12 896/5 960/17
**highlight** [2]  873/25 957/16
**highlighted** [2]  821/24 870/21
**highlighting** [1]  861/9
**highly** [4]  822/7 825/22 825/24 865/10
**hill** [1]  819/7
**him** [12]  761/8 761/12 816/16 816/17 899/3 903/14 907/20 908/20 915/6 915/20 949/23 950/10
**Hinson** [15]  760/5 797/10 797/19 797/22 797/24 810/17 820/14 822/4 827/20 828/7 834/2 836/7 837/13 840/17 847/19
**hired** [2]  850/25 951/2
**hiring** [1]  877/23
**his** [29]  782/9 784/9 785/3 785/15 786/1 786/5 787/13 788/5 788/8 806/6 854/2 900/6 900/7 915/13 916/21 917/4 918/8 918/8 918/10 919/9 920/4 922/6 923/5 923/7 924/12 924/12 938/9 950/8 958/22
**historic** [1]  774/7
**historically** [1]  817/18
**history** [8]  762/24 805/24 813/13 815/9 829/7 843/15 928/2 928/4
**hit** [5]  840/7 840/8 861/14 861/16 956/22
**hold** [6]  762/2 762/25 763/7 782/15 849/1 882/10
**holding** [2]  770/5 850/17
**holds** [2]  763/12 771/6
**holidays** [1]  935/23
**home** [7]  801/23 946/11 949/22 961/17 961/22 966/24 967/2
**hometown** [1]  804/17
**honest** [3]  940/11 958/2 963/6
**honor** [36]  797/8 799/2 802/12 846/5 848/15 848/21 882/7 903/10 903/12 903/21 907/6 907/19 907/23 908/17 931/22 932/1 943/1 968/17 969/9 969/13 969/18 970/4 970/14 970/23 972/4 972/12 973/9 973/11 973/21 973/24 974/2 974/4 975/11 977/1 977/19 978/8
**HONORABLE** [1]  758/11
**honors** [1]  763/1
**hope** [6]  812/23 852/19 880/8 880/12 941/22 968/12
**hopefully** [1]  796/22
**hoping** [1]  821/22
**horrible** [5]  842/11 842/13 842/14 842/15 843/17
**horrific** [1]  808/2 809/21

**hospital** [1]  798/7
**hostile** [2]  802/21 803/4
**hotel** [1]  962/11
**hotline** [2]  891/7 975/3
**hour** [8]  765/3 771/7 775/17 831/15 831/21 867/2 906/22 944/25
**hourly** [3]  765/3 765/4 906/21
**hours** [13]  765/6 765/7 775/18 775/19 775/20 871/11 906/23 935/5 935/6 945/2 946/11 949/23 962/15
**household** [1]  762/20
**housing** [1]  764/8
**how** [126]  762/18 765/6 766/15 767/6 772/16 775/20 779/18 788/22 799/15 802/19 804/11 804/21 806/11 808/2 811/10 815/10 817/14 828/4 832/19 833/14 839/1 839/2 839/4 840/3 840/5 840/6 840/6 840/15 841/17 842/23 845/19 845/20 848/5 848/9 850/15 851/1 854/14 854/24 855/7 856/22 857/5 865/15 865/20 867/10 868/13 868/25 871/25 873/14 874/9 875/7 881/8 883/2 883/25 885/2 886/5 887/1 890/24 891/8 892/7 892/9 892/14 892/19 892/20 892/22 893/9 894/14 895/21 896/20 897/11 897/17 898/21 899/15 900/15 905/11 906/23 908/6 908/15 908/16 908/25 909/21 910/8 912/10 914/5 915/14 916/6 917/19 921/5 921/8 924/11 925/3 928/18 932/18 932/20 933/10 933/20 934/11 934/15 934/16 935/9 935/13 936/19 936/22 938/10 940/2 940/2 942/9 944/13 945/3 945/6 945/12 945/18 946/25 947/25 948/21 949/4 950/1 955/6 959/1 961/10 961/22 962/13 962/20 962/21 963/12 963/23 964/6
**However** [2]  817/12 902/18
**HR** [21]  844/23 855/25 883/8 883/10 883/15 883/20 884/4 884/23 885/7 889/14 890/18 891/5 891/18 891/19 891/20 894/6 900/13 902/14 951/14 951/18 952/19
**HR-related** [1]  891/18
**HR-represented** [1]  891/19
**huh** [7]  860/14 936/18 941/5 945/24 946/18 951/23 954/9
**human** [18]  805/14 805/16 809/11 809/18 844/25 880/2 883/5 883/6 883/8 883/21 884/5 889/21 890/12 891/4 896/19 951/8 975/2
**hundred** [1]  905/14
**hundreds** [1]  915/18
**hung** [1]  809/10
**hurts** [1]  866/9

# I

**I'll** [22]  766/13 766/15 766/17 804/19 809/5 809/6 812/25 816/8 823/11 834/3 838/12 842/25 852/21 853/10 869/16 898/8 934/3 971/8 971/17 971/19 972/16 973/3
**I'm** [96]  763/22 764/5 766/2 780/16 782/16 784/3 784/23 787/12 787/20 788/11 790/17 792/1 792/8 792/15 793/18 794/6 794/22 799/4 800/23 801/10 803/14 807/6 808/24 808/25 808/25 810/19 810/19 814/2 816/2 817/22 817/22 818/18 819/15 823/12 827/16 828/11 829/16 829/17 830/16 831/6 831/8 832/5 833/2 833/7 833/24 834/2 834/23 837/20 838/7 838/7 842/1 844/1 849/16 849/19 849/20 851/22 852/19 854/2 855/1 855/8 859/2 862/8 866/2 869/6 870/18 875/6 875/25 876/24 878/25 879/9 879/21 885/8 889/20 890/8 896/16 901/16 901/25 901/25 902/12 902/17 903/1 926/24 928/3 928/11 932/14 933/21 935/21 940/21 943/19 959/14 965/6 965/21 968/2 972/21 973/25 974/14
**I've** [8]  763/18 765/1 783/22 849/17 945/20 945/20 969/12 972/15
**ID** [1]  876/6
**Idaho** [8]  944/20 944/21 944/21 945/1 959/7 961/15 969/1 969/3
**idea** [8]  801/10 801/13 823/9 839/4 847/10 913/21 915/11 923/14
**identified** [2]  975/2 975/14
**identifier** [2]  899/12 899/12
**identify** [4]  899/16 899/24 937/14 973/22
**ignore** [1]  838/19
**ignored** [3]  839/7 839/9 839/16
**illegitimate** [3]  975/4 975/20 977/15
**Immediate** [1]  941/13
**immediately** [3]  767/2 781/21 874/7
**impact** [4]  788/22 887/3 900/18 900/20

**I**

**impeccable [1]** 800/6
**implemented [1]** 847/1
**important [5]** 833/9 833/11 833/22 879/19 913/20
**Importantly [1]** 975/11
**impossible [2]** 790/7 803/23
**impressed [1]** 967/13
**impression [3]** 800/2 829/24 941/2
**impressive [2]** 817/16 877/3
**improper [2]** 917/17 953/23
**improve [2]** 939/14 959/23
**improved [3]** 851/13 851/15 950/5
**improvement [3]** 805/15 822/24 823/1
**in-person [2]** 816/21 854/19
**inappropriate [2]** 787/6 953/19
**incapacity [1]** 906/7
**incentive [9]** 825/2 825/12 825/16 826/16 826/19 826/20 826/24
827/1 827/3
**incident [9]** 774/14 775/14 775/15 775/16 776/19 776/20 779/9 780/15
788/14 789/13
**incident/income [1]** 776/19
**include [13]** 769/19 777/5 780/25 786/20 788/13 868/23 871/20
892/16 909/23 912/12 919/7 925/5 925/7
**included [12]** 771/3 771/20 774/15 783/5 788/24 789/10 789/21
795/6 856/10 919/9 921/20 923/8
**including [2]** 789/12 907/18
**income [75]** 769/18 770/9 770/11 770/15 770/16 770/20 771/3
771/9 771/9 771/10 771/11 771/16 772/3 772/12 772/20 774/14
774/14 774/14 774/16 774/21 775/14 775/15 775/15 776/18
776/19 776/20 776/22 777/3 777/5 777/8 777/9 778/2 778/3
778/4 779/9 779/10 779/11 779/21 779/22 779/25 780/15
780/17 780/18 780/21 780/21 781/24 782/2 782/12 782/18
783/3 783/5 787/14 788/15 789/13 789/21 790/12 792/25
794/17 796/19 909/17 909/18 909/24 910/3 914/6 916/2 917/20
918/5 918/9 918/12 918/14 919/6 919/7 921/18 923/12 929/21
**Income/no [1]** 779/9
**Income/No Incident [1]** 774/14
**Income/Post-Incident [1]** 775/14
**incomes [1]** 787/15
**inconsistent [1]** 976/11
**incorporated [3]** 791/10 794/7 857/5
**incorrect [3]** 791/13 791/14 827/2
**increase [5]** 771/24 795/23 813/16 912/3 937/21
**increased [3]** 771/19 854/18 922/4
**increases [2]** 771/21 771/25
**incurred [1]** 762/16
**Indeed [2]** 975/16 976/16
**independent [3]** 784/21 789/4 793/12
**INDEX [2]** 760/1 775/13
**indicate [3]** 793/10 920/14 924/6
**indicated [10]** 771/13 771/17 775/24 785/15 786/2 794/22
795/1 969/15 972/25 974/21
**indicates [1]** 974/12
**Indicating [1]** 811/11
**individual [8]** 805/23 806/17 816/14 816/15 879/2 923/17
925/21 925/24
**individuals [7]** 765/9 808/3 830/19 863/19 866/24 867/21
876/24
**industries [3]** 930/21 931/4 931/7
**industry [4]** 926/8 929/9 931/10 931/18
**inevitably [1]** 938/22
**inextricably [2]** 975/21 975/25
**inflation [6]** 768/21 771/23 771/25 775/13 779/4 909/23
**influence [3]** 853/25 856/25 857/8
**influenced [2]** 854/4 906/25
**inform [1]** 888/1
**information [34]** 767/21 767/21 767/22 768/5 768/8 768/16
768/17 768/18 768/18 771/6 777/19 780/16 781/19 782/24
783/22 789/24 791/20 792/23 793/9 794/25 796/25 808/22
869/13 870/23 870/25 893/6 893/14 917/14 923/23 926/6 928/1
948/11 949/17 955/12
**informed [1]** 887/24

**inhale [1]** 895/3
**initial [5]** 779/13 794/14 794/21 922/6 922/18
**initially [4]** 850/11 874/6 918/11 970/7
**injury [2]** 762/17 906/7
**inkling [1]** 972/14
**inquiries [1]** 883/13
**ins [1]** 837/1
**inside [1]** 810/1
**insight [3]** 902/22 955/19 956/1
**insights [3]** 857/4 953/19 953/23
**instance [1]** 816/25
**instantly [1]** 805/4
**instead [4]** 790/8 868/6 891/23 910/4
**instruct [2]** 971/17 971/19
**instruction [3]** 772/22 966/25 971/15
**instructions [10]** 833/6 833/10 967/4 971/11 971/16 971/18
971/21 971/23 971/24 972/1
**instructs [1]** 779/5
**insulate [1]** 810/2
**insurance [18]** 770/22 774/22 775/2 775/3 775/6 780/4 780/6
780/7 780/10 818/4 818/20 818/22 818/24 819/22 820/11
820/13 962/25 963/1
**intend [1]** 858/15
**intended [1]** 813/14
**intent [4]** 851/8 851/10 953/9 974/3
**intents [1]** 951/4
**interact [4]** 895/10 949/5 949/12 977/10
**interacting [1]** 895/14
**interaction [4]** 815/2 822/15 853/22 884/15
**interactions [12]** 815/19 815/20 851/23 852/8 852/25 871/3
884/12 949/6 949/24 949/25 954/10 954/12
**interest [17]** 767/9 774/6 774/7 774/8 774/10 774/12 775/9
779/2 779/2 779/3 779/7 780/13 795/15 795/18 795/19 795/23
922/4
**interested [2]** 950/6 971/6
**interesting [3]** 818/10 830/18 844/6
**interim [4]** 954/17 955/5 956/7 956/11
**InterMountain [1]** 947/23
**internal [6]** 800/8 804/8 897/19 897/20 958/9
**internal/external [1]** 804/8
**internally [2]** 804/15 897/24
**International [1]** 927/3
**interpret [2]** 940/20 942/20
**interrupt [2]** 805/9 832/21
**intertwined [2]** 975/21 975/25
**interview [14]** 792/8 804/9 877/22 877/24 878/2 927/12 928/2
928/5 928/6 929/24 930/13 958/11 958/17 958/23
**interviewed [11]** 804/8 855/25 877/23 915/25 927/22 927/24
930/6 951/7 952/19 958/13 976/17
**interviewing [2]** 803/25 804/11
**interviews [9]** 782/11 787/7 804/14 840/6 928/18 928/22
928/24 929/3 958/14
**intimidating [1]** 802/22
**introduce [6]** 761/16 797/22 849/13 865/5 932/12 943/17
**invested [3]** 767/8 781/22 819/23
**investigated [3]** 794/23 891/16 976/16
**investigation [9]** 856/1 857/11 891/17 892/1 902/4 902/10
951/8 974/25 975/6
**investigations [2]** 891/21 974/19
**investing [2]** 795/17 795/17
**investment [2]** 779/5 782/1
**involve [1]** 905/21
**involved [15]** 818/5 820/25 885/5 891/20 902/11 902/17 902/23
903/2 908/5 917/16 926/11 928/25 958/16 958/18 965/10
**involvement [1]** 821/14
**involves [2]** 908/4 908/7
**involving [1]** 962/19
**IPN [1]** 836/22
**irony [2]** 802/20 827/12
**IRS [2]** 775/1 794/23
**is [612]**
**isn't [1]** 906/12
**issue [24]** 783/8 783/10 787/19 787/20 788/20 789/8 831/14

**I**

**issue... [17]** 833/17 838/21 838/22 839/10 883/16 883/17 908/2 908/10 963/23 969/11 969/17 970/15 974/1 977/1 977/11 977/16 977/17

**issued [2]** 877/10 887/5

**issues [16]** 764/4 787/12 858/19 858/23 878/22 883/13 885/5 885/8 895/12 895/13 937/14 939/9 951/14 951/18 975/15 975/17

**it [552]**

**it's [26]** 779/4 787/2 790/7 802/15 805/6 806/18 806/18 806/19 815/22 818/10 818/18 853/17 866/4 866/15 866/20 867/8 872/5 886/16 915/12 924/4 926/8 931/9 965/20 971/23 972/16 975/13

**item [1]** 931/18

**items [1]** 950/24

**its [1]** 892/4

**itself [2]** 960/23 975/20

**IVIE [157]** 758/3 769/12 770/4 785/11 785/22 787/6 787/23 788/5 788/14 788/19 788/25 789/5 790/20 791/25 792/13 793/5 793/13 793/20 794/15 795/7 795/20 796/9 798/18 799/15 820/17 822/16 830/8 831/10 841/15 841/20 841/24 842/1 843/7 843/21 844/3 848/14 849/23 850/2 860/7 860/10 862/6 864/1 865/13 869/17 869/18 870/7 870/11 871/25 873/8 874/22 875/3 875/9 875/20 876/22 876/23 876/24 880/25 881/14 881/14 884/12 885/6 885/9 886/9 887/1 887/3 887/5 888/9 888/15 888/22 889/7 893/4 896/5 896/10 896/13 896/25 897/3 897/15 898/3 898/24 899/3 899/24 900/21 907/21 914/22 915/8 915/24 917/1 920/2 920/11 920/19 920/25 921/16 922/21 922/25 924/4 924/23 926/5 927/16 928/18 929/8 929/24 930/13 931/11 933/5 933/11 933/13 933/17 934/11 934/21 935/13 935/17 936/3 936/6 936/10 937/13 937/17 937/21 937/24 938/8 940/22 940/24 941/4 941/6 942/5 942/9 944/11 944/16 945/5 945/17 945/18 946/1 946/14 947/11 951/22 952/1 954/8 954/13 954/21 954/24 956/8 956/12 956/25 957/6 960/11 964/19 965/8 965/11 965/19 965/25 966/12 973/23 974/9 974/13 975/12 975/15 975/16 976/16

**Ivie' [1]** 789/21

**Ivie's [62]** 764/10 767/1 767/3 767/10 768/3 770/15 774/20 781/24 782/6 784/18 787/11 787/17 790/12 790/24 791/21 792/12 796/10 817/4 818/5 818/9 818/19 819/9 820/14 828/7 829/3 843/24 848/18 856/8 856/15 858/17 862/1 864/9 879/14 880/5 885/20 888/3 894/3 901/23 902/9 906/16 908/18 911/8 911/13 911/15 912/14 914/25 917/4 917/18 918/1 918/18 919/1 919/2 919/12 923/11 925/14 930/16 930/18 942/7 952/7 964/25 965/5 966/13

**J**

**JAMS [1]** 765/16

**January [7]** 768/12 768/12 773/6 777/18 781/15 809/13 809/23

**January 14th [3]** 773/6 777/18 781/15

**January 15 [1]** 768/12

**January 29th [1]** 768/12

**Jason [1]** 849/21

**JERS [1]** 967/21

**job [102]** 770/19 771/6 771/8 775/21 776/2 782/10 782/14 782/15 782/21 784/12 784/14 786/13 786/16 786/21 786/21 787/6 787/9 787/17 787/17 788/1 788/21 790/13 791/17 791/19 791/22 792/8 792/13 792/19 792/20 793/6 793/20 796/9 796/18 805/13 833/14 841/21 878/14 883/4 891/25 892/19 894/4 894/7 894/9 896/8 896/9 896/11 897/20 897/20 897/22 897/23 898/4 907/21 910/7 912/3 912/6 912/7 912/7 913/2 913/2 915/3 915/9 915/16 917/11 918/1 918/15 918/19 919/22 920/3 920/15 920/21 921/2 921/6 921/9 921/13 923/18 923/24 924/6 924/23 924/24 925/20 925/22 926/2 926/5 926/7 926/12 926/13 927/16 927/24 928/7 929/1 929/3 929/8 929/13 929/17 929/18 930/6 930/25 938/25 940/10 958/1 958/8 967/14

**jobs [13]** 786/17 887/6 897/24 908/16 912/25 913/8 914/4 914/11 915/25 916/3 916/7 923/22 928/25

**join [3]** 965/21 966/2 966/6

**joined [1]** 894/16

**joke [1]** 881/17

**jokingly [1]** 878/25

**JOLIE [1]** 758/11

**Joseph [1]** 904/7

**journal [1]** 763/11

**jovial [1]** 804/10

**JR [1]** 758/4

**Judge [10]** 773/11 781/4 806/4 810/14 822/9 827/17 834/22 846/2 864/13 968/13

**judgment [13]** 848/17 917/14 968/18 969/6 970/3 970/8 970/18 973/12 973/15 976/5 976/7 976/20 977/23

**July [3]** 844/8 844/11 845/15

**jumps [1]** 775/21

**June [26]** 758/5 761/1 772/22 773/5 774/16 776/21 776/24 770/10 777/18 778/6 778/21 781/14 781/14 783/17 795/4 809/22 845/14 845/15 887/11 957/19 959/1 959/3 959/13 959/15 960/10 961/11

**June 14th [8]** 772/22 773/5 774/16 776/24 777/10 777/18 778/6 781/14

**June 14th forward [1]** 776/21

**June 2019 [3]** 959/3 959/13 961/11

**June 30th [1]** 845/14

**June 5th [1]** 887/11

**June 6th [1]** 778/21

**June 7th [2]** 783/17 795/4

**June of [1]** 959/15

**jurisdiction [1]** 779/6

**jurisdictional [2]** 970/4 970/15

**jurisdictions [2]** 765/14 765/15

**jurors [3]** 761/13 834/24 972/6

**jurors' [1]** 862/18

**jury [57]** 758/10 761/17 762/24 773/1 773/16 777/24 778/16 781/10 797/23 810/6 810/9 810/12 831/14 835/4 836/1 836/3 839/22 849/13 851/18 865/5 867/16 871/6 882/20 883/7 903/18 903/23 904/16 908/25 909/16 913/19 919/8 919/15 921/16 923/9 924/1 925/3 932/13 943/17 948/20 960/12 962/17 966/22 967/12 967/21 971/17 971/17 971/19 971/25 972/2 976/21 977/2 977/2 977/11 977/13 977/14 977/16

**jury's [1]** 815/14

**just [125]** 764/23 769/6 769/15 771/22 772/23 776/19 777/21 778/20 781/13 782/5 789/6 791/3 791/11 793/15 793/19 796/4 799/24 801/4 802/1 802/16 803/23 804/15 806/18 807/23 812/25 814/3 816/2 819/25 821/11 822/19 823/14 829/22 832/3 832/8 832/12 833/7 833/24 833/25 836/12 836/14 837/18 839/5 839/15 839/20 839/21 840/4 840/13 842/20 846/7 847/10 847/24 848/4 849/1 850/14 851/19 854/6 855/5 859/5 859/13 860/24 862/12 862/18 863/1 863/10 864/8 864/8 865/5 865/11 865/24 868/9 869/6 870/11 872/4 873/6 873/18 874/21 875/1 875/17 877/3 877/22 878/3 878/8 888/14 892/22 893/6 899/7 900/3 900/7 903/12 905/18 907/9 907/9 917/24 919/17 920/10 921/2 923/2 923/4 923/7 924/1 924/20 925/3 926/11 931/7 935/21 941/8 941/11 943/17 948/8 948/12 948/17 953/7 955/9 955/10 955/24 956/1 956/18 957/15 960/4 962/7 963/17 965/16 968/2 970/14 974/21

**just a [1]** 801/4

**justify [1]** 877/21

**K**

**Karen [13]** 805/17 805/17 806/11 809/18 844/25 845/1 845/6 845/10 845/15 845/19 846/1 881/5 881/6

**keep [4]** 804/25 827/9 873/18 887/23

**kept [4]** 810/1 818/5 841/15 885/8

**Kevin [1]** 958/16

**key [4]** 817/19 949/18 949/25 972/9

**kids [6]** 849/19 884/9 945/10 945/10 945/12 945/13

**kind [43]** 768/15 770/19 786/12 792/10 801/14 802/20 816/6 816/16 818/4 852/19 853/14 867/13 867/13 867/25 868/9 868/10 868/11 870/25 872/5 872/14 873/16 874/15 875/25 878/15 881/8 881/15 881/17 892/16 933/2 936/11 938/24 939/1 941/1 941/2 941/9 941/11 945/11 949/21 950/11 950/11 955/16 959/8 960/21 961/3

**kinds [2]** 815/14 949/13

**knew [13]** 803/3 804/13 805/4 806/21 806/23 806/24 816/1 851/8 851/10 858/24 859/2 946/25 952/1

**know [91]** 782/19 788/4 788/4 792/7 799/15 808/21 808/25 811/23 813/2 814/3 817/14 819/2 821/2 822/2 828/12 829/7

## K

**know...** **[75]** 829/18 831/7 832/15 839/1 839/2 839/13 839/20 839/22 840/3 840/4 841/24 843/2 843/17 843/24 845/13 849/23 850/23 859/4 860/7 860/9 860/10 861/17 863/10 865/13 865/15 868/10 876/11 879/22 880/23 881/6 881/6 881/6 888/18 891/8 895/2 896/20 899/11 899/16 901/20 902/2 902/11 910/15 910/17 923/17 924/1 925/2 925/23 925/25 927/9 927/11 927/18 928/18 929/24 930/5 933/21 934/15 934/15 941/10 942/6 944/11 944/13 945/6 945/8 945/10 946/12 946/24 959/21 962/8 965/16 967/8 967/17 971/24 972/1 973/25 978/12 978/13

**knowing** **[2]** 810/1 930/8

**knowledge** **[4]** 800/15 875/24 930/12 936/4

**known** **[2]** 840/20 844/13

**knows** **[1]** 831/1

**KRFT972** **[2]** 876/9 900/2

**KTNJ400** **[1]** 869/19

## L

**label** **[11]** 857/12 857/18 857/22 857/25 858/1 942/11 942/21 951/15 954/1 954/4 975/9

**labeled** **[4]** 773/25 774/13 776/22 777/13

**labor** **[27]** 769/25 770/3 785/7 786/10 791/7 904/25 905/1 905/12 908/8 908/9 908/14 910/19 911/10 911/10 913/25 914/15 914/18 914/18 916/23 917/6 917/9 918/24 918/25 921/4 923/22 931/6 931/14

**lack** **[2]** 803/5 806/25

**Ladies** **[1]** 966/22

**Lake** **[31]** 798/11 818/13 865/7 873/5 873/6 873/9 873/10 873/21 921/9 932/14 933/3 933/10 935/7 943/20 944/23 944/25 944/25 945/1 954/17 955/9 955/14 957/20 957/25 958/12 959/2 959/20 960/5 961/14 962/14 964/13

**language** **[5]** 813/22 814/16 853/11 854/3 854/10

**large** **[1]** 782/10

**larger** **[3]** 784/11 913/12 913/14

**largest** **[1]** 962/25

**Larry** **[11]** 760/5 797/10 797/19 797/24 803/17 805/9 805/18 807/2 808/6 808/11 810/3

**last** **[18]** 765/11 773/22 776/23 797/18 798/16 822/9 841/15 849/6 849/8 849/17 862/16 864/22 882/16 899/7 904/6 932/7 943/11 968/23

**lasted** **[1]** 872/25

**late** **[5]** 802/24 850/6 969/16 972/12 972/15

**later** **[6]** 768/8 808/1 956/11 958/1 966/13 971/25

**lateral** **[2]** 898/8 898/11

**launch** **[6]** 802/13 802/16 803/5 820/1 820/3 964/12

**launching** **[1]** 819/14

**law** **[14]** 759/3 766/7 848/17 968/18 968/19 969/6 970/3 973/12 973/16 974/23 976/3 976/7 976/11 977/23

**lawyers** **[2]** 784/4 810/19

**layoffs** **[1]** 786/14

**lead** **[6]** 821/20 821/22 821/23 821/25 822/8 900/13

**leader** **[15]** 798/7 800/18 818/12 818/12 818/15 842/15 850/24 850/24 851/6 851/10 854/17 855/21 894/18 895/17 949/1

**leaders** **[4]** 799/7 799/9 799/10 842/12

**leadership** **[25]** 799/6 800/5 804/24 804/25 805/21 809/15 821/17 822/1 822/8 826/21 834/4 887/1 887/24 888/25 895/15 896/19 947/3 950/7 963/18 965/17 965/20 965/25 966/3 966/5 966/12

**leading** **[1]** 851/15

**leaned** **[2]** 851/7 851/11

**learn** **[8]** 846/14 852/19 901/12 901/16 949/13 949/14 949/14 955/6

**learned** **[2]** 805/11 860/11

**learning** **[8]** 897/7 897/8 898/3 898/6 898/10 898/16 898/25 899/4

**least** **[10]** 771/1 812/17 847/3 854/20 862/1 888/18 938/11 947/14 947/15 958/15

**leave** **[21]** 776/5 783/6 784/13 807/23 842/18 844/5 844/7 844/20 919/22 946/7 954/22 954/25 956/12 956/15 957/13 973/18 973/19 975/10 975/17 976/12 976/17

**leaving** **[1]** 809/23

**led** **[3]** 800/20 824/12 874/3

---

**left** **[31]** 773/21 774/5 777/14 781/25 798/16 798/22 802/7 808/7 842/16 842/21 843/3 843/10 843/18 844/8 845/18 851/24 872/22 880/23 881/8 894/19 894/23 894/25 906/6 909/7 909/11 911/20 912/24 914/1 938/8 949/22 964/6

**Legacy** **[1]** 803/10

**legal** **[3]** 905/8 905/19 972/21

**legitimate** **[7]** 973/22 974/9 976/2 976/4 977/5 977/21 978/3

**Lehi** **[1]** 873/11

**length** **[1]** 786/11

**less** **[8]** 772/20 898/24 899/2 909/11 917/1 917/22 919/23 934/16

**lesser** **[1]** 899/1

**let** **[13]** 813/2 814/3 829/17 832/20 839/19 844/22 863/10 900/15 900/23 919/17 923/9 971/19 978/7

**let's** **[33]** 772/15 792/18 802/2 807/23 813/1 815/2 822/18 831/14 834/1 842/24 845/4 845/15 872/17 873/23 885/20 886/25 887/9 887/13 889/20 890/2 890/8 890/12 890/18 895/25 903/16 911/21 917/10 934/24 936/1 950/2 961/5 961/10 971/13

**letter** **[1]** 787/4

**letters** **[2]** 786/15 786/18

**level** **[34]** 762/10 762/11 762/11 762/12 770/4 777/7 782/12 786/3 787/14 789/12 792/13 793/6 793/14 815/9 821/13 840/20 840/22 856/24 885/14 885/17 891/3 896/1 896/3 896/5 896/7 898/10 898/11 907/16 908/12 912/3 914/11 914/23 926/9 960/19

**levels** **[2]** 885/15 898/9

**Lewis** **[2]** 759/6 759/9

**liable** **[1]** 925/14

**license** **[1]** 831/11

**lieu** **[1]** 774/25

**life** **[34]** 762/2 762/7 767/10 768/19 768/19 769/1 769/2 769/6 769/6 769/7 769/7 769/8 769/9 769/13 769/15 769/16 769/17 769/21 769/24 769/25 770/2 770/5 772/7 772/20 774/1 774/12 774/22 780/4 781/24 801/22 807/21 808/13 809/6

**lift** **[1]** 816/17

**like** **[95]** 764/6 766/19 768/19 768/21 769/1 769/3 773/11 778/9 780/20 781/4 787/1 797/9 803/9 805/3 805/3 809/22 817/24 818/2 818/4 818/5 818/8 819/8 819/10 819/14 819/21 819/24 825/7 825/13 826/15 829/22 830/20 832/18 839/23 845/14 845/17 845/21 846/1 847/24 850/2 850/11 851/3 851/9 851/17 852/14 853/17 854/19 859/15 862/8 863/12 865/23 866/15 866/18 867/16 869/25 870/6 875/6 875/11 878/8 878/24 893/3 896/17 896/20 909/5 909/6 934/2 935/12 935/24 935/25 938/8 938/13 938/18 938/20 938/21 938/23 939/4 939/6 939/11 940/4 945/25 946/10 946/19 946/22 948/15 949/19 949/24 950/13 950/20 952/9 955/5 955/10 958/21 962/16 965/23 967/18 968/8 968/16

**liked** **[4]** 935/1 938/17 938/22 940/6

**likelihood** **[1]** 792/24

**likely** **[10]** 910/17 917/15 917/15 919/20 919/21 920/5 923/15 923/20 923/23 926/1

**limited** **[4]** 819/19 930/21 931/2 931/5

**Linda** **[1]** 879/3

**line** **[26]** 775/10 777/13 798/20 806/5 813/1 814/3 822/19 823/12 823/14 823/15 829/17 829/20 829/22 834/4 842/25 843/1 843/9 843/9 859/14 863/11 863/13 869/16 869/17 872/18 875/19 879/9

**lined** **[1]** 903/15

**lines** **[3]** 812/25 814/2 817/23

**list** **[1]** 968/2

**listed** **[1]** 977/3

**listen** **[1]** 803/14

**listened** **[2]** 844/1 970/18

**listening** **[1]** 955/20

**literally** **[2]** 804/13 976/1

**literature** **[1]** 764/22

**litigation** **[3]** 763/13 905/20 905/21

**little** **[43]** 762/23 766/1 768/22 768/24 779/25 780/11 785/5 793/25 800/11 802/6 810/22 812/15 817/4 822/18 849/14 851/17 855/24 859/17 865/17 865/23 866/10 866/18 866/25 867/4 868/6 868/7 868/11 874/25 876/1 883/3 887/12 943/17 945/10 945/14 946/16 947/23 949/19 956/5 960/24 963/10 966/23 969/21 971/25

**live** **[26]** 769/15 769/16 769/21 798/10 798/11 798/11 804/20

## L

**live...** [19] 815/21 832/13 849/16 883/23 883/24 932/14 934/2 934/10 934/12 934/17 934/20 935/6 935/13 935/17 935/19 936/3 936/5 939/6 958/5
**lived** [6] 798/11 873/11 883/25 884/1 933/15 955/9
**livelihood** [1] 808/14
**lives** [4] 819/16 933/11 933/12 959/19
**living** [3] 769/3 892/11 904/10
**LLP** [2] 759/6 759/9
**loans** [1] 766/17
**located** [4] 889/13 889/14 897/13 926/10
**log** [2] 899/13 899/15
**log-on** [1] 899/13
**long** [19] 804/20 805/11 842/19 843/15 883/2 883/25 885/2 890/8 893/9 894/14 909/21 910/8 920/21 921/5 921/8 932/20 935/9 959/2 962/13
**long time** [1] 805/11
**longer** [3] 775/6 872/18 920/22
**longest** [1] 947/13
**look** [60] 769/6 769/24 770/7 770/8 770/11 770/18 777/9 780/6 786/15 823/11 829/16 830/18 833/20 834/1 842/24 842/24 843/9 851/24 851/25 863/6 870/20 872/3 872/17 872/18 873/23 875/19 876/21 879/7 879/19 885/20 887/9 887/13 888/5 889/20 890/2 890/8 890/9 890/12 890/18 898/13 898/16 900/3 909/5 909/6 914/10 917/10 918/25 921/4 922/12 931/2 934/2 938/13 938/14 938/15 947/1 948/15 949/9 960/11 971/4 971/13
**looked** [17] 794/1 821/8 830/20 832/1 832/1 857/2 875/5 875/17 877/4 881/3 900/4 902/21 914/14 914/20 945/25 958/7 961/10
**looking** [20] 772/17 772/25 773/18 778/17 781/11 786/20 835/1 852/14 853/6 865/22 869/16 870/11 870/18 875/8 879/9 887/9 887/14 910/18 930/19 952/9
**looks** [5] 834/15 839/23 847/24 869/25 870/6
**loss** [28] 762/20 762/20 767/7 769/4 769/22 772/14 773/3 773/20 776/23 776/25 777/2 777/9 777/17 781/16 781/8 781/22 782/23 783/7 783/11 783/12 784/12 784/13 786/1 792/16 793/1 793/4 795/9 921/24
**loss is** [1] 921/24
**losses** [2] 779/3 921/25
**lost** [26] 772/12 775/7 776/18 776/22 777/3 777/5 777/9 778/2 779/15 779/24 780/6 780/9 780/18 780/21 781/24 782/23 784/12 786/13 786/21 791/17 796/11 905/6 907/18 919/2 921/18 924/10
**lot** [24] 785/4 787/1 800/14 817/8 822/2 822/14 834/24 851/18 853/19 866/24 873/23 946/4 946/8 946/9 947/1 947/4 947/17 947/24 948/2 949/10 955/22 955/23 962/16 963/22
**loud** [1] 863/12
**loved** [2] 831/11 958/4
**low** [3] 774/7 913/7 913/11
**lower** [8] 791/18 793/1 841/7 886/13 886/22 913/10 918/4 933/3
**lowered** [1] 783/11
**lowers** [1] 772/9
**lowest** [4] 822/22 822/25 823/2 886/12
**LP** [1] 758/6
**lump** [6] 762/19 767/7 768/8 767/14 772/14 781/20
**lunch** [10] 834/23 834/23 834/24 834/25 836/7 867/2 936/13 936/13 946/6 946/7
**lunches** [3] 866/24 866/25 939/25

## M

**M.S** [1] 784/23
**ma'am** [16] 764/16 765/11 765/19 766/8 773/10 778/8 783/22 784/7 784/17 788/20 796/13 796/17 796/20 849/1 849/2 882/10
**made** [34] 771/10 778/5 784/8 784/22 791/9 794/12 794/21 795/1 795/3 796/21 796/24 802/20 802/23 805/17 818/16 855/3 856/4 856/8 879/20 911/22 915/2 923/18 928/8 934/25 935/3 939/25 961/1 964/3 969/2 969/3 972/22 976/10 976/12 976/13
**MAGISTRATE** [1] 758/12
**Magnuson** [1] 967/22
**main** [2] 916/19 959/9
**maintaining** [1] 762/6
**major** [1] 825/2

**majority** [5] 866/21 870/18 871/9 871/17 960/6
**make** [44] 767/13 768/25 769/17 771/10 771/23 772/5 772/7 772/21 789/4 791/4 791/12 793/12 801/17 818/16 830/4 830/25 833/24 851/8 851/10 869/17 890/9 895/23 910/10 910/16 911/13 917/14 920/10 922/6 922/18 934/6 934/7 936/12 936/13 938/19 938/24 939/4 953/1 955/12 958/17 967/18 970/3 972/21 976/21 976/21
**maker** [1] 974/4
**makes** [5] 830/24 891/12 926/2 959/19 975/12
**making** [15] 792/21 820/4 836/21 843/21 852/7 856/14 895/18 895/19 895/21 895/22 908/7 910/10 929/5 929/14 937/14
**manage** [2] 801/24 819/16
**managed** [5] 802/16 803/9 819/11 900/13 933/14
**management** [13] 790/16 790/18 790/20 792/20 913/6 915/7 929/2 931/8 931/15 931/16 931/17 965/4 965/7
**manager** [90] 785/18 788/3 790/25 798/6 798/8 798/17 800/19 801/1 805/14 821/6 821/9 833/21 841/13 849/19 850/2 850/4 850/20 865/16 865/24 867/4 867/13 867/14 867/18 867/20 870/3 872/19 872/21 872/22 873/3 873/8 874/25 877/24 879/21 885/11 885/12 891/1 891/2 891/3 895/7 896/3 897/8 898/3 898/6 898/10 898/11 898/17 898/20 898/25 902/15 902/16 902/19 902/20 902/23 902/25 913/1 913/1 914/15 914/24 914/24 916/25 924/24 924/24 926/13 929/25 930/7 931/1 933/5 933/7 933/17 935/10 938/6 938/8 939/15 943/21 944/14 944/15 946/1 947/2 947/5 947/12 947/16 947/19 947/21 947/24 949/11 959/6 959/17 960/13 975/2
**managers** [24] 800/21 802/3 805/21 821/15 821/18 821/18 822/5 848/9 865/20 867/5 867/7 867/9 867/11 874/24 878/6 900/20 930/21 931/3 931/6 931/7 946/3 947/8 947/10 948/2
**managers'** [1] 816/20
**managing** [3] 955/7 955/25 962/23
**many** [29] 765/6 767/6 775/20 817/14 840/5 840/6 840/6 865/20 867/10 868/23 871/18 871/25 874/11 878/15 897/11 900/15 905/11 905/20 906/23 916/6 928/18 934/11 934/15 934/16 945/12 945/18 961/22 972/8 978/2
**Maratas** [1] 901/1
**March** [8] 803/20 827/11 886/4 954/19 954/25 959/13 959/15 961/11
**March 2020** [1] 961/11
**mark** [2] 855/4 855/7
**market** [31] 759/10 763/18 764/7 791/7 803/5 819/5 819/6 819/11 820/7 820/10 855/19 898/13 898/16 898/22 899/1 908/8 908/9 908/16 910/8 910/19 913/25 916/23 918/24 918/25 923/22 925/20 931/14 962/18 963/7 963/13 963/18
**marketable** [1] 931/12
**marketing** [7] 785/16 785/18 798/6 912/7 942/11 942/21 975/9
**marketplace** [14] 798/2 798/4 798/12 802/14 815/22 817/8 817/24 818/2 818/13 818/13 819/4 819/10 819/14 819/21
**marketplaces** [4] 817/12 817/20 818/1 856/23
**markets** [1] 911/11
**marking** [1] 854/24
**marks** [1] 826/2
**married** [5] 809/7 849/21 884/7 884/8 932/15
**Maryland** [1] 763/1 763/2
**mask** [6] 797/13 849/3 864/18 882/12 932/4 943/7
**master's** [3] 762/11 770/5 904/17
**match** [1] 775/25
**matching** [1] 770/22
**material** [2] 905/19 930/15
**materials** [2] 892/21 952/16
**math** [1] 861/17
**mathematically** [1] 925/5
**matter** [16] 764/10 764/15 765/6 766/2 767/2 767/18 848/17 859/9 879/11 968/18 969/6 970/3 970/10 973/12 973/15 974/22
**maximize** [2] 847/12 963/13
**may** [37] 770/21 770/22 776/4 790/1 790/1 797/4 799/17 802/3 802/3 802/4 804/4 809/24 819/6 834/20 841/22 849/2 854/1 854/18 864/12 864/18 871/14 874/6 882/6 882/12 883/16 901/15 903/6 909/6 915/18 931/21 938/16 939/13 942/25 943/6 971/11 974/23 976/13
**May 2019** [1] 901/15
**maybe** [35] 775/17 810/6 810/20 812/23 813/15 815/11 816/3 816/4 819/7 819/15 825/13 831/1 857/1 863/2 866/9 866/23

**M**

**maybe... [19]** 867/15 869/3 871/20 871/22 875/7 884/17 933/23 934/18 936/8 936/8 936/14 939/12 946/6 948/17 948/18 952/5 952/14 953/8 960/18

**Mazumdar [1]** 759/2

**MBA [2]** 762/11 763/2

**McCarthy [7]** 759/9 810/19 846/10 846/16 846/19 877/4 881/4

**McCullough [7]** 887/10 887/15 887/20 888/2 888/6 888/8 888/21

**McCullough's [1]** 887/23

**McDonnell [1]** 977/19

**me [90]** 773/1 777/19 777/22 779/5 794/2 803/25 804/2 804/9 804/18 805/17 805/20 806/1 807/8 807/8 807/11 807/13 807/21 808/10 808/11 808/18 808/22 808/23 809/1 809/3 809/4 813/2 813/23 814/3 815/25 816/10 816/13 818/10 820/4 826/22 827/13 827/15 828/24 829/18 830/20 830/23 832/20 833/19 839/10 839/18 839/19 839/23 841/22 842/6 842/21 842/23 844/22 846/15 846/19 847/19 850/23 850/25 851/3 851/9 851/20 863/10 863/12 865/11 867/8 867/25 868/1 868/5 868/7 869/1 870/25 873/15 877/15 883/14 887/24 899/10 919/17 923/9 928/8 938/15 940/21 941/3 942/13 945/21 945/22 947/25 948/8 948/10 952/14 955/4 958/2 973/11

**mean [23]** 767/16 769/1 792/15 800/3 802/22 803/14 809/21 829/23 832/11 847/12 847/14 856/5 861/11 881/19 896/18 912/14 914/25 917/8 925/5 934/7 936/2 942/6 954/12

**meaning [2]** 817/18 913/11

**meaningful [1]** 948/23

**means [7]** 762/1 767/6 770/2 781/20 792/1 832/12 963/3

**meant [1]** 806/11

**measure [1]** 925/15

**measured [2]** 817/13 821/8

**measurement [7]** 800/23 801/5 818/23 820/23 831/19 831/22 832/7

**measuring [1]** 823/7

**media [1]** 764/3

**median [2]** 921/12 921/14

**Medicaid [4]** 817/25 818/25 819/16 819/18

**medical [7]** 762/21 973/18 973/19 975/10 975/17 976/12 976/17

**Medicare [1]** 818/24

**medicine [1]** 872/25

**medicines [1]** 948/25

**meet [25]** 803/22 824/18 852/6 860/2 861/5 861/12 862/6 862/21 863/16 870/19 872/4 872/16 875/11 927/12 927/20 934/3 936/12 949/23 956/25 957/1 957/1 971/14 973/22 976/1 977/23

**meeting [13]** 804/2 805/7 806/10 821/19 834/8 852/7 859/25 860/8 860/9 884/14 884/15 902/15 971/14

**meetings [10]** 762/4 762/4 762/5 763/12 824/19 895/8 902/18 902/18 903/2 969/1

**meets [1]** 840/7

**Melinda [1]** 759/6

**member [2]** 762/3 762/6

**members [1]** 903/18

**memberships [2]** 763/5 763/7

**mentally [1]** 861/15

**mention [2]** 862/13 862/14

**mentioned [12]** 766/1 769/6 772/2 788/16 788/16 794/11 812/10 852/13 947/8 952/4 953/17 961/12

**merely [1]** 813/22

**merit [2]** 771/22 771/23

**message [3]** 831/4 831/9 860/12

**met [10]** 810/20 824/15 824/19 871/9 881/7 884/13 884/14 927/15 939/17 964/23

**method [2]** 791/5 881/15

**methodology [1]** 769/5

**microstructure [1]** 763/18

**mid [2]** 954/25 956/13

**mid-April [2]** 954/25 956/13

**middle [2]** 845/15 849/8

**might [20]** 777/7 789/16 792/10 853/2 878/24 878/25 879/21 882/20 895/12 898/3 907/21 910/14 912/6 912/7 918/12 935/22 936/15 936/16 961/25 968/10

**Mike [6]** 809/19 845/13 854/17 887/19 966/5 966/6

**Mike Hartman [1]** 966/5

**mile [2]** 775/1 780/5

**miles [5]** 770/25 774/23 780/5 783/9 873/11

**Mill [1]** 759/7

**million [2]** 793/22 924/4

**mind [9]** 804/12 804/25 815/11 815/14 816/3 823/19 827/10 853/18 936/15

**mindful [1]** 834/22

**mindset [7]** 856/23 952/23 953/3 953/9 953/9 953/11 953/11

**mine [5]** 839/5 859/5 859/7 941/9 941/24

**mini [1]** 859/17

**minimize [1]** 801/11

**minus [2]** 779/11 909/14

**minute [3]** 779/15 810/6 934/4

**minutes [7]** 810/9 835/1 835/2 872/9 882/22 957/2 967/16

**misguided [4]** 804/24 806/15 807/9 808/5

**misleading [1]** 786/12

**missed [3]** 779/5 853/13 932/20

**missing [1]** 938/17

**mistake [2]** 784/8 795/2

**mistakes [1]** 785/5

**mistreating [1]** 954/13

**mitigate [2]** 782/6 782/11

**mitigated [1]** 920/5

**mitigating [2]** 909/10 925/17

**mitigation [18]** 777/17 907/11 907/12 907/13 907/22 908/3 908/5 908/7 908/13 908/18 908/21 923/14 925/2 925/4 925/5 925/7 927/11 929/21

**mix [1]** 961/18

**model [3]** 852/23 950/1 955/16

**mom [1]** 849/19

**moment [10]** 792/18 815/18 849/1 870/13 874/2 874/8 874/9 882/10 903/12 925/20

**Monday [5]** 803/1 967/10 972/6 973/4 978/5

**Mondays [1]** 961/25

**monetary [9]** 770/8 770/16 770/20 771/3 774/14 774/16 774/21 779/10 779/24

**money [6]** 762/18 772/7 813/15 826/16 929/14 962/6

**monitored [2]** 902/3 902/5

**Montana [2]** 959/7 961/14

**month [8]** 775/17 809/22 861/16 881/9 935/23 938/11 938/11 952/5

**monthly [2]** 861/1 861/4

**months [14]** 775/16 785/12 785/24 786/6 809/21 842/13 842/20 865/17 865/19 876/16 920/24 928/21 928/23 933/24

**more [38]** 782/8 814/1 814/22 817/18 819/8 826/16 835/2 837/9 838/16 838/25 839/21 840/11 844/17 845/23 855/12 857/4 862/8 866/25 868/6 868/12 869/10 873/17 885/1 887/12 898/19 898/22 899/4 902/13 907/23 931/16 934/9 935/22 935/22 947/23 951/6 953/5 953/6 953/6

**Morgan [2]** 759/6 759/9

**morning [14]** 761/4 761/5 761/16 784/3 797/7 797/22 810/17 810/18 832/8 852/3 936/12 949/22 973/4 978/6

**Morris [1]** 864/23

**most [16]** 763/22 790/11 799/4 799/19 803/4 809/21 862/11 866/10 895/8 923/7 923/20 923/23 936/1 936/2 948/1 961/15

**mostly [4]** 762/16 765/15 766/17 859/6

**motion [7]** 967/17 970/3 970/24 971/5 971/11 971/15 973/12

**motions [3]** 760/15 968/16 978/6

**motivated [1]** 967/15

**motivator [1]** 800/8

**Mountain [2]** 873/17 873/18

**mouth [6]** 804/13 842/17 842/22 843/3 843/11 843/18

**move [20]** 767/1 773/11 778/9 781/4 806/8 822/3 822/9 827/16 841/9 846/2 846/4 853/21 879/18 897/1 897/15 944/1 970/1 971/15 977/9 977/11

**moved [5]** 867/23 895/1 939/21 944/3 947/22

**moving [6]** 834/21 848/17 947/3 950/7 968/17 973/15

**Mr [4]** 792/8 877/4 922/6 927/8

**Mr. [92]** 767/23 768/10 771/17 784/8 784/22 785/10 785/22 787/16 787/22 788/16 789/6 791/13 793/15 796/15 796/25 797/10 797/22 810/17 820/14 822/4 827/20 828/7 834/2 836/7

## M

**Mr.... [68]** 837/13 840/17 846/10 846/16 846/19 847/19 864/17 865/3 867/12 881/4 900/4 900/5 911/2 911/6 911/6 911/15 911/21 912/11 912/14 912/19 913/9 914/4 914/7 914/16 915/5 915/23 916/10 916/19 916/24 917/25 918/3 918/11 918/13 918/15 919/1 920/2 920/23 920/24 921/23 924/16 926/7 927/25 928/15 928/19 929/5 929/12 930/14 931/5 932/12 932/18 938/10 938/12 939/7 939/9 939/14 941/19 942/19 943/2 943/6 943/16 948/17 958/19 964/19 967/22 969/8 971/6 972/10 976/14

**Mr. Barnes [5]** 864/17 865/3 867/12 900/4 900/5
**Mr. Edelman's [1]** 911/6
**Mr. Garrity [1]** 958/19
**Mr. Hinson [11]** 797/22 810/17 820/14 822/4 827/20 828/7 834/2 836/7 837/13 840/17 847/19
**Mr. Larry Hinson [1]** 797/10
**Mr. Magnuson [1]** 967/22
**Mr. McCarthy [4]** 846/10 846/16 846/19 881/4
**Mr. Oswald [3]** 969/8 971/6 972/10
**Mr. Pomponi [1]** 976/14
**Mr. Scott Sevart's [1]** 796/15
**Mr. Sevart [25]** 771/17 784/8 784/22 788/16 793/15 911/2 912/11 913/9 914/4 914/7 914/16 915/5 915/23 916/10 916/24 918/3 918/13 918/15 920/2 920/23 920/24 921/23 924/16 928/19 929/5
**Mr. Sevart's [24]** 767/23 768/10 785/10 785/22 787/16 787/22 789/6 791/13 796/25 911/6 911/15 911/21 912/14 912/19 916/19 917/25 918/11 919/1 926/7 927/25 928/15 929/12 930/14 931/5
**Mr. Stickle [6]** 932/12 932/18 941/19 942/19 943/2 948/17
**Mr. Thomsen [8]** 938/10 938/12 939/7 939/9 939/14 943/6 943/16 964/19
**Ms [4]** 881/13 885/9 887/1 888/2
**Ms. [243]**
**Ms. Ceaser [1]** 974/17
**Ms. Chambers [2]** 761/5 930/24
**Ms. DiNunzio [29]** 806/7 822/15 824/13 824/15 828/20 856/4 856/7 856/12 856/14 856/17 857/11 885/5 889/4 889/7 894/12 939/23 940/17 940/19 941/7 942/20 951/15 951/21 953/18 953/22 953/25 954/8 954/13 958/13 958/20
**Ms. DiNunzio's [2]** 843/25 896/8
**Ms. Hamilton [5]** 849/11 858/6 860/24 862/5 863/5
**Ms. Ivie [131]** 769/12 770/4 785/11 785/22 787/6 787/23 788/5 788/14 788/19 788/25 789/5 790/20 791/25 792/13 793/5 793/13 793/20 794/15 795/7 795/20 796/9 798/18 820/17 822/16 830/8 831/10 841/20 841/24 842/1 843/21 844/3 848/14 850/2 860/7 860/10 871/25 874/22 875/3 875/9 875/20 881/14 884/12 885/6 886/9 887/3 887/5 888/9 888/15 888/22 889/7 896/5 896/10 896/13 896/25 897/3 897/15 898/3 898/24 899/3 900/21 907/21 914/22 915/8 915/24 917/1 920/2 920/11 920/19 920/25 921/16 922/21 922/25 924/4 924/23 926/5 927/16 928/18 929/8 929/24 930/13 931/11 933/5 933/11 933/13 933/17 934/11 934/21 935/13 935/17 936/3 936/6 936/10 937/13 937/17 937/21 937/24 938/8 940/22 940/24 941/4 941/6 942/5 942/9 944/11 944/16 945/5 945/17 945/18 946/1 946/14 947/11 951/22 952/1 954/8 954/13 954/21 954/24 956/8 956/12 956/25 957/6 960/11 965/8 965/11 965/25 966/12 973/23 974/9 974/13 975/16 976/16
**Ms. Ivie' [1]** 789/21
**Ms. Ivie's [58]** 764/10 767/1 767/3 767/10 768/3 770/15 774/20 781/24 782/6 784/18 787/11 787/17 790/12 790/24 791/21 792/12 796/10 818/5 818/9 818/19 819/9 820/14 828/7 829/3 843/24 848/18 856/8 856/15 858/17 879/14 880/5 885/20 888/3 894/3 901/23 906/16 908/18 911/8 911/13 911/15 912/14 914/25 917/4 917/18 918/1 918/18 919/1 919/2 919/12 923/11 925/14 930/16 930/18 942/7 952/7 964/25 965/5 966/13
**Ms. McCullough [6]** 887/10 887/15 887/20 888/6 888/8 888/21
**Ms. Ms. Ivie [1]** 881/14
**Ms. Olson [1]** 874/10
**Ms. Riechert [2]** 901/7 901/11
**Ms. Talcott [1]** 796/7
**Ms. Welch [2]** 882/20 901/6

**much [28]** 762/18 779/18 782/11 793/2 793/2 832/20 835/5 839/8 850/16 851/18 854/14 864/14 872/18 872/24 898/21 903/8 912/10 912/13 913/3 913/14 920/6 920/21 924/11 934/16 952/23 967/7 967/11 973/2
**multiple [5]** 804/22 804/25 805/1 806/20 817/15
**must [3]** 847/2 974/8 977/21
**mutual [9]** 843/2 843/17 844/13 844/16 844/19 844/22 844/24 845/9 846/11
**mutually [1]** 826/3
**my [214]** 761/19 762/9 762/16 763/15 764/11 764/11 764/12 764/21 765/1 766/3 769/20 771/20 782/21 784/3 785/1 785/3 785/20 785/21 786/1 786/8 788/24 789/8 791/10 791/11 793/16 794/9 797/19 797/24 798/2 798/2 798/3 798/5 798/9 798/16 798/22 799/1 799/4 799/13 799/18 800/3 800/6 800/8 800/18 801/8 801/11 801/11 801/22 801/22 803/3 803/7 804/5 804/12 804/12 804/19 805/5 805/5 805/20 805/21 805/22 806/2 806/3 806/15 806/23 807/4 807/13 807/14 807/15 807/16 807/20 807/21 808/2 808/13 808/13 809/6 809/7 809/7 809/8 809/9 810/2 811/5 811/8 811/18 812/8 813/13 814/14 815/9 815/10 815/19 815/21 815/23 820/4 820/5 820/21 821/20 826/9 826/13 826/13 826/13 826/21 827/10 827/12 827/13 827/14 829/5 831/25 832/2 832/24 833/2 833/20 833/23 837/23 837/24 838/9 838/12 838/20 839/3 841/14 843/3 843/11 843/14 843/15 843/16 843/18 844/7 844/18 844/23 844/25 845/13 847/10 848/1 851/10 853/9 853/10 853/18 854/17 855/18 861/17 862/14 865/9 865/16 867/8 869/16 871/23 872/22 873/3 874/13 876/24 877/17 878/3 878/14 878/14 878/14 878/17 878/19 879/23 880/1 880/3 885/7 888/13 888/13 924/15 924/18 928/5 929/11 930/4 931/1 933/12 935/10 936/4 936/15 939/24 940/25 941/3 943/19 943/25 944/14 944/22 944/24 945/10 946/2 946/5 946/8 946/10 947/4 947/7 947/12 947/18 947/21 948/1 948/3 948/3 949/1 949/1 949/3 949/20 949/22 952/11 952/14 955/8 955/10 955/17 958/4 958/5 959/21 960/25 962/12 966/25 967/4 968/2 968/12 972/19
**myriad [2]** 799/11 805/12
**myself [10]** 800/8 816/12 816/18 819/8 845/13 857/1 861/15 871/22 874/12 876/8

## N

**naive [1]** 808/1
**name [21]** 761/18 784/3 797/18 797/19 797/24 834/5 849/6 849/8 849/8 862/1 864/22 879/2 882/16 894/5 904/6 928/22 932/7 932/8 938/9 943/11 943/19
**named [4]** 799/3 811/3 849/21 958/16
**names [1]** 952/3
**narrow [1]** 972/9
**nation [8]** 802/17 877/2 958/4 960/5 960/7 960/9 964/10 964/14
**national [3]** 763/10 926/20 926/23
**nationally [5]** 823/6 823/25 873/1 877/5 944/5
**native [1]** 869/6
**nature [3]** 802/22 850/19 949/8
**near [1]** 933/23
**necessarily [2]** 850/13 866/9
**necessary [5]** 883/19 906/15 910/10 910/20 916/3
**need [18]** 768/6 801/24 808/12 808/19 808/21 809/1 809/4 851/4 856/23 868/5 897/15 897/18 918/22 925/7 934/5 946/23 955/21 970/1
**needed [16]** 855/4 855/7 857/3 857/6 861/16 883/14 887/25 947/20 950/9 953/4 953/5 953/6 953/7 954/3 954/5 954/5
**needs [4]** 822/24 823/1 902/22 953/7
**negatively [1]** 887/3
**negotiating [1]** 845/12
**neither [2]** 766/1 867/25
**net [4]** 776/18 778/2 780/18 781/24
**network [1]** 950/9
**networking [1]** 947/25
**Nevada [1]** 943/25
**never [59]** 782/20 793/11 800/21 800/21 801/3 801/20 801/25 801/25 802/5 803/7 804/12 804/20 806/23 809/3 809/5 809/6 811/18 817/10 817/11 820/17 821/8 826/3 827/14 829/13 832/1 832/19 832/22 838/14 838/21 840/5 840/8 840/10 840/13 841/6 846/15 846/21 848/6 858/17 858/19 858/23 864/9 878/12 878/21 880/24 881/1 881/4 881/18 901/13 901/13 927/22

**N**

**never... [9]** 927/24 936/4 942/4 952/13 962/11 965/4 965/7 975/18 976/17
**new [30]** 783/13 786/15 787/11 795/6 837/6 850/8 855/9 856/12 856/18 867/23 876/25 915/2 915/3 922/25 923/3 952/17 952/17 952/21 953/4 953/8 953/12 956/19 957/16 964/12 975/13 975/14 975/15 975/19 976/10 978/12
**new pharma [1]** 953/4
**newer [1]** 850/23
**news [1]** 795/20
**newspapers [1]** 764/5
**next [36]** 764/8 774/4 775/14 776/16 776/18 777/2 777/16 778/25 779/9 780/15 806/14 812/22 852/11 864/15 870/2 870/10 870/24 873/25 876/3 882/9 885/17 891/3 896/1 896/3 896/7 896/21 896/23 903/9 903/25 931/25 939/1 943/3 950/2 950/4 950/10 966/19
**next-level [1]** 891/3
**nice [4]** 815/12 938/14 967/13 971/14
**nice-sized [1]** 815/12
**nickname [14]** 828/13 828/16 828/20 828/24 829/2 829/13 829/24 830/5 831/11 856/9 951/22 952/6 952/12 965/13
**nicknamed [1]** 952/1
**night [1]** 818/1
**nine [4]** 872/3 928/21 946/3 947/8
**no [175]** 762/9 764/12 765/19 765/23 766/11 766/22 773/13 774/14 775/6 776/19 778/12 779/9 780/17 781/7 783/24 784/17 784/20 786/1 786/23 787/12 788/14 788/20 789/13 790/23 791/20 793/9 794/6 795/16 796/1 797/2 797/3 807/13 807/23 810/4 811/25 817/3 821/4 822/6 823/9 823/21 824/21 827/2 827/3 827/5 827/9 828/3 829/12 830/1 831/8 832/13 832/13 832/15 837/5 838/15 839/4 839/13 839/21 840/11 840/15 841/4 841/6 841/8 842/5 843/8 844/12 846/23 847/15 856/16 857/19 858/2 860/21 862/2 862/8 862/25 866/4 868/16 876/10 878/21 878/24 879/15 879/25 880/1 880/2 880/22 881/1 881/10 887/4 887/8 888/4 888/10 889/9 891/22 893/15 893/19 893/22 893/25 894/2 894/8 894/11 896/12 897/2 898/8 899/6 901/2 902/1 903/4 903/5 905/18 906/12 907/2 907/14 907/20 908/14 912/8 912/13 915/11 918/21 919/14 920/1 920/8 924/5 925/23 926/14 926/16 926/22 927/2 927/5 927/7 927/21 929/4 930/4 930/8 930/9 930/14 931/20 934/19 937/9 937/16 937/19 937/23 938/1 938/1 940/7 940/9 940/21 941/14 941/24 942/10 942/15 942/16 942/22 946/13 952/8 953/14 953/16 953/24 954/2 954/15 957/15 958/14 958/18 958/21 959/10 964/13 964/16 965/9 965/12 965/14 966/16 966/17 968/22 969/14 969/20 970/19 978/8
**no-incident [1]** 788/14
**No. [18]** 793/22 793/23 794/2 834/17 837/23 838/1 838/10 838/10 838/15 839/15 839/20 877/2 887/9 924/3 924/9 974/11 974/11 974/14
**No. 1 [1]** 837/23
**No. 2 [3]** 834/17 924/9 974/14
**No. 3 [8]** 793/22 838/1 838/10 838/10 838/15 839/15 839/20 924/3
**No. 4 [2]** 793/23 877/2
**No. 67 [3]** 887/9 974/11 974/11
**non [1]** 977/6
**non-retaliatory [1]** 977/6
**nondiscriminatory [3]** 977/6 977/21 978/3
**none [4]** 775/9 917/16 923/16 928/16
**nonresident [1]** 970/20
**nonresponsive [1]** 827/17
**noon [1]** 835/3
**normal [2]** 802/20 964/11
**northern [1]** 944/20
**Northwest [2]** 799/17 802/15
**not [254]**
**note [1]** 964/9
**notebook [1]** 874/6
**notes [1]** 877/4
**nothing [14]** 781/25 846/5 848/11 848/12 864/4 864/11 876/13 882/4 882/5 912/8 969/4 972/20 972/23 978/10
**notice [3]** 853/9 853/21 862/9

**now [68]** 766/25 769/15 771/15 773/18 775/14 777/8 777/22 778/17 785/4 789/15 795/17 800/24 805/4 806/2 808/4 808/22 811/8 816/13 824/3 830/16 834/25 835/4 837/18 849/19 857/8 858/9 865/24 865/25 868/20 869/16 872/18 873/23 879/18 882/23 885/9 886/21 887/14 889/4 894/3 897/3 900/10 903/10 905/15 921/16 933/2 938/2 939/22 946/14 948/14 948/15 948/16 950/25 956/12 956/15 957/17 957/19 959/6 959/8 960/13 968/16 970/5 970/9 970/10 971/2 971/2 973/12 974/21 976/10
**nowhere [1]** 967/6
**number [39]** 763/7 770/2 782/10 788/24 794/4 794/7 796/7 800/16 802/1 832/2 832/9 833/1 833/5 834/20 843/21 854/18 899/13 900/6 900/7 900/7 904/19 913/10 913/11 913/13 914/2 916/14 917/21 917/23 917/24 918/13 935/16 936/1 936/5 936/20 936/25 937/10 949/12 949/13 977/3
**numbers [25]** 772/5 780/22 788/23 791/3 791/11 791/14 792/2 796/10 803/2 817/11 817/11 818/8 824/8 877/20 881/16 881/20 909/8 914/1 914/10 914/13 916/10 916/11 917/7 918/3 920/4
**numerous [1]** 907/17
**NW [1]** 759/4

**O**

**o'clock [5]** 835/6 903/20 936/14 946/5 973/4
**O-U-C-H [1]** 881/21
**oath [2]** 812/17 814/23 829/22 831/15
**object [2]** 907/13 907/22
**objected [1]** 968/9
**objection [12]** 766/22 773/13 778/12 781/6 781/7 806/4 806/25 846/2 847/5 907/8 907/14 907/20
**objective [4]** 791/23 868/11 912/16 925/8
**objectives [7]** 852/17 858/24 859/3 859/5 859/22 886/19 886/19
**obligation [4]** 859/25 889/5 973/22 976/1
**observation [1]** 853/6
**observations [4]** 853/9 853/10 853/11 955/17
**observe [10]** 852/20 853/1 895/7 923/21 923/22 942/19 949/4 954/10 956/9 956/10
**observed [7]** 871/3 895/16 895/17 940/19 956/21 957/9 960/12
**observing [1]** 867/14
**obstacles [1]** 803/9
**obtain [7]** 785/11 785/23 792/13 792/19 793/6 907/21 920/15
**obtained [1]** 792/5
**obtaining [1]** 788/1
**obviously [14]** 773/21 778/24 814/17 867/1 867/8 870/20 870/22 870/25 875/4 877/7 877/19 963/5 966/24 972/16
**occasionally [1]** 766/13
**occupations [1]** 786/24
**occur [2]** 795/24 926/2
**occurred [6]** 878/3 968/23 968/23 969/1 969/5 974/19
**October [8]** 823/4 823/9 823/25 824/3 824/6 824/7 886/14 932/19
**October 2017 [2]** 823/4 823/25
**odds [1]** 769/19 772/4 774/2 774/3
**off [15]** 798/12 810/23 850/13 851/24 857/12 857/18 857/22 857/25 858/1 874/7 942/11 942/21 951/15 954/1 975/9
**off-label [10]** 857/12 857/18 857/22 857/25 858/1 942/11 942/21 951/15 954/1 975/9
**offer [2]** 766/19 793/17
**offered [6]** 844/19 844/20 844/22 889/2 889/3 907/3
**offers [3]** 787/9 907/6 908/17
**office [17]** 811/17 811/18 811/19 815/16 816/5 852/4 853/16 866/16 868/10 872/1 872/12 904/11 935/1 936/7 949/24 950/4 961/22
**offices [6]** 897/14 934/8 936/10 945/19 946/6 953/2
**official [2]** 825/19 979/10
**offset [22]** 780/18 785/19 909/10 909/14 910/3 914/6 916/1 916/11 918/19 919/6 919/7 919/22 919/23 919/25 920/6 921/24 921/25 923/12 923/14 925/17 929/21 930/25
**offsetting [2]** 777/17 788/6
**often [11]** 770/1 771/1 786/13 817/10 873/14 878/6 885/8 892/9 892/14 935/13 938/10
**Oftentimes [1]** 934/3
**Ogden [2]** 944/21 944/24
**oh [6]** 763/22 764/5 820/4 839/25 859/17 939/12

# O

**okay [71]** 765/24 768/22 772/23 776/15 779/20 781/11 784/8 785/7 788/13 789/25 792/23 793/19 797/11 797/15 798/24 799/21 801/6 804/15 805/6 806/2 806/8 808/17 813/3 815/2 817/4 823/13 829/21 832/8 832/11 834/1 840/2 842/24 848/19 849/2 859/9 859/16 859/20 860/6 863/8 863/15 863/19 863/22 869/24 870/15 877/18 878/12 880/13 882/23 882/24 892/25 902/2 902/13 903/17 927/17 929/24 931/19 934/4 936/5 938/19 938/25 939/3 941/14 965/24 966/21 970/12 970/22 971/4 972/7 972/18 973/2 978/4
**old [22]** 778/22 801/22 808/9 829/4 849/20 849/20 856/12 856/17 865/12 884/10 884/10 932/18 940/21 945/3 945/6 952/17 952/17 952/21 953/1 953/8 953/12 975/13
**older [3]** 941/1 945/8 945/10
**oldest [2]** 798/2 865/9
**Olson [5]** 872/19 873/3 873/18 874/10 878/24
**on-label [1]** 954/4
**onboard [1]** 963/2
**once [15]** 766/15 803/7 840/17 841/10 885/22 909/6 914/4 920/2 933/23 935/14 935/15 936/14 938/11 943/7 962/8
**one [112]** 763/22 766/1 771/12 781/15 782/17 784/4 799/13 806/17 807/16 807/17 807/20 808/21 810/19 813/18 816/25 817/16 821/8 825/25 826/4 828/7 828/12 828/18 828/21 833/20 834/6 834/9 835/6 836/20 837/13 842/12 843/6 843/16 847/9 853/18 864/8 866/23 867/18 867/21 867/23 870/1 870/1 870/2 872/11 872/14 873/2 873/16 876/9 876/24 881/24 881/25 882/10 884/20 886/9 886/11 886/12 888/12 889/24 891/1 898/19 900/23 903/19 909/2 912/1 913/22 916/13 916/14 916/19 918/16 919/19 919/22 922/9 922/9 922/20 926/8 926/10 928/22 931/10 935/2 935/23 936/16 936/20 937/5 937/6 937/17 937/10 938/15 942/19 946/6 948/8 949/10 949/20 949/25 950/18 950/22 951/21 952/13 958/3 959/25 960/1 960/4 960/16 960/17 960/24 961/13 961/20 962/17 963/1 967/1 974/15 974/18 977/5
**ones [1]** 972/9
**ongoing [1]** 763/20
**online [1]** 889/14
**only [29]** 771/12 771/24 772/6 772/8 783/12 785/2 788/9 790/14 799/13 805/19 808/1 808/3 821/23 838/13 848/6 862/5 872/4 873/2 913/2 915/6 926/6 936/16 945/21 948/2 958/13 960/24 968/20 969/22 977/5
**oOo [1]** 979/2
**open [11]** 761/3 807/4 807/7 810/12 836/1 890/19 890/21 890/22 903/23 960/25 967/12
**open-door [3]** 890/19 890/21 890/22
**opened [3]** 807/10 807/17 874/1
**opening [6]** 841/12 857/4 874/3 898/2 972/19 972/22
**openings [1]** 897/19
**operate [1]** 761/22
**operated [1]** 761/23
**operations [1]** 886/18
**opines [1]** 782/19
**opining [1]** 927/11
**opinion [25]** 767/1 782/20 784/5 785/2 794/14 796/15 801/11 801/11 814/14 833/23 847/10 906/15 906/25 908/25 911/22 912/11 915/10 916/2 918/17 920/10 924/4 924/10 924/22 925/4 952/11
**opinions [8]** 766/9 783/15 783/19 785/1 905/23 907/3 911/7 911/3
**opportunities [11]** 779/5 802/16 853/13 890/24 938/16 947/7 949/9 956/2 957/10 960/2 961/5
**opportunity [12]** 841/9 875/18 890/13 895/7 895/11 895/18 895/23 902/18 939/13 944/1 959/23 963/13
**opportunity-to-respond [1]** 902/18
**opposed [2]** 788/10 889/8
**opposite [4]** 818/16 954/3 954/6 977/20
**option [3]** 836/21 836/25 891/6
**options [6]** 794/19 890/23 891/1 891/4 891/9 922/3
**oral [1]** 971/7
**oranges [1]** 819/24
**order [3]** 762/19 768/4 970/2
**OREGON [27]** 758/2 758/6 765/18 798/2 798/4 802/14 802/15

---

815/21 817/24 818/2 819/14 819/17 959/7 968/18 968/19 968/21 968/24 969/5 969/6 969/9 969/20 969/22 969/22 970/16 970/17 970/20 972/21 972/23
**Oregon's [1]** 973/17
**organization [24]** 798/22 799/8 799/9 799/14 800/19 803/23 809/23 819/2 819/22 850/18 883/11 883/12 883/15 883/20 884/25 884/25 885/3 885/4 886/18 896/3 896/8 900/18 946/3 959/4
**organizations [1]** 763/19
**original [9]** 785/13 785/14 785/16 785/25 873/1 888/23 911/7 919/23 979/6
**OSHA [1]** 765/16
**Oswald [4]** 759/3 969/8 971/6 972/10
**Oswego [1]** 798/11
**other [55]** 765/9 766/12 794/12 812/5 825/25 831/4 836/9 839/1 854/22 854/24 858/24 859/2 859/4 860/7 860/16 865/20 869/3 872/11 872/13 872/14 874/22 877/22 879/24 884/20 887/6 888/6 889/14 905/6 905/8 909/5 909/20 910/8 912/19 915/19 922/2 922/4 922/18 923/16 940/8 947/8 947/10 947/21 948/2 949/10 949/14 949/14 949/16 955/7 955/10 955/25 959/25 963/11 970/7 975/21 978/11
**otherwise [1]** 844/13
**OTR [4]** 902/15 902/17 902/21 903/2
**ouch [2]** 881/18 881/21
**our [67]** 803/8 803/13 803/13 803/21 803/21 817/9 818/23 821/7 821/8 826/19 826/20 826/24 826/24 826/24 831/22 833/14 835/3 837/5 837/6 839/13 840/5 840/15 848/5 848/10 850/24 851/24 852/2 852/5 852/17 854/23 854/24 855/6 856/23 857/3 857/5 857/6 857/6 857/9 865/9 866/19 874/8 882/23 886/17 892/21 897/20 903/16 905/24 913/9 935/18 944/5 948/22 948/25 949/25 952/2 953/5 955/20 956/17 957/16 958/8 959/9 959/25 963/9 964/11 964/14 969/24 972/6 972/16
**ours [2]** 869/10 973/13
**ourselves [1]** 866/8
**out [88]** 763/18 774/4 776/8 777/11 780/11 782/21 783/3 783/5 791/19 792/17 792/18 792/25 793/2 793/20 793/24 794/20 794/23 795/6 795/9 795/11 799/6 799/9 804/13 808/1 814/22 816/4 816/13 819/19 822/2 822/20 823/5 823/17 823/25 838/5 845/17 852/18 853/18 861/9 862/9 862/13 862/14 863/12 866/10 867/18 867/24 869/2 872/3 873/3 874/13 875/2 875/4 877/1 881/8 881/16 884/14 886/23 889/7 890/25 891/4 923/7 935/21 936/15 938/20 938/24 940/5 942/8 948/5 949/3 949/11 950/12 950/13 950/18 951/3 957/11 960/18 961/1 961/19 963/12 964/12 964/24 966/23 968/2 968/10 968/20 971/12 972/5 972/24 973/6
**out-of-state [1]** 968/20
**outcome [3]** 764/13 764/24 923/23
**outlined [1]** 845/2
**output [2]** 788/5 791/2
**outset [1]** 969/11
**outside [9]** 785/1 786/7 789/8 791/11 793/16 853/3 877/23 892/2 897/23
**Outstanding [2]** 763/23 763/25
**over [52]** 763/15 763/19 765/11 767/9 768/15 774/2 774/12 778/25 779/25 780/11 787/2 798/3 798/5 798/12 799/17 800/3 804/16 805/24 806/15 811/24 815/19 816/23 819/10 821/9 821/10 833/24 851/12 851/15 867/23 869/24 871/7 875/20 883/3 885/14 915/17 915/25 934/11 935/25 938/3 945/17 946/16 954/16 956/3 956/25 957/2 957/3 958/11 963/21 966/13 971/13 972/15
**Overall [2]** 765/7 765/14
**overcome [1]** 803/24
**overlooked [1]** 939/12
**overnight [1]** 873/21
**Overruled [1]** 847/7
**overseas [1]** 787/1
**overstated [1]** 783/7
**own [6]** 853/8 853/9 886/5 916/21 974/22 976/11

# P

**PA [1]** 759/10
**Pacific [1]** 802/14
**package [14]** 808/7 808/12 808/20 808/23 809/4 844/13 845/5

# P

**package... [7]** 888/9 888/11 888/16 888/22 888/24 888/25 889/1

**page [20]** 759/7 812/25 814/3 823/12 823/15 829/16 829/19 842/25 843/1 843/9 859/14 859/15 863/6 863/8 863/9 863/11 863/11 879/8 879/18 974/12

**pages [1]** 859/17

**paid [19]** 764/10 764/11 764/14 764/19 765/1 779/11 779/12 815/6 844/20 845/3 858/13 859/5 880/7 898/19 898/24 899/4 906/18 908/15 963/12

**painful [3]** 802/18 803/4 803/19

**paint [1]** 866/15

**Palo [1]** 759/7

**panel [1]** 958/14

**paper [2]** 816/1 816/4

**paragraph [1]** 969/24

**paragraphs [1]** 969/23

**Parker [1]** 849/16

**part [60]** 771/7 790/13 790/14 791/22 796/22 799/16 821/22 825/16 825/19 827/1 827/3 827/21 831/18 831/22 839/13 839/15 852/13 860/18 880/20 882/23 883/9 883/11 884/22 885/2 887/23 893/19 895/1 895/3 895/8 896/25 897/2 909/2 909/2 909/5 909/25 913/22 913/22 913/24 919/19 919/19 919/20 923/3 923/11 925/2 925/6 925/11 927/3 944/24 949/4 949/25 951/7 965/19 965/22 966/5 966/7 966/11 968/22 969/18 970/9 970/15

**part-time [5]** 771/7 790/13 790/14 791/22 796/22

**partially [2]** 779/3 779/4

**participate [2]** 775/23 852/25

**participating [1]** 852/22

**particular [10]** 767/22 868/2 868/25 871/1 873/2 881/15 888/17 905/17 931/17 950/6

**parties [3]** 967/8 968/8 968/9

**partner [11]** 852/23 883/5 883/6 883/8 883/9 884/18 884/23 885/7 891/5 891/20 900/13

**partnership [1]** 883/11

**parts [4]** 853/20 911/8 916/15 948/1

**party [3]** 891/14 892/2 908/3

**party's [1]** 908/13

**pass [1]** 971/12

**passed [5]** 778/22 809/8 948/17 972/5 973/6

**past [18]** 762/9 762/19 767/7 770/12 770/14 778/5 779/3 779/22 781/22 782/18 787/2 794/19 806/12 825/22 907/18 908/2 952/24 977/10

**Pat [3]** 830/24 831/1 952/9

**path [1]** 941/1

**patient [3]** 816/11 854/2 871/24

**patients [3]** 948/24 964/2 964/3

**pay [42]** 772/15 772/17 773/3 773/19 774/11 777/21 778/19 779/13 780/8 781/1 781/14 781/16 781/17 781/18 781/18 782/23 789/25 792/14 792/22 793/6 793/7 793/22 793/23 796/14 818/20 859/7 862/10 883/17 898/13 898/16 898/23 912/4 912/10 918/9 919/2 919/3 919/8 919/13 920/11 924/3 924/5 929/19

**payer [1]** 817/21

**payers [1]** 817/25

**paying [6]** 780/8 784/14 858/9 858/11 907/1 923/22

**payment [3]** 764/12 764/24 770/21

**payroll [2]** 883/16 911/9

**pays [1]** 774/10

**paystub [2]** 770/20 780/8

**paystubs [3]** 767/25 768/13 775/19

**peek [1]** 803/1

**peer [1]** 799/21

**peers [1]** 821/24

**people [41]** 769/15 776/5 786/13 786/16 817/15 826/6 833/8 859/25 860/2 860/16 861/4 861/10 861/19 862/21 877/22 881/25 882/2 888/6 895/18 896/21 896/22 897/11 897/12 897/23 908/15 921/15 933/15 947/21 949/2 949/4 949/12 950/8 953/19 955/11 955/14 958/15 959/18 960/1 960/16 961/1 962/12

**per [19]** 765/5 770/25 771/8 772/1 775/12 775/19 775/20 775/22 776/11 776/13 780/13 816/24 854/19 861/16 899/4 906/22 912/4 914/12 935/23

**percent [61]** 771/13 772/1 772/6 772/9 774/4 774/4 774/19 774/21 775/12 775/25 776/7 776/8 776/11 776/13 778/23 779/8 779/14 780/3 780/13 783/1 789/1 789/5 790/8 802/2 802/2 813/6 817/23 821/1 821/10 823/18 824/1 824/13 825/5 825/13 825/13 826/11 826/15 826/20 826/23 832/22 832/23 833/3 833/4 837/10 838/16 838/25 839/21 840/9 840/9 840/11 840/11 854/20 854/22 855/13 861/18 934/18 936/8 960/5 960/7 960/9 964/10

**percentage [5]** 819/22 825/12 837/5 855/8 936/6

**perceptive [1]** 963/19

**perform [3]** 766/12 800/16 803/22

**performance [106]** 788/21 798/24 800/2 800/7 800/7 802/11 802/18 802/25 803/2 804/19 805/1 805/5 805/15 805/19 806/2 808/12 808/19 808/20 809/1 809/2 817/5 818/23 820/15 820/19 821/5 821/7 821/7 821/18 822/24 823/1 824/25 825/2 825/3 825/5 825/17 825/24 826/3 826/6 826/13 826/24 827/13 832/25 833/3 837/24 838/12 840/15 846/10 846/16 846/18 846/21 848/10 850/18 851/14 852/1 858/20 858/21 858/22 870/1 870/19 870/20 870/22 870/23 871/12 871/16 871/18 875/8 877/10 877/20 878/13 878/15 878/22 879/14 879/24 881/14 881/20 882/2 885/20 885/21 886/2 886/3 886/5 886/8 886/11 886/17 893/14 893/15 895/12 895/19 936/19 936/22 937/13 937/20 939/10 939/14 939/16 959/22 959/23 960/3 962/19 963/9 964/14 964/25 965/4 965/7 975/24

**performance/needs [1]** 822/24

**performances [1]** 817/14

**performed [2]** 876/19 964/22

**performer [2]** 877/7 877/9

**performers [1]** 896/17

**performing [8]** 802/19 803/2 804/21 804/23 805/23 936/25 958/4 961/7

**perhaps [3]** 771/22 771/22 937/1

**period [22]** 780/8 821/9 821/10 841/12 844/20 851/1 885/6 920/21 920/23 920/24 921/21 924/17 924/25 935/15 945/17 947/13 959/13 959/14 961/6 961/7 961/11 964/11

**periodically [1]** 861/9

**periods [2]** 776/3 865/18

**permanently [2]** 957/24 963/21

**permitted [2]** 857/25 976/21

**person [36]** 769/11 769/21 770/3 771/2 791/1 791/24 792/4 793/10 799/13 804/7 805/7 811/12 811/17 812/2 815/15 816/21 842/14 854/7 854/19 871/7 881/24 884/13 885/16 886/19 893/7 917/12 917/15 918/22 925/18 926/2 933/18 933/25 945/19 946/23 958/13 960/4

**person's [6]** 769/9 770/11 802/20 886/18 892/19 925/22

**personal [21]** 762/17 774/24 774/25 776/4 780/5 783/9 801/20 806/6 815/19 843/14 853/6 873/2 922/22 922/23 923/2 923/4 942/4 945/3 947/18 948/3 949/19

**personally [7]** 801/20 806/3 807/21 813/16 815/20 844/10 858/19

**personnel [3]** 784/18 911/9 928/3

**perspective [2]** 818/22 960/4

**pertained [1]** 787/11

**pervasive [1]** 809/20

**Peter [5]** 772/23 777/23 778/16 781/3 781/10

**Ph.D [3]** 763/3 784/24 904/18

**pharma [14]** 856/17 856/18 877/8 952/17 952/17 952/21 952/22 952/24 953/1 953/4 953/8 953/8 953/12 953/12

**pharma/new [2]** 953/8 953/12

**pharmaceutical [10]** 928/24 929/9 930/19 930/21 930/25 931/1 931/2 932/24 938/2 948/22

**pharmaceuticals [3]** 758/6 931/12 963/6

**Philadelphia [1]** 759/10

**phone [10]** 801/13 801/15 801/18 802/21 809/25 811/24 871/8 889/8 957/2 957/3

**photo [1]** 830/21

**photograph [1]** 830/8

**physical [4]** 803/10 803/11 868/21 889/8

**physician [1]** 816/10

**physician's [1]** 936/7

**physicians [3]** 803/12 819/20 934/22

**physicians' [2]** 813/21 936/10

**P**

pick [9]  801/18 807/6 807/7 807/15 807/20 808/19 809/3 829/16 977/4

picked [3]  821/23 821/25 879/1

picking [1]  808/25

picture [5]  815/14 829/7 829/8 866/15 952/8

PIP [2]  846/11 846/14

pit [1]  804/12

place [10]  781/15 801/22 807/22 808/5 813/23 818/25 853/3 914/8 923/8 926/10

places [5]  765/16 779/4 819/12 944/23 963/11

plain [1]  771/23

plaintiff [21]  758/4 759/2 760/3 760/6 794/12 849/23 865/13 887/9 927/12 944/11 968/24 971/2 972/4 972/25 974/7 976/5 976/8 976/20 977/9 977/13 977/24

plaintiff's [24]  766/2 772/24 772/25 773/12 777/24 778/10 781/3 781/5 781/12 882/22 909/17 910/2 910/23 911/1 914/5 916/9 924/9 967/24 968/9 969/2 969/18 970/19 974/11 974/11

Plaintiff's Exhibit [4]  772/24 777/24 781/12 968/9

plaintiffs' [1]  765/24

plan [21]  768/1 768/2 768/13 775/23 805/14 805/15 808/12 808/19 808/20 809/1 852/18 874/8 936/12 941/21 950/9 952/24 953/7 962/25 963/13 963/22 971/14

planning [5]  896/20 896/25 946/9 947/25 960/1

plans [4]  826/19 955/12 960/3 963/22

plate [1]  831/12

played [3]  882/22 941/11 958/6

pleasant [1]  866/3

please [35]  761/4 779/15 783/25 797/12 797/17 797/22 806/8 810/13 835/6 836/2 846/4 849/2 849/5 864/15 864/17 864/21 882/10 882/12 882/15 883/7 903/9 903/19 903/24 903/25 904/5 931/25 932/3 943/3 943/6 943/10 967/10 968/3 968/16 970/13 973/9

pleased [1]  903/13

plenty [2]  977/7 977/8

plus [5]  771/10 774/7 776/11 780/6 868/21

point [33]  771/1 771/24 777/10 778/5 779/17 795/5 826/22 854/18 869/2 869/15 876/1 883/10 884/19 889/2 898/23 899/1 915/19 915/20 916/14 920/8 930/25 933/5 940/5 943/22 946/15 946/16 948/5 951/1 962/2 963/2 974/14 975/24 976/3

pointed [1]  795/11

points [1]  970/7

policies [3]  889/10 901/7 902/14

policy [27]  800/15 800/21 801/4 801/25 816/19 831/15 831/19 831/23 832/6 832/13 832/17 833/11 838/5 839/2 839/13 839/15 839/17 839/18 839/22 857/21 890/10 890/13 890/15 891/10 893/1 974/22 976/11

Pomponi [2]  887/19 976/14

poor [3]  805/18 805/19 805/25

poorly [1]  804/21

portable [2]  931/8 931/9

portal [2]  889/14 889/25

portion [1]  781/21

Portland [12]  758/6 759/13 759/22 798/12 818/13 818/14 818/19 819/10 823/4 841/12 841/14 866/19

posed [1]  768/14

position [14]  790/16 790/18 794/16 804/7 840/18 840/22 841/7 867/23 899/21 929/25 932/23 956/13 957/24 959/6

positions [1]  910/9

positive [5]  826/12 826/14 827/6 827/24 954/14

possibility [2]  789/16 794/2

possible [4]  769/20 786/3 973/3 973/6

possibly [1]  911/9

post [5]  770/10 775/14 775/15 776/20 780/15

post-incident [2]  775/15 780/15

post-incident/income [1]  776/20

post-termination [1]  770/10

posted [4]  897/21 897/24 958/1 958/9

posting [2]  917/11 917/13

potential [11]  788/9 791/23 799/11 819/5 893/8 908/8 912/12 913/16 918/1 918/5 918/18

potentiality [3]  933/22 934/14 935/19

potentially [2]  852/23 975/10

practice [10]  761/23 762/16 764/22 766/4 874/22 874/23 902/14 939/4 949/7 950/2

practices [1]  903/1

practitioner [1]  761/24

pre [3]  801/14 874/8 959/12

pre-call [1]  874/8

pre-COVID [1]  959/12

pre-Team [1]  801/14

predecessor [1]  801/9

predicted [2]  776/6 918/14

prediction [1]  918/11

predictions [1]  768/20

prefer [2]  814/5 834/25

preference [2]  838/23 847/4

preferred [2]  814/12 964/1

prejudgment [5]  775/9 779/1 779/2 779/7 780/12

prejudice [1]  970/6

preliminary [1]  967/4

premise [1]  920/18

premiums [1]  770/22

preparation [1]  766/16

prepare [6]  766/16 851/22 852/11 867/25 887/24 896/20

preparing [3]  764/14 767/18 908/13

prescribe [2]  817/19 819/21

present [13]  761/3 767/5 767/5 772/12 774/6 777/6 810/12 836/1 895/9 903/23 933/12 954/8 967/12

presentation [1]  952/16

presentations [1]  763/19

presumed [1]  801/14

pretrial [1]  970/9

pretty [12]  807/12 807/18 817/16 825/12 825/13 866/20 867/18 868/3 920/6 933/16 946/20 955/22

prevail [1]  908/16

prevent [1]  887/6

previous [13]  765/20 770/11 850/24 851/23 855/4 913/2 925/25 926/11 938/17 943/23 960/14 962/1 963/7

previously [6]  766/6 773/8 880/14 889/2 929/1 965/19

Price [1]  775/13

priced [1]  774/25

prices [1]  764/8

PRID [10]  876/4 899/8 899/10 899/11 899/15 899/18 899/22 899/24 900/1 900/5

prima [4]  969/19 970/15 974/8 977/23

prima facie [1]  974/8

primarily [5]  763/20 768/18 786/23 817/21 928/24

primary [2]  957/8 959/9

principal [2]  774/10 774/12

principles [1]  766/4

print [2]  777/13 871/14

prior [16]  765/2 768/15 770/11 770/16 775/19 777/7 779/21 793/3 797/25 846/25 850/20 878/13 894/17 894/18 906/24 942/7

priorities [1]  959/25

priority [4]  870/19 871/11 871/16 972/16

private [1]  914/16

privilege [1]  879/2

pro [1]  766/18

probabilities [2]  774/1 776/13

probability [8]  769/19 778/23 783/21 789/22 790/2 790/3 790/4 790/7

probably [21]  763/22 765/7 799/4 802/1 813/15 817/24 819/6 821/19 831/9 833/2 836/18 838/19 868/2 868/21 933/15 933/16 933/21 934/10 935/24 937/1 947/14

problem [3]  873/17 913/9 913/11

procedure [3]  890/19 890/21 890/22

procedures [2]  901/7 902/14

proceedings [1]  979/5

process [16]  768/24 769/1 769/4 769/5 776/10 874/14 874/21 909/2 913/22 919/19 923/24 925/10 958/11 958/17 958/18 972/15

produce [2]  768/6 914/19

produced [3]  928/13 928/16 928/17

## P

**product [11]** 802/13 803/6 819/20 820/1 854/2 871/21 871/22 871/24 955/21 963/4 964/12
**products [2]** 802/16 819/14
**profession [2]** 761/19 786/10
**professional [21]** 763/5 763/9 763/15 763/19 765/3 765/4 773/8 807/14 815/20 833/23 849/18 851/24 853/19 854/11 854/22 868/6 884/5 904/19 904/20 944/8 948/4
**professionals [5]** 818/6 856/22 857/6 866/17 927/4
**professor [4]** 761/18 761/20 761/25 762/1
**profile [1]** 886/7
**program [2]** 770/24 774/20
**progress [1]** 902/12
**prohibited [1]** 858/1
**project [5]** 900/14 910/5 912/23 920/4 925/18
**projected [6]** 911/17 911/19 914/1 918/12 918/15 920/5
**projecting [1]** 909/25 910/14
**projection [2]** 918/10 923/15
**projects [4]** 883/21 883/22 887/3
**promise [1]** 872/17
**promote [2]** 819/20 821/6 857/18 954/1
**promoted [11]** 784/14 821/10 877/13 877/15 877/21 885/14 895/4 896/13 896/15 897/4 959/5
**promoting [1]** 819/19
**promotion [37]** 771/18 771/19 788/14 788/19 788/25 789/5 789/10 789/12 789/16 789/19 790/2 790/9 794/4 794/7 804/6 821/12 822/5 841/10 857/22 857/25 858/1 877/17 885/14 885/17 895/2 895/6 898/7 912/3 912/12 912/18 917/4 917/5 917/8 917/10 917/19 917/24 951/16
**promotions [6]** 771/17 798/9 821/15 878/1 878/3 895/25
**prompt [1]** 836/3
**proof [1]** 806/18
**properly [3]** 892/20 892/21 969/13
**proposed [1]** 809/6
**pros [1]** 948/25
**prospect [2]** 917/4 917/18
**proud [3]** 763/22 799/4 810/23
**proved [1]** 972/24
**provide [14]** 816/25 853/10 887/20 887/22 893/14 893/15 893/16 893/19 905/23 912/5 947/5 956/1 956/18 956/20
**provided [16]** 767/20 767/23 768/3 768/9 768/17 777/19 783/23 784/17 784/19 796/25 845/25 853/15 881/4 911/12 918/3 918/8
**Providence [1]** 803/9
**providers [9]** 866/20 867/1 868/2 871/1 871/4 875/4 875/6 959/8 959/9
**providing [2]** 843/12 975/22
**Provo [1]** 933/2
**PSS [4]** 836/21 837/2 943/23 944/2
**PSSs [2]** 949/16 965/13
**public [3]** 763/17 914/19 914/19
**publication [1]** 766/14
**publications [5]** 763/14 764/1 764/6 770/1 927/6
**publish [4]** 773/15 778/16 781/10 905/1
**published [2]** 763/16 897/20
**publishers [1]** 766/13
**publishes [1]** 763/11
**pull [4]** 777/23 832/17 886/8 938/24
**pulled [2]** 807/4 964/4
**pulling [1]** 838/5
**pulmonologists [2]** 872/24 959/11
**purely [1]** 788/22
**purpose [2]** 890/21 957/5
**purposes [2]** 920/22 951/4
**pursue [1]** 939/13
**push [1]** 868/7
**pushback [1]** 962/11
**pushed [4]** 806/2 861/8 868/1 868/5
**put [20]** 761/12 778/2 782/4 805/14 812/17 815/14 815/25 821/18 826/9 842/23 848/10 848/15 880/13 916/12 920/3 951/21 954/5 963/8 970/19 977/10
**putting [2]** 781/13 808/18

## Q

**Q1 [1]** 960/4
**Q4 [2]** 960/7 960/9
**qualification [2]** 791/7 923/21
**qualifications [10]** 791/24 916/3 916/5 917/13 918/22 919/1 920/4 925/19 927/9 929/23
**qualified [8]** 765/20 765/22 787/20 788/21 908/12 908/20 912/25 917/12
**qualify [1]** 844/22
**quality [1]** 818/6
**quarter [2]** 956/6 964/13
**quarters [3]** 824/9 824/12 824/16
**question [36]** 785/21 787/20 791/8 794/8 794/9 814/5 818/10 822/4 826/8 832/20 833/18 833/20 838/9 838/15 843/10 846/4 847/25 848/1 859/21 860/1 862/17 863/14 864/8 870/16 874/2 874/7 874/14 878/3 879/13 879/23 908/5 928/5 930/23 931/1 945/3 950/3
**questioned [1]** 794/11
**questioning [1]** 806/5
**questions [45]** 768/4 768/14 782/5 783/24 796/1 796/7 797/2 797/3 810/4 812/18 836/14 846/7 847/15 851/3 856/7 856/10 856/11 857/10 857/14 857/15 858/2 860/21 862/2 862/25 881/10 881/13 883/13 888/1 890/25 893/12 901/2 903/4 903/5 907/24 926/16 930/9 931/20 941/15 942/16 948/6 951/14 955/20 964/16 966/16 966/17
**quick [2]** 919/17 957/15
**quickly [1]** 889/21
**quite [5]** 804/10 822/7 826/14 861/20 936/23
**quoted [2]** 785/17 788/5

## R

**radius [1]** 876/1
**raise [11]** 789/20 790/1 790/3 833/18 904/2 969/11 969/17 970/10 974/20 974/23 975/6
**raised [16]** 789/12 858/19 858/23 878/12 878/21 879/23 965/4 965/7 969/13 970/6 970/7 970/8 970/9 972/19 975/15 975/18
**raises [2]** 901/9 909/23
**raising [3]** 970/5 975/8 975/16
**randomly [1]** 807/17
**range [5]** 886/13 890/24 899/2 960/6 960/6
**ranges [1]** 892/18
**rank [1]** 762/2
**ranked [5]** 823/4 823/5 823/17 823/25 886/21
**ranking [4]** 877/1 886/16 937/3 937/8
**rare [1]** 960/18
**rate [11]** 765/3 765/4 776/2 776/7 779/2 779/6 779/7 791/19 906/21 922/5 960/16
**rated [5]** 825/22 825/24 825/25 839/4
**rates [13]** 767/9 768/20 768/20 774/6 774/7 774/8 779/2 779/7 795/15 795/18 795/19 795/23 962/8
**rather [3]** 818/8 915/7 962/10
**rating [8]** 822/19 822/22 822/23 823/1 824/13 826/24 826/24 886/11
**ratings [1]** 964/24
**rationale [2]** 974/12 975/22
**RDR [2]** 759/21 979/10
**re [2]** 819/3 837/1
**re-established [1]** 819/3
**re-focus [1]** 837/1
**reach [8]** 855/21 858/24 859/3 867/24 890/25 891/4 942/8 948/5
**reaching [2]** 859/4 859/21
**read [34]** 806/23 807/8 807/11 814/2 823/14 823/19 823/22 829/17 832/5 833/15 833/16 837/17 837/18 837/19 838/1 838/8 838/17 838/9 839/15 842/25 843/11 847/20 848/2 860/4 862/13 862/19 863/9 863/11 863/12 870/13 873/24 879/16 967/19 967/23
**readiness [1]** 798/7
**reading [2]** 786/1 870/16
**ready [3]** 835/6 896/21 897/1
**real [4]** 919/17 949/18 949/25 957/1
**realize [1]** 938/24

**R**

realized [1] 845/19
really [32] 766/1 782/8 784/25 792/9 792/15 800/10 801/23
801/24 807/23 826/1 850/14 866/20 868/1 868/5 868/7 868/7
872/2 875/17 876/21 937/16 941/10 945/20 953/9 955/19 958/4
958/5 959/22 959/24 963/23 963/25 967/8 974/10
realtime [1] 886/1
reams [2] 914/19 914/19
reason [22] 776/5 804/20 813/14 814/17 839/7 865/10 872/4
896/10 957/8 969/5 973/21 973/23 974/9 974/10 975/5 976/2
976/4 977/4 977/6 977/14 977/15 977/22
reasonable [14] 783/20 790/12 791/23 792/4 907/3 910/16
910/23 911/13 915/5 915/10 916/2 925/9 925/18 926/1
reasonably [8] 785/11 785/23 910/6 912/24 913/23 913/25
918/23 929/22
reasons [14] 776/3 776/4 787/8 805/13 813/18 814/5 843/6
972/15 974/15 976/19 977/3 977/4 977/7 978/3
recall [53] 788/11 802/10 804/3 812/10 813/7 817/5 817/17
818/11 818/11 824/5 826/20 827/7 830/7 830/8 830/10 830/14
831/10 831/20 832/3 832/24 832/24 833/2 833/3 837/16 840/16
841/23 847/8 848/1 855/24 856/3 856/5 856/5 856/7 856/11
856/17 857/10 861/2 861/22 863/19 863/22 871/25 901/19
914/12 924/12 928/24 934/20 936/9 942/10 951/7 951/18
951/24 952/21 953/20
recalled [1] 863/15
receive [7] 788/25 799/12 827/10 874/14 881/18 892/8 937/3
received [19] 763/21 763/22 763/25 773/14 778/13 794/25
799/13 810/1 811/5 847/19 848/2 874/19 875/9 912/2 947/9
964/24 967/23 968/6 968/24
receiving [4] 866/1 866/2 874/21 945/15
recent [4] 790/11 795/14 799/19 923/7
recess [6] 810/6 810/11 835/4 835/7 903/22 973/10
recessed [1] 848/23
recipients [2] 834/6 837/13
recognize [6] 834/14 834/15 855/2 869/8 871/23 882/20
recognized [3] 798/24 799/12 939/12
recollection [10] 823/11 823/16 823/24 826/13 830/11 831/8
856/14 863/5 864/2 888/13
recommend [1] 865/11
recommendation [3] 786/15 786/18 787/4
record [15] 797/18 800/7 822/7 843/15 843/16 848/16 849/6
864/22 869/7 882/16 904/6 932/8 943/11 967/20 979/5
records [5] 787/10 787/13 788/18 911/9 928/7
recover [5] 777/7 920/11 921/17 924/5 970/21
RECROSS [2] 847/17 862/3
RECROSS-EXAMINATION [2] 847/17 862/3
recruiters [1] 958/10
recruiting [1] 894/9
red [2] 760/3 845/17
redirect [8] 796/3 796/5 846/6 846/8 860/22 881/11 930/10
942/17
reduce [1] 769/18
reduced [7] 772/4 776/1 776/13 794/5 794/7 794/10 795/9
reduces [1] 769/22
reduction [1] 900/10
reemployed [2] 784/12 924/17
refer [1] 812/25
reference [10] 798/3 829/4 829/6 830/24 841/23 893/4 893/19
899/1 930/18 930/24
referenced [2] 836/16 848/7
references [3] 892/24 893/1 893/2
referred [2] 794/25 952/16
referring [4] 833/7 834/8 834/18 861/13
refers [3] 836/14 872/18 969/21
reflect [1] 783/11
reflected [1] 787/15
reflection [3] 827/9 853/8 854/4
reflects [1] 870/6
refresh [5] 823/11 823/16 823/24 863/5 864/2
refreshes [1] 830/11
regard [1] 771/11
regarding [10] 767/2 771/23 783/8 856/1 858/19 858/21 858/22

906/16 908/10 956/1
regardless [2] 786/21 817/13
region [13] 799/17 799/20 799/25 803/21 836/10 877/5 884/19
884/22 900/20 900/23 921/6 958/20 958/22
regional [12] 763/9 798/7 800/20 817/9 839/1 840/17 841/3
841/8 841/9 913/1 914/24 924/24
regions [2] 799/24 884/20
regret [1] 818/14
regular [6] 762/7 857/23 873/15 892/8 895/19 896/18
regularly [2] 859/5 905/5
regulators [1] 892/20
regulatory [1] 763/17
rehab [6] 784/24 784/24 906/11 907/20 926/21 926/23 927/3
927/6
rehabilitation [3] 906/1 906/13 927/10
rehire [1] 893/21
relate [1] 976/8
related [13] 783/19 857/14 886/18 891/18 902/7 905/5 915/12
917/8 925/24 951/11 951/18 969/2 972/23
relating [5] 975/9 975/9 975/9 975/15 975/17
relation [5] 901/23 902/7 902/21 944/22 958/20
relations [6] 883/18 891/5 891/15 891/19 891/23 891/24
relationship [3] 803/13 853/15 915/20
relationships [1] 868/3
relative [2] 817/17 818/18
Relevance [1] 806/4
relevant [9] 763/6 763/14 763/21 768/5 792/2 856/24 857/4
905/23 911/10
relied [10] 768/23 782/20 784/5 784/9 789/6 791/14 793/15
796/14 927/25 930/14
rely [4] 786/8 786/10 813/24 917/7
relying [1] 787/16
remain [1] 909/22
remainder [4] 767/8 780/17 781/22 782/22
remained [10] 767/14 771/17 772/19 774/15 777/14 778/4
782/2 912/1 913/23 919/20
remaining [5] 770/3 780/22 782/5 795/7 858/15
remember [40] 821/21 829/8 829/9 839/14 845/10 845/12 856/2
856/13 857/13 859/9 861/15 862/16 864/3 872/5 872/6 872/10
872/11 872/14 872/15 880/22 884/12 884/16 894/22 898/21
903/19 934/19 934/23 934/24 934/24 934/24 935/1 936/11 936/16
939/24 942/10 945/20 945/21 952/15 972/4 975/7 976/13
remind [2] 897/5 966/23
remove [8] 794/2 797/13 803/16 849/3 864/18 882/12 932/4
943/6
removed [2] 816/10 965/24
Reno [1] 943/25
rep [22] 811/15 811/20 816/7 851/21 852/15 853/15 867/8
875/23 878/9 933/14 936/20 938/2 943/24 943/25 944/16
944/19 946/19 946/20 946/22 948/19 950/6 950/23
repeat [4] 779/16 930/23 965/6 968/3
repeated [1] 807/19
repetitive [2] 802/22 806/19
replace [4] 762/19 767/11 781/21 791/17
replaced [2] 767/8 783/9
replacement [15] 785/12 785/23 787/23 788/9 790/12 793/13
793/20 918/5 918/5 918/9 920/15 920/19 920/25 923/11 924/6
replay [3] 816/16 939/1 940/6
replayed [1] 816/12
replaying [1] 813/22
reply [1] 977/19
report [66] 764/14 767/19 767/24 768/7 768/10 776/6 782/10
782/10 782/21 782/25 783/15 783/17 783/18 785/5 785/13
785/14 785/16 785/20 785/25 786/1 787/8 787/18 787/22
788/13 789/3 790/6 790/11 791/10 794/13 794/21 795/4 797/1
823/10 850/5 850/7 859/24 861/1 861/22 862/1 862/9 868/17
868/19 868/20 869/13 870/6 901/14 901/23 912/19 915/13
918/8 918/10 918/12 918/14 919/10 922/6 922/15 922/19 923/6
925/2 928/15 930/3 930/4 950/15 950/17 958/19 960/23
reported [3] 833/8 922/14 964/19
REPORTER [2] 759/21 979/10
reporting [9] 799/22 824/10 857/16 947/11 948/7 951/1 956/18
957/16 964/11

**R**

**reports [17]** 806/23 855/5 863/16 870/20 870/23 871/19 871/21 874/15 875/8 911/6 911/7 926/7 956/1 960/2 960/14 960/15 960/21

**represent [1]** 791/22

**representative [9]** 801/16 805/12 816/9 816/12 867/22 876/4 900/5 950/12 961/20

**representative/employee [2]** 876/4 900/5

**representatives [5]** 857/21 948/22 949/21 960/8 961/19

**represented [1]** 891/19

**representing [1]** 784/4

**reps [12]** 805/22 812/2 815/4 815/5 815/17 867/10 930/19 935/22 941/1 949/15 956/9 961/17

**request [1]** 768/16

**requests [2]** 895/21 956/17

**require [1]** 906/11

**required [2]** 860/8 926/4

**requirement [13]** 800/15 836/17 838/3 838/17 839/11 840/10 840/14 840/16 847/24 854/16 863/16 874/18 974/22

**requirements [8]** 800/22 837/22 838/11 847/21 854/14 855/17 892/10 917/12

**research [4]** 763/20 764/1 764/1 799/10

**residents [1]** 968/20

**Resolution [1]** 904/12

**resolve [2]** 968/13 971/15

**resources [18]** 805/14 805/16 809/12 809/18 844/25 880/2 883/5 883/6 883/8 883/21 884/5 884/18 889/21 890/12 891/4 896/19 951/8 975/3

**respect [5]** 822/3 833/15 857/22 868/8 911/3

**respects [1]** 915/19

**respiratory [10]** 804/6 872/23 877/16 884/19 884/25 885/2 885/4 894/17 895/3 959/10

**respond [1]** 902/18

**responded [1]** 868/25

**response [5]** 880/1 971/6 971/7 971/8 972/11

**responsibilities [4]** 885/13 885/18 885/18 885/19

**responsibility [8]** 795/3 801/24 867/8 880/3 884/24 926/9 948/23 949/1

**responsible [1]** 902/20

**rest [2]** 802/17 805/20

**restating [1]** 874/3

**restaurant [2]** 871/10 934/6

**restricted [6]** 768/1 783/2 783/5 922/10 922/11 922/14

**restrictions [1]** 962/3

**restructure [1]** 959/5

**rests [4]** 760/6 760/14 848/14 966/20

**result [6]** 900/16 913/6 913/13 918/4 925/15 974/25

**results [3]** 905/24 974/19 975/6

**resume [1]** 768/3

**resumed [1]** 956/13

**retail [1]** 797/24

**retainer [1]** 764/12

**retaliate [1]** 901/8

**retaliation [4]** 889/11 902/24 906/9 973/16

**retaliatory [3]** 902/16 968/22 977/6

**retire [2]** 842/19 941/21

**retired [1]** 762/1

**retirement [4]** 769/9 770/23 774/20 775/23

**retrain [1]** 957/13

**retrained [2]** 901/14 902/6

**retraining [1]** 902/12

**returned [3]** 956/12 956/15 957/13

**reverse [1]** 778/1

**review [39]** 766/14 767/18 784/15 784/18 787/10 788/18 822/19 824/25 825/3 825/20 827/10 827/13 832/25 833/3 837/25 846/16 846/18 846/21 848/10 869/22 885/21 886/5 886/10 886/10 890/16 896/22 902/11 902/22 905/22 905/23 911/1 911/5 916/3 919/9 928/7 928/13 937/3 956/7 956/16

**reviewed [17]** 763/11 768/23 787/13 831/25 839/4 840/4 860/25 874/19 875/22 875/24 888/24 891/14 911/6 911/7 928/3 930/16 931/7

**reviewing [3]** 860/1 862/20 905/19

**reviews [10]** 826/6 836/25 838/13 840/15 848/5 877/11 885/21 886/8 893/14 893/15

**ReX [1]** 760/3

**Rexburg [1]** 944/21

**Richard [3]** 760/4 761/9 761/18

**rid [2]** 805/6 941/1

**ride [12]** 813/6 870/2 870/10 870/24 871/2 879/3 889/5 936/15 945/18 950/16 960/17 962/1

**ride-along [1]** 936/15

**ride-alongs [2]** 813/6 879/3

**rides [3]** 811/22 811/23 889/8

**riding [1]** 811/20

**ridings [1]** 955/14

**Riechert [3]** 759/6 901/7 901/11

**right [125]** 773/9 773/21 773/23 774/5 777/15 778/7 780/21 796/12 796/19 796/23 796/24 800/11 800/12 802/8 806/7 807/8 807/11 808/22 811/8 811/12 814/20 815/8 818/3 818/7 818/18 820/8 821/15 823/6 823/8 824/6 826/11 826/15 826/23 827/23 828/16 829/3 829/14 831/3 834/18 838/22 846/12 850/13 858/7 858/9 858/11 858/15 858/17 858/25 859/3 860/8 860/13 861/17 862/13 862/23 863/9 866/16 869/14 869/16 870/9 872/19 876/17 876/20 877/5 877/6 877/11 877/14 878/1 878/2 878/7 878/10 878/13 878/23 879/11 880/5 880/6 880/15 880/18 880/25 887/16 893/3 898/4 898/5 901/8 903/16 904/2 909/14 913/13 917/2 924/13 924/19 927/8 927/12 927/13 927/14 927/20 929/6 929/10 929/19 930/3 930/7 933/2 937/12 939/24 942/5 944/7 944/9 944/15 947/16 950/25 951/2 954/6 958/8 959/19 963/12 964/20 964/25 965/5 965/7 966/9 971/11 971/2 971/9 971/15 971/17 972/24

**right-hand [1]** 863/9

**rise [2]** 795/15 901/12

**risk [2]** 774/4 954/5

**risk-free [1]** 774/9

**RMR [1]** 979/10

**road [2]** 759/7 962/17

**Robert [4]** 759/3 760/12 932/1 932/9

**rock [1]** 829/4

**rocker [2]** 830/20 831/2

**role [54]** 782/9 798/16 798/18 799/19 802/5 804/7 805/11 822/5 841/13 845/3 867/25 876/25 878/14 878/17 885/7 887/23 887/23 893/10 894/17 894/18 894/19 894/20 894/22 894/25 895/3 896/21 896/23 897/5 897/15 897/17 898/1 898/6 898/8 898/12 899/5 900/12 905/15 911/15 913/6 914/24 916/8 939/21 943/22 944/3 947/7 947/22 947/23 950/7 955/5 955/5 959/2 960/10 963/14 964/6

**roles [11]** 799/18 885/13 885/18 892/23 896/23 896/23 897/9 897/11 898/9 899/4 947/3

**rolling [1]** 845/17

**room [3]** 759/22 801/15 971/19

**rooms [1]** 962/11

**rotational [2]** 841/9 841/11

**Roth [1]** 854/17

**round [1]** 772/5

**route [1]** 865/11

**routes [1]** 975/1

**routine [1]** 953/7

**RSD [1]** 841/7

**RSUs [1]** 783/2

**ruined [1]** 803/3

**rule [3]** 801/25 848/8 978/5

**ruling [2]** 968/15 976/21

**running [2]** 940/25 956/22

**rural [1]** 949/22

**RUSSO [1]** 758/11

**Ryan [2]** 759/9 810/19

**S**

**S-T-I-C-K-L-E [1]** 932/9

**safe [1]** 820/6

**said [70]** 789/9 790/17 796/8 798/13 802/2 804/15 804/20 806/1 806/15 806/20 806/22 806/24 807/5 807/12 807/13 807/15 807/17 807/20 807/22 808/11 808/19 808/20 808/22 808/23 808/24 818/11 826/6 828/18 831/18 831/22 831/24 833/3

# S

**said...** [38]  833/14 836/18 838/8 838/20 839/3 839/17 842/5 843/10 844/24 845/4 845/15 845/17 847/23 854/1 860/15 861/10 862/19 868/24 878/24 878/25 895/14 912/4 912/6 913/3 921/2 922/11 925/20 928/19 935/1 935/19 939/11 941/8 947/18 952/14 967/4 968/10 972/14 972/20

**salaries** [4]  911/11 915/6 930/20 931/3

**salary** [31]  771/19 772/18 773/4 773/4 785/17 788/5 788/6 788/7 788/9 788/10 791/2 791/3 792/20 793/14 793/21 796/23 858/9 893/11 909/21 914/14 914/16 915/17 915/21 916/25 918/18 920/16 922/2 923/11 924/7 924/7 929/9

**sales** [149]  785/16 785/17 785/18 788/2 790/16 790/18 790/20 790/24 791/19 792/19 797/25 798/6 798/7 798/8 798/17 799/2 799/3 799/7 799/9 800/18 800/19 800/20 800/20 801/1 801/15 801/17 805/1 805/12 805/21 805/22 811/3 811/15 812/2 812/8 815/3 815/5 815/17 815/23 816/7 816/9 816/12 816/12 817/9 818/6 818/12 818/12 819/9 819/10 821/6 821/15 821/18 821/18 822/5 824/19 825/24 826/3 840/17 841/3 841/8 841/13 843/17 848/9 849/18 849/19 850/2 850/4 850/24 851/6 851/20 851/23 852/15 852/23 853/15 853/18 853/19 854/10 854/21 855/20 856/22 856/22 857/6 857/20 865/24 874/23 874/25 875/23 881/14 881/15 884/13 884/24 884/25 885/3 885/11 885/12 886/17 886/17 886/19 886/19 896/2 896/3 896/7 898/10 898/20 900/18 900/20 912/25 913/1 913/6 914/15 915/7 916/25 926/13 926/15 929/1 929/9 929/25 930/6 930/19 930/20 930/22 930/25 931/1 931/2 931/5 931/7 931/8 931/14 931/17 932/24 933/14 934/13 938/2 939/23 940/2 943/21 943/24 943/25 944/8 944/16 944/18 945/19 946/9 947/19 948/19 948/22 949/1 950/7 959/5 962/19

**salespeople** [1]  866/7

**salesperson** [1]  937/11

**Salt** [30]  818/13 865/7 873/5 873/6 873/9 873/10 873/21 921/9 932/14 933/3 933/10 935/7 943/20 944/23 944/25 944/25 945/1 954/17 955/9 955/17 956/4 957/20 957/25 958/12 959/2 959/20 960/5 961/14 962/14 964/13

**Salt Lake** [2]  943/20 944/23

**same** [42]  767/15 775/11 778/19 780/23 782/3 791/24 792/13 792/14 793/3 793/6 793/14 793/21 798/18 799/20 799/20 799/25 807/16 810/23 817/13 836/15 840/20 840/22 881/9 885/13 885/19 897/25 915/1 918/7 920/6 920/15 920/23 929/1 929/9 929/13 929/14 940/6 945/11 953/2 953/2 953/3 955/24 960/8

**Sandy** [1]  933/15

**sat** [2]  805/13 970/18

**satisfied** [1]  828/23

**Saturday** [1]  802/24

**save** [2]  813/15 862/18

**savings** [5]  768/1 770/23 774/20 775/23 964/2

**saw** [14]  816/18 822/15 827/6 827/12 832/19 832/22 846/18 853/10 861/19 867/15 914/20 945/22 954/12 960/21

**say** [71]  772/5 772/6 786/24 791/15 800/8 801/8 803/15 805/4 806/13 808/3 809/9 816/6 817/10 819/13 820/6 821/2 821/4 822/2 822/6 822/15 824/8 825/13 826/18 829/12 829/12 830/10 830/24 831/10 832/14 838/19 839/5 839/9 839/9 840/7 842/3 850/22 853/17 861/14 862/12 866/5 866/6 875/1 884/17 893/20 893/23 894/1 894/15 895/20 902/19 912/9 917/10 923/20 925/23 934/4 934/7 938/21 938/22 938/23 938/25 939/3 939/19 940/9 940/19 941/10 942/20 953/15 954/12 971/24 972/1 974/5 975/7 974/12 975/7

**saying** [10]  779/16 805/18 806/2 832/6 839/14 862/8 897/3 897/4 974/12 975/7

**says** [25]  776/18 778/25 780/15 834/17 837/5 855/10 859/20 869/17 869/19 869/22 873/24 873/25 875/21 876/3 876/9 886/9 886/14 893/3 900/4 912/24 913/2 915/15 960/24 974/14 977/20

**scale** [4]  852/9 886/10 886/11 886/13

**scar** [1]  842/23

**scenario** [1]  923/20

**scenarios** [2]  785/15 949/8

**schedule** [4]  762/7 903/2 926/9 962/9

**Scholarship** [1]  763/25

**school** [3]  829/5 829/7 952/10

**Schwabe** [1]  759/12

**science** [2]  762/25 884/3

---

**scientific** [2]  766/4 806/18

**scientifically** [1]  768/7

**scorecard** [9]  800/22 800/25 801/5 831/18 831/22 832/6 832/25

**Scott** [3]  759/3 784/6 796/15

**screen** [4]  782/5 830/12 836/8 974/15

**screens** [1]  761/12

**scroll** [3]  869/24 875/20 887/12

**scrolling** [1]  836/14

**search** [9]  894/5 920/21 923/18 923/24 925/22 926/3 927/16 927/24 928/7

**searches** [2]  894/7 894/9

**seat** [4]  801/21 849/2 864/18 932/4

**seated** [5]  761/4 797/17 836/2 903/24 967/13

**Seattle** [6]  802/15 819/11 866/19 884/19 884/20 884/22

**second** [18]  768/17 770/8 773/23 782/10 783/8 787/18 799/13 799/13 822/22 822/25 823/2 874/21 882/21 913/24 918/10 918/12 919/20 941/13

**section** [1]  825/19

**securities** [3]  774/8 774/9 781/23

**Security** [1]  768/2

**see** [58]  776/25 777/9 782/9 810/21 813/2 813/21 815/15 816/8 816/18 830/11 830/12 834/3 834/5 834/5 834/10 834/16 836/19 836/23 837/3 837/17 837/12 841/17 844/10 852/10 852/13 852/15 852/16 853/10 853/23 854/9 855/14 861/10 866/21 867/10 869/15 870/4 870/21 871/12 871/13 871/4 875/4 875/6 875/7 885/22 888/17 903/19 906/13 923/19 923/21 934/17 934/25 946/6 949/12 954/7 954/13 960/25 963/22 973/3

**seeing** [9]  814/15 853/6 853/7 853/15 861/22 866/23 867/11 875/6 895/9

**seem** [1]  780/16

**seemed** [1]  963/17

**seems** [2]  787/18 825/15

**seen** [10]  773/1 794/19 816/16 820/14 820/22 828/8 895/10 916/23 968/12 968/12

**selected** [8]  821/16 821/20 873/2 877/22 877/25 914/4 917/16 958/11

**SelectHealth** [7]  817/22 819/23 962/25 963/1 963/3 963/8 964/1

**self** [2]  853/8 874/9

**self-awareness** [1]  874/9

**self-reflection** [1]  853/8

**sell** [1]  857/1

**selling** [14]  815/4 815/6 857/3 857/5 857/7 857/7 931/11 931/13 937/24 948/3 950/1 955/16 959/24 959/24

**senate** [1]  762/5

**send** [2]  861/9 882/1

**senior** [5]  762/2 762/6 887/24 932/24 958/6

**sense** [8]  813/12 813/20 813/25 814/7 814/20 814/24 931/9 961/2

**sent** [6]  809/18 833/13 854/14 860/12 887/15 976/15

**separated** [2]  838/14 860/11

**September** [3]  824/7 880/23 881/8

**September 5th** [1]  881/8

**September/October** [1]  824/7

**September18** [1]  979/9

**series** [1]  818/25

**serious** [1]  876/25

**serve** [4]  851/10 852/22 959/2 971/2

**service** [2]  845/10 893/9

**services** [2]  762/21 766/12

**session** [1]  836/1

**sessions** [8]  934/2 934/11 934/12 934/21 935/17 935/19 936/2 936/5

**set** [6]  860/6 868/7 869/1 869/4 874/13 950/23

**sets** [2]  834/16 947/20

**Sevart** [28]  771/17 784/6 784/8 784/22 788/16 792/8 793/15 911/2 912/11 913/9 914/4 914/7 914/16 915/5 915/23 916/10 916/24 918/3 918/13 918/15 920/2 920/23 920/24 921/23 924/16 927/8 928/19 929/5

**Sevart's** [25]  767/23 768/10 785/10 785/22 787/16 787/22 789/6 791/13 796/15 796/25 911/6 911/15 911/21 912/14 912/19 916/19 917/25 918/11 919/1 926/7 927/25 928/15 929/12 930/14 931/5

# S

**seven [15]** 798/9 834/16 836/19 849/18 933/6 933/6 933/21 934/11 935/20 935/25 936/17 946/15 946/16 946/23 960/8
**seven-and-a-half [1]** 933/6
**seventh [1]** 968/19
**several [6]** 784/6 785/14 818/15 905/14 933/24 944/2
**severance [11]** 808/7 808/12 808/20 808/23 809/3 844/14 845/5 888/9 888/11 888/16 888/22
**shaped [1]** 818/14
**share [9]** 803/5 809/16 819/6 819/8 851/9 948/11 949/15 953/19 963/20
**shared [2]** 846/19 952/8
**sharing [4]** 839/18 839/23 870/25 955/19
**she [319]**
**sheet [2]** 815/25 816/4
**shift [3]** 857/6 939/17 953/3
**shoot [1]** 802/2
**short [1]** 803/15
**shortly [2]** 808/8 953/10
**shot [1]** 934/18
**should [28]** 767/12 779/21 783/12 789/20 790/12 806/17 810/5 837/6 837/9 854/15 855/9 855/12 879/8 908/25 909/16 910/2 913/14 916/17 918/1 920/11 920/15 923/8 924/5 924/6 924/11 970/6 976/5 977/24
**shouldn't [1]** 866/6
**show [10]** 770/20 772/23 777/23 778/7 781/3 781/12 834/13 869/5 894/5 915/20
**showed [2]** 830/8 830/14
**showing [7]** 780/24 834/2 838/7 855/1 855/8 869/6 974/15
**shown [7]** 777/22 782/22
**shows [7]** 773/19 774/1 775/19 778/18 778/18 779/12 859/24
**shut [2]** 786/25 819/19
**sick [1]** 840/6
**side [2]** 815/24 815/24
**side-by-side [1]** 815/24
**sides [4]** 776/8 941/6 973/5 973/7
**sign [1]** 808/12
**signal [1]** 854/3
**signature [3]** 979/7 979/7 979/7
**signed [1]** 979/7
**significantly [1]** 913/16
**signing [1]** 979/4
**similar [7]** 792/20 839/5 910/4 940/4 945/9 975/6 975/7
**simple [1]** 915/15
**simply [2]** 770/10 970/10
**since [9]** 782/24 798/2 869/5 877/1 889/2 927/11 946/19 959/1 961/2
**single [3]** 815/18 816/25 855/7
**singled [1]** 889/7
**sir [15]** 797/6 797/12 810/21 814/3 816/3 838/7 838/15 839/19 843/9 848/13 882/8 931/23 932/3 966/18 976/25
**sit [2]** 801/21 934/20
**sitting [3]** 811/8 812/16 816/1
**situation [8]** 776/5 802/24 807/17 844/25 854/10 902/22 941/10 963/15
**six [9]** 776/7 776/8 798/9 928/23 944/2 946/15 946/22 962/14 962/14
**six-and-a-half [3]** 776/7 776/8 962/14
**sixth [1]** 968/19
**sized [1]** 815/12
**skill [3]** 870/3 931/8 947/20
**skills [12]** 790/24 815/4 815/6 910/7 916/6 926/4 931/11 931/16 937/24 946/25 948/3 959/24
**slid [7]** 807/5 807/10 807/13 807/15 807/16 807/19 807/20
**small [4]** 766/15 775/2 871/14 872/12
**smaller [1]** 784/13
**smile [1]** 826/9
**smugness [1]** 809/9
**snapshot [1]** 861/4
**sneak [1]** 966/22
**so [362]**
**sold [1]** 794/17

**sole [3]** 761/23 963/3 963/8
**some [105]** 768/14 775/19 776/5 779/4 786/5 789/16 792/9 799/8 801/2 801/2 801/3 801/11 801/24 802/3 802/4 808/9 813/15 814/5 814/17 817/15 825/17 826/1 826/6 826/11 826/22 827/24 838/24 839/23 841/20 843/24 847/3 848/18 850/20 854/18 856/25 857/1 857/10 857/11 857/14 857/15 860/1 861/19 862/20 863/15 863/17 863/19 866/13 867/5 867/7 868/3 869/12 871/20 871/22 874/15 881/13 884/19 888/6 902/13 905/25 906/7 910/16 910/21 911/9 911/21 916/12 922/3 922/6 922/10 922/22 925/11 925/14 926/11 929/5 933/5 933/15 934/5 935/3 935/18 944/7 946/17 947/10 948/5 950/4 950/8 950/8 950/10 951/1 951/8 951/15 952/3 952/3 952/16 953/17 954/7 955/14 955/14 955/17 956/1 956/7 956/20 960/11 960/25 962/1 962/19 972/6
**somebody [9]** 802/1 813/22 816/8 832/12 842/4 847/12 862/8 893/3 893/5
**somebody's [1]** 899/13
**someone [18]** 792/12 819/8 856/3 897/1 913/3 913/22 914/9 914/22 914/25 915/6 915/16 916/25 918/25 919/19 920/4 923/24 929/21 929/22
**someone's [6]** 833/25 908/8 908/11 909/3 909/6 923/21
**someplace [1]** 961/16
**something [23]** 800/4 826/9 829/11 829/25 830/5 832/18 833/15 838/6 853/24 867/16 877/19 877/21 878/24 879/21 890/5 893/18 896/19 899/7 915/13 925/24 931/13 935/2 935/12
**sometimes [23]** 764/6 769/15 769/16 769/17 776/4 776/4 811/22 817/10 825/22 834/20 851/8 859/7 866/6 866/7 866/7 866/8 866/9 868/13 868/14 875/1 938/11 940/7 961/24
**somewhat [1]** 810/1
**somewhere [1]** 853/4
**son [2]** 884/10 958/6
**soon [4]** 806/22 932/19 972/13 972/17
**sorry [12]** 776/17 779/20 790/17 794/6 805/9 811/19 859/2 924/18 928/11 930/23 965/6 968/2
**sort [7]** 801/14 861/4 861/11 861/13 883/18 896/21 954/25
**sound [2]** 869/13 939/4
**sounds [1]** 962/16
**source [2]** 832/15 919/24
**sources [1]** 768/23
**south [2]** 849/17 935/5
**southern [1]** 944/20
**southernmost [1]** 944/24
**span [1]** 799/1
**speak [4]** 803/11 899/10 905/3 978/13
**speaking [2]** 847/8 856/17
**special [1]** 887/3
**specialist [2]** 932/25 944/4
**specialists [2]** 873/7 959/10
**specialization [1]** 904/24
**specialized [1]** 947/23
**specialty [7]** 804/6 867/20 872/23 872/24 895/4 895/5 959/5
**specific [16]** 783/10 868/24 870/22 895/20 912/6 927/9 949/6 950/9 950/19 950/22 950/24 960/3 963/22 963/22 964/4 976/22
**specifically [13]** 780/1 794/13 802/14 804/19 813/5 841/23 872/15 885/1 896/2 938/1 969/25 975/4 975/11
**specifics [1]** 911/21
**spectrum [1]** 937/5
**speculation [4]** 792/10 822/11 846/2 847/5
**speculative [1]** 912/13
**spell [1]** 932/7
**spelled [1]** 849/8
**spelling [6]** 797/18 849/6 864/22 882/16 904/6 943/11
**spend [7]** 765/6 871/11 944/4 946/11 947/17 949/18 961/20
**spending [4]** 936/9 961/16 961/18 962/16
**spent [12]** 854/24 855/7 868/23 906/23 944/2 947/13 947/17 947/24 948/2 948/10 949/2 949/9
**spin [1]** 802/21
**split [3]** 801/7 832/16 846/24
**Spokane [2]** 958/3 961/13
**spoke [2]** 816/14 880/24
**spoken [1]** 856/12
**spot [3]** 827/11 841/3 841/7
**spread [1]** 819/17

# S

**spreadsheet [4]**  869/6 869/10 872/17 875/25
**spring [1]**  804/1
**St [6]**  872/6 872/7 935/2 935/4 935/7 935/13
**St. [2]**  933/4 935/9
**St. George [2]**  933/4 935/9
**stacked [1]**  809/17
**staff [2]**  853/1 978/11
**stage [2]**  879/5 970/3
**stages [1]**  802/13
**stand [2]**  783/16 879/8
**standards [4]**  850/15 850/17 889/21 955/24
**standpoint [1]**  818/8
**stands [7]**  867/18 886/16 896/4 897/6 897/7 899/11 936/15
**star [1]**  829/4
**start [10]**  761/8 805/2 810/22 813/1 850/13 852/2 855/4 863/10 863/11 919/18
**started [20]**  796/3 798/2 804/18 810/23 820/5 828/4 849/18 850/6 854/17 857/1 874/7 881/9 884/24 894/15 938/4 943/25 946/24 955/23 960/25 963/21
**starting [6]**  850/4 850/5 850/6 859/20 863/13 960/10
**starts [1]**  813/4
**state [21]**  765/16 797/18 817/20 817/24 819/17 849/5 864/21 873/7 882/15 892/10 904/5 904/18 910/7 910/18 921/10 921/13 925/20 932/7 943/10 968/20 968/21
**stated [5]**  821/11 826/9 837/24 880/14 954/2
**statement [4]**  805/17 970/9 972/20 972/22
**statements [3]**  766/16 796/11 856/4
**states [6]**  758/1 758/12 759/21 787/19 975/12 977/20
**statistic [3]**  786/12 786/18 787/3
**statistical [1]**  803/20
**statistics [10]**  785/7 786/10 786/20 787/5 905/23 911/10 914/15 914/18 921/4 931/6
**status [2]**  761/22 762/6
**statutes [3]**  970/16 970/21 973/24
**stay [8]**  785/3 801/23 845/7 845/22 856/24 873/21 934/5 954/3
**stay-at-home [1]**  801/23
**stayed [5]**  767/12 794/15 842/9 909/11 909/19
**steering [1]**  966/7
**step [7]**  769/5 769/5 772/11 797/12 882/12 932/3 943/6
**Steph [1]**  941/1
**Steph's [1]**  941/9
**Stephani [74]**  798/23 799/22 801/8 802/7 802/10 803/1 803/5 803/22 804/9 806/10 806/15 807/5 808/11 809/8 817/9 821/25 822/7 822/14 824/5 826/8 827/14 829/9 831/5 831/9 833/8 834/5 836/9 840/22 842/8 842/11 843/14 843/22 844/23 846/10 846/22 847/1 847/20 850/5 850/7 850/8 850/12 856/1 857/16 857/17 861/9 880/24 881/2 881/4 881/7 881/9 896/11 901/11 901/13 902/2 939/17 940/3 940/22 940/24 942/12 948/5 951/1 951/3 951/12 952/2 952/15 956/15 956/24 957/22 958/22 965/24 966/2 966/4 966/7 976/15
**Stephani DiNunzio [5]**  802/7 833/8 847/1 951/12 958/22
**Stephani's [2]**  805/11 896/9
**stepping [1]**  785/1
**steps [5]**  772/10 870/2 870/10 870/24 873/25
**stewards [1]**  962/6
**sticking [2]**  862/9 862/13
**Stickle [10]**  760/12 932/1 932/9 932/12 932/14 932/18 941/19 942/19 943/2 948/17
**sticks [1]**  853/18
**still [14]**  778/23 783/15 800/5 813/17 817/13 817/14 820/11 845/3 858/6 866/20 885/4 941/19 964/1 964/1
**stipulation [1]**  968/10
**stock [12]**  764/7 768/1 783/2 783/4 783/4 794/15 795/2 922/3 922/10 922/11 922/14 922/15
**stockholder [1]**  842/19
**stomach [1]**  804/12
**stop [2]**  852/10 852/11
**stopped [2]**  865/10 924/21
**stops [1]**  929/19
**story [2]**  872/5 872/14
**strategic [3]**  947/25 953/6 960/1

**strategically [1]**  963/12
**strategy [2]**  937/17 964/4
**Street [2]**  759/4 759/10
**strengths [1]**  853/13
**stricken [2]**  827/18 846/4
**strike [4]**  822/9 827/16 829/1 846/3
**strive [1]**  801/1
**strong [4]**  877/9 877/10 964/9 964/14
**stronger [1]**  877/7
**struck [1]**  793/18
**struggles [1]**  937/20
**stuck [4]**  805/20 862/14 872/6 872/8
**stuff [6]**  809/17 816/6 934/5 947/1 952/14 963/6
**style [3]**  812/5 857/7 878/8
**subject [3]**  834/4 838/4 977/18
**subjects [2]**  783/20 834/9
**submit [2]**  970/23 970/25
**submitted [1]**  875/1
**subordinate [2]**  965/5 965/8
**subordinates [2]**  800/12 800/17
**subsequent [4]**  768/8 775/10 787/7 902/9
**subsequently [1]**  774/18
**substance [1]**  908/24
**substantial [2]**  789/22 931/15
**substantially [1]**  793/1
**substantiate [1]**  832/13
**subtract [1]**  771/4
**subtraction [3]**  909/13 913/9 913/11
**suburb [1]**  849/17
**success [7]**  817/8 843/16 885/16 886/18 886/20 915/25 959/18
**successful [12]**  782/12 876/22 876/22 876/23 878/18 923/25 926/2 946/20 946/25 947/4 957/12 959/18
**successfully [2]**  876/19 964/22
**succession [2]**  896/20 896/25
**successor [1]**  800/6
**such [4]**  765/16 895/9 897/11 897/15
**sudden [2]**  804/18 805/23
**sufficient [1]**  911/12
**suggest [1]**  853/2
**suggested [3]**  814/18 830/5 840/3
**suggesting [2]**  818/17 856/9
**Suite [2]**  759/4 759/12
**sum [7]**  762/19 767/7 767/8 767/14 772/14 776/23 781/21
**summarized [1]**  770/1
**summary [11]**  768/1 768/2 768/13 870/2 870/10 870/24 871/2 873/24 887/25 970/8 970/18
**summer [2]**  958/1 963/20
**summit [6]**  821/17 821/20 821/22 821/23 822/1 822/8
**supervise [1]**  878/6
**supervising [1]**  824/20
**supervision [3]**  876/19 964/22 964/25
**supervisor [9]**  798/20 798/22 802/7 842/9 850/8 858/17 876/16 878/4 879/13 879/24 880/15 880/16 880/17 941/13 941/13 941/23 942/2 946/14 966/4
**supplemental [1]**  923/6
**support [5]**  788/12 788/18 885/2 965/21 970/24
**supported [2]**  910/20 912/16
**supporting [1]**  944/5
**supportive [1]**  940/21
**supposed [6]**  789/20 854/23 900/6 912/17 917/10 952/25
**sure [38]**  768/5 769/4 769/8 787/12 788/11 792/1 800/23 810/8 824/17 833/20 842/7 844/1 844/19 848/1 849/16 851/4 853/17 863/13 867/3 870/14 895/18 895/19 895/21 895/23 895/24 901/16 909/2 909/25 919/17 920/10 921/21 930/24 932/14 955/12 958/17 959/14 964/3 965/7
**surprised [2]**  960/21 960/24
**surroundings [1]**  854/12
**survey [1]**  914/16
**survival [4]**  769/19 773/25 776/13 778/23
**survive [1]**  769/11 877/8
**Sustained [1]**  822/12
**SUZANNE [68]**  758/3 799/15 799/16 817/4 817/11 817/17 821/7 821/16 821/19 821/25 829/6 839/3 841/15 843/7 849/23 860/11

# S

**SUZANNE... [52]** 860/15 860/19 862/1 862/6 862/10 862/13
862/14 864/1 864/9 865/13 869/17 870/7 870/11 870/19 871/9
872/6 872/12 872/16 873/8 873/10 876/16 876/22 876/23
876/24 877/4 877/10 877/13 878/4 880/14 880/16 880/21
880/25 884/13 888/24 893/4 899/24 902/9 935/10 941/2 944/14
946/4 947/12 947/22 948/7 952/8 956/16 956/19 964/19 965/19
974/18 975/12 975/15
**Suzanne Ivie [1]** 880/25
**Suzanne's [17]** 800/2 800/9 817/7 819/9 819/21 820/19 821/1
821/5 829/25 830/6 858/22 871/6 872/22 878/12 878/22 879/24
900/9
**SW [2]** 759/12 759/22
**swear [4]** 797/14 849/3 864/19 943/8
**swearing [1]** 761/8
**swifter [1]** 963/11
**switch [2]** 828/6 886/25
**Switching [2]** 855/24 892/24
**sworn [10]** 761/10 797/16 849/4 864/20 879/10 882/14 904/3
904/4 932/6 943/9
**SYMBICORT [10]** 817/19 818/20 820/3 820/7 962/20 963/2
963/8 963/16 963/24 964/1
**system [15]** 854/24 874/16 874/22 875/14 885/22 885/25 886/1
886/6 886/6 886/17 899/17 947/22 948/1 962/23 967/21
**systems [4]** 889/15 899/16 899/19 944/3

# T

**T-H-O-M-S-E-N [1]** 943/13
**table [24]** 773/3 773/7 773/18 773/19 775/16 777/10 778/7
778/17 778/20 779/13 780/20 780/20 781/12 781/14 782/23
782/23 807/5 812/23 915/15 915/20 924/3 924/9 924/12 929/19
**tables [16]** 769/8 769/10 769/12 769/18 769/20 770/1 772/7
774/1 914/7 915/14 918/2 919/2 919/9 923/7 924/2 931/5
**tactful [1]** 866/11
**take [40]** 765 790/23 791/1 795/3 808/17 810/6 815/11 815/13
821/11 827/20 835/3 842/24 843/9 844/24 845/2 845/5 845/9
870/13 870/14 872/17 875/19 879/7 889/1 897/15 903/16
917/10 920/25 921/8 923/13 932/4 938/14 954/16 956/3 956/3
958/11 959/12 971/4 971/13 971/13 971/18
**taken [4]** 776/8 783/2 794/20 807/22
**takes [3]** 780/13 876/24 890/22
**taking [9]** 785/18 795/9 808/5 811/22 859/9 868/9 887/2 917/18
955/5
**Talcott [3]** 759/11 784/3 796/7
**talk [30]** 762/23 766/15 768/22 768/24 772/15 800/11 803/9
815/2 822/18 831/14 851/17 852/21 853/1 865/23 879/13
895/25 896/18 896/19 911/21 939/3 945/14 948/14 950/19
951/6 953/2 959/1 959/22 961/10 962/21 967/1
**talked [28]** 766/25 768/22 777/21 800/14 802/6 802/10 804/14
806/11 819/25 824/22 832/19 832/22 833/4 846/10 848/6 874/4
901/6 901/6 902/13 902/13 919/8 925/1 929/5 949/19 950/1
950/7 959/17 959/21
**talking [16]** 779/18 803/15 810/22 824/8 856/21 856/22 888/11
893/2 896/2 901/25 902/1 902/7 910/14 921/21 953/3 955/20
**talks [1]** 867/15
**target [2]** 834/21 935/24
**targeted [1]** 836/22
**targeting [1]** 871/1
**targets [1]** 886/20
**tarmac [1]** 872/8
**taste [5]** 842/16 842/21 843/3 843/11 843/18
**taught [1]** 762/11
**tax [2]** 768/20 794/22
**taxable [1]** 771/1
**teach [3]** 762/3 762/8 762/9
**teaching [4]** 762/2 762/7 762/10 763/23
**team [53]** 800/8 800/9 800/20 801/14 803/18 804/21 804/22
804/23 812/8 815/10 815/19 815/21 815/24 819/9 819/10
851/11 851/14 860/16 867/20 872/22 872/23 872/25 873/2
873/3 877/16 880/17 880/23 881/17 884/19 889/5 895/3 895/4
895/10 895/12 895/14 895/15 895/22 941/8 944/5 955/18
956/20 956/21 957/9 957/11 957/12 958/4 958/7 959/6 959/18

---

**teams [5]** 800/6 878/7 895/9 896/19 955/25
**technique [1]** 857/4
**techniques [1]** 856/25
**telephone [1]** 809/10
**tell [28]** 773/1 777/22 782/16 803/25 808/23 809/1 809/4 813/5
849/14 865/5 869/12 870/10 870/11 870/16 871/6 883/7 893/11
899/10 903/14 905/15 911/2 932/13 936/24 940/24 943/17
945/18 955/4 960/12
**ten [16]** 799/7 799/12 810/6 810/9 817/25 824/12 835/1 835/2
868/21 872/4 932/15 935/24 936/2 936/4 946/2 946/5
**ten o'clock [1]** 946/5
**ten-minute [1]** 810/6
**ten-plus [1]** 868/21
**tend [2]** 851/22 853/8
**tenth [1]** 774/20
**tenure [4]** 798/5 803/13 820/21 821/20
**tenured [1]** 904/22
**terminate [3]** 860/18 880/20 965/10
**terminated [13]** 769/14 770/13 770/13 778/20 786/16 893/23
894/1 909/4 912/15 921/22 966/14 977/3 977/5
**termination [22]** 770/10 770/10 770/12 771/5 778/5 780/17
785/12 785/24 786/19 787/3 888/3 906/5 906/9 909/1 928/20
933/7 942/7 968/25 974/16 976/2 977/8 978/3
**terminology [2]** 800/23 919/3
**terms [15]** 852/17 853/11 853/25 857/2 861/5 871/7 885/18
890/24 892/20 895/17 898/22 899/12 907/21 908/12 918/8
**territories [1]** 877/1
**territory [19]** 804/5 818/19 878/14 878/19 881/25 933/1 933/2
933/10 933/12 935/6 935/9 937/14 939/10 940/25 944/18
944/24 946/9 947/4 964/9
**testified [21]** 761/10 765/9 765/12 765/18 766/6 790/11 814/23
817/4 822/14 827/7 832/3 839/20 839/25 846/24 896/13 900/5
900/7 907/17 908/2 915/5 915/23
**testify [5]** 832/8 858/13 863/15 880/5 894/4
**testifying [3]** 831/20 844/3 907/20
**testimonies [1]** 765/12
**testimony [20]** 764/20 764/21 765/5 773/8 793/17 813/9 814/9
827/14 830/2 836/16 838/20 839/3 843/4 843/19 844/2 862/5
886/25 911/8 970/19 974/16
**Texas [2]** 958/22 969/4
**text [5]** 831/4 831/9 841/18 860/12 875/1
**textbook [1]** 766/13
**textbooks [1]** 766/14
**texting [1]** 831/10
**than [41]** 791/19 792/16 794/18 812/16 815/22 819/8 835/2
837/9 838/16 838/25 839/21 840/11 840/25 844/17 855/13
860/7 873/12 899/4 903/14 909/11 912/16 913/12 913/14
914/12 915/7 915/19 917/1 917/22 919/23 919/25 920/22 926/8
931/17 934/17 935/22 945/8 945/10 946/24 962/10 963/11
978/11
**thank [87]** 766/21 766/23 772/15 773/14 773/15 777/20 778/11
778/13 778/14 780/24 781/8 782/4 782/24 783/24 783/25 796/2
797/2 797/6 797/8 797/11 797/17 802/6 808/6 810/3 810/5
810/10 810/14 827/18 835/5 836/3 846/6 847/15 847/16 848/13
848/19 848/24 849/5 849/22 860/6 864/4 864/14 864/21 880/13
881/10 882/8 882/10 882/15 888/19 901/3 903/4 903/8 903/18
903/21 904/2 904/5 908/20 908/22 926/17 931/19 931/22
931/23 932/2 941/14 941/16 942/16 942/23 943/1 943/2 943/5
943/10 943/16 964/16 966/18 966/21 967/7 967/11 969/7
970/22 971/4 973/2 976/24 976/25 977/25 978/4 978/8 978/11
978/16
**thanks [6]** 810/21 849/13 858/2 862/2 865/3 966/17
**that [1193]**
**that the [1]** 808/8
**that's [141]** 768/16 769/22 774/24 775/1 775/10 777/19 778/1
779/1 786/7 786/7 786/12 786/23 789/8 790/10 790/16 790/19
790/22 791/16 792/7 793/16 793/25 794/9 794/18 795/13
796/24 798/3 798/14 798/18 798/19 799/23 800/1 800/13 802/9
805/5 805/25 807/12 807/14 807/17 808/17 811/16 811/21
812/5 815/6 817/16 820/2 822/17 823/3 823/5 823/18 824/3
825/4 825/6 826/15 827/2 828/15 828/18 828/19 828/22 829/15
831/3 831/16 832/14 833/11 834/17 834/18 834/25 836/11

**T**

that's... **[74]** 836/15 837/24 840/19 840/21 840/22 840/24 840/25 842/6 843/6 843/20 844/6 844/9 844/15 846/13 846/17 851/1 852/9 857/7 864/3 865/11 870/22 871/5 877/3 880/3 880/19 889/24 890/5 890/15 890/15 891/24 899/15 902/21 908/14 909/18 913/11 913/18 915/14 919/22 919/24 920/14 923/2 923/13 924/14 925/2 925/17 927/23 927/25 928/5 929/18 934/9 934/18 935/25 936/1 939/21 944/10 944/17 947/4 950/11 953/10 956/14 958/17 958/25 961/4 961/4 963/11 964/21 965/1 966/15 968/14 968/18 973/25 977/11 977/15 977/16

**their [74]** 769/15 769/16 769/17 769/21 772/13 774/12 786/13 786/21 800/17 801/16 801/18 805/7 805/13 805/22 815/4 815/6 847/13 851/25 852/25 853/8 853/12 853/25 853/25 854/3 854/11 854/11 854/14 859/22 860/2 861/5 862/21 868/8 878/7 878/8 883/16 883/17 886/5 886/7 886/8 886/16 886/20 890/23 891/1 893/10 893/11 899/15 902/22 900/7 910/4 910/5 910/7 910/7 910/18 911/3 913/23 914/20 914/20 915/19 917/13 925/9 925/19 949/18 955/11 956/1 956/2 956/2 959/19 961/17 972/5 973/22 974/22 976/1 976/11 977/23

**theirs [1]** 973/13

**them [54]** 772/13 788/24 789/10 791/10 791/14 798/16 801/19 805/19 809/16 815/24 816/1 817/16 847/11 849/14 852/20 852/21 852/23 853/5 853/7 853/8 853/16 853/24 854/23 862/11 865/5 871/23 874/19 883/15 884/21 893/11 893/17 909/18 910/6 910/8 916/7 928/9 928/10 928/12 932/13 941/12 943/17 948/21 948/24 954/11 955/11 958/5 961/3 961/13 961/21 971/3 971/13 971/18 971/19 978/13

**themselves [2]** 853/12 893/16

**then [122]** 769/24 772/8 772/11 773/25 775/5 775/21 776/10 776/14 777/3 777/8 779/9 780/12 781/23 790/2 790/14 791/14 793/1 793/3 793/21 794/1 796/14 796/21 804/18 807/8 808/1 808/6 810/6 811/19 830/25 836/12 836/14 837/5 841/10 841/12 851/5 852/7 852/9 852/10 852/11 852/19 852/25 853/1 853/2 853/2 853/9 853/10 854/3 854/17 855/22 859/7 861/8 863/11 865/9 865/11 868/9 868/11 868/12 869/2 869/18 869/18 869/24 874/2 874/6 876/3 877/24 881/20 890/12 890/18 891/12 891/12 895/4 909/12 909/21 911/18 913/2 914/2 916/12 920/1 920/5 922/4 922/24 923/23 928/20 930/4 934/4 934/4 934/24 935/2 936/13 936/13 938/25 939/2 939/4 940/5 940/6 941/13 944/1 944/3 944/4 946/7 946/7 946/11 950/3 950/9 950/21 954/24 955/20 955/24 956/20 959/4 959/25 960/3 966/11 966/11 966/12 969/24 971/15 971/17 971/19 972/2 974/8 976/15

**there [199]** 768/15 770/20 770/22 771/18 771/21 772/6 772/19 774/16 774/23 775/2 776/3 777/6 777/16 778/4 779/13 780/2 780/5 780/12 780/22 781/25 783/8 784/9 785/4 785/14 786/14 787/3 787/5 789/15 789/18 789/22 790/23 792/24 794/6 794/18 795/22 799/8 799/11 800/21 801/3 802/5 806/18 807/11 809/5 812/16 812/22 812/22 813/1 814/3 817/24 818/25 820/11 821/21 822/2 825/2 826/11 829/18 831/6 832/12 832/15 834/6 834/12 836/19 841/2 842/19 843/11 847/2 849/11 852/20 854/7 854/22 855/18 859/7 859/7 859/20 859/24 862/8 863/11 865/10 865/17 866/17 867/4 867/5 867/7 867/14 868/1 869/18 869/25 869/25 870/1 873/23 874/18 875/9 875/13 876/6 879/8 883/17 883/25 884/1 884/20 885/8 886/25 887/14 891/6 892/18 896/17 896/21 897/11 897/12 897/22 898/2 900/6 901/23 902/11 902/12 902/15 902/19 904/22 905/25 906/8 906/10 908/10 908/11 911/22 912/8 912/19 912/21 915/14 916/15 917/8 917/9 920/1 920/8 925/15 933/15 933/21 933/22 934/5 934/14 934/14 934/15 935/2 935/7 935/18 935/19 936/2 936/4 937/5 938/16 938/25 939/11 940/7 940/25 941/21 944/2 944/4 946/6 946/7 946/8 947/8 947/20 948/8 949/9 950/17 952/4 953/17 953/18 954/7 954/16 955/12 955/21 956/19 956/12 956/19 957/24 958/9 958/15 960/6 960/15 962/3 962/18 963/3 963/14 963/19 968/20 969/14 969/20 969/21 970/6 970/16 972/8 972/23 977/3 977/3 977/5 977/6 977/8

**there's [2]** 925/23 958/18

**thereafter [1]** 953/10

**therefore [7]** 804/23 806/21 892/2 895/5 920/7 969/15 975/25

**these [34]** 772/2 772/18 774/7 782/17 783/9 783/19 787/5 802/18 802/25 803/19 804/9 813/14 859/17 868/2 874/15 888/5 889/21 891/8 891/8 891/21 899/3 899/18 910/10 952/25 952/25 967/20 969/19 970/2 970/21 974/17 974/18 975/8 975/19

**they [186]** 766/5 766/5 766/14 769/16 769/17 770/13 774/2 774/9 774/10 774/11 783/17 783/22 784/11 784/14 786/14 786/15 786/16 786/21 799/6 799/9 799/12 800/23 801/2 801/16 801/17 801/17 802/22 804/23 804/24 813/7 813/15 813/22 814/18 816/1 819/4 819/5 819/13 819/16 819/16 819/17 821/6 821/8 821/17 821/23 826/3 828/4 828/4 828/4 828/19 828/25 831/25 832/1 832/1 837/9 838/13 839/2 840/5 840/7 841/11 845/17 845/19 848/5 848/6 853/1 853/9 853/12 853/13 853/21 853/22 853/22 853/23 854/1 854/4 854/4 855/12 856/4 861/11 861/12 862/9 867/10 867/10 868/22 868/23 868/23 870/25 871/13 871/14 872/23 873/1 875/1 875/24 879/4 883/9 883/12 883/13 885/12 885/24 886/7 886/17 886/19 886/21 888/25 889/13 889/14 890/16 890/23 890/24 890/24 891/1 891/2 891/3 891/4 891/6 891/7 891/17 891/19 891/25 892/1 892/2 892/9 892/11 893/9 893/10 893/16 895/19 897/10 897/13 906/5 909/4 909/4 909/9 909/10 909/11 909/11 909/19 909/20 909/22 910/1 912/17 913/23 913/24 914/12 914/19 915/18 916/18 916/21 916/22 919/20 919/21 919/22 925/8 925/8 925/9 925/23 928/8 928/13 928/17 928/25 931/17 934/3 943/23 949/4 950/17 950/22 952/13 952/14 955/12 958/23 961/1 961/2 961/4 961/6 961/7 968/10 970/5 970/19 973/12 974/24 974/25 975/13 975/14 975/19 975/22 977/3 977/4 977/22 977/22

**they're [5]** 817/20 871/21 871/21 886/1 975/7

**they've [4]** 885/22 906/6 900/7 969/11

**thing [5]** 767/15 770/8 799/4 842/6 866/3 883/18 896/22 938/14 938/17 938/22 940/6 953/3 954/6 962/20 978/5

**things [38]** 768/19 769/1 769/2 770/7 770/25 783/1 803/9 806/20 809/5 815/15 818/25 826/7 826/25 845/2 850/19 851/2 851/8 853/2 866/8 871/22 889/24 892/16 927/8 935/24 937/18 938/24 939/11 940/5 947/12 949/8 949/10 949/10 950/4 950/10 950/22 956/16 962/17 968/25

**think [83]** 764/23 769/22 779/18 794/6 795/22 798/2 798/8 803/16 803/17 803/17 810/20 814/7 815/3 815/5 815/13 815/18 815/19 816/3 816/21 826/5 827/7 827/24 828/2 829/2 829/10 829/23 830/17 833/9 833/21 835/2 836/18 838/10 839/11 839/17 841/22 845/19 845/25 847/20 848/1 848/4 848/8 850/6 850/13 851/3 853/14 854/17 854/20 860/25 861/15 862/16 865/16 865/18 865/18 867/12 872/2 878/17 879/19 888/13 896/14 906/10 917/14 918/22 923/10 926/14 933/6 933/23 934/14 935/18 939/11 940/9 940/25 948/18 952/9 952/13 953/12 962/14 968/11 969/9 969/16 970/5 971/1 972/14 977/4

**thinking [4]** 839/14 861/15 863/6 874/4

**third [6]** 759/22 773/25 807/20 870/2 955/8 964/10

**this [240]**

**Thomsen [15]** 760/13 938/9 938/10 938/12 939/7 939/9 939/14 941/23 941/25 943/4 943/6 943/12 943/16 943/19 964/19

**those [101]** 763/19 765/12 769/10 769/19 770/7 770/12 770/19 770/25 771/25 772/12 779/25 782/8 784/9 785/18 786/20 786/23 787/12 787/13 787/15 791/9 793/23 795/8 803/15 805/20 808/21 809/2 812/2 819/18 826/25 828/2 830/18 833/9 843/24 847/23 851/19 854/20 857/14 861/18 866/24 867/6 867/21 871/1 871/20 875/13 876/24 878/3 879/4 887/2 890/25 891/4 893/12 895/24 896/22 905/22 906/4 907/22 909/8 910/20 911/25 912/22 913/8 913/19 914/1 914/10 914/11 916/11 918/22 919/16 919/23 919/25 920/4 922/8 922/14 923/5 927/8 929/3 929/23 934/2 934/12 934/17 936/16 944/23 947/10 949/2 949/5 949/10 950/4 950/24 951/11 960/2 963/9 964/23 965/2 969/3 969/23 971/12 971/12 976/5 976/19 976/22

**though [8]** 776/2 796/21 818/18 820/10 839/15 867/23 930/6 940/17

**thought [33]** 807/3 807/25 811/1 812/1 812/2 812/5 812/6 813/7 813/11 813/19 813/22 814/1 814/11 814/13 814/20 814/22 819/5 822/7 823/20 827/9 827/11 828/18 828/25 829/10 829/13 833/11 842/18 843/15 844/16 844/17 847/2 927/19 945/20

**thoughts [1]** 978/5

**thousand [1]** 799/8

**thousands [1]** 915/18

**three [31]** 763/15 769/5 769/5 785/19 795/7 799/1 806/20 808/9 809/24 821/9 821/10 824/9 824/12 824/15 830/18 866/23 869/25 871/11 872/15 903/20 923/1 923/1 936/14 945/1 945/13 949/3 949/23 961/12 964/24 975/15 976/10

**three o'clock [1]** 903/20

# T

**three-and-a-half [3]** 763/15 945/1 949/23
**three-quarters [1]** 824/12
**three-step [2]** 769/5 769/5
**three-year [1]** 821/10
**threes [1]** 961/1
**threshold [1]** 969/11
**through [54]** 763/18 767/24 768/25 770/15 772/19 772/21
773/5 773/19 773/24 775/24 775/24 776/24 777/10 778/6
778/18 781/14 787/1 792/8 799/18 801/16 802/12 804/2 808/15
809/23 820/5 822/3 823/4 823/15 823/24 824/3 853/19 861/8
874/15 883/14 883/15 884/14 885/15 885/15 889/20 890/22
891/5 891/10 891/11 892/8 895/8 949/7 958/10 958/10 959/4
961/3 961/11 964/4 966/6 967/24
**throughout [1]** 960/19
**till [1]** 903/15
**time [167]** 764/10 764/11 764/14 764/17 764/19 765/1 766/19
769/14 771/7 771/8 774/2 775/5 775/21 776/6 778/22 790/13
790/14 790/15 791/22 796/22 796/22 796/23 797/6 798/6 799/6
802/10 803/7 803/14 803/14 803/25 804/1 804/4 805/6 805/11
805/18 805/24 808/17 811/13 812/3 812/6 812/15 813/8 815/13
815/18 819/25 820/4 820/25 821/25 822/3 824/7 824/9 829/10
821/1 829/12 836/10 836/13 837/19 838/21 840/5 841/2
841/12 842/19 845/4 845/12 845/21 845/23 846/18 847/13
850/4 850/9 851/1 851/12 851/15 852/5 852/7 852/24 853/17
855/17 862/18 865/20 866/10 866/21 866/25 868/2
868/8 870/14 870/18 871/9 872/11 872/14 873/6 873/10 874/5
875/3 884/19 885/6 885/14 886/11 888/23 889/1 889/2 894/16
897/25 906/18 908/4 916/14 918/16 920/24 921/12 921/14
921/15 921/22 922/1 924/16 924/25 931/23 932/17 933/7
934/16 934/18 934/23 935/15 936/16 937/21 939/1 944/16
945/16 947/13 947/14 947/17 947/18 947/24 948/2 948/9
948/10 949/10 949/18 950/2 950/23 951/5 951/6 954/16 954/21
954/24 955/7 955/15 955/25 956/4 957/19 957/24 958/3 958/12
959/1 959/13 959/16 960/22 961/6 961/7 961/10 961/13 962/16
963/20 964/7 967/9 969/25 974/24
**timely [1]** 816/6
**times [19]** 765/12 854/24 868/23 871/18 871/25 872/3 872/15
874/11 875/9 875/13 878/15 905/11 940/8 945/18 945/21
945/23 954/7 959/12 959/14
**tiring [1]** 879/4
**title [3]** 836/13 838/8 883/4
**today [20]** 762/19 764/17 765/2 767/7 767/14 783/16 795/20
808/10 812/16 813/17 822/14 829/22 858/11 880/4 885/4
906/18 907/3 934/20 944/7 973/1
**together [16]** 781/13 781/15 785/19 805/14 809/17 811/22
811/23 826/4 826/5 852/6 946/11 949/7 949/9 950/2 950/20
956/21
**told [14]** 780/16 792/8 799/13 828/20 828/24 831/14 839/22
841/24 842/1 846/11 879/21 899/3 928/16 971/25
**tomorrow [4]** 792/18 793/5 793/20 796/9
**too [10]** 807/18 889/18 912/13 913/7 913/10 913/11 962/10
969/16 970/10 972/6
**Tooele [2]** 934/24 936/15
**took [16]** 783/5 788/23 796/18 811/23 813/23 818/3 818/25
874/5 879/11 915/23 916/11 921/5 921/12 963/21 966/11
966/13
**tool [3]** 956/18 957/16 957/16
**top [11]** 773/21 821/10 822/19 834/18 877/4 877/5 881/21
958/3 960/5 960/9 964/9
**topic [4]** 905/1 905/3 907/7 908/18
**topics [2]** 886/25 892/24
**total [25]** 772/14 773/20 776/23 780/3 780/7 780/13 780/25
781/16 781/18 782/23 825/14 837/5 837/8 837/10 838/16
838/25 840/13 848/6 855/9 855/12 855/13 865/16 865/22
922/13 922/16
**totally [3]** 793/16 817/20 817/22
**Totals [1]** 777/13
**touch [1]** 841/15
**touched [1]** 764/23
**tough [1]** 815/23
**tougher [1]** 819/7

**toward [6]** 776/12 780/2 786/24 837/8 840/12 840/13
**towards [4]** 834/17 855/11 934/25 941/8
**town [1]** 873/19
**track [18]** 800/7 822/7 843/15 843/16 860/2 861/5 861/11
861/19 861/20 861/23 862/6 862/10 862/21 863/16 863/20
863/23 896/13 896/15
**tracked [1]** 886/21
**tracking [1]** 967/16
**tracks [1]** 886/18
**trade [1]** 795/10
**trade-in [1]** 795/10
**traded [1]** 783/14
**train [1]** 902/11
**trained [3]** 901/20 901/21 957/14
**training [15]** 792/5 857/23 891/11 892/8 892/9 892/12 892/17
897/4 901/17 901/17 902/3 914/25 920/14 924/5 951/4
**transcript [3]** 812/22 979/5 979/6
**transferable [1]** 931/10
**transition [1]** 850/14
**transitioned [1]** 951/3
**transportation [1]** 922/20
**travel [5]** 813/14 922/22 922/23 923/2 926/11
**traveling [2]** 801/12 962/4
**travels [1]** 961/10
**Treasury [3]** 774/8 774/9 781/23
**treat [1]** 955/10
**treated [3]** 845/20 846/1 917/3
**treating [1]** 954/14
**treatment [2]** 794/19 794/24
**trial [2]** 758/10 920/12
**trials [1]** 765/13
**tried [6]** 805/2 815/20 868/7 945/20 952/13 972/9
**trip [1]** 935/2
**trophy [7]** 811/5 811/7 811/8 811/9 815/12 816/22 827/21
**true [9]** 805/20 806/24 806/8 818/18 827/9 829/15 875/17 894/6
899/5
**truly [2]** 854/4 867/21
**truth [2]** 806/22 866/10
**truthful [1]** 812/20
**try [12]** 800/25 801/11 802/2 810/2 818/1 818/3 821/22 839/19
873/18 873/25 915/3 963/15
**trying [23]** 800/9 805/4 808/4 815/24 816/2 816/17 819/23
822/3 822/6 841/20 845/6 845/21 851/24 852/5 852/17 852/18
853/21 871/23 872/2 888/14 948/20 952/2 952/3
**turn [2]** 879/8 937/17
**turned [2]** 807/13 918/15
**turns [1]** 866/10
**TV [1]** 764/5
**twice [5]** 799/14 877/13 939/24 939/25 962/8
**twin [1]** 865/11
**twins [2]** 865/9 865/10
**two [57]** 767/20 772/10 779/25 780/12 799/5 799/5 800/4
806/17 808/1 809/7 817/20 822/19 822/23 823/1 825/2 826/25
838/14 849/19 865/9 871/11 873/19 878/25 879/4 879/5 880/17
881/25 882/2 884/10 886/9 886/13 909/2 909/8 913/22 919/19
928/22 935/12 937/5 937/8 938/11 944/14 945/17 945/23 946/6
950/19 950/22 952/5 954/10 955/7 955/10 955/25 956/17
958/15 960/7 960/18 960/24 961/20 964/19
**two-part [3]** 909/2 913/22 919/19
**two-year [1]** 945/17
**type [9]** 762/22 839/23 847/24 860/25 869/11 906/12 907/21
961/2 963/5
**types [5]** 767/20 893/12 905/12 906/4 909/20
**typical [5]** 769/9 789/25 902/14 920/22 950/11
**typically [18]** 770/10 786/17 794/19 852/3 852/9 861/14 866/4
866/20 866/22 867/10 881/25 891/15 892/10 896/23 903/2
906/5 906/12 923/13

---

# U

**U.S [5]** 774/9 781/22 785/7 786/9 890/10
**U.S. [1]** 774/8
**U.S. Treasury [1]** 774/8
**Uh [7]** 860/14 936/18 941/5 945/24 946/18 951/23 954/9

## U

**Uh-huh [7]** 860/14 936/18 941/5 945/24 946/18 951/23 954/9
**ultimately [2]** 844/6 976/15
**unable [2]** 784/12 787/8
**unaware [2]** 842/1 854/11
**uncomfortable [1]** 853/23
**uncritically [1]** 916/20
**under [22]** 812/17 814/23 824/13 829/22 831/15 837/6 837/23 855/9 870/21 876/19 881/14 924/20 964/22 964/25 968/19 969/16 970/16 970/21 973/17 973/19 974/14 977/23
**undergo [1]** 768/25
**undergraduate [1]** 762/12
**underperforming [4]** 805/12 956/5 956/5 959/20
**understand [21]** 788/8 788/11 790/16 790/17 790/22 837/21 838/10 838/17 839/19 843/21 850/15 857/21 877/10 879/7 880/4 895/23 926/10 938/15 948/25 961/3 971/11
**understanding [13]** 837/23 838/3 854/13 855/16 855/18 856/20 857/24 888/13 908/15 909/3 909/6 926/4 958/23
**understood [4]** 836/16 838/24 845/6 857/8
**undervalued [1]** 913/16
**unemployed [3]** 921/5 921/8 921/13
**unemployment [4]** 776/2 776/3 776/7 786/11
**unfortunately [1]** 818/23
**unfounded [1]** 828/3
**unit [2]** 799/3 799/20
**UNITED [3]** 758/1 758/12 759/21
**units [4]** 783/2 783/4 922/10 922/14
**university [11]** 761/21 762/10 763/1 763/2 763/23 763/24 763/25 768/12 771/7 904/18 926/5
**unjustly [1]** 846/1
**unless [1]** 852/3
**unlikely [1]** 915/9
**unprofessional [2]** 828/19 828/25
**untenable [1]** 941/9
**until [16]** 790/14 795/24 808/25 813/1 827/10 842/20 848/22 852/11 894/19 920/19 921/22 924/17 928/23 936/13 954/25 959/4
**unusual [1]** 964/10
**up [69]** 770/20 772/13 772/13 777/23 780/21 783/8 786/3 795/20 799/12 801/9 801/18 805/25 807/7 807/10 808/9 809/10 809/23 816/17 816/20 816/25 829/16 832/12 832/17 834/3 836/8 838/25 841/12 842/20 843/9 847/9 853/22 858/13 863/9 865/18 869/1 869/4 873/19 874/3 875/11 879/1 885/8 886/8 896/1 896/7 896/24 897/1 897/19 903/15 913/6 913/9 916/10 919/17 921/22 922/5 923/9 924/1 924/17 924/20 928/15 935/25 937/1 937/17 950/23 952/14 953/1 961/15 962/1 963/2
**upcoming [1]** 834/8
**update [6]** 779/1 955/16 956/17 956/18 957/6 957/16
**updated [4]** 768/9 768/10 794/13 918/8
**updates [1]** 859/6
**upon [18]** 762/21 815/9 819/4 819/5 820/21 821/4 826/20 840/5 840/15 843/15 844/17 844/23 845/1 845/25 848/5 848/9 851/5 916/6
**upper [1]** 913/10
**upsetting [1]** 802/23
**uptake [1]** 963/10
**us [26]** 761/13 768/25 773/19 778/18 778/23 840/16 847/14 850/17 857/1 861/8 866/14 871/19 875/20 897/5 905/11 905/15 911/2 923/16 936/24 945/18 950/17 952/3 952/8 958/10 972/1 978/13
**USA [3]** 889/21 890/13 890/18
**use [35]** 770/24 774/8 774/24 774/24 779/6 785/7 795/18 800/23 805/2 809/15 833/23 836/20 836/25 847/11 886/6 886/17 898/9 906/11 914/9 915/6 915/22 917/21 918/7 918/17 918/22 919/2 920/24 922/21 922/21 923/4 923/10 925/17 936/1 953/23 962/5
**used [26]** 774/6 793/11 856/25 867/11 875/25 879/1 879/22 899/14 906/1 912/8 914/7 914/13 914/16 914/21 916/24 918/3 918/15 920/23 920/23 922/22 925/9 930/19 930/24 950/4 952/16 961/2
**uses [1]** 915/15
**using [11]** 782/14 791/21 796/10 820/22 856/9 871/21 871/22

915/20 920/3 975/3 975/19
**usual [1]** 975/23
**usually [13]** 769/9 770/14 897/24 902/17 946/5 946/6 946/10 950/17 950/18 950/20 961/20 961/24 961/24
**Utah [35]** 786/11 815/22 817/21 817/24 818/2 820/12 865/7 866/18 873/3 873/7 880/4 921/5 921/9 921/10 921/13 932/14 932/16 933/4 943/19 944/1 944/2 944/20 944/21 949/21 949/22 958/5 959/6 961/15 961/18 962/18 962/24 962/25 963/11 968/25 969/1
**utility [1]** 763/17
**utilize [2]** 950/2 960/1
**utilizing [1]** 955/18

## V

**vacancies [1]** 897/19
**vacant [1]** 804/5
**vacated [1]** 804/7
**vacations [1]** 935/23
**Valley [1]** 933/3
**valuation [1]** 782/13
**valuations [2]** 783/15 905/21
**value [26]** 762/16 767/5 767/5 767/8 772/13 774/6 780/25 783/10 783/13 794/14 795/6 795/8 795/10 814/22 822/23 823/1 847/3 922/3 922/13 922/15 922/16 922/22 922/23 922/24 922/25 923/1
**valued [1]** 916/13
**values [1]** 772/12
**variety [1]** 854/22
**various [8]** 763/9 765/13 767/25 776/3 799/18 824/19 883/21 891/8
**Veeva [3]** 836/13 854/24 855/4
**verbal [1]** 853/11
**verbalize [1]** 935/2
**verbiage [1]** 953/10
**verdict [1]** 971/10
**verification [3]** 784/21 785/2 789/7
**verify [1]** 780/16
**vernacular [1]** 934/9
**version [1]** 869/6
**versus [11]** 819/21 820/12 832/13 854/15 869/3 871/7 947/10 953/9 953/11 963/16 963/24
**very [40]** 770/1 770/10 777/12 835/5 839/8 842/19 850/16 850/16 855/3 864/14 868/24 870/22 872/11 873/15 876/22 876/22 889/21 890/8 895/20 903/8 916/20 920/21 926/7 926/11 940/4 946/13 952/23 954/3 960/19 961/7 962/24 964/8 964/8 964/14 967/7 967/11 969/21 973/2 977/11 977/16
**vesting [1]** 794/18
**via [4]** 761/10 810/20 812/17 897/22
**video [1]** 761/10
**view [1]** 802/25
**violations [1]** 975/10
**virtual [22]** 801/10 801/15 802/3 812/1 812/5 813/11 813/15 813/19 814/11 814/13 814/18 816/13 816/19 832/14 833/4 838/20 838/24 840/9 847/1 847/3 847/12
**virtually [3]** 811/24 813/6 839/8
**visibility [2]** 886/2 886/4
**visit [7]** 873/14 873/15 873/24 934/4 959/8 959/9 962/12
**visited [1]** 934/6
**visiting [2]** 871/7 936/10
**visits [8]** 812/1 812/1 813/11 814/11 814/13 816/24 933/22 934/7
**vocational [38]** 767/24 768/10 782/9 782/16 782/19 782/20 784/23 784/25 785/2 785/5 786/7 787/12 787/13 787/19 787/20 788/20 788/23 788/23 789/2 789/7 791/1 791/4 791/8 791/9 791/12 793/10 793/17 793/18 796/15 906/1 906/11 906/13 907/19 924/22 926/20 926/25 927/6 927/10
**Volume [1]** 758/10
**volunteered [1]** 841/13
**vote [1]** 762/5

## W

**W-2 [9]** 767/24 768/11 768/12 779/12 779/24 783/5 796/10 922/12 922/16

# W

**W-2s [1]** 770/14

**W-E-L-C-H [1]** 882/17

**wage [3]** 768/20 771/21 786/17

**wages [11]** 762/20 764/8 767/11 767/11 767/12 771/24 786/3 788/22 905/6 907/18 908/15

**wait [1]** 813/1

**waive [1]** 970/17

**waived [3]** 969/10 969/16 970/11

**waiver [1]** 969/20

**walk [5]** 768/25 773/19 778/18 801/16 804/1

**walking [1]** 816/4

**want [55]** 762/23 766/25 768/22 768/24 769/8 796/9 800/11 809/3 810/22 812/25 813/24 816/5 816/6 822/2 827/20 828/18 828/20 829/12 834/12 834/22 841/14 842/18 845/4 847/10 851/19 862/18 864/8 866/13 869/5 872/12 873/25 874/12 884/17 886/22 890/16 925/14 925/18 925/25 935/16 939/13 939/17 940/7 940/8 945/14 948/14 948/24 951/6 956/25 959/1 959/12 959/17 959/18 967/19 971/12 973/7

**wanted [16]** 762/3 801/21 815/23 831/11 838/23 844/21 845/7 845/13 845/22 847/12 868/9 881/18 897/17 947/6 947/6 968/14

**wants [1]** 848/15

**war [1]** 941/1

**warning [3]** 887/6 888/23 968/24

**was [698]**

**Washington [5]** 759/4 761/21 904/11 959/7 961/14

**wasn't [32]** 805/4 815/25 816/8 816/13 818/23 820/22 820/23 824/13 828/24 831/15 831/17 831/20 831/24 832/21 838/22 839/10 839/13 847/3 847/13 851/4 875/17 900/6 902/11 912/6 917/8 930/3 931/5 934/19 946/8 953/8 956/10 957/1

**waste [4]** 812/2 812/6 813/8 813/8

**watch [2]** 852/20 852/25

**way [37]** 764/12 764/20 766/10 778/1 808/14 810/23 830/5 839/20 845/7 845/16 847/11 847/13 853/2 867/8 872/13 875/5 875/17 877/15 913/7 917/3 917/9 918/21 922/14 923/19 925/23 930/8 933/3 935/1 938/15 947/8 952/6 954/14 955/21 956/16 959/19 972/15 973/24

**ways [1]** 850/20

**we [355]**

**we'd [1]** 872/23

**we're [11]** 772/17 779/6 795/17 822/3 824/8 852/17 852/18 887/13 896/2 910/14 910/18

**we've [3]** 794/19 848/23 968/23

**week [20]** 764/6 775/18 775/19 775/20 802/12 802/19 906/24 949/3 949/3 949/20 953/2 961/16 961/19 961/22 961/24 967/7 968/23 969/5 978/12 978/15

**weekend [6]** 803/3 809/11 809/14 966/25 971/13 973/3

**weekly [3]** 802/18 803/19 809/21

**weeks [8]** 786/11 803/15 873/16 873/20 921/11 921/14 950/10 952/4

**weight [1]** 790/2

**weighted [1]** 786/24

**Welch [4]** 760/10 882/17 882/20 901/6

**welcome [2]** 797/13 932/4

**well [91]** 763/7 763/15 766/13 767/4 770/1 772/17 784/23 786/9 786/20 788/11 791/1 795/16 799/5 801/6 802/17 803/2 803/21 807/24 814/7 829/1 829/4 845/12 847/13 847/23 848/5 852/8 853/11 853/13 860/16 866/6 869/3 869/4 875/6 875/7 875/21 877/15 888/6 889/14 891/11 892/11 892/15 892/21 895/9 895/15 895/15 905/19 908/19 910/4 910/14 911/17 912/1 913/21 914/7 915/11 915/12 916/10 916/19 917/6 917/14 917/21 918/10 919/4 919/7 922/3 923/20 925/10 926/1 928/3 928/13 929/11 931/9 931/15 941/8 944/6 946/13 947/7 948/4 951/14 952/19 955/8 959/9 961/8 961/14 962/2 962/24 964/8 964/15 971/3 972/1 972/3 973/12

**went [19]** 787/1 787/6 816/9 834/21 853/19 869/4 872/13 877/16 900/6 928/18 928/22 929/24 934/21 944/20 946/11 949/23 950/3 958/10 959/4

**were [211]** 764/10 764/14 764/19 765/12 765/13 765/14 765/15 765/15 765/20 767/2 768/15 770/13 777/8 779/16 779/18 782/11 782/12 783/2 785/14 788/8 791/9 793/19 794/11 796/10 798/15 798/20 798/24 799/9 799/16 799/19 800/9 800/10 801/22 802/13 802/23 803/25 804/11 808/5 810/23 811/1 811/3 812/2 812/15 812/17 813/7 814/11 814/13 815/15 817/12 818/5 818/19 821/9 821/11 823/17 823/20 824/9 826/11 828/4 828/5 828/19 828/23 828/25 829/22 831/4 831/7 832/15 833/18 833/21 834/18 836/7 836/12 837/13 838/4 840/4 840/8 840/15 840/17 841/2 842/4 842/5 843/10 844/19 844/19 845/12 845/17 845/20 848/5 848/9 850/2 853/22 853/23 854/7 854/21 854/23 856/21 856/21 856/22 857/15 858/17 859/7 859/7 860/2 860/18 860/24 861/10 861/11 861/13 861/19 862/11 862/21 863/16 863/17 863/20 864/8 869/1 873/5 873/8 875/9 875/13 877/4 877/23 877/24 880/20 881/13 882/21 884/18 884/20 885/5 888/11 893/10 900/15 904/19 904/22 909/20 912/8 912/16 912/22 916/21 916/22 917/11 917/13 917/22 922/8 928/13 928/15 930/19 931/7 933/12 933/15 934/1 934/10 934/14 934/15 934/23 936/2 936/4 937/14 937/20 938/16 939/11 941/12 942/4 943/23 944/15 944/18 945/9 945/11 945/15 946/19 947/11 948/7 949/21 951/14 952/19 952/23 953/3 953/17 954/3 954/7 954/8 954/16 954/25 955/17 956/17 957/10 957/17 958/23 960/2 960/6 960/7 961/1 961/4 961/5 961/6 962/9 962/16 963/24 963/25 965/5 965/8 965/10 966/11 967/15 969/12 969/23 969/23 974/17 975/13 975/14

**weren't [13]** 803/2 813/13 820/19 820/25 839/7 841/5 841/7 842/3 862/10 928/8 936/25 961/2 961/7

**West [1]** 811/4

**West's [1]** 799/3

**western [1]** 944/22

**what [290]**

**what's [17]** 764/7 764/8 765/3 830/12 839/20 852/14 857/24 885/9 890/21 906/21 916/23 923/15 923/20 923/23 926/1 954/4 954/4

**whatever [3]** 777/11 883/16 974/25

**when [179]** 767/22 770/6 775/18 779/1 787/7 794/11 794/17 794/18 794/23 797/12 798/16 798/20 798/22 799/12 802/10 803/14 803/25 804/13 804/14 805/2 805/11 805/13 806/16 806/24 808/15 808/18 812/15 812/16 814/3 815/15 816/8 818/11 819/13 820/3 824/18 825/13 826/8 826/11 827/6 827/12 827/13 827/20 828/2 828/3 829/18 830/14 830/24 830/24 831/25 832/15 833/6 836/21 836/25 837/1 841/8 843/10 844/19 844/24 845/12 845/18 846/18 846/19 850/6 850/18 850/23 851/20 851/22 852/14 853/5 854/17 855/3 857/1 860/11 861/10 862/8 863/10 866/8 867/4 867/6 867/13 867/20 867/22 868/9 868/12 869/4 870/18 871/9 872/11 872/15 872/21 872/22 873/8 873/18 874/1 874/4 875/9 875/10 875/11 877/13 877/16 878/4 879/1 879/3 880/17 880/23 881/15 884/16 884/22 885/8 885/24 888/23 894/16 894/16 894/22 894/23 901/12 901/16 912/23 914/9 915/25 918/7 921/15 921/21 923/13 925/17 930/19 938/12 944/15 944/18 945/5 945/15 946/14 946/24 947/11 947/12 948/7 948/16 948/20 950/13 950/25 952/2 954/7 954/12 954/16 954/21 955/4 956/3 956/7 956/10 956/11 956/12 956/15 956/22 957/13 957/24 958/8 958/14 960/10 960/21 960/25 961/6 961/7 961/21 962/8 963/7 963/14 963/21 964/6 970/25 972/10

**where [61]** 775/16 776/5 786/24 787/3 798/10 801/22 802/15 816/3 818/19 820/12 841/2 847/21 849/14 851/24 852/13 854/20 857/3 861/4 861/11 862/15 865/6 868/22 869/24 869/25 870/25 871/20 873/9 873/11 875/23 878/16 883/23 889/13 897/13 900/20 905/25 906/5 906/8 908/10 914/8 924/9 933/11 934/6 934/21 935/3 935/4 935/6 938/16 944/18 944/23 948/8 949/9 950/8 950/8 952/9 957/10 960/2 961/4 961/5 961/25 973/25 976/9

**whereas [2]** 850/24 926/10

**whether [31]** 766/2 782/17 788/20 793/13 800/19 802/15 832/3 832/3 839/11 839/14 840/10 840/13 844/20 852/21 852/22 854/13 856/7 856/11 857/24 861/10 870/11 871/21 871/21 893/20 893/23 916/21 916/22 925/24 930/18 930/24 945/8

**which [74]** 763/4 763/11 765/12 765/14 769/8 770/13 770/13 772/11 775/12 779/10 780/19 780/13 780/25 782/15 786/10 792/23 794/1 799/2 802/20 803/10 803/10 803/11 814/20 827/7 828/14 832/25 836/12 836/16 838/15 841/10 849/17 851/18 852/6 872/9 872/14 873/11 874/3 874/11 878/19 881/25 885/20 896/7 898/19 900/3 904/12 905/21 910/15 913/1 913/4 913/10 914/17 914/18 917/22 920/3 922/2 922/12 922/12

**W**

**which... [16]** 922/21 924/3 924/3 924/16 931/9 933/2 935/1 941/8 947/22 961/15 963/3 968/21 974/14 975/17 976/10 976/12

**while [19]** 763/23 766/15 771/1 776/6 783/11 819/6 820/7 820/10 821/20 843/2 843/17 854/1 874/6 947/17 956/5 957/10 964/25 965/5 965/8

**whistle [9]** 805/3 805/6 805/9 806/1 808/4 824/23 827/8 828/2 828/3

**whistleblower [4]** 894/6 906/10 915/9 915/11

**who [56]** 786/13 786/16 786/17 786/20 796/15 798/20 799/11 801/23 805/12 805/16 805/23 818/14 819/11 819/14 819/21 847/9 847/12 851/19 858/24 860/7 861/19 861/22 861/25 862/6 863/16 863/17 863/20 863/22 863/25 865/6 865/24 866/24 873/16 876/11 881/6 881/6 881/22 891/17 894/3 896/21 896/22 897/1 899/17 900/25 901/9 907/16 915/9 916/25 917/12 938/8 956/23 957/22 958/13 958/16 969/2 976/14

**whole [6]** 818/25 831/10 932/17 946/8 955/23 960/20

**whom [1]** 882/25

**whose [3]** 858/21 876/6 900/7

**why [40]** 786/21 792/1 805/9 805/10 806/1 807/2 808/18 809/1 832/14 835/3 843/6 843/12 846/14 855/21 865/10 866/5 875/16 887/22 888/8 888/12 888/15 888/18 888/21 891/23 894/1 910/13 913/19 923/9 924/21 925/5 925/7 925/7 925/17 929/18 935/25 963/12 965/15 974/12 977/2 977/9

**wife [3]** 801/23 809/6 809/7

**will [70]** 761/8 767/11 767/13 769/11 769/21 770/11 771/16 773/14 774/11 775/3 775/5 775/5 775/6 775/24 777/3 778/13 782/19 785/16 796/22 796/23 797/14 803/18 804/16 804/16 815/11 826/9 826/22 827/18 830/11 833/20 843/11 846/4 848/20 848/22 849/3 852/22 864/19 872/6 885/16 885/17 891/14 891/15 892/3 896/23 903/13 903/19 908/20 922/11 943/8 945/4 956/12 963/18 966/24 967/5 967/5 967/21 967/22 968/13 968/15 971/3 971/4 971/18 971/19 971/21 972/2 972/13 972/16 973/10 978/5

**Williamson [1]** 759/12

**willing [1]** 975/23

**Wilmington [3]** 883/24 884/1 897/14

**win [1]** 817/16

**windfall [3]** 795/21 795/22 796/1

**wiped [1]** 793/23

**wisely [1]** 962/5

**wish [1]** 971/25

**withdraw [2]** 767/10 781/23

**within [13]** 773/23 783/20 785/3 785/12 785/24 786/6 799/25 805/6 881/9 887/6 901/12 933/12 963/13

**without [11]** 785/1 795/7 837/7 837/7 838/16 840/12 854/15 855/10 855/10 915/25 979/6

**witness [31]** 761/6 761/10 765/10 772/23 797/4 797/16 849/4 857/17 864/12 864/15 864/20 882/6 882/9 882/14 882/21 899/7 903/6 903/9 903/15 903/25 904/4 905/8 907/7 931/21 931/25 932/6 942/25 943/3 943/9 953/22 966/19

**witnessed [1]** 820/17

**Witnesses [2]** 760/3 760/7

**women [6]** 965/17 965/25 965/25 966/2 966/5 966/12

**won [6]** 799/1 799/5 799/14 800/4 804/25 817/15

**won't [2]** 770/19 872/18

**wondering [1]** 810/5

**word [4]** 805/10 805/24 824/22 843/25

**wording [2]** 876/2 953/8

**words [6]** 805/3 805/20 812/6 815/25 832/5 859/15

**work [51]** 764/11 766/3 766/17 767/10 768/19 769/2 769/6 769/24 769/25 770/2 770/5 772/20 781/24 785/8 787/23 816/9 836/22 857/21 883/11 883/13 883/14 883/15 883/15 883/20 883/21 886/6 886/7 894/19 895/11 897/21 905/20 906/1 908/4 908/16 910/8 915/15 916/21 920/19 921/15 926/11 937/24 947/19 948/1 950/10 950/22 950/23 961/3 961/5 967/13 973/24 975/23

**work-life [10]** 767/10 768/19 769/2 769/6 769/24 769/25 770/2 770/5 772/20 781/24

**worked [20]** 798/13 799/24 801/23 842/12 849/17 877/13 881/8 894/12 895/13 895/14 900/21 905/25 932/20 933/13 943/20

944/4 947/23 948/19 949/20 951/4

**worker [3]** 921/5 921/8 921/13

**workforce [1]** 771/2

**working [22]** 764/10 766/2 775/18 775/20 782/21 850/11 851/15 868/25 869/1 894/15 913/23 945/5 947/18 947/25 949/21 950/6 950/21 955/15 956/21 957/10 961/17 968/11

**workplace [1]** 974/24

**works [1]** 877/15

**world [1]** 953/4

**worry [1]** 878/16

**worrying [1]** 878/16

**worst [3]** 808/14 809/25 842/12

**worth [1]** 914/9

**would [334]**

**wouldn't [7]** 793/1 819/20 839/9 855/21 877/19 921/23 946/9

**wounds [1]** 808/9

**wrap [1]** 924/1

**write [4]** 854/2 874/5 887/17 950/14

**written [8]** 787/8 832/19 840/16 847/21 881/21 887/5 968/24 970/23

**wrong [7]** 842/2 842/6 845/19 863/8 914/3 923/2 929/16

**wrongful [4]** 906/5 906/9 925/11 925/13

**wrote [3]** 870/7 887/10 887/18

**Wyatt [1]** 759/12

**Y**

**Y-U [1]** 849/8

**yeah [55]** 791/16 792/7 792/24 800/18 804/4 808/8 813/13 814/25 815/1 817/9 822/23 824/7 828/24 838/12 840/1 841/19 867/4 867/9 870/13 875/4 875/11 878/8 879/19 880/16 907/11 920/23 931/14 933/16 934/23 935/8 938/7 938/23 939/8 939/11 939/11 939/24 940/1 940/8 940/15 940/23 941/8 942/1 943/25 946/2 948/22 950/16 952/2 955/7 956/10 956/17 957/4 957/8 959/17 962/23 963/17

**year [98]** 764/8 767/9 767/9 768/8 768/9 770/6 770/13 770/25 771/4 771/8 771/14 772/1 773/22 773/22 773/24 774/2 774/4 774/16 775/10 775/10 775/12 775/22 776/10 776/10 776/11 776/13 776/23 776/23 776/24 776/25 777/2 778/20 780/13 781/23 781/23 795/7 799/4 799/7 799/12 800/10 800/24 800/24 802/5 810/20 811/3 812/13 815/12 816/24 819/3 821/8 821/10 821/11 821/16 822/19 826/8 826/18 827/20 827/25 831/25 832/6 832/25 833/1 834/21 834/21 838/12 840/4 840/7 846/19 846/21 848/5 848/10 849/20 849/20 854/19 861/6 861/12 865/12 872/25 884/10 884/10 885/21 886/20 899/4 912/4 914/12 922/25 930/7 935/24 936/3 936/4 936/21 937/2 937/10 938/17 945/17 956/6 958/6 964/15

**year's [2]** 769/18 770/16

**year-by-year [2]** 767/9 781/23

**year-end [6]** 822/19 832/6 832/25 838/12 848/5 848/10

**yearly [1]** 892/10

**years [90]** 761/22 761/24 762/10 765/11 768/15 769/13 770/3 770/6 772/6 778/22 780/12 783/13 787/2 788/2 788/4 790/21 792/19 798/1 798/4 798/5 798/9 798/12 798/13 799/1 799/5 799/18 800/4 800/18 801/2 801/2 803/10 809/24 816/23 818/15 821/9 826/11 826/13 833/24 841/16 847/6 849/18 865/8 865/8 868/3 868/21 883/3 884/1 884/8 904/19 904/20 913/5 913/15 915/7 915/8 915/12 915/21 915/22 916/1 917/1 918/2 923/1 923/1 932/16 932/22 933/6 933/21 934/11 935/12 935/20 935/25 936/17 938/3 940/21 943/21 943/22 944/2 944/2 944/5 944/14 945/23 946/2 946/15 946/16 946/23 963/7 963/9 964/19 964/23

**years' [2]** 913/4 914/9

**yes [235]**

**yesterday [3]** 894/3 915/5 973/1

**yet [1]** 773/1

**you [1250]**

**you'd [7]** 801/15 805/25 815/12 826/5 863/10 936/12 940/7

**you'll [4]** 845/16 878/18 924/14 972/1

**you're [17]** 792/4 792/15 807/14 808/11 808/24 817/10 817/11 821/24 838/5 839/14 844/3 867/6 868/17 880/9 893/2 938/20 949/15

**you've [8]** 826/1 841/15 841/20 851/12 853/15 866/14 867/13 948/19

## Y

**young [4]** 768/12 771/7 804/8 926/5
**younger [1]** 945/8
**youngest [1]** 865/9
**your [321]**
**Your Honor [30]** 797/8 846/5 848/15 848/21 903/10 903/12
907/6 907/19 907/23 908/17 931/22 932/1 943/1 968/17 969/9
969/13 969/18 970/4 970/14 970/23 972/4 972/12 973/9 973/21
973/24 974/2 974/4 975/11 977/1 977/19
**your sworn [1]** 879/10
**yours [2]** 818/4 876/9
**yourself [13]** 761/16 797/23 803/16 815/13 823/14 849/13
863/10 865/5 874/1 874/2 932/12 932/13 943/17
**Yu [1]** 849/7

## Z

**zero [5]** 780/18 793/7 793/24 920/8 921/25
**Zoom [2]** 810/20 812/17